**EXHIBIT A**

<u>**EXHIBIT B**</u>
<u>**FRANCHISE AGREEMENT AND EXHIBITS**</u>

*MULTISTATE FORM*



KOALA FRANCHISE, LLC

FRANCHISE AGREEMENT

<u>Lotus & The Rooster Holdings Company</u>
Franchisee Name

3/15/2022 | 2:42 EDT
Date of Agreement

1

© COPYRIGHT 2021 KOALA FRANCHISE, LLC.  ALL RIGHTS RESERVED.
COMMERCIAL SALE PROHIBITED WITHOUT EXPRESS WRITTEN PERMISSION OF KOALA FRANCHISE, LLC.

<u>SUMMARY PAGE</u>

1. Effective Date: _____
   3/15/2022 | 2:42 EDT

2. Franchisee's Name:  Lotus & The Rooster Holdings Company

3. Franchisee's State of Organization (if applicable): Pennsylvania

4. Ownership of Franchisee:

   If the Franchisee is an entity, the following persons constitute all of the owners of a legal and/or beneficial interest in the franchisee:

   | <u>Name</u> | <u>Percentage Ownership</u> |
   |---|---|
   | Salim Michel Makhlouf | 100% |

5. Territory (Section 1.1): Harrisburg, PA

   Initial Geographic Area: 17028, 17043, 17070, 17101, 17102, 17103, 17104, 17109, 17110, 17111, 17112, 17113, 17120, 17177

   Population: 204,891

6. Initial Franchise Fee (Section 4.1): $49,500.00

7. Operating Principal (Section 5.6): Salim Michel Makhlouf

8. Franchisee's Address for Notices (Section 20): 251 S. Pitt St, Carlisle, PA 17013

   Franchisee Email Address for Notices: salim.makhlouf@gmail.com

9. Additional Terms (if any): N/A

Initials: _SM_____(KOALA FRANCHISE, LLC)    _____(Franchisee)

<u>Exhibits:</u>
A    Trademarks
B    Lease Rider
C    Guarantee, Indemnification and Acknowledgment
D    Non-Disclosure and Non-Competition Agreement
E    Equipment Sale Agreement
F    General Release

© COPYRIGHT 2021 KOALA FRANCHISE, LLC.  ALL RIGHTS RESERVED.
COMMERCIAL SALE PROHIBITED WITHOUT EXPRESS WRITTEN PERMISSION OF KOALA FRANCHISE, LLC.

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-96A8E3875CB0

## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into as of the date (the "Effective Date") set forth on the Summary Page, which appears after the cover page of this Agreement (the "Summary Page") (the Summary Page and all appendices and schedules attached to this Agreement are hereby incorporated by this reference), by and between KOALA FRANCHISE, LLC, a Florida limited liability company with its principal place of business at 445 West Drive, Melbourne, Florida 32904 ("Franchisor" or "we" or "us"), and the entity identified on the Summary Page as the franchisee ("Franchisee" or "you") with its principal place of business as set forth on the Summary Page.

### BACKGROUND:

A.    Franchisor owns a format and system (the "System") relating to the establishment, development and operation of franchises (each a "Franchise") that offer and provide insulation evaluation, removal, installation and related services that operate under the Marks (as defined below) using specially equipped Koala service vehicles and equipment (collectively "Koala Rigs").

B.    The distinguishing characteristics of the System include, without limitation, distinctive business formats; procedures; the Manual (as defined in Section 3.5); the Koala Rigs; procedures for operations, accounting, collections, management and inventory control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time;

C.    Franchisor identifies the System by mark Koala Insulation and associated logos, commercial symbols and such other trade names, mascots, service marks and trademarks as are now, or in the future, designated by Franchisor as an integral part of the System ("Marks") including but not limited to the currently registered Marks identified on Exhibit A some of which may be incorporated into other brands or other systems developed by Franchisor or its affiliates in the future;

D.    Franchisor continues to develop, use, and control the use of such Marks to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance, and service; and

E.    Franchisee desires to operate a Franchise under the System and using the Marks, and wishes to obtain a license from Franchisor for that purpose, as well as to receive the training and other assistance provided by Franchisor in connection therewith;

NOW, THEREFORE, the parties agree as follows:

1.    GRANT

    **1.1.**    Grant of Rights; Protected Territory.  Upon the terms and conditions set forth in this Agreement, Franchisor hereby grants to Franchisee a non-exclusive license (the **"License"**) to operate a Franchise that specializes in providing insulation evaluation, removal, installation and related services (the **"Services"**) within the initial geographic area described on the Summary Page (the **"Territory"**).  Franchisee hereby accepts such License and undertakes the obligation to operate a Franchise in accordance with this Agreement during the entire initial term of the License (as specified in **Section 2.1**).  Franchisee acknowledges and agrees that this Territory is non-exclusive but subject to certain limited protections as defined below.

    **1.2.**    Protected Territory.  The Territory, as listed on the Summary Page, shall be designated as "Protected" from the Effective Date of this agreement and shall remain Protected for the duration of the entire initial term plus any extensions thereof provided that the Territory may lose its Protected status through any default of this Agreement or any other agreement with Franchisor or its Affiliates, or by Franchisee's failure to maintain sufficient equipment and staff as required in Franchisor's discretion to provide, without substantial delay, all Services offered under the System to customers within the Territory.  Any of these events, without limitation, constitute cause for revocation of Protected status of the Territory.  Protected status may be revoked only with cause and upon notice.  Once the Territory loses its Protected status it may not be regained.

    **1.2.1**    While the Territory is Protected Franchisor shall not provide the Services or grant other franchisees or others the right to provide the Services using the Koala Insulation System and Koala Insulation Marks to customers at any location within the Territory other than through the Revenue Sharing Program as hereafter defined.

    **1.2.2**    Franchisor and other franchisees may advertise (subject to Franchisor approval) online or through any other medium without geographical limitations, including within the Protected Territory, but only Franchisee shall be permitted to provide the Services under the Koala Insulation System within the Protected Territory.

    **1.3.**    Reservation of Rights.  Franchisor and its affiliates have the right to conduct any business activities, under any name, in any geographic area, and at any location, without any liability to Franchisee regardless of the proximity to or effect on the Franchise. By way of illustration, and without limiting the foregoing, Franchisor and its affiliates have the right:

    **1.3.1.**    to operate and permit franchisees or others to establish and operate Franchises at any location within or outside the Territory (subject to the

Protections defined in section 1.2.1 above) notwithstanding their actual or threatened impact on sales of the Franchise;

**1.3.2.** to operate or permit franchisees or others to establish and operate businesses at any location under other systems or other Marks, including businesses that may offer or sell products or services that are the same or similar to the products or services offered from the Franchise, within or outside the Territory and notwithstanding their proximity to the Territory, Protected status of Territory, or their threatened or actual impact on sales of the Franchise;

**1.3.3.** to sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, within or outside of the Territory, products and services bearing the Marks or similar marks through other channels of distribution including, without limitation, the internet, catalogs, or commercial channels other than the on-site installation or removal of insulation; and

1.3.4. to acquire, be acquired by, or merge with other businesses and to convert them to the Marks or any other name at any location and such acquiring or acquired businesses shall not be bound by any Protections applicable to the Territory.

1.3.5. If the Territory is not Protected, the geographic area of the Territory may be revised by Franchisor from time to time, after the expiration of the initial term, to include only the Population listed as the actual population in the initial geographic area increases. If Franchisor reduces the Territory's geographic area due to a population increase after the expiration of the initial term, Franchisor shall first offer the right to purchase such additional population to Franchisee at the then-current rates, provided that Franchisee is and has been at all times in compliance with the terms hereunder.

Franchisee acknowledges that the activities described in Section 1.3. through 1.3.5 are only examples, and do not limit the business activities that Franchisor and its affiliates may undertake. Franchisee also acknowledges that, other than those rights expressly conveyed through this agreement and narrowly limited to same, Franchisor has made no other representations concerning Franchisee's rights in any geographic territory.

**1.4.** <u>Advertising and Promotional Materials</u>. Franchisor and Franchisee acknowledge that advertising and promotional materials created, placed, and/or distributed by Franchisor, other franchisees operating under the System, or other entities authorized by Franchisor, may appear in media distributed in, or may be directed to prospective customers located within, trade areas or market areas nearby or encompassing the Territory, including on Franchisor's website or any related website. Neither Franchisee, nor any other franchisee, is restricted from advertising or promoting products or services to any customers regardless of where they reside; provided, however, Franchisee may not perform Services outside of the Territory, except as expressly provided herein.

**1.5.**    Sale of Products and Services.  Unless otherwise permitted by Franchisor, Franchisee shall offer and sell only then-current products and services previously authorized by Franchisor, using Koala Rigs, and only within the Territory, only in accordance with the requirements of this Agreement and the then-current procedures set forth in the Manuals as they may be developed and/or modified from time to time.  Franchisee may not perform Services using equipment other than a Koala Rig that meets Franchisor's then-current specifications and standards.  Franchisee understands and acknowledges that certain other Koala franchisees were granted protected territories, and shall not perform Services in the protected territory of another Koala franchisee.

**1.5.1.**  Franchisee may perform Services for customers that are located outside of the Territory provided (a) Franchisee has submitted to Franchisor a written request to provide Services for such customer giving the name of the customer and its location; and (b) Franchisor has approved such request in writing.  Franchisor may at any time revoke its approval effective upon giving written notice of the same to Franchisee.  Franchisor may require Franchisee to purchase any territory, at then-current rates, in which Franchisee requests permission to provide Services if (a) Franchisee requests permission to service customers in the area more than twice per 90-day period, or (b) if Franchisee has operated for at least 12 months and Gross Sales for Services performed outside the Territory constitute more than 10% of the prior 12 months' Gross Sales.  Any permission granted to operate outside of the Territory shall not constitute an ongoing grant of rights to the area and Franchisor retains all rights thereto.

1.5.2.  Revenue Sharing Program.  Franchisee may at its option enter into a revenue sharing program ("Revenue Sharing Program") with any other franchisee which may permit the out of territory franchisee to operate within Franchisee's Territory for the purposes of servicing existing clients who have previously received services within the out of territory franchisee's own territory.  Franchisee may also enter into a revenue sharing agreement with any other franchisee as Franchisee deems appropriate to complete extraordinarily large jobs or for other purposes subject to Franchisor approval which must be received in writing in advance of any Revenue Sharing Program between franchisees.  Franchisor shall not be a party to any Revenue Sharing Program which shall be conducted solely between franchisees.

2.    TERM AND RENEWAL

**2.1.**    Term.  Except as otherwise provided herein and unless sooner terminated in accordance with the provisions hereof, the initial term of the License commences on the Effective Date and continues until that date which is 10 years after the Effective Date.

**2.2.**    Renewal.  Franchisee may, at its option, request to renew Franchisee's right to operate the Franchise for two additional terms of five years each.  Franchisee's option of renewal is subject to the following conditions, each of which must be met prior to the renewal:

**2.2.1.** Franchisee shall give Franchisor written notice of Franchisee's election to renew no fewer than six months, nor more than 12 months, prior to the end of the initial term;

**2.2.2.** Franchisee shall update, refurbish, or replace the Franchise Location (if applicable) and its Koala Rig(s) to comply, as determined solely by Franchisor, with Franchisor's then-current standards;

**2.2.3.** From the time of Franchisee's election to renew through the expiration of the original term, Franchisee and its affiliates shall not have been in default of any provision of this Agreement, any amendment to this Agreement, any successor to this Agreement, or any other agreement between Franchisee (and its affiliates) and Franchisor (and its affiliates); and, as determined in the sole discretion of Franchisor, Franchisee and its affiliates shall have complied with all the terms and conditions of this Agreement, such other agreements, as well as the Operating Standards (as defined in **Section 5.9**) prescribed by Franchisor during the term of this Agreement;

**2.2.4.** Franchisee shall have satisfied all monetary, reporting and other obligations owed by Franchisee to Franchisor and its affiliates, and shall have timely met those obligations throughout the term of this Agreement;

**2.2.5.** Franchisee shall execute Franchisor's then current form of franchise agreement; which agreement shall supersede this Agreement in all respects (except the renewal franchise agreement shall not require payment of an initial franchise fee or include the ability to renew for any years beyond the aggregate of those contained in the original term and extensions herein).  Franchisee acknowledges that the terms, conditions, and provisions of the renewal franchise agreement, and the obligations of the parties thereto, may differ substantially from the terms, conditions, provisions and obligations in this Agreement, including, without limitation, a higher percentage royalty fee and advertising contribution;

**2.2.6.** Franchisee shall pay, in lieu of an initial franchise fee, a renewal fee equal to 25% of the Initial Franchise Fee or $5,000, whichever is greater;

**2.2.7.** Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, agents, and employees; and

**2.2.8.** Franchisee and its personnel shall comply with Franchisor's then current qualification and training requirements, prior to commencement of operations under the renewal form of franchise agreement.

3.    <u>FRANCHISOR'S DUTIES</u>

**3.1.**    <u>Initial and On-Going Training</u>. Franchisor shall provide for Franchisee's Operating Principal (as defined in **Section 5.6**) Salesperson, and Manager (as defined in **Section 5.6**), such initial training programs as Franchisor may

designate, to be conducted at such time(s) and location(s) designated by Franchisor. Franchisor may charge a reasonable fee for additional individuals who attend training. Franchisor shall also provide such ongoing training as it may, from time to time, deem appropriate. Franchisor shall be responsible for the cost of instruction and materials, subject to **Section 5.6** for the training of the initial Operating Principal, Manager, and Salesperson. Franchisee shall be responsible for the cost of training any subsequently hired or replacement staff including without limitation Operating Principal, Manager and Salesperson.

**3.2.**　Opening Assistance and Training. In addition to the initial training described in Section 3.1, should Franchisee request additional assistance from Franchisor to facilitate the opening of the Franchise and should Franchisor, in its discretion, deem it necessary, feasible and appropriate to comply with the request, Franchisee shall reimburse Franchisor for the expenses of Franchisor providing such additional assistance, which may include Franchisor's then-current service fee, as set forth in the Manuals or otherwise communicated to Franchisee in writing from time to time. Franchisor will provide such additional on-site assistance as Franchisor deems advisable.

**3.3.**　Manuals. Franchisor shall provide Franchisee access to the confidential operations manuals (which may include technical bulletins, and other written, video or audio materials (collectively the "**Manuals**"), as more fully described in **Section 7**.

**3.4.**　Advertising and Promotion. Franchisor shall review, and shall have the right to approve or disapprove, all advertising and promotional materials that Franchisee proposes to use pursuant to **Section 10.6**. In addition, during the term of this Agreement, Franchisor shall provide Franchisee with such other advertising assistance, sales advice, or related materials as Franchisor deems advisable.

　　3.4.1　Electronic Advertising and Support Services. Franchisor shall establish and maintain, during the Term of this agreement, a website and/or other such listings as Franchisor deems appropriate for the Koala brand which shall contain content deemed appropriate in its sole and unlimited discretion. Franchisor may also maintain certain location specific or franchise specific sites ("Micro-Sites") in its sole discretion. Franchisor may establish and assign a phone number to the Franchise and if it does so, Franchisee must use this number as its only published and/or advertised phone number for the Franchise. Franchisor shall retain full rights to control, suspend, redirect and transfer any web domains and phone numbers and other listings. Franchisor shall have the right to suspend or revoke any or all of these services immediately and without further notice upon Franchisee's Default of any term of this Agreement, specifically but not limited to financial or reporting obligations.

**3.5.**　Brand Fund. Franchisor may establish and administer a System-wide advertising, marketing, promotional, and creative fund, which is referred to as the

"**Brand Fund**", or such other name as Franchisor may designate, in the manner set forth in **Section 10.3.**

**3.6.** <u>Technology System</u>.  Franchisor shall specify or require that certain brands, types, makes, and/or models of communications, computer systems, software and hardware be used by, between, or among the Franchises, including without limitation:  (a) back office and point of sale systems, data, audio, video, and phone, voice storage, retrieval, and transmission systems for use at the Franchise, between or among Koala franchisees, the corporate units and Franchisor; (b) physical, electronic, and other security systems including without limitation vehicle and/or Koala Rig tracking devices; (c) printers and other peripheral devices; (d) archival back-up systems; (e) communication systems (including without limitation email and phone systems); and (f) Internet access mode and speed (collectively, the "**Technology System**").  Franchisor may also designate: (i) software programs that Franchisee must use in connection with the Technology System ("**Required Software**"), which Franchisee shall install; (ii) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee shall install; (iii) the tangible media upon which such Franchisee shall record data; (iv) the database file structure of the Technology System; and (v) additional Technology Systems that must be used.

**3.7.** <u>On-Going Assistance</u>.  Franchisor shall provide periodic assistance to Franchisee in the marketing, management, and operation of the Franchise as Franchisor determines at the time(s) and in the manner determined by Franchisor.

**3.8.** <u>Additional Services.</u>  Franchisor, at its option may provide Additional Services including a call center, recruiting assistance and other services at the then-current fees.  Franchisor shall have no ongoing obligation to offer these services and may discontinue them for any or all franchisees at any time.

4.    <u>ROYALTY FEES; SALES REPORTING</u>

**4.1.** <u>Initial Franchise Fee</u>.  Franchisee shall pay Franchisor an initial franchise fee that is specified on the Summary Page (the "**Initial Franchise Fee**"), which must be paid in full prior to or upon execution of this Agreement.  The Initial Franchise Fee is not refundable under any circumstances and shall be deemed earned in full upon receipt, except if Franchisee's Operating Principal or Manager fails to successfully complete initial training in accordance with the requirements of **Section 5.6**.  If Franchisor terminates this Agreement due to any failure to successfully complete initial training pursuant to **Section 5.6**, Franchisor will refund the Initial Franchise Fee, less an amount equal to $5,000, subject to Franchisee' and its owners' execution of a General Release.

**4.2.**  <u>Royalty Fees</u>.  Franchisee shall pay Franchisor continuing royalty fees ("**Royalty Fees**") at such time, for such periods, and in such manner as specified herein, or as otherwise specified in writing by Franchisor.  The term "**Gross Sales**" means amounts, less refunds, sales tax and chargebacks, derived from all products or services sold from or through the Franchise, including any sale of products or services made for cash or credit, or partly for cash and partly for credit.  **"Gross Sales"** also includes the fair market value of any services or products received by the Franchisee in barter or in exchange for Franchisee's services and products.

Royalty Fees shall be paid weekly in an amount equal to 6.5% of Gross Sales during the first 6 calendar months of operations (which for clarity shall begin and include any portion of any month during which Franchisee first receives any Gross Sales). Beginning on the 7th month of operations, Royalty Fees shall be paid weekly in an amount that is the greater of the required Minimum Royalty, or 6.5% of Gross Sales for the first $1,000,000 in Gross Sales (see Table 1 below); then the Royalty Fee shall be reduced to 5% of Gross Sales for amounts between $1,000,000.01 and $1,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 4.5% of Gross Sales amounts between $2,000,000 and $2,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 3.5% of Gross Sales for all amounts over $3,000,000 annually for the remainder of the calendar year.

Table 1: Minimum Royalty Per Territory, Per week.

| Months After Opening | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5+ Territories |
|---|---|---|---|---|---|
| 7-12 | $250 | $225 | $200 | $175 | $150 |
| 13-24 | $350 | $325 | $300 | $275 | $250 |
| 25-36 | $500 | $475 | $425 | $400 | $375 |
| 37+ | $625 | $600 | $575 | $550 | $525 |

Franchisee expressly acknowledges and agrees that Franchisee's obligations for the full and timely payment of Royalty Fees, Brand Fund Contributions (as defined in Section 10.2), if any, and all other amounts provided for in this Agreement, shall be absolute and unconditional.  Franchisee shall not for any reason delay or withhold the payment of all or any part of those or any other payments due hereunder, put the same in escrow or setoff the same against any claims or alleged claims Franchisee may allege against Franchisor, the Brand Fund or others. Franchisee shall not, on grounds of any alleged nonperformance by Franchisor or others, withhold payment of any fee, including without limitation Royalty Fees, Brand Fund Contributions, nor withhold or delay submission of any reports due hereunder.  Royalty Fees shall be deemed earned in full upon receipt.  Franchisee and Franchisor expressly acknowledge that all services provided by Franchisor to Franchisee shall not exceed in cost the amount of the Royalty Fees received from Franchisee.

9

4.2.1   <u>Sales Reports.</u>  Franchisee shall deliver to Franchisor any and all reports, statements and/or other information regarding its Gross Sales and other metrics or data specified by Franchisor at the time(s) and in the format(s) reasonably requested by Franchisor from time to time ("Sales Reports").

Upon notice by Franchisor Franchisee must use, and pay the fees required to use, the Koala proprietary software or other software as specified by Franchisor, when made available, or other systems or methods as specified by Franchisor for the purposes of providing Sales Reports in compliance with this Section. All payments required by this Agreement to Franchisor, its affiliates, and/or the Brand Fund must be made by the method or methods that Franchisor specifies from time to time, which may include, without limitation, payment by deduction as specified in Section 3.8.2, payment via wire transfer or electronic debit to Franchisee's bank account.  Franchisee must furnish Franchisor and Franchisee's bank with all authorizations necessary to effect payment by the methods Franchisor specifies.

**4.3.**   <u>Overdue Payments or Reports</u>.   Any payment, Sales Report or other required report not actually received by Franchisor on or before the date such payment or report is due (currently, no later than noon Eastern Time on Monday of each week) shall be deemed overdue.  If an attempt to electronically debit Franchisee's bank account fails or any other payment method is declined or returned, the payment shall be deemed not received.  Franchisor may at its option from time to time specify or change the date such reports are due upon 7 days' Notice to Franchisee.  If any payment or required report is overdue, Franchisor shall collect from Franchisee the greater of the Minimum Royalty amount, or 1.5 times the Royalty Fees and other fees or amounts due based on the prior report received ("Presumptive Fees").  The Presumptive Fees shall be credited towards the actual Royalty Fees due once the Sales Report is received.  Additionally, Franchisee shall pay Franchisor, a late payment/late report charge of $50 for each day (or portion thereof) that the payment or report is late (collectively "Late Fee").  Entitlement to such Late Fee shall be in addition to any other remedies Franchisor may have including without limitation the suspension of services as defined in §3.4.1 and elsewhere in this Agreement.

**4.4.**   <u>Payments on Behalf of Franchisee</u>.  Franchisee shall pay to Franchisor, within 15 days after any written request by Franchisor which is accompanied by reasonable substantiating material, any monies (plus a fee equal to 10% of the amount paid by Franchisor on Franchisee's behalf) which Franchisor has paid, or has become obligated to pay, on behalf of Franchisee, by consent or otherwise under this Agreement.

5.    <u>FRANCHISEE'S DUTIES</u>

**5.1.1.**  Franchisee may operate from their home office, provided doing so would be in compliance with applicable laws and regulations.  If Franchisee choses to rent or lease a site, storage location or other physical site other than Franchisee's home, at which it will base or park Koala Rigs or from which it will operate the Franchise, Franchisee must provide notice to Franchisor at least 30 days in

advance. Before Franchisee makes a binding commitment to lease, sublease or purchase a site, Franchisor must approve the location in writing and approve in writing the proposed lease for the location (the "**Lease**") or purchase agreement or any letter of intent between Franchisee and the third-party seller or lessor. FRANCHISEE ACKNOWLEDGES AND AGREES THAT FRANCHISOR'S APPROVAL OF A PROPOSED SITE IS NOT A WARRANTY OR REPRESENTATION OF ANY KIND AS TO THE POTENTIAL SUCCESS OR PROFITABILITY OF THE FRANCHISE. If Franchisee leases the approved Franchise Location, unless Franchisor waives the requirement in writing, Franchisee must arrange for the execution of the Lease Rider in the form of **Exhibit B** by Franchisee and its landlord in connection with any Lease for the approved Franchise Location and any other provisions that Franchisor may reasonably require. Franchisee must deliver to Franchisor the completely executed purchase agreement or Lease and Lease Rider within 10 days after execution of the Lease or purchase agreement. Franchisee must comply with the terms and conditions of the Lease for the approved Franchise Location. Franchisor is not obligated to execute Franchisee's Lease or guarantee a Lease for Franchisee.

**5.1.2.** Before commencing construction of the Franchise Location, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

**5.1.2.1.** Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations, including, without limitation, the applicable provisions of the American with Disabilities Act (as amended, the "ADA") regarding the construction and design of the Franchise Location.

**5.1.2.2.** If so requested by Franchisor, Franchisee shall submit to Franchisor, for Franchisor's approval, final plans for construction based upon the preliminary plans and specifications. Franchisor shall not review, nor shall any approval be deemed to include, approval or acceptance of Franchisee's compliance with federal, state, or local laws and regulations, including the ADA. Once approved by Franchisor, such final plans shall not thereafter be changed or modified without the prior written permission of Franchisor.

**5.1.2.3.** Franchisee shall obtain all permits and certifications required for the lawful construction of the Franchise Location. Franchisee shall be responsible for obtaining all zoning classifications and clearances which may be required by state or local laws, ordinances, or regulations or which may be necessary or advisable owing to any restrictive covenants relating to the Franchise Location.

**5.1.2.4.** Franchisee shall employ a qualified licensed general contractor who is acceptable to Franchisor to construct the Franchise Location and to complete all improvements. Franchisee shall obtain and maintain in force during the entire period of construction the insurance required under Article 11. Franchisee shall deliver to Franchisor such proof of such insurance as Franchisor shall require.

**5.1.2.5.** During the construction of the Franchise Location, Franchisee will permit Franchisor to make such on-site inspections of the Franchise Location as Franchisor determines appropriate to evaluate the construction or remodeling of the Franchise Location for compliance with Franchisor's requirements. Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.

**5.1.2.6.** Within 30 days after the opening of the Franchise Location, Franchisee shall provide to Franchisor a full breakdown of all costs associated with the development and construction of the Franchise Location if so requested by Franchisor.

**5.1.3.** Franchisee shall use the Franchise Location solely for the operation of the Franchise; shall keep the Franchise open and in normal operation for such hours and days as Franchisor may from time to time specify in the Manuals or as Franchisor may otherwise approve in writing; and shall refrain from using or permitting the use of the Franchise Location for any other purpose or activity at any time. As used in this Section, the term Franchise Location shall include the grounds surrounding the Franchise.

**5.1.4.** Franchisee shall at all times maintain the Franchise Location in a high degree of sanitation, repair, and condition, and in connection therewith shall make such additions, alterations, repairs, and replacements thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting or replacement of obsolete signs, furnishings, equipment, and decor as Franchisor may reasonably direct. If at any time in Franchisor's judgment the general state of repair or the appearance of the Franchise Location or its equipment, fixtures, signs or decor does not meet Franchisor's quality control and standards therefor, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate, within 30 days after receipt of such notice, and thereafter diligently continue a bona fide program to complete any required maintenance, Franchisor shall have the right, in addition to all other remedies, to enter upon the Franchise Location and effect such repairs, painting, maintenance or replacements of equipment, fixtures or signs on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

**5.1.5.** In addition to the maintenance obligations set forth in above, Franchisee shall, at its expense, undertake such periodic and ongoing remodeling and upgrading of the Franchise Location, and the furniture, fixtures, equipment, décor, signage and trade dress of the Franchise Location, as required by Franchisor to cause the Franchise Location building design, exterior facade, trade dress, signage, fixtures, furnishings, equipment, decor, color schemes, and presentation of the Marks to be consistent with the then-current standards. Such remodeling and refurbishment may include structural changes, installation of new equipment and signs, remodeling, redecoration, and modifications to existing improvements,

DocuSign Envelope ID: 815543D5-680F-4668-8CF9-96A3E3875C89

and, shall be completed to Franchisor's satisfaction pursuant to such standards, specifications, and deadlines as Franchisor may specify.

**5.1.6.** Franchisee may not relocate its Franchise Location unless it receives Franchisee's prior written approval. Franchisee's relocation will be at its expense and Franchisor has the right to charge Franchisee for all reasonable costs and expenses it incurs to approve and implement the relocation.

**5.2.** <u>Koala Rigs</u>.

**5.2.1.** Franchisee shall obtain that number of Koala Rigs prescribed by Franchisor from time to time, and ensure that its Koala Rigs are in proper working order.

**5.2.2.** Each Koala Rig shall consist of an enclosed trailer and certain proprietary equipment, and other items (the **"Koala Rig" or "Rig"**) installed in accordance with Franchisor's standards and requirements pursuant to the terms of an Equipment Sale Agreement. Currently Koala Rigs include blow-in rigs and spray-foam rigs but may include other equipment packages or otherwise be modified or substituted as specified from time to time by Franchisor. Franchisee acknowledges and agrees that Franchisor and its designees are the only approved suppliers of such Rigs, equipment and installation services. The Koala Rig must generally be moved by towing with an approved truck capable of and rated for the weight and requirements of the Koala Rig. When attached, the truck ("Truck") and trailer shall collectively constitute the Koala Rig.

**5.2.3.** Prior to Franchisee purchasing a Truck, Franchisee shall submit to Franchisor, in a form specified by Franchisor, information regarding the specifications and conditions of the Truck as Franchisor may reasonably require or Franchisee may comply with the then current guidelines as defined in the Manual. Franchisee may not purchase any Truck to be used with a Koala Rig unless and until it has received Franchisor's prior approval or ensures that the Truck complies with brand appearance standards in Franchisor's discretion. Franchisor may establish relationships with truck dealers and if it does so, Franchisee agrees to purchase solely from these approved dealers.

To the extent that other vehicles or equipment are used in the Franchise, including without limitation Manager or Salesperson vehicles, they must comply with the then current Brand Standards and Manual.

**5.2.4.** If the Franchise is not operated from a Franchise Location, Franchisee will make arrangements to store the Koala Rig(s) used in the operation of the Franchise in compliance with all applicable state and local laws and other restrictions.

**5.2.5.** Franchisee shall at all times maintain the Koala Rigs in a high degree of repair and condition, and in connection therewith shall make such repairs, replacements and refurbishment thereto (but no others without Franchisor's prior

written consent) as may be required for that purpose, including, without limitation, such periodic repainting, replacement of wraps or decals, replacement of equipment and parts or installation or refurbishment of signage as Franchisor may reasonably direct and pursuant to such standards, specifications and deadlines as Franchisor may specify.

**5.3.**   <u>System Standards</u>.  Franchisee understands and acknowledges that every detail of the Franchise is important to Franchisee, Franchisor, and other franchisees to develop and maintain high operating standards, to increase the demand for the Services sold by all franchisees, and to protect Franchisor's reputation and goodwill.

**5.4.**   <u>Pre-Opening Obligations</u>.  Before commencing operations, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

**5.4.1.** Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations.

**5.4.2.** Franchisee shall obtain all licenses, permits, and certifications required for the operation of the Franchise within the Territory and the parking and/or storage of Koala Rigs in the Territory.

**5.5.**   <u>Opening</u>.  Franchisee shall open the Franchise within four months after the Effective Date.  Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.  In addition, in connection with the opening of the Franchise:

**5.5.1.** Franchisee shall provide at least 14 days' prior notice to Franchisor of the date on which Franchisee proposes to first open the Franchise for business.

**5.5.2.** If the Franchise will operate from a Franchise Location, Franchisee shall not open the Franchise until Franchisor has determined that all construction has been substantially completed, and that such construction conforms to Franchisor's standards, and Franchisor has given Franchisee written approval to open, which approval shall not be unreasonably withheld.

**5.5.3.** Franchisee shall not open the Franchise until Franchisor has determined that Franchisee has obtained a sufficient number of Koala Rigs to Franchisor's standards in compliance with **Section 5.2** which shall be no less than one Blow-In and one Spray Foam rig.

**5.5.4.** Franchisee shall not open the Franchise until the Operating Principal, Salesperson and Manager have successfully completed all initial training required by Franchisor, and Franchisee has hired and trained, to Franchisor's standards, a sufficient number of employees to service the anticipated level of the Franchise's customers.

**5.6.** <u>Management and Training</u>. Franchisee must appoint an individual owner as its **"Operating Principal"** who has at least a 20% equity interest in Franchisee, must have authority over all business decisions related to the Franchise, and must have the power to bind Franchisee in all dealings with Franchisor. The Operating Principal is specified on the Summary Page. Franchisee must also appoint a manager to manage the day-to-day business of the Franchise (the **"Manager"**). Franchisee's Operating Principal may serve as its Manager, unless Franchisor believes that he or she does not have sufficient experience. Franchisee must appoint a salesperson to manage the day-to-day customer service and sales functions in accordance with Franchisor's specifications (the "Salesperson"). Franchisee must provide Franchisor with written notice of its Manager and Salesperson at least 14 days prior to initial training. Prior to the opening of the Franchise, the Manager, Salesperson and the Operating Principal must attend and successfully complete, to Franchisor's satisfaction, the initial training program offered by Franchisor, pursuant to **Section 3.2**. If Franchisor determines, in its sole discretion, that the Operating Principal, Salesperson or Manager is unable to satisfactorily complete any phase of the training program, Franchisor shall have the right to: (i) require the Salesperson, Operating Principal or Manager, as the case may be, to attend such additional training as Franchisor may require, at Franchisee's expense; or (ii) terminate this Agreement, in which event neither Franchisor nor Franchisee shall have any further rights or obligations hereunder. If Franchisor terminates this Agreement pursuant to the prior sentence, Franchisor shall refund a portion of the Initial Franchise Fee as provided in Section 4.1. The daily operations of the Franchise are at all times required to be supervised under the active full-time management of the Manager and Salesperson who have each successfully completed Franchisor's initial training program.

**5.6.1.** If the Manager or Salesperson ceases active management of the Franchise or in the event the Operating Principal is changed or is no longer a 20% equity owner of the Franchisee, Franchisee must hire a new Manager or Salesperson or appoint a new Operating Principal (as the case may be), who must be approved in writing by Franchisor. The new Manager, Salesperson or Operating Principal must undergo a certification training program that is prescribed by Franchisor, which may include training at the Franchise, another Franchise or such other place as Franchisor shall designate. All expenses incurred by the new Manager, Salesperson or Operating Principal in attending such program including, without limitation, travel costs, room and board expenses and salaries and other benefits, shall be the sole responsibility of Franchisee. In addition, Franchisee shall: (a) pay Franchisor's then-current certification program fees; and (b) reimburse Franchisor for its out of pocket expenses, including without limitation, reasonable travel and room and board expenses. If Franchisor determines, in its sole discretion, that the new Manager, Salesperson or Operating Principal is unable to satisfactorily complete the certification program, Franchisor shall have the right to: (i) require the new Manager, Salesperson or Operating Principal, as applicable, to attend such additional training, at Franchisee's expense, so as to demonstrate his or her ability to operate the Franchise to Franchisor's satisfaction;

15

or (ii) require Franchisee to promptly hire a replacement New Manager, Salesperson or appoint a new Operating Principal among its equity owners (who must have at least 20% equity ownership) who shall be required to undergo the training and certification programs contemplated by this Section.

**5.6.2.** Franchisor from time to time may provide and, if it does, may require that the Operating Principal, Manager, Salesperson and/or other employee attend and successfully complete refresher training programs or seminars including without limitation an annual conference ("Annual Conference"), to be conducted at such location as may be designated by Franchisor.  Franchisee shall pay to Franchisor the then current Annual Conference Fee for each person required to attend.  All expenses incurred by Franchisee and its employees in attending such program including, without limitation, travel costs, room and board expenses and salaries and benefits, shall be the sole responsibility of Franchisee.

**5.6.3.** If Franchisee requests that Franchisor provide on-site training in addition to the opening assistance described in **Section 3.4**, and Franchisor chooses to do so, then Franchisee agrees that it shall pay Franchisor's then-current per diem charges and out-of-pocket expenses, which shall be as set forth in the Manuals or otherwise in writing.

**5.7.** <u>Personnel</u>.  Franchisee agrees to maintain a competent, conscientious and trained staff in numbers sufficient to promptly provide the Services and to take such steps as are necessary to ensure that its employees preserve good customer relations and comply with such dress code as Franchisor may prescribe.

**5.8.** <u>Equipment Upgrades.</u> Franchisee shall make, from time to time, such upgrades and other changes to the equipment, Koala Rigs and electronic equipment utilized in the Franchise, the Technology System and Required Software as Franchisor may request in writing (collectively, "**Equipment Upgrades**").  Franchisor shall have the right to require any Equipment Upgrades it deems necessary for the Franchise.

**5.9.** <u>Standards and Specifications</u>.  To insure that the highest degree of quality and service is maintained, Franchisee shall operate the Franchise in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing (as used in this Agreement, Franchisor's "**standards**", "**requirements**", "**specifications**" or "**Operating Standards**").  At a minimum, the Operating Standards shall include:

**5.9.1.** offering and selling at all times such services that conform to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming services without Franchisor's specific prior written consent

**5.9.2.** maintaining in sufficient supply, using, offering and selling at all times only such products, equipment, supplies, materials, and goods that conform

to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming products without Franchisor's specific prior written consent.

**5.9.3.** offering and selling only such products as have been expressly approved for sale in writing by Franchisor; offering all products and services as Franchisor may specify from time to time as required offerings at the Franchise; offering all products authorized for sale as specified by Franchisor; refraining from any deviation from Franchisor's standards, without Franchisor's prior written consent; and discontinuing the sale of any products which Franchisor has disapproved, in writing, at any time.  If Franchisee deviates or proposes to deviate from Franchisor's standards, whether or not such deviation is approved by Franchisor, such deviation shall become the property of Franchisor.

**5.9.4.** operating the Franchise to fully comply with all applicable laws and regulations.

**5.9.5.** offering and selling the services and products in accordance with any minimum, maximum, and/or specific prices that Franchisor may determine from time to time (except to the extent determination of prices by Franchisor is limited or prohibited by applicable law).

**5.10.**  <u>Non-Compliance</u>.  If Franchisee violates an Operating Standard, and fails to bring the Franchise into compliance with such Operating Standard within 10 days after Franchisor has delivered to Franchisee written notice of the violation, Franchisee shall pay to Franchisor upon demand $100 for each day that Franchisee is not in compliance with the relevant Operating Standard.  Franchisor's right to charge these amounts is in addition to any other remedy provided under this Agreement, including under **Section 13**.  Franchisor's damages from Franchisee's failure to comply with this Section may include loss of good will and other damages, and are difficult to measure and quantify; such amount is, therefore, a reasonable approximation of damages, and not a penalty.

**5.11.**  <u>Suppliers and Sourcing Requirements</u>.  Franchisor has the right to require that services and products offered by Franchisee, and services, products and equipment used by Franchisee in the establishment and operation of the Franchise:  (a) meet specifications that Franchisor establishes from time to time; and/or (b) be purchased only from manufacturers, vendors, distributors, and other suppliers that Franchisor has expressly approved; and/or (c) be purchased only from a single source (which may include Franchisor or its affiliates or other suppliers which provide a financial benefit to Franchisor and may not be the least expensive supplier).  To the extent that Franchisor establishes specifications, requires approval of suppliers, or designates specific suppliers for particular items, Franchisor will notify Franchisee via the Manuals or otherwise in writing.  In determining whether Franchisor will approve any particular supplier, Franchisor shall consider various factors, including a supplier who can demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then current standards and specifications for such items; who possesses adequate

quality controls and capacity to supply Franchisee's needs promptly and reliably; who would enable the System, in Franchisor's sole opinion, to take advantage of marketplace efficiencies; and who has been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved. For the purpose of this Agreement, the term **"supplier"** shall include, but not be limited to, manufacturers, distributors, resellers, and other vendors. Franchisee recognizes that Franchisor shall have the right to appoint only one supplier for any particular item, and that Franchisor may so designate itself or its affiliate.

      **5.11.1.**      If Franchisee wishes to purchase any services, products, equipment or any items that Franchisor has not approved or to purchase from an unapproved supplier, Franchisee shall first submit to Franchisor a written request for such approval. Franchisee shall not purchase any products or services or make purchases from any supplier until, and unless, such item or supplier has been approved in writing by Franchisor. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, either to Franchisor or to an independent laboratory designated by Franchisor for testing or evaluation. Franchisor may require that Franchisee or supplier pay a reasonable fee charge for such testing or evaluation. Franchisor may also require that the supplier comply with such other requirements as Franchisor may deem appropriate, including payment of reasonable continuing inspection/evaluation fees and administrative costs. Franchisor reserves the right, at its option, to reinspect from time to time the facilities and products or equipment of any such approved supplier and to revoke its approval of any item or supplier upon the item's or supplier's failure to continue to meet any of Franchisor's then current criteria.

      **5.11.2.**      Franchisee acknowledges and agrees that Franchisor shall have the right to collect and retain all manufacturing allowances, markups, marketing allowances, rebates, credits, monies, payments or benefits (collectively, "**Allowances**") offered by suppliers to Franchisee or to Franchisor or its affiliates based upon purchases of products, equipment and other goods and services made by the Brand Fund or Franchisees. These Allowances are based on System-wide purchases of products, services, merchandise and other items and shall be unrestricted income to Franchisor. Franchisee assigns to Franchisor or its designee all of Franchisee's right, title and interest in and to any and all such Allowances and authorizes Franchisor or its designee to collect and retain any or all such Allowances without restriction (unless otherwise instructed by the supplier). Franchisor may mark up or receive Allowances from any providers or vendors doing business with Franchisees, Franchisor or the Brand Fund including without limitation, equipment, supplies, advertising and marketing vendors. Franchisor may in its sole discretion retain as income with no further obligations, or utilize some or all of the Allowances for System-wide marketing, other brand enhancement activities or specific required or local area marketing, or such Allowance monies may be deposited into the Brand Fund for future use and expenditures by the Brand Fund.

**5.11.3.**      Compliance with laws regarding the chemicals, products, equipment and other supplies that Franchisee uses in its Franchise is Franchisee's sole responsibility.   Franchisor makes no warranty or representation that chemicals, products and other supplies that it recommends, approves or requires comply with applicable laws in Franchisee's jurisdiction. Franchisee must notify Franchisor in writing immediately if any recommended, approved or required chemical, product or supply is subject to regulation or laws in Franchisee's jurisdiction.   Franchisor will cooperate with Franchisee in identifying substitute equipment, products or supplies as appropriate.

**5.12.**   <u>Inspections</u>.  Franchisee grants Franchisor and its agents the right to enter upon the Franchise premises (if applicable) or attend and monitor Franchisee while performing services for customers at any time for the purpose of conducting inspections, for among other purposes, preserving the validity of the Marks, and verifying Franchisee's compliance with this Agreement and the Operating Standards and policies and procedures outlined in the Manuals.  Franchisee shall cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, Franchisee shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Franchisee shall reimburse Franchisor for the travel expenses and room and board of Franchisor's representatives for all inspections including subsequent inspections to ensure all deficiencies have been corrected.  Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right, but not the obligation, to correct any deficiencies which may be susceptible to correction by Franchisor and to charge Franchisee for Franchisor's actual expenses in taking such actions, payable by Franchisee upon demand.  The foregoing shall be in addition to such other remedies Franchisor may have.

**5.13.**   <u>Technology System</u>.  At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Technology System and Required Software, and Franchisee shall enter into all licenses or agreements and pay such licensing fees as necessary for Franchisee to obtain the rights to use the Technology System and Required Software.   Franchisee shall also pay to Franchisor the then-current amount of the Technology Fee ("Technology Fee"), currently $80 per Territory per week.  If Franchisee has more than one Territory, the total Technology Fee for up to 4 contiguous Territories shall be equal to the then-current Technology Fee for one Territory.  Franchisor shall have the right at any time to retrieve and use such data and information from Franchisee's Technology System that Franchisor deems necessary or desirable, including, without limitation, the uses identified in **Section 9.5**, and Franchisee agrees to do all things necessary to provide such access.  Franchisee expressly agrees that it shall strictly comply with Franchisor's standards and specifications for all item(s) associated with Franchisee's Technology System, and will otherwise operate its Technology System in accordance with Franchisor's standards and specifications.  Franchisee agrees it

shall keep its Technology System in good maintenance and repair, at its expense, and shall promptly install such additions, changes, modifications, substitutions and/or replacement to the Technology System and the Required Software as Franchisor directs periodically in writing. Franchisee shall provide to Franchisor, upon Franchisor's request, all email lists and customer lists used or maintained by Franchisee on the Technology System, the Required Software or elsewhere. Franchisee must execute and pay any fees associated with any software license agreements or any related software maintenance agreements that Franchisor or the licensor of the Required Software require. Franchisee must comply with all laws and payment card provider standards relating to the security of the Technology System, including, without limitation, the Payment Card Industry Data Security Standards. Franchisee may not use any other cash registers or computer systems in the Franchise.

**5.14.** Uniform Attire. To promote a uniform System image, Franchisee shall require all of its personnel to dress during business hours in the attire specified in the Manuals.

**5.15.** Participation in Promotions and Incentive Programs. Franchisee shall participate in promotional programs developed by Franchisor for the System, in the manner directed by Franchisor in the Manuals or otherwise in writing.

**5.16.** Franchisee Advisory Council. Franchisor may establish an advisory council comprised of Franchisees for the purpose of fostering communication among and between franchisees and Franchisor, as well as to establish, modify or discuss various policies applicable to Franchise businesses operating under the System (the **"Franchisee Advisory Council"**). If Franchisor establishes the Franchisee Advisory Council, Franchisee may be required to become a member of the Franchisee Advisory Council, and participate in Franchisee Advisory Council meetings and programs as Franchisor shall designate. Franchisor will not assess fees or dues for participation in or on the Franchisee Advisory Council, but Franchisee may be required to pay dues (which may be expended in any allocation in accordance with the vote of the Franchisee Advisory Council subject to the approval of Franchisor) to the Franchisee Advisory Council if the Franchisee Advisory Council, which is controlled by franchisees, determines that fees shall be assessed. Franchisee may be required to pay all costs and expenses incurred in connection with participation in the Franchisee Advisory Council including, without limitation, the costs of transportation, lodging, and meals.

**5.17.** Franchisee Structure.

**5.17.1.** Except as otherwise approved in writing by Franchisor, if Franchisee is a corporation, it shall: (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles or certificates of incorporation and bylaws, as well as such other documents as Franchisor may reasonably request, and any amendment thereto; (iii) maintain stop transfer instructions on its records against the transfer of any equity securities

and shall only issue securities upon the face of which a legend, in a form satisfactory to Franchisor, appears which references the transfer restrictions imposed by this Agreement; (iv) not issue any voting securities or securities convertible into voting securities; and (v) maintain a current list of all owners of record and all beneficial owners of any class of voting stock of Franchisee and furnish the list to Franchisor upon request, which list shall be amended to reflect changes in ownership, as permitted under this Agreement.

**5.17.2.** If Franchisee is a partnership or limited liability partnership it shall: (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with its partnership agreement as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all general and limited partners in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records and in its partnership agreement against the transfer of partnership interests and equity securities, and shall only issue securities or partnership interests with documentation which bears a notice or legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.17.3.** If a Franchisee is a limited liability company, Franchisee shall: (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles of organization and operating agreement, as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all members and managers in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records against the transfer of equity securities and shall only issue securities upon the face of which bear a legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.18.** <u>Guarantee of Performance</u>. Each present and future: (i) shareholder of a corporate Franchisee; (ii) member of a limited liability company Franchisee; (iii) partner of a partnership Franchisee; or (iv) partner of a limited liability partnership Franchisee; shall jointly and severally guarantee Franchisee's performance of each and every provision of this Agreement by executing the Guarantee, Indemnification and Acknowledgment in the form attached to this Agreement as **<u>Exhibit C</u>**. In addition, Franchisor may require that the spouse (or domestic partner or other immediate family member) of an owner of Franchisee sign the Guarantee, Indemnification and Acknowledgment however such Guarantee by a spouse shall only be pursued by Franchisor if there is a material transfer of assets from the spouse having an ownership interest in the Franchisee to the non-owning spouse.

**5.19.** <u>System Modifications</u>.  Franchisee acknowledges and agrees that from time to time hereafter Franchisor may change or modify the System as Franchisor deems appropriate, including, without limitation, to reflect the changing market and/or to meet new and changing consumer demands, and that variations and additions to the System may be required from time to time to preserve and enhance the public image of the System and operations of Franchises.  Franchisor's changes to the System may include, without limitation, the adoption and use of new or modified products, services, equipment and furnishings and new techniques and methodologies relating to the sale, promotion and marketing of products and services, and new trademarks, service marks and copyrighted materials. Franchisee shall, upon reasonable notice, accept, implement, use and display in the operation of the Franchise any such changes in the System, as if they were part of this Agreement at the time of execution hereof, at Franchisee's sole expense. Additionally, Franchisor reserves the right, in its sole discretion, to vary the standards throughout the System, as well as the services and assistance that Franchisor may provide to some franchisees based upon the peculiarities of a particular site or circumstance, existing business practices, or other factors that Franchisor deems to be important to the operation of any Franchise or the System.

**5.20.** <u>Third-Party Management</u>.  The Franchise shall be operated under the control and supervision of Franchisee (or if an entity, the Operating Principal) or its Manager. Franchisee shall not, without the prior written approval of Franchisor, which may be denied for any reason or no reason at all, hire or retain a management company, manager (other than an employee manager trained and approved by Franchisor), or third party to undertake any of the management or operational functions of the Franchise.

6.  <u>PROPRIETARY MARKS</u>

**6.1.** <u>Ownership of the Marks</u>.  Franchisor represents that it is the owner of all right, title and interest in and to the Marks or otherwise maintains the right to use, license and sub-license such Marks.

**6.2.** <u>Use of the Marks</u>.  With respect to Franchisee's use of the Marks, Franchisee agrees that:

**6.2.1.** Franchisee shall use only the Marks designated by Franchisor, and shall use them only in the manner authorized and permitted by Franchisor; all items bearing the Marks shall bear the then-current logo.

**6.2.2.** Franchisee shall use the Marks only for the operation of the business franchised hereunder and only at the location authorized hereunder, or in Franchisor approved advertising for the business conducted at or from that location.

**6.2.3.** Unless Franchisor otherwise directs Franchisee, in writing to do so, Franchisee shall operate and advertise the Franchise only under the name "Koala Insulation" or the name listed on the Summary Page to this Agreement.

**6.2.4.** During the term of this Agreement and any renewal of this Agreement, Franchisee shall identify itself to the public (in a manner reasonably acceptable to Franchisor) as an independent contractor operating the Franchise under a license from Franchisor, and to post a notice to that effect, and as Franchisor directs, in Franchisee's advertising, contracts, forms, stationery and promotional materials.

**6.2.5.** Franchisee's right to use the Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

**6.2.6.** Franchisee shall not use the Marks to incur any obligation or indebtedness on behalf of Franchisor.

**6.2.7.** Franchisee shall not use the Marks or the word Koala or any variant thereof as part of its corporate or other legal name, or as part of any e-mail address, domain name, or other identification of Franchisee in any electronic medium.

**6.2.8.** Franchisee shall execute any documents deemed necessary by Franchisor to obtain protection for the Marks or to maintain their continued validity and enforceability.

**6.2.9.** With respect to litigation involving the Marks, the parties agree that:

**6.2.9.1.** Franchisee shall promptly notify Franchisor of any suspected infringement of the Marks, any known challenge to the validity of the Marks, or any known challenge to Franchisor's ownership of, or Franchisee's right to use, the Marks licensed hereunder. Franchisee acknowledges that Franchisor shall have the right to direct and control any administrative proceeding or litigation involving the Marks, including any settlement thereof. Franchisor shall also have the right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks.

**6.2.9.2.** If Franchisor undertakes the defense or prosecution of any litigation relating to the Marks, Franchisee shall execute any and all documents and do such acts and things as may, in the opinion of counsel for Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action.

**6.3.** Franchisee Acknowledgments. Franchisee expressly understands and acknowledges that:

**6.3.1.** The Marks are valid, owned by Franchisor, and serve to identify the System and those who are authorized to operate under the System.

**6.3.2.** Neither Franchisee nor any owner of Franchisee shall directly or indirectly contest the validity of Franchisor's ownership of the Marks, nor shall

Franchisee, directly or indirectly, seek to register the Marks with any government agency, except with Franchisor's express prior written consent.

**6.3.3.** Franchisee's use of the Marks does not give Franchisee any ownership interest or other interest in or to the Marks, beyond the limited non-exclusive License granted by this Agreement.

**6.3.4.** Any and all goodwill arising from Franchisee's use of the Marks shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the License herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Marks.

**6.3.5.** The License of the Marks is nonexclusive, and Franchisor thus has and retains the rights, among others:

**6.3.5.1.** To use the Marks itself in connection with selling products and services;

**6.3.5.2.** To grant other licenses for the Marks, in addition to those licenses already granted to existing franchisees or other licensees authorized to operate using the Marks;

**6.3.5.3.** To develop and establish (or acquire or be acquired by) other systems using the same or similar Marks, or any other proprietary marks, and to grant licenses or franchises thereto without providing any rights therein to Franchisee.

**6.3.6.** Franchisor reserves the right to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder if the Marks no longer can be used, or if Franchisor, exercising its right to do so, determines that substitution of different proprietary marks will be beneficial to the System. In such circumstances, Franchisee shall implement, at Franchisee's expense, such substituted proprietary marks in such ways as Franchisor may direct, and the use of the substituted proprietary marks shall be governed by the terms of this Agreement.

7.    <u>CONFIDENTIAL OPERATING MANUALS</u>

**7.1.** <u>Manuals</u>. In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Marks, Franchisee shall conduct its business in accordance with the Manuals, one or more copies of which, or access to, Franchisee acknowledges having received on loan from Franchisor for the term of this Agreement. The Manuals may consist of multiple volumes of printed text, video and/or audio tapes and files, computer disks, and other electronically stored data, and Franchisee acknowledges and agrees that Franchisor may provide a portion or all of the Manuals (including updates and

amendments), and other instructional information and materials in, or via, electronic media, including without limitation, through the Internet.

**7.2.** <u>Confidentiality of the Manuals</u>.  Franchisee shall at all times treat the Manuals, any other manuals created for or approved for use in the operation of the Franchise, and the information contained therein, as confidential, and shall use best efforts to maintain such information as secret and confidential, protect it from viewing by others, and treat the Manuals with the same degree of care as it would treat its most highly confidential documents.  Franchisee shall not at any time download, print, copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person.

**7.3.** <u>Protection of the Manuals</u>.  The Manuals shall at all times remain the sole property of Franchisor and shall at all times be kept in a secure manner at the Franchise premises.  Franchisee shall ensure that the Manuals are kept current and up to date; and, in the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor at Franchisor's home office shall be controlling.

**7.4.** <u>Revisions to the Manuals</u>.  Franchisor may from time to time revise the contents of the Manuals, and Franchisee expressly agrees to make corresponding revisions to its copy (to the extent Franchisor permits Franchisee to maintain a written copy) of the Manuals and to comply with each new or changed standard immediately upon receipt of such revision.

8.    <u>CONFIDENTIAL INFORMATION</u>

**8.1.** <u>Confidential Information</u>.  Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised hereunder which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement.  Franchisee shall divulge such confidential information only to such of its employees as must have access to it in order to operate the Franchise.  Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others.  Any employee who may have access to any confidential information regarding the Franchise shall execute a covenant that s/he will maintain the confidentiality of information they receive in connection with their association with Franchisee.  Such covenants or non-disclosure/non-competition agreements shall be on a form provided by Franchisor, which form shall, among other things, designate Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.

**8.2.** <u>Irreparable Injury</u>. Franchisee acknowledges that any failure to comply with the requirements of this **Section 8** will cause Franchisor irreparable injury, and Franchisee agrees to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this **Section 8**.

**8.3.** <u>Information Exchange</u>. Franchisee agrees to disclose to Franchisor all ideas, concepts, methods, techniques, services, and products conceived or developed by Franchisee, its affiliates, owners, agents, or employees during the term of this Agreement relating to the development and/or operation of the Franchise. Franchisee hereby grants to Franchisor and agrees to procure from its affiliates, owners, agents, or employees a perpetual, nonexclusive, and worldwide right to use any such ideas, concepts, methods, techniques, services and products. Franchisor shall have no obligation to make any payments to Franchisee with respect to any such ideas, concepts, methods, techniques or products. Franchisee agrees that Franchisee will not use or allow any other person or entity to use any such concept, method, technique or product without obtaining Franchisor's prior written approval.

9. <u>ACCOUNTING AND RECORDS</u>

**9.1.** <u>Records</u>. With respect to the operation and financial condition of Franchisee and the Franchise, Franchisee shall adopt, until otherwise specified by Franchisor, a fiscal year and fiscal accounting periods which coincide with Franchisor's then-current fiscal year, as specified by Franchisor. Franchisee shall maintain for a period of not less than three years during the term of this Agreement, and, for not less than three years following the termination, expiration, or non-renewal of this Agreement, full, complete, and accurate books, records, and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing.

**9.2.** <u>Periodic Reports</u>. In addition to the record keeping requirements of **Section 9.1**:

**9.2.1.** If requested by Franchisor, Franchisee shall, at its expense, provide to Franchisor, in a format specified by Franchisor, a complete annual financial statement (prepared according to generally accepted accounting principles, that includes a fiscal year-end balance sheet, an income statement of the Franchise for such fiscal year reflecting all year-end adjustments, and a statement of changes in cash flow of Franchisee), on a review basis, prepared by an independent certified public accountant satisfactory to Franchisor, no later than April 15 of each year for the preceding fiscal year of the Franchise, showing the results of operations of the Franchise during the most recently completed fiscal year. Franchisee shall also provide Franchisor with a copy of Franchisee's federal and state tax returns, not more than 30 days following Franchisee's submission of the same to governmental authorities. If Franchisee files any extension request with any taxation authority,

Franchisee shall within 30 days of filing such extension request provide a copy of the request and any confirmation or approval received by the taxing authority.

**9.2.2.** Within 45 days following the end of each calendar quarter during the term of this Agreement, after the opening of the Franchise, Franchisee shall submit to Franchisor, in a format acceptable to (or, at Franchisor's election, specified by) Franchisor, as amended from time to time: (i) a fiscal quarter and fiscal year to date profit and loss statement and a quarterly balance sheet (which may be unaudited) for the Franchise; (ii) reports of those income and expense items of the Franchise which Franchisor specifies from time to time for use in any revenue, earnings, and/or cost summary it chooses to furnish to prospective franchisees and/or developers; and (iii) copies of all state sales tax returns for the Franchise. If required by Franchisor, Franchisee shall use on-line or other electronic accounting and reporting systems as Franchisor may specify periodically.

**9.3.** Reporting Requirements. Franchisee shall also submit to Franchisor in addition to the Sales Reports required pursuant to **Section 4.2**, for review or auditing, such other forms, reports, records, information, and data as and when Franchisor may reasonably designate, in the form and format, and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing, including, without limitation, via computer diskette, or otherwise in electronic format, and/or restated in accordance with Franchisor's financial reporting periods, consistent with Franchisor's then current financial reporting periods and accounting practices and standards. Franchisee shall, without limitation, provide Franchisor with login, API and other access information as required from time to time to permit Franchisor to remotely access Franchisee's bookkeeping software (i.e. QuickBooks or other software designated by Franchisor) to pull reports, download data and perform any other action permitted under this Agreement. Franchisee shall immediately, without further request from Franchisor, provide updated access information to Franchisor when the previously provided information is changed. The reporting requirements of this **Section 9.3** shall be in addition to, and not in lieu of, the electronic reporting that may be required in connection with the use of the required Technology System under **Section 5.13**.

**9.4.** Audit. Franchisor or its designated agents shall have the right at all reasonable times to examine, copy, and/or personally review or audit, at Franchisor's expense, all books, records, and sales and income tax returns of Franchisee. Franchisor shall also have the right, at any time, to have an independent audit made of the books of Franchisee and Franchisee agrees that it shall pay Franchisor the costs of one audit each calendar quarter during the term of this Agreement, if an audit is necessitated because Franchisee fails to timely provide Sales Reports or if an audit discloses an understatement in any report by Franchisee of 5% or more, Franchisee shall, reimburse Franchisor for all costs and expenses connected with the audit (including, without limitation, travel, room and board and salaries and other benefits, and reasonable accounting and legal costs). If an inspection should reveal that any payments have been understated in any report to Franchisor, then Franchisee shall immediately pay Franchisor the

amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of 1.5% per month, or the maximum rate permitted by law, whichever is less. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

**9.5.** Data. Franchisor may, from time-to-time, specify in the Manuals or otherwise in writing the information that Franchisee shall collect and maintain on the Technology System installed at the Franchise, and Franchisee shall provide to Franchisor such reports as Franchisor may reasonably request from the data so collected and maintained. All data provided by Franchisee in any form, and whether required by this **Section 9.5** or any other requirement under the System or in the Manuals, including data uploaded to Franchisor's computer system from the Franchisee's Technology System, and/or downloaded from the Franchisee's Technology System to Franchisor's computer system, is and will be owned exclusively by Franchisor, including without limitation, customer lists and email lists, and Franchisor will have the right to use such data in any manner that Franchisor deems appropriate without compensation to Franchisee. In addition, all other data created or collected by Franchisee in connection with the System, or in connection with Franchisee's operation of the business (including but not limited to consumer and transaction data), is and will be owned exclusively by Franchisor during the term of, and following termination or expiration of, this Agreement. Copies and/or originals of such data must be provided to Franchisor upon Franchisor's request. Franchisor hereby licenses use of such data back to Franchisee, at no additional cost, solely for the term of this Agreement and solely for Franchisee's use in connection with the business franchised under this Agreement. Franchisor may use all such information, data, and reports in any manner, including, without limitation, providing financial and operating reports to franchisees and developers operating under the System.

10. ADVERTISING

Recognizing the value of advertising, and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

**10.1.** Brand Funds. Franchisor shall have the right to establish, at any time, the Brand Fund as described in this **Section 10**.

**10.2.** Brand Fund Contributions and Local Marketing Expenditures. Franchisee shall, during each calendar month, spend on advertising and promotion the greater of $2,000 or 5% of Franchisee's Gross Sales to advertise and to promote the Franchise through methods, media and advertising approved by Franchisor (together, "Local Marketing"). If Franchisee has more than one Territory, the total combined Local Marketing minimum spending requirement for up to 4 contiguous Territories shall be equal to the then-current Local Marketing minimum spending requirement for one Territory. Franchisor shall have the right to designate in writing from time to time how, and in what proportions, Franchisee is to allocate its Local Marketing. Additionally, Franchisee shall contribute (i) 1% of Gross Sales

to the Brand Fund ("Brand Fund") as may be established pursuant to Section 10.3. The Brand Fund contribution may be increased to 2% upon notice to Franchisee.

**10.2.1.**     Franchisor shall provide Franchisee with not less than 60 days prior written notice of any change in the required Local Marketing (which will not exceed 5% of Gross Sales).  Franchisor shall not increase required Brand Fund contributions to an amount exceeding 2% of Gross Sales.

**10.2.2.**     Franchisee shall pay required Brand Fund Contributions in the manner required under **Section 4** (or as otherwise provided in this **Section 10**).

**10.2.3.**     For all company-owned Franchises, Franchisor shall contribute to the Brand Fund on the same basis as franchisees.

**10.3.**   Brand Fund.  Although it is under no obligation to do so, Franchisor may at any time establish a Brand Fund, as follows:

**10.3.1.**     Franchisor or its designee shall have the right to direct all advertising programs, as well as all aspects thereof, including without limitation, the concepts, materials, and media used in such programs and the placement and allocation thereof.  Franchisee agrees and acknowledges that the Brand Fund is intended to maximize general public recognition, acceptance, perception of, and use of the System; and that Franchisor and its designee are not obligated, in administering the Brand Fund, to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or pro rata from expenditures by the Brand Fund.  Franchisor may engage the services of a franchise sales organization for development of the franchise system, and Franchisee specifically acknowledges and agrees that such franchise sales organization may be compensated out of the Brand Fund in exchange for services and products that, while not intended solely to market the sale of franchises, benefit the franchise system through franchise development and brand marketing."

**10.3.2.**     The Brand Fund, all contributions thereto, and any earnings thereon, shall be used exclusively (except as otherwise provided in this **Section 10.3**) to meet any and all costs of maintaining, administering, directing, conducting, creating and/or otherwise preparing advertising, marketing, public relations and/or promotional programs and materials, research and design relating to branding and implementation of re-branding programs and strategies, and any other activities which Franchisor believes will enhance the image of the System, including, without limitation, the costs of: preparing and/or conducting media advertising campaigns; marketing surveys and other public relations activities; employing advertising and/or public relations agencies; purchasing promotional items; developing new or modified trade dress and marks; point-of-purchase (POP) materials; design and photographs; purchasing media space or time (including all associated fees and expenses); administering regional and multi-regional marketing and advertising programs; market research; developing

and implementing customer loyalty programs; the creative development of, and actual production associated with, premium items, give-aways, promotions, contests, public relation events, and charitable or non-profit events; developing, implementing and maintaining an electronic commerce website and/or related strategies; maintaining and developing one or more websites devoted to the System, the Marks and/or the "Koala" brand; providing promotional and other marketing materials and services to the Franchises operated under the System; and the salaries of Franchisor's employees to the extent such employees provide services in conjunction with System marketing activities. The Brand Fund may also be used to provide rebates or reimbursements to franchisees for local expenditures on products, services, or improvements, approved in advance by Franchisor, which products, services, or improvements Franchisor shall have the right to determine what will promote general public awareness and favorable support for the System.

**10.3.3.**    Franchisee shall contribute to the Brand Fund in the manner specified by Franchisor. All sums paid by Franchisee to the Brand Fund shall be maintained in an account separate from Franchisor's other monies. The Brand Fund will not be used to defray the general operating expenses of Franchisor except that Franchisor shall have the right to charge the Brand Fund for such reasonable administrative costs and overhead as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund and advertising programs for franchisees and the System. The Brand Fund and its earnings shall not otherwise inure to the benefit of Franchisor.

**10.3.4.**    The Brand Fund is not intended to be, nor will it be deemed to be a trust, and Franchisor does not assume any fiduciary obligation to Franchisee for maintaining, directing or administering the Brand Fund or for any other reason. A statement of the operations of the Brand Fund as shown on the books of Franchisor shall be prepared annually by Franchisor, and shall be made available to Franchisee on an annual basis upon Franchisee's written request.

**10.3.5.**    Although the Brand Fund is intended to be of perpetual duration, Franchisor maintains the right to terminate the Brand Fund. The Brand Fund shall not be terminated, however, until all monies in the Brand Fund have been expended for advertising and/or promotional purposes. If Franchisor terminates the Brand Fund, Franchisor shall have the right to require Franchisee to spend an amount equal to previous Brand Fund contribution amount on Local Marketing and allocate such spending as directed by Franchisor.

**10.4.** Promotional Materials and Marketing Assistance. Franchisor shall make available to Franchisee from time to time, at Franchisee's expense, advertising plans and promotional materials, including newspaper mats, coupons, merchandising materials, sales aids, point of purchase materials, special promotions, direct mail materials, community relations programs, and similar advertising and promotional materials for use in advertising and promotion. Franchisor may provide periodic marketing assistance to Franchisee.

**10.5.**  Approvals.  For all proposed advertising, marketing, and promotional plans, Franchisee shall submit samples of such plans and materials to Franchisor (by means described in **Section 20**), for Franchisor's review and prior written approval (except with respect to prices to be charged by Franchisee).  If written approval is not received by Franchisee from Franchisor within 30 days of the date of receipt by Franchisor of such samples or materials, Franchisor shall be deemed to have disapproved them. Franchisee acknowledges and agrees that any and all copyright in and to advertising and promotional materials developed by or on behalf of Franchisee shall be the sole property of Franchisor, and Franchisee agrees to execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Franchisor to give effect to this provision.

**10.6.**  Minimum Requirements Only.  Franchisee understands and acknowledges that the required Local Marketing and Brand Fund contributions are minimum requirements only, and that Franchisee may, and is encouraged by Franchisor to expend additional funds for local advertising and promotion of a local nature which will focus on disseminating advertising directly related to the Franchise.

**10.7.**  Websites; Internet Use.  Franchisee shall not, without Franchisor's prior written approval, offer, promote, or sell any products or services, or make any use of the Marks, through the Internet, including the use of websites, domain names, uniform resource locators, keywords, linking, search engines (and search engine optimization techniques), banner ads, meta-tags, marketing, auction sites, e-commerce (as defined below) and co-branding arrangements.  Any website shall be deemed "advertising" under this Agreement, and will be subject to (among other things) Franchisor's approval under **Section 10.6**.  Franchisor has the right to control or designate the manner of Franchisee's use of all URLs, domain names, website addresses, metatags, links, key words, e-mail addresses and any other means of electronic identification or origin ("**e-names**").  Franchisor also has the right to designate, approve, control or limit all aspects of Franchisee's use of the Internet, Intranet, World Wide Web, wireless technology, digital cable, use of e-names, e-mail, home pages, bulletin boards, chat rooms, social networking sites, linking, framing, online purchasing cooperatives, marketplaces, barter exchanges, and related technologies, methods, techniques, registrations, networking, and any electronic communication, commerce, computations, or any means of interactive electronic documents contained in a network of computers or similar devices linked by communications software or hardware (collectively, "**e-commerce**"). Franchisee agrees to follow all of Franchisor's policies and procedures related to the use and regulation of e-commerce.  Franchisee agrees to be bound by any terms of use, privacy policy and copyright notice and takedown policies and the like that Franchisor establishes from time to time.  Franchisor may require Franchisee, at Franchisee's expense, to coordinate its e-commerce activities with Franchisor, other Franchises, suppliers and/or affiliates. Other than any e-mail or any similar account provided to Franchisee by Franchisor, if any, Franchisee shall not establish any e-mail account using the Marks or similar names or marks. Franchisee agrees to use any e-mail or any similar account provided to Franchisee

DocuSign Envelope ID: 815543D5-680F-4666-8CF9-96A9F3875G59

by Franchisor solely for business purposes. Franchisee shall be required to follow Franchisor's intranet and Internet usage rules, policies and requirements. Franchisor retains the sole right to approve any linking to, or other use of, the Koala Website. Franchisee may not establish or participate in any Koala related blog or other discussion forum. Franchisee recognizes and agrees that Franchisor and its affiliates own all rights, title and interest in and to any and all websites and e-names that Franchisor commissions or utilizes, or requires or permits Franchisee to utilize, in connection with the System, which bear the Marks or any derivative of the Marks. Franchisee also recognizes and agrees that Franchisor and/or its affiliates own all rights, title and interest in and to any and all data or other information collected via e-commerce related to the System or the Marks, including any customer data, click-stream data, cookies, user data, hits and the like. Such data or other information also constitutes Franchisor's confidential information subject to **Article 8.**

**10.8.** <u>Limitations on Associations with the Marks</u>. Franchisee acknowledges and agrees that certain associations between Franchisee and/or the Franchise, and/or the Marks and/or the System, and/or businesses operating under or products sold under the Marks or the Koala brand names on the one hand, and certain political, religious, cultural or other types of groups, organizations, causes, or activities, on the other, however well-intentioned and/or legal, may create an unwelcome, unfair, or unpopular association with, and/or an adverse effect on, the reputation of Franchisor, the System, the Koala brand, or the good will associated with the Marks. Accordingly, Franchisee shall not, without the prior written approval of Franchisor, engage in any activities with, or donate any money, products, services, goods, or other items to, any charitable, political or religious organization, group, or activity, if such action is taken, or may be perceived by the public to be taken, in the name of, in connection with, or in association with Franchisee, the Marks, the Franchise, the Franchisor, or the System.

11.    <u>INSURANCE</u>

**11.1.** <u>Insurance Requirements</u>. Prior to the commencement of any activities or operations pursuant to this Agreement, Franchisee shall procure and maintain in full force and effect during the term of this Agreement (and for such period thereafter as is necessary to provide the coverages required hereunder for events having occurred during the term of this Agreement), at Franchisee's expense, the following insurance policy or policies in connection with the Franchise or other facilities on the premises, or by reason of the construction, operation, or occupancy of the Franchise or other facilities on premises. Such policy or policies shall be written by an insurance company or companies acceptable to Franchisor, having a rating of at least "A-7" in the most recent Key Rating Guide published by the A.M. Best Company (or another rating that Franchisor reasonably designates if A.M. Best Company no longer publishes the Key Rating Guide) and licensed to do business in the state in which the Franchise is located. Such policy or policies shall be in accordance with standards and specifications set forth in the Manuals or otherwise in writing and shall include, at a minimum (except as additional coverages and higher policy limits may reasonably be specified for all franchisees

from time to time by Franchisor in the Manuals or otherwise in writing to reflect inflation, identification of new risks, changes in the law or standards of liability, higher damage awards and other relevant changes in circumstances), the following:

**11.1.1.** Comprehensive general liability insurance, written on an occurrence basis, extended to include contractual liability, products and completed operations, and personal and advertising injury, with a combined bodily injury and property damage limit of not less than $1,000,000 per occurrence.

**11.1.2.** If any vehicles are used for business purposes, business automobile liability insurance, including a combined single bodily injury and property damage coverage for all owned, nonowned, and hired vehicles, with limits of liability not less than $1,000,000 per occurrence for both bodily injury and property damage.

**11.1.3.** Statutory workers' compensation insurance and employer's liability insurance for a minimum limit of at least $500,000, as well as such other disability benefits type insurance as may be required by statute or rule of the state in which the Franchise is located.

**11.1.4.** Commercial umbrella liability insurance with limits which bring the total of all primary underlying coverages to not less than $2,000,000 total limit of liability.

**11.1.5.** Property insurance providing coverage for direct physical loss or damage to real and personal property for all-risk perils, including the perils of flood and earthquake.

**11.1.6.** Any other insurance coverage that is required by federal, state, or municipal law.

**11.2.** Referenced in Manuals. All policies listed in **Section 11.1** (unless otherwise noted below) shall contain such endorsements as shall, from time to time, be provided in the Manuals.

**11.3.** Policy Cancellation. In the event of cancellation, material change, or nonrenewal of any policy, 60 days' advance written notice must be provided to Franchisor in the manner provided in **Article 20**. Franchisee shall arrange for a copy of such notification to be sent to Franchisor by the insurance company.

**11.4.** Construction and Remodeling Insurance. In connection with all significant construction, reconstruction, or remodeling of the Franchise during the term of this Agreement, Franchisee will cause the general contractor, its subcontractors, and any other contractor, to effect and maintain at general contractor's and all other contractor's own expense, such insurance policies and bonds with such endorsements as are set forth in the Manuals, all written by insurance or bonding companies approved by Franchisor, having a rating as set forth in **Section 11.1**.

**11.5.**  No Waiver of Obligations.  Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in **Section 17.4.**

**11.6.**  Franchisor to be Additional Insured.  All insurance policies shall list Franchisor and its affiliates, officers, directors, employees, and agents as additional insureds.

**11.7.**  Certificates of Insurance.  At least 30 days prior to the time any insurance is first required to be carried by Franchisee, and thereafter at least 30 days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor, certificates of insurance evidencing the proper coverage with limits not less than those required hereunder.  All certificates shall expressly provide that no less than 30 days' prior written notice shall be given Franchisor in the event of material alteration to, cancellation, or nonrenewal of the coverages evidenced by such certificates.    Further certificates evidencing the insurance required by **Section 11.1** shall name Franchisor, and each of its affiliates, directors, agents, and employees as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions for which such certificates evidence coverage.    In the event that Franchisee fails to provide evidence reasonably satisfactory to Franchisor of the insurance policies required by this **Article 11**, Franchisor may, but is not required to, obtain such required policies on Franchisee's behalf, and Franchisee agrees that it will promptly reimburse Franchisor for all costs related to obtaining such policies upon notice from Franchisor.

**11.8.**  Proof of Insurance.  In addition to its obligations under **Section 11.7**, on the first anniversary of the Effective Date, and on each subsequent anniversary thereof during the term of this Agreement and any renewal hereof, Franchisee shall provide Franchisor with proof of insurance evidencing the proper coverage with limits not less than those required hereunder, in such form as Franchisor may reasonably require.

**11.9.**  Policy Limit Changes.  Franchisor shall have the right, from time to time, to make such changes in minimum policy limits and endorsements as it may determine; provided, however, all changes shall apply, generally, to all franchisees of Franchisor who are similarly situated.

12.    TRANSFER OF INTEREST

**12.1.**  Franchisor Transfers.  Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations under this Agreement, or any interests in the assets of Franchisor, or any ownership or equity interests in Franchisor, to any person or entity, and any assignee of Franchisor shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment.

**12.2.**  Principals.  If Franchisee is an entity, each person or entity that is an owner of, or has an ownership interest in, Franchisee (each, a "**Principal**"), and the interest of each Principal in Franchisee, is identified on the Summary Page. Franchisee represents and warrants that its owners are as set forth on the Summary Page attached to this Agreement, and covenants that it will not permit the identity of such owners, or their respective interests in Franchisee, to change without complying with this Agreement.  Franchisor shall have the right to designate any person or entity which owns a direct or indirect interest in Franchisee as a Principal, and the Summary Page shall be so amended automatically upon notice thereof to Franchisee.

**12.3.**  Franchisee Transfers.  Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and its Principals, and that Franchisor has granted this License in reliance on Franchisee's or Franchisee's Principals' business skill, financial capacity, and personal character.  Accordingly:

**12.3.1.**     Franchisee shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber:  (a) this Agreement or any of the rights and obligations of Franchisee under this Agreement; or (b) any material asset of Franchisee or the Franchise; provided, however, that Franchisee may grant a security interest in, or otherwise encumber certain assets of the Franchise, excluding the Franchise Agreement, in connection with Franchisee obtaining financing for the development and/or operation of the Franchise or equipment leasing, if such financing satisfies the requirements of Franchisor, which may include, without limitation, execution of agreements by Franchisor, Franchisee, and/or such Principal, and any secured creditor of Franchisee, in a form satisfactory to Franchisor, acknowledging such creditor's obligations to be bound by the terms of this **Article 12**.

**12.3.2.**     If Franchisee is a corporation or limited liability company, Franchisee shall not, without the prior written consent of Franchisor, issue any voting securities or securities convertible into voting securities, and the recipient of any such securities shall become a Principal under this Agreement, if so designated by Franchisor.

**12.3.3.**     If Franchisee is a partnership or limited partnership, the partners of the partnership shall not, without the prior written consent of Franchisor, admit additional general partners, remove a general partner, or otherwise materially alter the powers of any general partner.  Each general partner shall automatically be deemed a Principal of Franchisee.

**12.3.4.**     A Principal shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber any interest of a Principal in Franchisee.

**12.4.**  Conditions for Approval.  Franchisor shall not unreasonably withhold any consent required by **Section 12.3**; provided, that if Franchisee proposes to

transfer its obligations hereunder or any interest in any material asset, or if a Principal proposes to transfer any direct or indirect interest in Franchisee, or if Franchisee or any Principal proposes to undertake any transfer that is subject to **Section 12.3**, Franchisor shall have the right to require any or all of the following as conditions of its approval (except as provided in **Section 12.9**):

**12.4.1.**    The transferor shall have executed a general release (which shall include a release from the transferor, Franchisee, Principals, and guarantors of Franchisee), in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, successors, and assigns, and their respective directors, officers, owners, members, managers, partners, agents, representatives, servants, and employees in their corporate and individual capacities including, without limitation, claims arising under this Agreement, any other agreement between Franchisee and Franchisor or its affiliates, and federal, state, and local laws and rules.

**12.4.2.**    The transferee of a Principal shall be designated as a Principal and each transferee who is designated a Principal shall enter into a written agreement, in a form satisfactory to Franchisor, agreeing to be bound as a Principal under the terms of this Agreement as long as such person or entity owns any interest in Franchisee; and, the Principal shall guarantee the performance of all such obligations in writing in a form satisfactory to Franchisor.

**12.4.3.**    Prior to, and after the transfer, Franchisee's new Principals shall meet Franchisor's educational, managerial, and business standards; each shall possess a good moral character, business reputation, and credit rating; have the aptitude and ability to operate the Franchise, as may be evidenced by prior related business experience or otherwise; and have adequate financial resources and capital to operate the Franchise.

**12.4.4.**    If a proposed transfer would result in a change in control of Franchisee, at Franchisor's option, Franchisee (or transferee) shall execute, for a term ending on the expiration date of this Agreement the form of franchise agreement then being offered to new System franchisees, and such other ancillary agreements required by Franchisor for the business franchised hereunder, which agreements shall supersede this Agreement and its ancillary documents in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, higher royalty and advertising fees.

**12.4.5.**    If a proposed transfer would result in a change in control of Franchisee, and if so requested by Franchisor, Franchisee, at its expense, shall upgrade the Franchise to conform to the then current standards and specifications of new Franchises then being established in the System, and shall complete the upgrading and other requirements set forth in **Sections 5.1.6** and **5.2.5** within the time period specified by Franchisor.

**12.4.6.**    All monetary obligations of Franchisee hereunder shall be paid in full on a current basis, and Franchisee must not be otherwise in default of

any of its obligations hereunder including, without limitation, its reporting obligations.

**12.4.7.** The transferor shall remain liable for all of the obligations to Franchisor in connection with the Franchise that arose prior to the effective date of the transfer, and any covenants that survive the termination or expiration of this Agreement, and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability.

**12.4.8.** At Franchisee's expense, the transferee's Manager and other employees designated by Franchisor shall successfully complete (to Franchisor's satisfaction) all training programs required by Franchisor upon such terms and conditions as Franchisor may reasonably require (and while Franchisor will not charge a fee for attendance at such training programs, the transferee shall be responsible for the salary and all expenses of the person who attends training).

**12.4.9.** If a proposed transfer would result in a change in control of Franchisee, and to compensate Franchisor for Franchisor's legal, accounting, training, and other expenses incurred in connection with the transfer, Franchisee shall pay Franchisor a non-refundable transfer fee in an amount equal to the greater of $10,000 or 20% of the then-current franchise fee applicable to the Territory. One-half of the transfer fee shall be paid at the time Franchisee submits its request to Franchisor for consideration of the proposed transfer, and such amount shall be non-refundable. The balance of the transfer fee shall be paid at the time the transfer is consummated or closes. In addition, in the event a proposed transfer is not consummated or closed, for any reason except for disapproval by Franchisor, Franchisee or the proposed transferee shall reimburse Franchisor for all of its costs and expenses incurred in connection with its evaluation of the proposed transfer, including, without limitation, attorneys' and accountants' fees, background checks, site evaluation, and training, if applicable, to the extent the portion of the transfer fee paid when the transfer approval request was made does not cover those costs and expenses.

**12.4.10.** If the proposed transfer will result in a change in control of Franchisee, the terms of the proposed transfer will not adversely impact the continued operations of the Franchise, as determined in Franchisor's sole discretion.

**12.4.11.** The transferor must acknowledge and agree that the transferor shall remain bound by the covenants contained in **Sections 15.2** and **15.3**.

12.4.12 Franchisee shall be solely responsible for paying any broker fees and/or commissions involved with the sale or transfer of the Franchise regardless of whether Franchisee directly engages such broker or if, at Franchisee's request, Franchisor engages such broker to assist with the sale or transfer of the Franchised Business.

**12.5.**   Right of First Refusal.

**12.5.1.**   If Franchisee or any Principal desires to accept any *bona fide* offer from a third party to purchase Franchisee, any material assets of Franchisee, or any direct or indirect interest in Franchisee, Franchisee or such Principal shall promptly notify Franchisor of such offer and shall provide such information and documentation relating to the offer as Franchisor may require.   Franchisor shall have the right and option, exercisable within 30 days after receipt of all such information, to send written notice (the "**Exercise Notice**") to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party.   If Franchisor elects to purchase the seller's interest, the contract to purchase the Franchise (or interests or assets) shall be executed within 60 days after the Exercise Notice and the closing shall occur at the principal offices of Franchisor; provided, however, that in no event shall the closing occur later than 90 days following the execution of the definitive purchase agreement.

**12.5.2.**   Any material change in the terms of the *bona fide* offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of the third party's initial offer.   Additionally, if Franchisor elects not to exercise its purchase right and Franchisee fails to complete the proposed sale within six months from the date Franchisor notifies Franchisee that Franchisor will not make the purchase, Franchisor shall again have the right of first refusal described in this **Section 12.5**.   Failure of Franchisor to exercise the option afforded by this **Section 12.5** shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this **Section 12**, with respect to a proposed transfer, or a waiver of any subsequent offer.

**12.5.3.**   In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash.   If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, they must attempt to appoint a mutually-acceptable independent appraiser to make a binding determination.   If the parties are unable to agree upon one independent appraiser, then an independent appraiser shall be promptly designated by Franchisor and another independent appraiser shall be promptly designated by Franchisee, which two appraisers shall, in turn, promptly designate a third appraiser; all three appraisers shall promptly confer and reach a single determination, which determination shall be binding upon Franchisor and Franchisee.   The cost of any such appraisal shall be shared equally by Franchisor and Franchisee.   If Franchisor elects to exercise its right under this **Section 12.5**, Franchisor shall have the right to set off all amounts due from Franchisee, and one-half of the cost of the appraisal, if any, against any payment to the seller.

**12.6.**   Transfer Upon Death.   Upon the death of a Principal, the deceased's executor, administrator, or other personal representative shall transfer the

deceased's interest to a third party approved by Franchisor within 12 months after the death. If the distributee is not approved by Franchisor, then the distributee shall transfer the deceased's interest to a third party approved by Franchisor within 12 months after the deceased's death.

**12.7.** <u>Transfer Upon Permanent Disability</u>. Upon the permanent disability of any Principal with a controlling interest in Franchisee, Franchisor shall have the right to require such interest to be transferred to a third party in accordance with the conditions described in this **Section 12** within six months after notice to Franchisee, provided that no transfer fee shall be due for a transfer pursuant to this **Section 12.7.** "**Permanent Disability**" shall mean any physical, emotional, or mental injury, illness, or incapacity that would prevent a person from performing the obligations set forth in this Agreement for at least six consecutive months, and from which condition recovery within six consecutive months from the date of determination of disability is unlikely. Permanent disability shall be determined by a licensed practicing physician upon examination of such person or, if such person refuses to be examined, then such person shall automatically be deemed permanently disabled for the purposes of this **Section 12.7** as of the date of refusal. The licensed practicing physician making such determination shall be chosen by the mutual agreement of a doctor selected by Franchisor and a doctor selected by Franchisee. Franchisor shall pay the cost of the required examination.

**12.8.** <u>Notification Upon Death or Permanent Disability</u>. Upon the death or permanent disability any Principal of Franchisee, such person or his representative shall promptly notify Franchisor of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as any *inter vivos* transfer.

**12.9.** <u>Exceptions for Entity Formed Convenience of Ownership or Transfer to Family Member</u>. Notwithstanding anything to the contrary in this **Section 12**, if Franchisee is an individual and seeks to transfer this Agreement to an entity formed for the convenience of ownership or if Franchisee seeks to transfer this Agreement to a spouse, adult sibling or adult child (subject to compliance with all other provisions of the Transfer), the conditions of **Sections 12.4.4** (signing a new franchise agreement), **12.4.5** (upgrading the Franchise), **12.4.8** (initial training of new Manager), and **12.4.9** (transfer fee) shall not apply; provided however, that in lieu of a transfer fee, Franchisee shall reimburse Franchisor for its legal, accounting and other professional fees and other costs incurred in connection with the transfer if any, and Franchisee may undertake such transfer, provided that Franchisee (or their spouse, sibling or child as applicable above) owns 100% of the equity interest in the transferee entity, and the Franchisee and transferee personally guarantees, in a written guaranty satisfactory to Franchisor, the performance of the obligations of Franchisee under this Agreement.

**12.10.** <u>No Waiver of Claims</u>. Franchisor's consent to a transfer which is the subject of this **Section 12** shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to

demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

**12.11.** <u>Insolvency</u>.  If Franchisee or any person holding any interest (direct or indirect) in Franchisee becomes a debtor in a proceeding under the U.S. Bankruptcy Code or any similar law in the U.S. or elsewhere, it is the parties' understanding and agreement that any transfer of Franchisee, Franchisee's obligations and/or rights hereunder, any material assets of Franchisee, or any indirect or direct interest in Franchisee shall be subject to all of the terms of this **Section 12**.

**12.12.** <u>Securities Offerings</u>.  All materials for an offering of stock or partnership interests in Franchisee or any affiliate of Franchisee which are required by federal or state law shall be submitted to Franchisor for review as described below before such materials are filed with any government agency.  Any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use.  No offering by Franchisee or any affiliate of Franchisee shall imply (by use of the Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of the securities of Franchisee or Franchisee's affiliates; and Franchisor's review of any offering shall be limited solely to the relationship between Franchisor and Franchisee and affiliates, if applicable, and shall not constitute any opinion as to any legal requirement.  Franchisor may, at its option, require the offering materials to contain a written statement prescribed by Franchisor concerning the limitations stated in the preceding sentence.  Franchisee (and the offeror if not Franchisee), the Principals, and all other participants in the offering must fully indemnify Franchisor, its affiliates, successors, and assigns, and their respective directors, officers, shareholders, partners, agents, representatives, servants, and employees in connection with the offering and shall execute any and all documents required by Franchisor to endorse such indemnification.  For each proposed offering, Franchisee shall pay Franchisor an amount as is necessary to reimburse Franchisor for its reasonable costs and expenses (including legal and accounting fees) for reviewing the proposed offering.  Franchisee shall give Franchisor written notice at least 30 days before the date that any offering or other transaction described in this **Section 12.12** commences.  Any such offering shall be subject to all of the other provisions of this **Article 12**; and further, without limiting the foregoing, it is agreed that any such offering shall be subject to Franchisor's approval as to the structure and voting control of the offeror (and Franchisee, if Franchisee is not the offeror) after the financing is completed.

13.    <u>DEFAULT AND TERMINATION</u>

**13.1.** <u>Automatic Termination</u>.  Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and not opposed by Franchisee; or if Franchisee is adjudicated as bankrupt or insolvent; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for

Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied or of record for 30 days or longer (unless unappealed or a supersedeas bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's business or property; or if suit to foreclose any lien or mortgage against the Franchise premises or equipment is instituted against Franchisee and not dismissed within 30 days; or if the real or personal property of Franchisee's Franchise shall be sold after levy thereupon by any sheriff, marshal, or constable.

**13.2.** <u>Termination Upon Notice Without Opportunity to Cure</u>. Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the delivery of written notice to Franchisee by Franchisor (in the manner set forth under **Section 20**), upon the occurrence of any of the following events:

**13.2.1.**    If Franchisee fails to open the Franchise as provided in **Section 5.5**;

**13.2.2.**    If Franchisee or other designated employee fails to complete the initial training program pursuant to **Sections 3.2** and **5.6** of this Agreement;

**13.2.3.**    If Franchisee at any time ceases to operate or otherwise abandons the Franchise for three consecutive business days, or loses the right to possession of the Franchise Location, any Koala Rig(s), or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchise is located;

**13.2.4.**    If Franchisee or any Principal is convicted of a felony or engages in any other activity that Franchisor believes is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or Franchisor's interest therein;

**13.2.5.**    If a threat or danger to public health or safety results from the construction, maintenance, or operation of the Franchise;

**13.2.6.**    If Franchisee or any Principal purports to transfer any rights or obligations under this Agreement or any interest to any third party in a manner that is contrary to the terms of **Section 12**;

**13.2.7.**    If Franchisee or any Principal fails to comply with the covenants in **Section 15.2**;

**13.2.8.**    If, contrary to the terms of **Sections 7** or **8**, Franchisee discloses or divulges confidential information provided to Franchisee by Franchisor;

**13.2.9.**      If Franchisee knowingly maintains false books or records, or submits any false reports (including, but not limited to, information provided as part of Franchisee's application for this franchise) to Franchisor, underreports Gross Sales by more than 5% or more for any period;

**13.2.10.**      If Franchisee commits three or more defaults under this Agreement in any 12-month period, whether or not each such default has been cured after notice;

**13.2.11.**      If Franchisee or any Principal makes any unauthorized or improper use of the Marks or contests the validity of Franchisor's ownership of the Marks or its right to use and to license others to use the Marks; and/or

13.2.12.      If Franchisee or any Principal is in breach or default under any other agreement (whether existing as of the date of this Agreement or subsequently made) with Franchisor or any of its subsidiaries or Affiliates, and if such default is curable, fails to cure the default as required within the time permitted.

**13.3.**  <u>Termination With Opportunity to Cure</u>.  Except as otherwise provided in **Sections 13.1** and **13.2**, upon any other default by Franchisee of its obligations hereunder, Franchisor may terminate this Agreement only by giving written notice of termination (in the manner set forth under **Article 20**) setting forth the nature of such default to Franchisee at least 30 days prior to the effective date of termination (or, with respect to monetary defaults, five days); provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor, all within the 30 day period (or five day period with respect to monetary defaults).  If any such default is not cured within the specified time, this Agreement may, upon Franchisor's election, be terminated without further notice to Franchisee effective immediately upon the expiration of the 30 day period (or five day period with respect to monetary defaults) or such longer period as applicable law may require.

**13.4.**  <u>Extended Notice of Termination</u>.  If any law applicable to this **Section 13**, requires a longer notice period prior to termination of this Agreement, or prior to a refusal to enter into a successor or renewal franchise, than is required hereunder, a different standard of "good cause", or the taking of some other action not required hereunder, the prior notice, "good cause" standard, and/or other action required by such law shall be substituted for the comparable provisions hereof.

**13.5.**  <u>Assignment Upon Bankruptcy</u>.  If, for any reason, this Agreement is not terminated pursuant to this **Article 13**, and this Agreement is assumed, or assignment of the same to any person or entity who has made a *bona fide* offer to accept an assignment of this Agreement is contemplated, pursuant to the United States Bankruptcy Code, then notice of such proposed assignment or assumption, setting forth:  (i) the name and address of the proposed assignee; and (ii) all of the terms and conditions of the proposed assignment and assumption, shall be given to Franchisor within 20 days after receipt of such proposed assignee's offer to

DocuSign Envelope ID: 815543D5-680F-4668-8CF9-96A9F3875GB9

accept assignment of this Agreement, and, in any event, within 10 days prior to the date application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Franchisor shall thereupon have the prior right and option, to be exercised by notice given at any time prior to the effective date of such proposed assignment and assumption, to accept an assignment of this Agreement to Franchisor itself upon the same terms and conditions and for the same consideration, if any, as in the *bona fide* offer made by the proposed assignee, less any brokerage commissions which may be payable by Franchisee out of the consideration to be paid by such assignee for the assignment of this Agreement.  In the event Franchisor does not elect to exercise the options described in this **Section 13.5**, any transfer or assignment pursuant to the United States Bankruptcy Code shall be subject to the same terms and conditions of any other transfer or assignment set forth in **Article 12**.

**13.6.**  Damages.  In addition to any other claims Franchisor may have (other than claims for lost future Royalty Fees and Brand Fund Contributions), if Franchisor terminates this Agreement based on Franchisee's default or if Franchisee terminates this Agreement in violation of its terms, Franchisee must pay Franchisor liquidated damages calculated as follows:  (a) the greater of (i) the average of Franchisee's monthly Royalty Fees and Brand Fund Contributions due for the last 12 months (or for such shorter period of time that the Franchise has been in operation) before termination, (ii) or the average monthly amount which would be due based on the minimum fees set forth in **Section 4.2** for a period 37+ months after the Effective Date,  (b) multiplied by the lesser of 24 or the number of months remaining in the then-current term under **Section 2.1**, (c) discounted to present value using the then-current prime rate of interest quoted by Franchisor's principal commercial bank.  The parties hereto agree that calculation of damages if Franchisor terminates due to default or if Franchisee terminates this Agreement in violation of its terms will be difficult to measure and quantify, and the damages described in this **Section 13.6** are a reasonable approximation of such damages, and are not a penalty.

14.    OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

**14.1.**  Cease Operations.   Franchisee shall immediately cease to operate the Franchise, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

**14.2.**  Cease Use of Marks.  Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures and techniques associated with the System, the mark "Koala Insulation" and all other Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System.  In particular, Franchisee shall cease to use, without limitation, the Koala Rigs, all signs, advertising materials, displays, stationery, forms, and any other articles that display the Marks.

43

**14.3.**  Cancellation of Assumed Names.  Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark "Koala Insulation" and all other Marks, and/or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five days after termination or expiration of this Agreement.

**14.4.**  Assign Lease; Modification of Premises.  Franchisor, or any affiliate of Franchisor, shall have the right and option, but not the obligation, in Franchisor's sole discretion, to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location (if applicable).  Franchisor may assign or delegate this right or option to any affiliate or designee of Franchisor, without notice to, or request for approval from, the landlord or lessor of the Franchise Location.  If Franchisor or its assignee or delegatee does not elect or is unable to exercise any option it may have to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location, Franchisee shall make such modifications or alterations to the Franchise Location operated hereunder immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of said premises from that of other Franchises, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  If Franchisee fails or refuses to comply with the requirements of this **Section 14.4**, Franchisor (or its designee) shall have the right to enter upon the premises of the Franchise, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

**14.5.**  Telephone, Etc.  Franchisee shall cease use of, and if Franchisor requests, shall transfer to Franchisor, all telephone numbers, customer lists, and any domain names, websites, email addresses, and any other identifiers, whether or not authorized by Franchisor, used by Franchisee while operating the Franchise.

**14.6.**  No Confusion.  Franchisee agrees, if it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit copy, or colorable imitation of the Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Marks, and further agrees not to utilize any designation of origin, description, trademark, service mark, or representation which suggests or represents a present or past association or connection with Franchisor, the System, or the Marks.

**14.7.**  Pay Monies Owed.  Franchisee shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates (regardless of whether those obligations arise under this Agreement or otherwise).  In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default.

**14.8.**  Damages and Costs.  Franchisee shall pay Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this **Section 14**.

**14.9.**  Return of Manuals.  Franchisee shall immediately deliver to Franchisor the Manuals and all other manuals, records, and instructions containing confidential information (including without limitation any copies thereof, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of Franchisor.

**14.10.** Option to Purchase Furnishings and Equipment.  Franchisor shall have the option to purchase from Franchisee any or all of the Koala Rigs and other vehicles, furnishings, equipment, signs, fixtures, supplies, or inventory of Franchisee related to the operation of the Franchise, at the lesser of the fair market value or Franchisee's book value.  Franchisor shall have 30 days from the expiration or termination of this Agreement to notify Franchisee that Franchisor will exercise its option under this Section 14.10, and another 60 days from such notice to complete such purchase.  The book value of any such item shall be determined based upon a five-year straight-line depreciation of original costs.  For equipment that is five or more years old, the parties agree that fair market value shall be deemed to be 10% of the equipment's original cost.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee as well as all amounts due to Franchisor's affiliates from Franchisee.  Franchisee shall take all actions as necessary to ensure that any items purchased by Franchisor shall be free of all liens or other encumbrances at the time Franchisee sells such items to Franchisor.

**14.11.**  Right to Enter and Operate.  In order to preserve the goodwill of the System following termination, Franchisor (or its designee) shall have the right to enter the Franchise Location (if applicable) (without liability to Franchisee, Franchisee's Principals, or otherwise) or to take possession of the Koala Vehicle(s) used by Franchisee for the purpose of continuing the Franchise's operation and maintaining the goodwill of the business.

**14.12.** Close Vendor Accounts.  Franchisee must close all accounts with vendors which were opened in connection with the opening and operation of the Franchise.  Franchisor has the right to notify Franchisee's vendors that this Agreement has expired or been terminated and to require them to close Franchisee's accounts, if Franchisee fails to do so.

**14.13.** Security Interest.  For the purpose of securing its obligations under this Agreement, Franchisee hereby grants Franchisor a security interest in all personal property related to the operation of the Franchise of any nature now owned or hereinafter acquired by Franchisee, including, but not limited to, all signs, logos bearing any of the Marks, inventory, equipment, Koala Rigs(s), trade fixtures, furnishings and accounts, together with the proceeds therefrom (the **"Security Agreement"**).  Any event of default by Franchisee under this Agreement shall be

deemed a breach of the Security Agreement. Franchisee covenants to execute and deliver to Franchisor any and all instruments Franchisor may reasonably request from time to time in order to perfect the security interest granted herein, including, without limitation, the appropriate UCC-1 Financing Statements.

15. <u>COVENANTS</u>

**15.1.** <u>Full Time and Best Efforts</u>. Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee (or its Operating Principal if Franchisee is an entity) (or a Manager who will assume primary responsibility for the franchise operations and shall have been previously approved in writing by Franchisor) and a Salesperson shall devote full time, energy, and best efforts to the management and operation of the Franchise.

**15.2.** <u>In-Term Covenants</u>. Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System. Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

**15.2.1.** Divert or attempt to divert any business or customer of the Franchise or of any Franchise using the System to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Marks and the System.

**15.2.2.** Unless released in writing by the employer, (a) employ or seek to employ any person who (i) is at that time employed by Franchisor, or (ii) who was, within six months prior to his/her employ by Franchisee, or any person acting for, on behalf of, or at the directions of Franchisee employed by Franchisor, or (b) otherwise directly or indirectly induce such person to leave his or her employment.

**15.2.3.** Except as otherwise approved in writing by Franchisor, own, maintain, operate, engage in, or have any interest in any "**Competitive Business**" in any location, which shall mean a business which offers insulation evaluation, installation or removal, energy efficiency evaluations and improvements, and related services.

**15.3.** <u>Post-Term Covenants</u>. Franchisee covenants that, except as otherwise approved in writing by Franchisor, it shall not, for a continuous uninterrupted period of two years from the date of: (a) a transfer permitted under **Section 12**; (b) expiration or termination of this Agreement (regardless of the cause for termination); or (c) a final order of a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to the enforcement of this **Section 15.3**; either directly or indirectly (through, on behalf

of, or in conjunction with any persons or entity), own, maintain, operate, engage in, or have any interest in any Competitive Business which is, or is intended to be, located: (a) at the Approved Location; (b) within a 100 mile radius of the Territory; or (c) within a 100 mile radius of the territory of any other Franchises or company or affiliate-owned Koala Insulation business in operation as of the time that the obligations under this **Section 15.3** commence.

**15.4.**  Publicly-Held Corporations.  **Section 15.3** shall not apply to ownership by Franchisee of less than 5% beneficial interest in the outstanding equity securities of any Publicly Held Corporation.  As used in this Agreement, the term "**Publicly Held Corporation**" shall be deemed to refer to a corporation which has securities that have been registered under the Securities Exchange Act of 1934.

**15.5.**  Individual Covenants.  Franchisee shall require and obtain execution of covenants similar to those set forth in **Section 8 and** this **Article 15** (as modified to apply to an individual) from any or all of Franchisee's Principals, the Manager, any replacement Manager and other highly trained personnel as designated by Franchisor.  The covenants required by this **Section 15.5** shall be in the form provided in **Exhibit D** to this Agreement.

**15.6.**  Severability.  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of the covenants in this **Section 15** is held to be unenforceable or unreasonable by any court, it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

**15.7.**  Scope of Covenants.  Franchisee understands and acknowledges that Franchisor shall have the right to reduce the scope of any covenant set forth in **Sections 15.2** and **15.3** in this Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified.

**15.8.**  Enforcement of Claims.  Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this **Section 15**.  Franchisee agrees to pay all costs and expenses (including without limitation reasonable attorneys' fees and all other costs) incurred by Franchisor in connection with the enforcement of this **Section 15**.

**15.9.**  Irreparable Injury.  Franchisee acknowledges that Franchisee's violation of the terms of this **Section 15** would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this **Section 15**.

16.    <u>TAXES, PERMITS, AND INDEBTEDNESS</u>

**16.1.**    <u>Taxes</u>.  Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, income, unemployment, and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement.  Franchisee shall pay Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

**16.2.**    <u>Tax Disputes</u>.  In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchise, or any improvements thereon.

**16.3.**    <u>Compliance With Laws</u>.  Franchisee shall comply with all federal, state, and local laws, rules, and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the business franchised under this Agreement, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, and fire clearances.

**16.4.**    <u>Notification of Claims</u>.  Franchisee shall notify Franchisor in writing within three days of receipt of notice of any health or safety violation, the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, or within three days occurrence of any accident or injury which may adversely affect the operation of the Franchise or the financial condition of Franchisee, or give rise to liability or a claim against Franchisee or Franchisor.

17.    <u>INDEPENDENT CONTRACTOR AND INDEMNIFICATION</u>

**17.1.**    <u>Independent Contractors</u>.  It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

**17.2.**    <u>Identification as Independent Contractor</u>.  At all times during the term of this Agreement and any extensions hereof, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor.

**17.3.** <u>No Agency</u>.  It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be liable by reason of any act or omission of Franchisee in its conduct of the Franchise or for any claim or judgment arising therefrom against Franchisee or Franchisor.

**17.4.** <u>Indemnification and Advancement</u>.  Franchisee shall immediately and unconditionally advance costs and expenses, indemnify and hold Franchisor and its affiliates, and their respective officers, directors, members, managers, employees, and agents harmless against any and all claims, obligations, and damages (as well as the costs, including attorneys' fees, of defending against them) arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Franchise or Franchisee's breach of this Agreement, including, without limitation, those alleged to be caused by Franchisor's negligence or breach of this Agreement, but not including those claims, obligations, and damages that are determined to be caused solely by Franchisor's gross negligence or willful misconduct according to a final, unappealable ruling issued by a court with competent jurisdiction.  In addition to the above and without regard to the final ruling on any matter, Franchisee and its respective Principals hereby agree to immediately and unconditionally advance, or pay directly to designated parties, any amounts which are incurred in connection with any claim against Franchisor or its affiliates, and their respective officers, directors, members, managers, employees, and agents arising from or relating to, directly or indirectly, Franchisee's operation of the Franchise or Franchisee's breach of this Agreement without regard to any defenses based on errors, omissions or conduct of Franchisor or its members, managers, shareholders, directors, affiliates or agents.  If Franchisor incurs any costs or expenses, including, without limitation, legal fees, travel expenses, and other charges, in connection with any proceeding involving Franchisee in which Franchisor is not a party, Franchisee shall reimburse Franchisor for all such costs and expenses promptly upon presentation of invoices. Franchisee acknowledges and agrees that Franchisee's indemnification and hold harmless obligations under this **Section 17.4** shall survive the termination or expiration of this Agreement.

18.  <u>FORCE MAJEURE</u>

Neither party shall be responsible to the other for non-performance or delay in performance occasioned by causes beyond its control, including without limiting the generality of the foregoing:  (a) acts of God; (b) acts of war, terrorism, or insurrection; (c) strikes, lockouts, labor actions, boycotts, floods, fires, hurricanes, tornadoes, and/or other casualties; (d) the inability of Franchisor and/or its affiliates or suppliers to manufacture, purchase, and/or cause delivery of any products used in the operation of the Franchise; and (e) legislative changes and/or governmental orders affecting the sale of the products from Franchises.  The inability of either party to obtain and/or remit funds shall be considered within control of such party.

19. <u>APPROVALS AND WAIVERS</u>

**19.1.** <u>Approvals</u>.   Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent must be obtained in writing.

**19.2.** <u>No Warranties</u>.   Franchisee acknowledges and agrees that Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

**19.3.** <u>Waivers</u>.   No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee or any other franchisee under any of the terms, provisions, covenants, or conditions of this Agreement, and no custom or practice by the parties at variance with the terms of this Agreement, shall constitute a waiver by Franchisor to enforce any such right, option, duty, or power as against Franchisee, or as to subsequent breach or default by Franchisee.  Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding or succeeding breach by Franchisee of any terms, provisions, covenants, or conditions of this Agreement.

20. <u>NOTICES</u>

All notices and other communications required or permitted under this Agreement will be in writing and will be given by one of the following methods of delivery: (i) personally; (ii) by certified or registered mail, postage prepaid; (iii) by overnight delivery service; or (iv) if to Franchisee, by email if an email address is designated on the Summary Page.  Notices to Franchisee will be sent to the address set forth on the Summary Page.  Notices to Franchisor must be sent to:

> KOALA FRANCHISE, LLC
> 445 West Drive
> Melbourne, FL 32904
> Attention:  General Counsel

Either party may change its mailing address by giving notice to the other party.  Notices will be deemed received the same day when delivered personally or upon actual or attempted delivery when sent by registered or certified mail or overnight delivery service.

21. <u>ENTIRE AGREEMENT AND AMENDMENT</u>

This Agreement and all exhibits to this Agreement, constitute the entire agreement between the parties. This Agreement supersedes any and all prior negotiations, understandings representations and agreements. No representations have induced You to execute this Agreement with Franchisor. Except for those permitted to be made

unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require You to waive reliance on any representation that Franchisor made in the most recent disclosure document (including its exhibits and amendments) (the "FDD") that Franchisor delivered to You or Your representative, subject to any agreed-upon changes to the contract terms and conditions described in that disclosure document and reflected in this Agreement (including any riders or addenda signed at the same time as this Agreement).

You acknowledge that you are entering into this Agreement as a result of your own independent investigation and not as a result of any representations (with the exception of those representations made in the FDD) made by Franchisor, its members, managers, officers, directors, employees, agents, representatives or independent contractors that are contrary to the terms set forth in this Agreement. You acknowledge that the FDD you received contained a copy of this Franchise Agreement and that you reviewed the FDD and Franchise Agreement at least fourteen (14) days (or such other time as applicable law requires) before you signed this Agreement. You further understand acknowledge and agree that any information you obtain from any Franchisor's franchisee, including relating to their sales, profit, cash flows, and/or expenses, does not constitute information obtained from Franchisor, nor does Franchisor make any representation as to the accuracy of any such information.

22.    SEVERABILITY AND CONSTRUCTION

**22.1.**  Severability.  If any of the provisions of this Agreement may be construed in more than one way, one of which would render the provision illegal or otherwise voidable or unenforceable, such provision shall have the meaning which renders it valid and enforceable.  The language of all provisions of this Agreement shall be construed according to its fair meaning and not strictly against any party.  In the event any court or other government authority shall determine any provision in this Agreement is not enforceable as written, the parties agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws and public policies of the jurisdiction in which enforcement is sought and affords the parties the same basic rights and obligations and has the same economic effect.  If any provision in this Agreement is held invalid or otherwise unenforceable by any court or other government authority or in any arbitration proceeding, such findings shall not invalidate the remainder of this Agreement unless in the reasonable opinion of Franchisor the effect of such determination has the effect of frustrating the purpose of this Agreement, whereupon Franchisor shall have the right by notice in writing to the other party to immediately terminate this Agreement.

**22.2.**  No Other Rights.  Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or entity other than Franchisee, Franchisor, and such of Franchisee's and

Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted by **Article 12**), any rights or remedies under or by reason of this Agreement.

**22.3.** <u>Enforceability of Covenants</u>.  Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

**22.4.** <u>Construction</u>.  All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

**22.5.** <u>Importance of Timely Performance</u>.  Time is of the essence in this Agreement.

**22.6.** <u>Survival of Provisions</u>.  All provisions of this Agreement which, by their terms or intent, are designed to survive the expiration or termination of this Agreement, shall so survive the expiration and/or termination of this Agreement.

**22.7.** <u>Additional Terms; Inconsistent Terms</u>.  The parties may provide additional terms by including the terms on the Summary Page.  To the extent that any provisions of the Summary Page are in direct conflict with the provisions of this Agreement, the provisions of the Summary Page shall control.

23.    <u>APPLICABLE LAW AND DISPUTE RESOLUTION</u>

**23.1.** <u>Governing Law</u>.  This Agreement takes effect upon its acceptance and execution by Franchisor, and shall be interpreted and construed exclusively under the laws of the State of Florida, which laws shall prevail in the event of any conflict of law (without regard to, and without giving effect to, the application of Florida choice-of-law rules).  Nothing in this **Section 23.1** is intended by the parties to subject this Agreement to any franchise, business opportunity, consumer protection, or similar law, rule, or regulation of the State of Florida to which this Agreement would not otherwise be subject.

**23.2.** <u>Arbitration</u>.

**23.2.1.**    <u>Disputes Subject to Arbitration</u>. Except as expressly provided to the contrary in this Agreement, any controversy or claim arising out of or relating to this Agreement or the relationship of the parties shall be settled by arbitration administered by the American Arbitration Association (the **"AAA"**) in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction. Any

dispute as to whether this arbitration clause applies or whether any particular claim is subject to arbitration shall be decided by arbitration in accordance with this Article 23.

**23.2.2.** <u>Arbitration Claims</u>. The parties agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. The parties further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is waived and forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either party. The parties agree that arbitration will be conducted on an individual basis, that neither party shall pursue class claims nor multi-plaintiff actions, and that an arbitration proceeding between Franchisor and its affiliates, or any of them, on the one hand, and Franchisee and its affiliates and any of their respective officers, directors, managers, agents, representatives, employees, successors and assigns, on the other hand, may not be consolidated with any other arbitration proceeding to which Franchisor and/or its affiliates are a party. Notwithstanding the foregoing, if any court determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section, then the parties agree that this arbitration clause shall not apply to that dispute and that such dispute shall be resolved in a judicial proceeding. For purposes of this Section, Franchisor and its affiliates includes their respective shareholders, partners, members and other owners, officers, directors, managers, agents, representatives, employees, successors and assigns.

**23.2.3.** <u>Location</u>. The place of arbitration shall be the AAA office located nearest to Franchisor's principal place of business on the date the arbitration action is filed.

**23.2.4.** <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration will be confidential, except as required by law or as required for Franchisor to comply with laws and regulations applicable to the sale of franchises.

**23.2.5.** <u>Performance During Arbitration</u>. Franchisor and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration process.

**23.3.** <u>Venue</u>. For any matter which is not subject to the arbitration provisions of **Section 23.2**, each party hereto consents to personal jurisdiction in the federal or state courts located in the county in which Franchisor's principal place of business is located at the time that the action commences. Franchisee and its Principals hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.

**23.4.** <u>No Exclusive Remedies</u>.  No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

**23.5.** <u>Injunctive Relief</u>.  Notwithstanding anything contained herein, Franchisor reserves the right to seek and obtain temporary restraining orders or other emergency temporary or preliminary equitable injunctive relief and file actions to collect royalties and other amounts owed by Franchisee to Franchisor (collection actions) from federal or state courts located in the state in which the Franchise is located.  The parties acknowledge and agree that the rights of Franchisor under this Agreement with respect to the use of the Marks and the System and the enforcement of the in-term and post-term noncompetition covenants of Franchisor are of a specialized and unique nature and that immediate and irreparable damage will result to Franchisor if Franchisee fails or refuses to perform obligations under this Agreement, and, notwithstanding any election by Franchisor to claim damages from Franchisee as a result of such failure or refusal, Franchisor may, in addition to any other remedies and damages available, seek an injunction in any court of competent jurisdiction to restrain such failure or refusal.

**23.6.** <u>Waiver of Jury Trial</u>.  Franchisor and Franchisee irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action or proceeding.

**23.7.** <u>Limitation of Actions</u>.  Any and all claims and actions arising out of or relating to this agreement, the relationship of Franchisee and franchisor, or Franchisee's operation of the Franchise (including any defenses or any claims of set-off or recoupment) must be brought or asserted before the expiration of the earlier of (a) the time period for bringing an action under any applicable state or federal statute of limitations; (b) one  year after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim; or (c) two years after the first act or omission giving rise to an alleged claim; or it is expressly acknowledged and agreed by all parties that such claims or actions shall be irrevocably barred.  Claims of franchisor attributable to underreporting of sales, and claims of the parties for failure to pay monies owed and/or indemnification shall be subject only to the applicable state or federal statute of limitations.

**23.8.** <u>Limitation on Damages</u>.  Franchisor and Franchisee hereby waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other, and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.  In any action arising out of or relating to this Agreement or the relationship of the parties, in no event shall Franchisor be liable to Franchisee for more than the total Initial Franchise Fee.

**23.9.** <u>Costs and Attorneys' Fees</u>.  If either Franchisor or Franchisee seeks to enforce this Agreement in an arbitration or a judicial or other proceeding, the

prevailing party shall be entitled to recover its reasonable costs and expenses (including attorneys' fees, attorneys' assistants' fees, accountants' fees, expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel, room and board, salaries and benefits of those employees participating in such proceeding) incurred in connection with such judicial or other proceeding.

24.   ACKNOWLEDGMENTS

**24.1.**  Acknowledgments.   Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, recognizes that the business venture contemplated by this Agreement involves business risks, and that its success will be largely dependent upon the ability of Franchisee and, if an entity, its owners as independent businesspersons.  Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received from Franchisor or any employee, representative or other party purporting to act on Franchisee's behalf, any warranty, promise or guarantee, express or implied, as to the potential sales volume, profits, or success of the business venture contemplated by this Agreement.

**24.2.**  Receipt of Documents.   Franchisee acknowledges that it received a copy of this Agreement, the exhibit(s) hereto, and agreements relating hereto, if any, with all of the blank lines therein filled in, prior to the date on which this Agreement was executed, and with sufficient time within which to review this Agreement, with advisors of its choosing.  Franchisee further acknowledges that it received the franchise disclosure document required by the Federal Trade Commission's Franchise Rule at least 14 days prior to the date on which this Agreement was executed.

**24.3.**  Representations and Warranties.  Franchisee and its Principals represent and warrant to Franchisor that:  (a) neither Franchisee nor any of its Principals have made any untrue statement of any material fact nor omitted to state any material fact in obtaining the rights granted herein; (b) neither Franchisee nor any of its Principals have any direct or indirect legal or beneficial interest in any business that may be deemed a Competitive Business, except as otherwise completely and accurately disclosed in its franchise application materials; and (c) Franchisee and its Principals have a legal right to own and operate the Franchise. Franchisee recognizes that Franchisor approved Franchisee in reliance on all of the statements Franchisee and its Principals have made in connection therewith, and that Franchisee has a continuing obligation to advise Franchisor of any material changes in these statements and representations made to Franchisor in this Agreement or in the franchise application.

**24.4.**  Compliance with Executive Order 13224.   Under applicable U.S. law, including, without limitation, Executive Order 13224, signed on September 23, 2001 (**"Order"**), Franchisor is prohibited from engaging in any transaction with any person engaged in, or with a person aiding any person engaged in, acts of terrorism, as defined in the Order.  Accordingly, Franchisee represents and

warrants to us that, as of the date of this Agreement, neither Franchisee nor any person holding any ownership interest in you, controlled by you, or under common control with Franchisee is designated under the Order as a person with whom business may not be transacted by Franchisor, and that Franchisee: (a) does not, and hereafter will not, engage in any terrorist activity; (b) are not affiliated with and do not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and (c) are not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity.

**24.5.** <u>No Other Obligations</u>.  Each party represents and warrants to the others that there are no other agreements, court orders, or any other legal obligations that would preclude or in any manner restrict such party from: (a) negotiating and entering into this Agreement; (b) exercising its rights under this Agreement; and/or (c) fulfilling its responsibilities under this Agreement.

**24.6.** <u>No Other Representations</u>.  Franchisee acknowledges Franchisor has not (and shall not be deemed to have) given any representation, promise, or guarantee of Franchisee's success.

**24.7.** <u>Business Judgment</u>.  Franchisee understands and agrees that Franchisor may operate and change the System and its business in any manner that is not expressly and specifically prohibited by this Agreement.  Whenever Franchisor has expressly reserved in this Agreement or is deemed to have a right and/or discretion to take or withhold an action, or to grant or decline to grant Franchisee a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement, Franchisor may make such decision or exercise its right and/or discretion on the basis of Franchisor's judgment of what is in Franchisor's best interests, including without limitation Franchisor's judgment of what is in the best interests of the franchise network, at the time Franchisor's decision is made or its right or discretion is exercised, without regard to whether: (a) other reasonable alternative decisions or actions, or even arguably preferable alternative decisions or actions, could have been made by Franchisor; (b) Franchisor's decision or the action taken promotes Franchisor's financial or other individual interest; (c) Franchisor's decision or the action it takes applies differently to Franchisee and one or more other franchisees or Franchisor's company-owned or affiliate-owned operations; or (d) Franchisor's decision or the exercise of its right or discretion is adverse to Franchisee's interests.   In the absence of an applicable statute, Franchisor will have no liability to Franchisee for any such decision or action.  Franchisor and Franchisee intend that the exercise of Franchisor's right or discretion will not be subject to limitation or review.  If applicable law implies a covenant of good faith and fair dealing in this Agreement, Franchisor and Franchisee agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants Franchisor the right to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisee's rights and obligations hereunder.

**24.8.** <u>Consultation</u>.  Franchisee acknowledges that it has read and understands this Agreement, the exhibits hereto, and agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors (including attorneys) of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**
**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Agreement on the day and year first above written.

KOALA FRANCHISE, LLC

By: _Scott Marr_____

Name: Scott Marr

Title: CEO

Lotus & The Rooster Holdings Company

By: _____

Name: Salim Michel Makhlouf

Title:   CEO

EXHIBIT A TO THE FRANCHISE AGREEMENT

TRADEMARKS

| Mark | Registration Number | Registration Date |
|---|---|---|
| **KOALA INSULATION** | 6006546 | March 10, 2020 |
|  | 6007883 | March 10, 2020 |
|  | 6173027 | October 13, 2020 |
| **Delivering Efficiency. Improving Comfort.** | 6079379 | March 31, 2020 |

1

© COPYRIGHT 2021 KOALA FRANCHISE, LLC.  ALL RIGHTS RESERVED.
COMMERCIAL SALE PROHIBITED WITHOUT EXPRESS WRITTEN PERMISSION OF KOALA FRANCHISE, LLC.

## EXHIBIT B TO THE FRANCHISE AGREEMENT

LEASE RIDER TO LEASE AGREEMENT DATED _____

BY AND BETWEEN

_____, AS "LANDLORD"

AND

_____, AS "TENANT" FOR
THE DEMISED PREMISES ("PREMISES") DESCRIBED THEREIN

This Rider and the provisions hereof are hereby incorporated into the body of the lease to which this Rider is attached (the "Lease"), and the provisions hereof shall be cumulative of those set forth in the Lease, but to the extent of any conflict between any provisions of this Rider and the provisions of the Lease, this Rider shall govern and control.

1.      Consent to Collateral Assignment to Franchisor. If Franchisor takes possession of the Premises and confirms to Landlord that Franchisor has assumed the Lease as tenant thereunder, Landlord will recognize Franchisor as tenant under the Lease.  Landlord agrees that in such event Franchisor may further assign the Lease to or enter into a sublease with a person or entity who agrees to assume the tenant's obligations under the Lease and is reasonably acceptable to Landlord and that, upon that assignment, Franchisor will have no further liability or obligation under the Lease as assignee, tenant or otherwise, other than to certify that the additional assignee or sublessee operates the Premises as a Franchise.

2.      Use of Premises.   Without limitation of uses permitted under the Lease, but in expansion thereof, the Premises may be used for the purpose of operation of a Koala Insulation Franchise offering insulation installation, removal, evaluation and related services.

3.      Compliance of Premises With Applicable Law.  Landlord represents and warrants that as of the date hereof the Premises are in compliance with all applicable law.

4.      Notice and Cure Rights to Franchisor.  Prior to exercising any remedies under the Lease (except in the event of imminent danger to the Premises), Landlord shall give Franchisor written notice of any default thereunder by Tenant, and commencing upon receipt thereof by Franchisor, Franchisor shall have the same length cure period as is given to Tenant under the Lease for such default, provided that in no event shall Franchisor have a cure period of less than (i) 10 days after Franchisor's receipt of such notice as to monetary defaults or (ii) 30 days after Franchisor's receipt of such notice as to non-monetary defaults.  Landlord agrees to accept cure tendered by Franchisor as if

2

the same was tendered by Tenant, but Franchisor has no obligation to cure such default. The initial address for notices to Franchisor is as follows:

> KOALA FRANCHISE, LLC
> 445 West Drive
> Melbourne, FL 32904
> Attention:  General Counsel

5.    <u>Non-disturbance from Mortgage Lenders</u>. It is a condition of the Lease being subordinated to any mortgage, deed of trust, deed to secure debt or similar encumbrance on the Premises that the holder of such encumbrance agree not to disturb Tenant's rights under the Lease or Tenant's possession of the Premises, so long as Tenant is not in default of its obligations under the Lease beyond any applicable grace or cure period provided therein.

*CHECK THE FOLLOWING PARAGRAPH THAT APPLIES. CHECK ONLY ONE.  IF NONE IS CHECKED, THEN CLAUSE a) BELOW WILL BE APPLICABLE, AND CLAUSE b) BELOW WILL BE DEEMED DELETED*

a)    ☐    Landlord represents and warrants that on the date hereof no mortgage, deed of trust, deed to secure debt or similar encumbrance encumbers the Premises.

b)    ☐    A mortgage, deed of trust or deed to secure debt currently encumbers the Premises.  It is a condition precedent to Tenant's obligations under the Lease that the holder of such encumbrance enter into a written recordable form subordination and non-disturbance agreement with Tenant, in a form reasonably acceptable to Tenant, as described above.

6.    <u>Third Party Beneficiary</u>.  For so long as Franchisor holds a collateral assignment of the Lease, Franchisor is a third party beneficiary of the Lease.

7.    <u>Franchisor Right to Enter</u>.  Upon the expiration or earlier termination of the Lease or the Franchise Agreement, Franchisor or its designee may enter upon the Premises for the purpose of removing all signs and other material bearing the Koala name or trademarks, service marks or other commercial symbols of Franchisor.

 AGREED and executed and delivered under seal by the parties hereto as of the day and year of the Lease.

LANDLORD:                          TENANT:

_____          _____


By:                               By:

_____          _____
_____          _____
                                  _____
Name:                             Name:

_____          _____
_____          _____
                                  _____
Title:                            Title:

_____          _____
_____          _____
_____          _____

# EXHIBIT C TO THE FRANCHISE AGREEMENT

## GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to KOALA FRANCHISE, LLC, a Florida limited liability company ("Franchisor") to execute the Franchise Agreement between Franchisor and Lotus & The Rooster Holdings Company, a corporation in Pennsylvania ("Franchisee"), dated 3/15/2022 | 2:42 EDT , (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and Franchisor's successors and assigns that all of Franchisee's monetary and other obligations under the Agreement will be punctually paid and performed.

Each of the undersigned has had the opportunity to review the Agreement, and understands his or her obligations hereunder and thereunder.

Upon demand by Franchisor, the undersigned each hereby jointly and severally agree to immediately make each payment required of Franchisee under the Agreement and waive any right to require Franchisor to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee; or (d) give notice of demand for payment by Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee, and the undersigned each hereby jointly and severally waive notice of same and agree to remain and be bound by any and all such amendments and changes to the Agreement.

The undersigned each hereby jointly and severally agree to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorney's fees, reasonable costs of financial and other investigation, court costs, and fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned each hereby jointly and severally acknowledge and expressly agree to be individually bound by all of the covenants contained in Sections 8, 12, 14, 15 and 17.4 of the Agreement, and acknowledge and agree that this Guarantee does not grant the undersigned any right to use the "Koala" marks or system licensed to Franchisee under the Agreement. Each of the undersigned represents that he or she has received a copy of the Franchise Agreement and understands his or her obligations hereunder and thereunder.

Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

If Franchisor is required to enforce this Guarantee in a judicial or arbitration proceeding, and prevails in such proceeding, Franchisor shall be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, travel and room and board expenses, salaries and benefits of those of Franchisor's employee's participating in such proceeding, whether incurred prior to, in

preparation for, or in contemplation of the filing of any such proceeding. If Franchisor is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guarantee, the undersigned shall reimburse Franchisor for any of the above-listed costs and expenses Franchisor incurs.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Sections 22 and 23 of the Agreement. This Guarantee shall be interpreted and construed under the laws of the State of Florida. In the event of any conflict of law, the laws of the State of Florida shall prevail (without regard to, and without giving effect to, the application of Florida conflict of law rules). Jurisdiction and venue shall be in the state or federal courts located nearest Franchisor's principal place of business at the time that the action is commenced, and the undersigned hereby waives any objection to such jurisdiction and venue. The arbitration provisions of Section 23 of the Agreement shall apply to this Guaranty.

Non-Owner Spousal Guarantee. If this Guarantee is executed by a spouse (or domestic partner or immediate family member) of the owner of a franchisee entity and such person has no equity or ownership in the franchisee entity or franchise then this Guarantee shall only be enforceable against such non-owner spouse in the event that they receive a material transfer of assets from the spouse (or domestic partner or immediate family member) who has the ownership interest in the franchise or franchisee entity. This section is intended to ensure that one spouse cannot avoid liability under their guarantee by simply transferring assets to the other spouse.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

GUARANTOR(S)

Signed: _____
(In his/her individual capacity)
Name: Salim Michel Makhlouf
Address: 251 S Pitt St, Carlisle, PA 17013

## EXHIBIT D TO THE FRANCHISE AGREEMENT

## NON-DISCLOSURE AND NON-COMPETITION AGREEMENT

**THIS AGREEMENT** ("**Agreement**") is made this _____ 3/15/2022 | 2:42 EDT, by and Between Lotus & The Rooster Holdings Company (the "**Franchisee**"), and Salim Michel Makhlouf, who is a principal, manager, supervisor, member, partner, or a person in a managerial position with, Franchisee (the "**Member**").

BACKGROUND:

A.      Koala Franchise, LLC, a Florida limited liability company ("**Franchisor**") owns a format and system (the "**System**") relating to the establishment, development and operation of an insulation and related services business that operate under the name "Koala Insulation" (or other names designated by Franchisor, the "**Marks**") and such additional or alternate services and/or products as Franchisor may designate from time to time (each a "**Franchise**").

B.      Franchisor and Franchisee have executed a Franchise Agreement ("**Franchise Agreement**") granting Franchisee the right to operate a Franchise (the "**Franchise**") and to produce and distribute products and services approved by Franchisor and use the Marks in connection therewith under the terms and conditions of the Franchise Agreement;

C.      The Member, by virtue of his or her position with Franchisee, will gain access to certain of Franchisor's Confidential Information, as defined herein, and must therefore be bound by the same confidentiality and non-competition agreement that Franchisee is bound by.

**IN CONSIDERATION** of these premises, the conditions stated herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.      <u>Confidential Information</u>. Member shall not, during the term of the Franchise Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity, persons, partnership, entity, association, or corporation any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised thereunder which may be communicated to Member or of which Member may be apprised by virtue of Franchisee's operation under the terms of the Franchise Agreement. Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others.

2.      Covenants Not to Compete.

(a)      Member specifically acknowledges that, pursuant to the Franchise Agreement, and by virtue of its position with Franchisee, Member will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.

(b)      Member covenants and agrees that during the term of Member's employment with, or ownership interest in, Franchisee, and except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity:

(i)      Divert or attempt to divert any business or customer of the Franchise or of any other System franchisee or unit operated by Franchisor (or an affiliate of Franchisor) to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and/or the System;

(ii)      Employ or seek to employ any person who is at that time employed by Franchisor or Franchisee, or otherwise directly or indirectly induce such person to leave his or her employment; or

(iii)      Own, maintain, operate, engage in, be employed by, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services.

(c)      Member covenants and agrees that during the Post-Term Period (defined below), except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity, own, maintain, operate, engage in, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services and which business is, or is intended to be, located: (a) at the Franchise location or within a 100 mile radius of the Territory of the Franchise, which Territory includes the areas defined by the Summary Page of the Franchise Agreement and any amendments thereto; or (b) within a 100 mile radius of the territory any other System franchisee or Koala Insulation business owned by Franchisor or its affiliate at the time that the obligations under this **Section 2(c)** commence;

(d)      As used in this Agreement, the term **"Post-Term Period"** shall mean a continuous uninterrupted period of two years from the date of: (a) a transfer permitted under **Section 12** of the Franchise Agreement with respect to Member; and/or (b) termination of Member's employment with, and/or ownership interest in, Franchisee.

3.      Injunctive Relief. Member acknowledges that any failure to comply with the requirements of this Agreement will cause Franchisor irreparable injury, and Member agrees

to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this Agreement.

4.    Severability. All agreements and covenants contained herein are severable. If all or any portion of the covenants in this Agreement is held to be unenforceable or unreasonable by any court, then it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

5.    Delay. No delay or failure by Franchisor or the Franchisee to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right provided herein, and no waiver of any violation of any terms and provisions of this Agreement shall be construed as a waiver of any succeeding violation of the same or any other provision of this Agreement.

6.    Third-Party Beneficiary. Member hereby acknowledges and agrees that Franchisor is an intended third-party beneficiary of this Agreement with the right to enforce it, independently or jointly with Franchisee.

**IN WITNESS WHEREOF**, Franchisee and the Member attest that each has read and understands the terms of this Agreement, and voluntarily signed this Agreement on this__ day of_____.

3/15/2022 | 2:42 EDT

**FRANCHISEE:**                              **MEMBER:**

**Lotus & The Rooster Holdings Company**                          **Salim Michel Makhlouf**

Signature:_____        Signature:_____

**Salim Michel Makhlouf,**  CEO

# EXHIBIT E TO THE FRANCHISE AGREEMENT

## EQUIPMENT SALES AGREEMENT

THIS EQUIPMENT SALES AGREEMENT is made on _____, 2021, by KOALA FRANCHISE LLC, a Florida limited liability company (hereinafter known as "Seller") and [Franchisee], a _____ (hereinafter known as "Buyer").  Buyer and Seller shall collectively be known herein as "the Parties".

### BACKGROUND

WHEREAS, Seller desires to sell the equipment described below, known herein as the "Acquired Equipment", under the terms and conditions set forth below;

WHEREAS, Buyer desires to purchase the Acquired Equipment offered for sale by Seller under the terms and conditions set forth below; and, therefore,

### TERMS AND CONDITIONS

IN CONSIDERATION of the mutual promises and other valuable consideration exchanged by the Parties as set forth herein, the Parties, intending to be legally bound, hereby agree as follows:

**1.  Description of Acquired Equipment.**

The following vehicle (and all equipment within or attached to such vehicle):

2. **Purchase Price.** The total purchase price to be paid by Buyer to Seller for the Acquired Equipment is _____ ("Purchase Price").

Payment is to be made by Buyer to Seller in cash, by certified funds, financed under the terms of a commercial finance agreement, or through another instrument acceptable to Seller. Buyer must receive permission in advance from Seller for use of a non-certified funds in payment of the Purchase Price.


3. Delivery of Acquired Equipment and Conveyance of Title.

(a). <u>Delivery of Acquired Vehicle</u>. Seller shall deliver the Acquired Equipment, and Buyer shall take possession of same, at Seller's premises or other premises as designated by Seller (either in person or through a third party) on or before that date that is within 10 days of the date hereof ("Delivery Date"). If delivery is to be made at a date after the execution of this contract, it is Seller's duty to ensure that the Acquired Equipment is delivered in the same condition as when last inspected by the Buyer (or, if no Buyer inspection, the execution date of this agreement). It is Buyer's duty, either in person or through a third party to appear at Seller's premises during standard business hours on or before the Delivery Date to remove the Acquired Equipment from Seller's premises. However, if Buyer fails to appear at Seller's premises on or before the Delivery Date to accept possession of the Acquired Equipment, then risk of loss passes to the Buyer on the Delivery Date.

(b). <u>Conveyance of Title</u>. Seller shall convey title to Buyer upon delivery of the equipment to

Buyer, which shall not occur until payment is made in full. Seller agrees and covenants to execute all documents presented by Buyer which are necessary to finalize transfer of title and registration upon the Acquired Equipment to Buyer.

**4. Representations, Warranties, and Disclosures.**

(a) Warranties.

THIS EQUIPMENT IS SOLD "AS IS", AND SELLER DOES NOT IN ANY WAY, OTHER THAN PARAGRAPH A §§ 1-7 ABOVE, EXPRESSLY OR IMPLIEDLY, GIVE ANY WARRANTIES TO BUYER. SELLER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE.

_____
Buyer Initials

(b) Odometer Declaration. Seller hereby states that the odometer in the Acquired Equipment (if such equipment has an odometer) now reads as indicated above and, to the best of Seller's knowledge, it reflects the actual mileage of the equipment described herein.

**(c) Buyer Representation**. The individual signing this agreement on behalf of Buyer hereby represents to Seller that he or she has the power and authority to do so on behalf of Buyer.

**5. Buyer's Responsibility – Insurance, Tags and Inspections.** Buyer acknowledges that unless prohibited by applicable law, any insurance coverage, license, tags, plates or registration maintained by Seller on the Acquired Equipment shall be canceled upon delivery of the Acquired Equipment to, and the acceptance of, by Buyer. Buyer shall inspect and test all equipment and vehicles delivered under this agreement including the inspection of all workmanship performed by installation contractors, vehicle outfitters and other parties that performed any work on the conveyed equipment and vehicle. Buyer accepts full responsibility for the condition, effectiveness, appropriateness, and use of the conveyed equipment and vehicle. Buyer must inform Seller of any discovered problems or inspection failure prior to taking delivery of vehicle, and provide Seller at least 7 days to cure any flaw, at Seller's own expense. Upon acceptance of delivery, Buyer acknowledges compliance with these requirements and waives all rights of claim against Seller and agrees to indemnify Seller against all claims resulting from the ownership or use of conveyed equipment and vehicles. Buyer agrees to ensure through due diligence and through its own inspection, assisted by professionals as it sees fit, that all equipment and vehicles comply with all applicable laws, regulations and rules including any weight and engineering requirements.

_____
Buyer Initials

**6. Continuation of Representations and Warranties**. All representations and warranties contained in this Agreement (if any) shall continue in full force and effect after execution of this agreement. If either party later learns that a warranty or representation that it made is untrue, it is under a duty to promptly disclose this information to the other party in writing. No representation or warranty contained herein shall be deemed to have been waived or impaired by any investigation made by or knowledge of the other party to this Agreement.

**7. Indemnification of Attorneys' Fees and out-of-pocket costs.** Should any party materially breach this agreement (including representations and warranties made to the other side), the non-breaching party shall be indemnified by the breaching party for its reasonable

DocuSign Envelope ID: 815543D5-680E-4668-8CF9-96A9F3875CB9

attorneys' fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach of this contract (including the breach of representations or warranties). This provision shall not limit in any way the remedies either party may have otherwise possessed in law or equity relative to a breach of this contract. The term "out- of-pocket costs", as used in this contract, shall not include lost profits.

**8. Severability**. In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

9. Modification. Except as otherwise provided in this document, this agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.

**10. Acknowledgements**. Each party acknowledges that he or she has had an adequate opportunity to read and study this Agreement, to consider it, to consult with attorneys if he or she has so desired.

**11. Exclusive Jurisdiction for Suit in Case of Breach**. The Parties, by entering into this agreement, submit to jurisdiction in Melbourne, Florida for adjudication of any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts which have jurisdiction over Melbourne, Florida shall have **exclusive** jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sound in contract, tort, or other areas of the law.

12. State Law. This Agreement shall be interpreted under, and governed by, the laws of the state of Florida.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, Seller and Buyer affix their signatures hereto.


SELLER

By: _____

Name: _____ Authorized Officer for Seller

Date: _____, 2021


BUYER


By: _____

Name: _____ Authorized Officer for Buyer

Date: _____, 2021

## EXHIBIT E
## FRANCHISEE DISCLOSURE QUESTIONNAIRE

### FRANCHISEE DISCLOSURE QUESTIONNAIRE

Koala Franchise, LLC ("we", "us", or "our") and you are preparing to enter into a franchise agreement for the operation of a Koala Insulation Franchise. The purpose of this Questionnaire is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading and to be certain that you understand the limitations on legal claims you may make by reason of the purchase and operation of your franchise.  Please review each of the following questions carefully and provide honest responses to each question.

| | | | |
|---|---|---|---|
| 1. | Yes __X__ | No ____ | Have you received and personally reviewed the Franchise Agreement and each attachment or schedule attached to it? |
| 2. | Yes __X__ | No ____ | Have you received and personally reviewed the Franchise Disclosure Document we provided |
| 3. | Yes __X__ | No ____ | Did you sign a receipt for the Franchise Disclosure Document indicating the date you received it? |
| 4. | Yes __X__ | No ____ | Do you understand all the information contained in the Franchise Disclosure Document and Franchise Agreement? |
| 5. | Yes __X__ | No ____ | Have you reviewed the Franchise Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor or have you had the opportunity for such review and chosen not to engage such professionals? |
| 6. | Yes __X__ | No ____ | Have you discussed the benefits and risks of developing and operating a Koala Insulation Business with an existing Koala Insulation franchisee? |
| 7. | Yes __X__ | No ____ | Do you understand the risks of developing and operating a Koala Insulation Business? |
| 8. | Yes __X__ | No ____ | Do you understand the success or failure of your franchise will depend in large part upon your skills, abilities and efforts and those of the persons you employ as well as many factors beyond your control such as competition, interest rates, the economy, inflation, labor, and supply costs, and other relevant factors? |
| 9. | Yes __X__ | No ____ | Do you understand all disputes or claims you may have arising out of or relating to the Franchise Agreement must be litigated, mediated, and/or arbitrated in Florida, if not resolved informally or by mediation? |

10.  Yes __X__    No ____    Do you understand that you must satisfactorily complete the initial training course before we will allow your Business to open or consent to a transfer?

11.  Yes __X__    No ____    Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a Koala Insulation Business, that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

12.  Yes __X__    No ____    Do you agree that no employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

13.  Yes __X__    No ____    Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue a Koala Insulation Business will generate, that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

14.  Yes __X__    No ____    Do you understand that the Franchise Agreement and attachments to the Franchise Agreement contain the entire agreement between us and you concerning the franchise for the Koala Insulation Business, meaning any prior oral or written statements not set out in the Franchise Agreement or the attachments to the Franchise Agreement will not be binding?

15.  Yes __X__    No ____    Do you understand that we are relying on your answers to this questionnaire to ensure that the franchise sale was made in compliance of state and federal laws?

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.

## EXPLANATION OF ANY NEGATIVE RESPONSE
### (REFER TO QUESTION NUMBER)

| Questionnaire Number | Explanation of Negative Response |
|---|---|
|  |  |
|  |  |

**Do not sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document. Sign and date this Questionnaire the day you sign the Franchise Agreement and pay your franchise fee.**

FRANCHISEE:  Lotus & The Rooster Holdings Company

Signature: _____

Print Name: Salim Michel Makhlouf,    CEO

Date: 3/14/2022 | 1:50 PDT _____

SPECIAL NOTE FOR RESIDENTS OF THE STATE OF MARYLAND AND FRANCHISED BUSINESSES LOCATED IN MARYLAND:  Nothing in this Questionnaire will act as a release, estoppel, or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

# EXHIBIT F

## GENERAL RELEASE

This General Release ("Release") is executed by the undersigned ("Releasor") in favor of Koala Franchise, LLC., a Florida Limited Liability Company ("Franchisor").

**Background Statement**: Releasor wishes to dispose of all outstanding liabilities against Released Parties.

Releasor agrees as follows:

1.    **Release.** Releasor (on behalf of itself and its parents, subsidiaries and affiliates and their respective past and present officers, directors, shareholders, managers, members, partners, agents, and employees (collectively, the "Releasing Parties") hereby release Franchisor, its parent(s), affiliates, and each of their respective directors, officers, shareholders, members, employees, and agents (collectively, the "Released Parties") from any and all claims, causes of action, suits, debts, agreements, promises, demands, liabilities, contractual rights and/or obligations, of whatever nature, known or unknown, which any Releasing Party now has or ever had against any Released Party based upon and/or arising out of events that occurred through the date hereof, including without limitation, anything arising out of the Franchise Agreement (collectively, "Claims").

2.    **Covenant Not to Sue.** Releasor (on behalf of all Releasing Parties) covenant not to initiate, prosecute, encourage, assist, or (except as required by law) participate in any civil, criminal, or administrative proceeding or investigation in any court, agency, or other forum, either affirmatively or by way of cross-claim, defense, or counterclaim, against any Released Party with respect to any Claim.

3.    **Representations and Acknowledgments.** Releasor represents and warrants that: (i) Releasor is the sole owners of all Claims, and that no Releasing Party has assigned or transferred, or purported to assign or transfer, to any person or entity, any Claim; (ii) Releasor has full power and authority to sign this Release; and (iii) this Release has been voluntarily and knowingly signed after Releasor has had the opportunity to consult with counsel of Releasor's choice. Releasor acknowledges that the release in Section 1 is a complete defense to any Claim.

4.    **Miscellaneous.** If any of the provisions of this Release are held invalid for any reason, the remainder of this Release will not be affected and will remain in full force and effect. In the event of any dispute concerning this Release, the dispute resolution, governing law, and venue provisions of the Franchise Agreement shall apply. Releasor agrees to take any actions and sign any documents that Franchisor reasonably requests to effectuate the purposes of this Release. This Release contains the entire agreement of the parties concerning the subject matter hereof.

Executed by:

Date:  3/14/2022 | 1:50 PDT

Name: Salim Michel Makhlouf, Personally

*[notary acknowledgement to follow]*

GL20191204                                    16                          Koala Franchise, LLC
                                                                          FDD 2021.1

DocuSign Envelope ID: 815543D5-680F-4668-8CE9-96A9F3875C59

# EXHIBIT G
## STATE SPECIFIC ADDENDA AND RIDERS

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU**.

Each of the following provisions is void and unenforceable if contained in any documents relating to a franchise:

1. A prohibition on the right of a franchisee to join an association of franchisees.

2. A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

3. A provision that permits a franchisor to terminate a franchise before the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

4. A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchise's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

5. A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

6. A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

DocuSign Envelope ID: 815543D5-680E-4668-8CF9-96A9F3875C99

7. A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(a) The failure of the proposed transferee to meet the franchisor's then-current reasonable qualifications or standards.

(b) The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(c) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(d) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

8. A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in Section 3.

9. A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000.00, the franchisee may request the franchisor to arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations, if any, of the franchisor to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.

Any questions regarding this notice should be directed to:

Michigan Department of Attorney General

G. Mennen Williams Building,

7th Floor 525 W. Ottawa St.

P.O. Box 30212

Lansing, MI 48909

(517) 373-7117

## ILLINOIS ADDENDUM TO THE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT

Illinois law governs the Franchise Agreement.

In conformance with Section 4 of the Illinois Franchise Disclosure Act, any provision in a franchise agreement that designates jurisdiction and venue in a forum outside of the State of Illinois is void. However, arbitration may take place outside of Illinois.

Franchisees' rights upon Termination and Non-Renewal are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

In conformance with section 41 of the Illinois Franchise Disclosure Act, any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with Illinois Franchise Disclosure Act **or any other law of Illinois** is void.

# EXHIBIT I
## SMALL BUSINESS ADMINISTRATION ADDENDUM



**ADDENDUM TO** _Franchise_          ◉ ¹ **AGREEMENT**

**THIS ADDENDUM** ("Addendum") is made and entered into on _____, 20____, by and

between  Koala Franchise, LLC                                              ("Franchisor    ◉ "),

located at  445 West Drive, Melbourne, FL 32904                              , and

_____ ("Franchisee    ◉ "),

located at _____.

_Franchisor_      and  _Franchisee_      entered into a  _Franchise_      Agreement on
_____, 20___, (such Agreement, together with any amendments, the "_Franchise_
Agreement").  _Franchisee_      is applying for financing(s) from a lender in which funding is provided
with the assistance of the U. S. Small Business Administration ("SBA"). SBA requires the execution of this
Addendum as a condition for obtaining SBA-assisted financing.

In consideration of the mutual promises below and for good and valuable consideration, the receipt and
sufficiency of which the parties acknowledge that notwithstanding any other terms in
the  _Franchise_      Agreement or any other document  _Licensor_      requires  _Licensee_
to sign:

**CHANGE OF OWNERSHIP**

- If  _Licensee_      is proposing to transfer a partial interest in  _Franchisee_      and
_Franchisor_      has an option to purchase or a right of first refusal with respect to that
partial interest, _Franchisor_      may exercise such option or right only if the proposed
transferee is not a current owner or family member of a current owner of
_Licensee_     . If the  _Franchisor_      's consent is required for any transfer (full or
partial), _Franchisor_      will not unreasonably withhold such consent. In the event of an
approved transfer of the  _Franchise_      interest or any portion thereof, the transferor
will not be liable for the actions of the transferee  _Franchisee_     .

**FORCED SALE OF ASSETS**

- If  _Franchisor_      has the option to purchase the business personal assets upon default or
termination of the  _Franchise_      Agreement and the parties are unable to agree on the
value of the assets, the value will be determined by an appraiser chosen by both parties. If
the  _Franchisee_      owns the real estate where the  _Franchise_      location is
operating,  _Franchisee_      will not be required to sell the real estate upon default or
termination, but  _Franchisee_      may be required to lease the real estate for the
remainder of the  _Franchise_      term (excluding additional renewals) for fair market
value.

---

¹ While relationships established under license, jobber, dealer and similar agreements are not generally described
as ''franchise'' relationships, if such relationships meet the Federal Trade Commission's (FTC's) definition of a
franchise (see 16 CFR § 436), they are treated by SBA as franchise relationships for franchise affiliation
determinations per 13 CFR § 121.301(f)(5).

**COVENANTS**

- If the _____Franchisee_____ owns the real estate where the _____Franchisee_____ location is operating, _____Franchisor_____ has not and will not during the term of the _____Franchise_____ Agreement record against the real estate any restrictions on the use of the property, including any restrictive covenants, branding covenants or environmental use restrictions. If any such restrictions are currently recorded against the _____Franchisee_____'s real estate, they must be removed in order for the _____Franchisee_____ to obtain SBA-assisted financing.

**EMPLOYMENT**

- _____Franchisor_____ will not directly control (hire, fire or schedule) _____Franchisee_____'s employees. For temporary personnel franchises, the temporary employees will be employed by the _____Franchisee_____ not the _____Franchisor_____.

As to the referenced _____Franchise_____ Agreement, this Addendum automatically terminates when SBA no longer has any interest in any SBA-assisted financing provided to the _____Franchisee_____.

Except as amended by this Addendum, the _____Franchise_____ Agreement remains in full force and effect according to its terms.

_____Franchisor_____ and _____Franchisee_____ acknowledge that submission of false information to SBA, or the withholding of material information from SBA, can result in criminal prosecution under 18 U.S.C. 1001 and other provisions, including liability for treble damages under the False Claims Act, 31 U.S.C. §§ 3729 - 3733.

**Authorized Representative of <u>FRANCHISOR</u>:**

By: _____

Print Name: _____

Title:_____

**Authorized Representative of <u>Franchisee</u>:**

By: _____

Print Name: _____

Title:_____

**Note to Parties**: This Addendum only addresses "affiliation" between the _____Franchisor_____ and _____Franchisee_____. Additionally, the applicant _____Franchisee_____ and the _____Franchise_____ system must meet all SBA eligibility requirements.

SBA Form 2462 (01-2018)                                                                   Page 2

## EXHIBIT B
## FRANCHISE AGREEMENT AND EXHIBITS

*MULTISTATE FORM*



KOALA FRANCHISE, LLC

FRANCHISE AGREEMENT

<u>Lotus & The Rooster Holdings Company</u>
Franchisee Name

3/15/2022 | 2:42 EDT
————————————————————
Date of Agreement

1

© COPYRIGHT 2021 KOALA FRANCHISE, LLC.  ALL RIGHTS RESERVED.
COMMERCIAL SALE PROHIBITED WITHOUT EXPRESS WRITTEN PERMISSION OF KOALA FRANCHISE, LLC.

## SUMMARY PAGE

1. Effective Date: _____3/15/2022 | 2:42 EDT_____

2. Franchisee's Name: Lotus & The Rooster Holdings Company

3. Franchisee's State of Organization (if applicable): Pennsylvania

4. Ownership of Franchisee:

   If the Franchisee is an entity, the following persons constitute all of the owners of a legal and/or beneficial interest in the franchisee:

   | Name | Percentage Ownership |
   |------|---------------------|
   | Salim Michel Makhlouf | 100% |

5. Territory (Section 1.1): Elizabethtown, PA

Initial Geographic Area: 17003, 17022, 17033, 17034, 17036, 17042, 17057, 17064, 17078, 17319, 17339, 17370, 17502

Population: 205,348

6. Initial Franchise Fee (Section 4.1): $4,149.00

7. Operating Principal (Section 5.6): Salim Michel Makhlouf

8. Franchisee's Address for Notices (Section 20): 251 S Pitt St, Carlisle, PA 17013

   Franchisee Email Address for Notices: salim.makhlouf@gmail.com

9. Additional Terms (if any): N/A

Initials: ____SM____(KOALA FRANCHISE, LLC)    _____(Franchisee)

Exhibits:
A    Trademarks
B    Lease Rider
C    Guarantee, Indemnification and Acknowledgment
D    Non-Disclosure and Non-Competition Agreement
E    Equipment Sale Agreement
F    General Release

1

© COPYRIGHT 2021 KOALA FRANCHISE, LLC.  ALL RIGHTS RESERVED.
COMMERCIAL SALE PROHIBITED WITHOUT EXPRESS WRITTEN PERMISSION OF KOALA FRANCHISE, LLC.

DocuSign Envelope ID: 815543D5-680E-4668-8CF9-96A9E3875C89

FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into as of the date (the "Effective Date") set forth on the Summary Page, which appears after the cover page of this Agreement (the "Summary Page") (the Summary Page and all appendices and schedules attached to this Agreement are hereby incorporated by this reference), by and between KOALA FRANCHISE, LLC, a Florida limited liability company with its principal place of business at 445 West Drive, Melbourne, Florida 32904 ("Franchisor" or "we" or "us"), and the entity identified on the Summary Page as the franchisee ("Franchisee" or "you") with its principal place of business as set forth on the Summary Page.

BACKGROUND:

A.      Franchisor owns a format and system (the "System") relating to the establishment, development and operation of franchises (each a "Franchise") that offer and provide insulation evaluation, removal, installation and related services that operate under the Marks (as defined below) using specially equipped Koala service vehicles and equipment (collectively "Koala Rigs").

B.      The distinguishing characteristics of the System include, without limitation, distinctive business formats; procedures; the Manual (as defined in Section 3.5); the Koala Rigs; procedures for operations, accounting, collections, management and inventory control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time;

C.      Franchisor identifies the System by mark Koala Insulation and associated logos, commercial symbols and such other trade names, mascots, service marks and trademarks as are now, or in the future, designated by Franchisor as an integral part of the System ("Marks") including but not limited to the currently registered Marks identified on Exhibit A some of which may be incorporated into other brands or other systems developed by Franchisor or its affiliates in the future;

D.      Franchisor continues to develop, use, and control the use of such Marks to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance, and service; and

E.      Franchisee desires to operate a Franchise under the System and using the Marks, and wishes to obtain a license from Franchisor for that purpose, as well as to receive the training and other assistance provided by Franchisor in connection therewith;

NOW, THEREFORE, the parties agree as follows:

1.   <u>GRANT</u>

**1.1.**   <u>Grant of Rights; Protected Territory</u>.  Upon the terms and conditions set forth in this Agreement, Franchisor hereby grants to Franchisee a non-exclusive license (the **"License"**) to operate a Franchise that specializes in providing insulation evaluation, removal, installation and related services (the **"Services"**) within the initial geographic area described on the Summary Page (the **"Territory"**).  Franchisee hereby accepts such License and undertakes the obligation to operate a Franchise in accordance with this Agreement during the entire initial term of the License (as specified in **Section 2.1**).  Franchisee acknowledges and agrees that this Territory is non-exclusive but subject to certain limited protections as defined below.

**1.2.**   Protected Territory.  The Territory, as listed on the Summary Page, shall be designated as "Protected" from the Effective Date of this agreement and shall remain Protected for the duration of the entire initial term plus any extensions thereof provided that the Territory may lose its Protected status through any default of this Agreement or any other agreement with Franchisor or its Affiliates, or by Franchisee's failure to maintain sufficient equipment and staff as required in Franchisor's discretion to provide, without substantial delay, all Services offered under the System to customers within the Territory.  Any of these events, without limitation, constitute cause for revocation of Protected status of the Territory.  Protected status may be revoked only with cause and upon notice.  Once the Territory loses its Protected status it may not be regained.

**1.2.1**  While the Territory is Protected Franchisor shall not provide the Services or grant other franchisees or others the right to provide the Services using the Koala Insulation System and Koala Insulation Marks to customers at any location within the Territory other than through the Revenue Sharing Program as hereafter defined.

**1.2.2**  Franchisor and other franchisees may advertise (subject to Franchisor approval) online or through any other medium without geographical limitations, including within the Protected Territory, but only Franchisee shall be permitted to provide the Services under the Koala Insulation System within the Protected Territory.

**1.3.**   Reservation of Rights.  Franchisor and its affiliates have the right to conduct any business activities, under any name, in any geographic area, and at any location, without any liability to Franchisee regardless of the proximity to or effect on the Franchise. By way of illustration, and without limiting the foregoing, Franchisor and its affiliates have the right:

**1.3.1.**  to operate and permit franchisees or others to establish and operate Franchises at any location within or outside the Territory (subject to the

3

Protections defined in section 1.2.1 above) notwithstanding their actual or threatened impact on sales of the Franchise;

**1.3.2.** to operate or permit franchisees or others to establish and operate businesses at any location under other systems or other Marks, including businesses that may offer or sell products or services that are the same or similar to the products or services offered from the Franchise, within or outside the Territory and notwithstanding their proximity to the Territory, Protected status of Territory, or their threatened or actual impact on sales of the Franchise;

**1.3.3.** to sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, within or outside of the Territory, products and services bearing the Marks or similar marks through other channels of distribution including, without limitation, the internet, catalogs, or commercial channels other than the on-site installation or removal of insulation; and

1.3.4. to acquire, be acquired by, or merge with other businesses and to convert them to the Marks or any other name at any location and such acquiring or acquired businesses shall not be bound by any Protections applicable to the Territory.

1.3.5. If the Territory is not Protected, the geographic area of the Territory may be revised by Franchisor from time to time, after the expiration of the initial term, to include only the Population listed as the actual population in the initial geographic area increases. If Franchisor reduces the Territory's geographic area due to a population increase after the expiration of the initial term, Franchisor shall first offer the right to purchase such additional population to Franchisee at the then-current rates, provided that Franchisee is and has been at all times in compliance with the terms hereunder.

Franchisee acknowledges that the activities described in Section 1.3. through 1.3.5 are only examples, and do not limit the business activities that Franchisor and its affiliates may undertake. Franchisee also acknowledges that, other than those rights expressly conveyed through this agreement and narrowly limited to same, Franchisor has made no other representations concerning Franchisee's rights in any geographic territory.

**1.4.** <u>Advertising and Promotional Materials</u>. Franchisor and Franchisee acknowledge that advertising and promotional materials created, placed, and/or distributed by Franchisor, other franchisees operating under the System, or other entities authorized by Franchisor, may appear in media distributed in, or may be directed to prospective customers located within, trade areas or market areas nearby or encompassing the Territory, including on Franchisor's website or any related website. Neither Franchisee, nor any other franchisee, is restricted from advertising or promoting products or services to any customers regardless of where they reside; provided, however, Franchisee may not perform Services outside of the Territory, except as expressly provided herein.

**1.5.**    Sale of Products and Services.  Unless otherwise permitted by Franchisor, Franchisee shall offer and sell only then-current products and services previously authorized by Franchisor, using Koala Rigs, and only within the Territory, only in accordance with the requirements of this Agreement and the then-current procedures set forth in the Manuals as they may be developed and/or modified from time to time.  Franchisee may not perform Services using equipment other than a Koala Rig that meets Franchisor's then-current specifications and standards.  Franchisee understands and acknowledges that certain other Koala franchisees were granted protected territories, and shall not perform Services in the protected territory of another Koala franchisee.

**1.5.1.** Franchisee may perform Services for customers that are located outside of the Territory provided (a) Franchisee has submitted to Franchisor a written request to provide Services for such customer giving the name of the customer and its location; and (b) Franchisor has approved such request in writing.  Franchisor may at any time revoke its approval effective upon giving written notice of the same to Franchisee.  Franchisor may require Franchisee to purchase any territory, at then-current rates, in which Franchisee requests permission to provide Services if (a) Franchisee requests permission to service customers in the area more than twice per 90-day period, or (b) if Franchisee has operated for at least 12 months and Gross Sales for Services performed outside the Territory constitute more than 10% of the prior 12 months' Gross Sales.  Any permission granted to operate outside of the Territory shall not constitute an ongoing grant of rights to the area and Franchisor retains all rights thereto.

**1.5.2.** Revenue Sharing Program.  Franchisee may at its option enter into a revenue sharing program ("Revenue Sharing Program") with any other franchisee which may permit the out of territory franchisee to operate within Franchisee's Territory for the purposes of servicing existing clients who have previously received services within the out of territory franchisee's own territory.  Franchisee may also enter into a revenue sharing agreement with any other franchisee as Franchisee deems appropriate to complete extraordinarily large jobs or for other purposes subject to Franchisor approval which must be received in writing in advance of any Revenue Sharing Program between franchisees.  Franchisor shall not be a party to any Revenue Sharing Program which shall be conducted solely between franchisees.

2.    TERM AND RENEWAL

**2.1.**    Term.  Except as otherwise provided herein and unless sooner terminated in accordance with the provisions hereof, the initial term of the License commences on the Effective Date and continues until that date which is 10 years after the Effective Date.

**2.2.**    Renewal.  Franchisee may, at its option, request to renew Franchisee's right to operate the Franchise for two additional terms of five years each.  Franchisee's option of renewal is subject to the following conditions, each of which must be met prior to the renewal:

**2.2.1.** Franchisee shall give Franchisor written notice of Franchisee's election to renew no fewer than six months, nor more than 12 months, prior to the end of the initial term;

**2.2.2.** Franchisee shall update, refurbish, or replace the Franchise Location (if applicable) and its Koala Rig(s) to comply, as determined solely by Franchisor, with Franchisor's then-current standards;

**2.2.3.** From the time of Franchisee's election to renew through the expiration of the original term, Franchisee and its affiliates shall not have been in default of any provision of this Agreement, any amendment to this Agreement, any successor to this Agreement, or any other agreement between Franchisee (and its affiliates) and Franchisor (and its affiliates); and, as determined in the sole discretion of Franchisor, Franchisee and its affiliates shall have complied with all the terms and conditions of this Agreement, such other agreements, as well as the Operating Standards (as defined in **Section 5.9**) prescribed by Franchisor during the term of this Agreement;

**2.2.4.** Franchisee shall have satisfied all monetary, reporting and other obligations owed by Franchisee to Franchisor and its affiliates, and shall have timely met those obligations throughout the term of this Agreement;

**2.2.5.** Franchisee shall execute Franchisor's then current form of franchise agreement; which agreement shall supersede this Agreement in all respects (except the renewal franchise agreement shall not require payment of an initial franchise fee or include the ability to renew for any years beyond the aggregate of those contained in the original term and extensions herein).  Franchisee acknowledges that the terms, conditions, and provisions of the renewal franchise agreement, and the obligations of the parties thereto, may differ substantially from the terms, conditions, provisions and obligations in this Agreement, including, without limitation, a higher percentage royalty fee and advertising contribution;

**2.2.6.** Franchisee shall pay, in lieu of an initial franchise fee, a renewal fee equal to 25% of the Initial Franchise Fee or $5,000, whichever is greater;

**2.2.7.** Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, agents, and employees; and

**2.2.8.** Franchisee and its personnel shall comply with Franchisor's then current qualification and training requirements, prior to commencement of operations under the renewal form of franchise agreement.

3. <u>FRANCHISOR'S DUTIES</u>

**3.1.** <u>Initial and On-Going Training</u>. Franchisor shall provide for Franchisee's Operating Principal (as defined in **Section 5.6**) Salesperson, and Manager (as defined in **Section 5.6**), such initial training programs as Franchisor may

designate, to be conducted at such time(s) and location(s) designated by Franchisor. Franchisor may charge a reasonable fee for additional individuals who attend training. Franchisor shall also provide such ongoing training as it may, from time to time, deem appropriate. Franchisor shall be responsible for the cost of instruction and materials, subject to **Section 5.6** for the training of the initial Operating Principal, Manager, and Salesperson. Franchisee shall be responsible for the cost of training any subsequently hired or replacement staff including without limitation Operating Principal, Manager and Salesperson.

**3.2.**   Opening Assistance and Training.   In addition to the initial training described in Section 3.1, should Franchisee request additional assistance from Franchisor to facilitate the opening of the Franchise and should Franchisor, in its discretion, deem it necessary, feasible and appropriate to comply with the request, Franchisee shall reimburse Franchisor for the expenses of Franchisor providing such additional assistance, which may include Franchisor's then-current service fee, as set forth in the Manuals or otherwise communicated to Franchisee in writing from time to time.   Franchisor will provide such additional on-site assistance as Franchisor deems advisable.

**3.3.**   Manuals.   Franchisor shall provide Franchisee access to the confidential operations manuals (which may include technical bulletins, and other written, video or audio materials (collectively the "**Manuals**"), as more fully described in **Section 7**.

**3.4.**   Advertising and Promotion.   Franchisor shall review, and shall have the right to approve or disapprove, all advertising and promotional materials that Franchisee proposes to use pursuant to **Section 10.6**.   In addition, during the term of this Agreement, Franchisor shall provide Franchisee with such other advertising assistance, sales advice, or related materials as Franchisor deems advisable.

> 3.4.1   Electronic Advertising and Support Services.   Franchisor shall establish and maintain, during the Term of this agreement, a website and/or other such listings as Franchisor deems appropriate for the Koala brand which shall contain content deemed appropriate in its sole and unlimited discretion.   Franchisor may also maintain certain location specific or franchise specific sites ("Micro-Sites") in its sole discretion. Franchisor may establish and assign a phone number to the Franchise and if it does so, Franchisee must use this number as its only published and/or advertised phone number for the Franchise.   Franchisor shall retain full rights to control, suspend, redirect and transfer any web domains and phone numbers and other listings.   Franchisor shall have the right to suspend or revoke any or all of these services immediately and without further notice upon Franchisee's Default of any term of this Agreement, specifically but not limited to financial or reporting obligations.

**3.5.**   Brand Fund.   Franchisor may establish and administer a System-wide advertising, marketing, promotional, and creative fund, which is referred to as the

"**Brand Fund**", or such other name as Franchisor may designate, in the manner set forth in **Section 10.3.**

**3.6.**  Technology System.  Franchisor shall specify or require that certain brands, types, makes, and/or models of communications, computer systems, software and hardware be used by, between, or among the Franchises, including without limitation:  (a) back office and point of sale systems, data, audio, video, and phone, voice storage, retrieval, and transmission systems for use at the Franchise, between or among Koala franchisees, the corporate units and Franchisor; (b) physical, electronic, and other security systems including without limitation vehicle and/or Koala Rig tracking devices; (c) printers and other peripheral devices; (d) archival back-up systems; (e) communication systems (including without limitation email and phone systems); and (f) Internet access mode and speed (collectively, the "**Technology System**").  Franchisor may also designate: (i) software programs that Franchisee must use in connection with the Technology System ("**Required Software**"), which Franchisee shall install; (ii) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee shall install; (iii) the tangible media upon which such Franchisee shall record data; (iv) the database file structure of the Technology System; and (v) additional Technology Systems that must be used.

**3.7.**  On-Going Assistance.  Franchisor shall provide periodic assistance to Franchisee in the marketing, management, and operation of the Franchise as Franchisor determines at the time(s) and in the manner determined by Franchisor.

**3.8.**  Additional Services.  Franchisor, at its option may provide Additional Services including a call center, recruiting assistance and other services at the then-current fees.  Franchisor shall have no ongoing obligation to offer these services and may discontinue them for any or all franchisees at any time.

4.    ROYALTY FEES; SALES REPORTING

**4.1.**  Initial Franchise Fee.  Franchisee shall pay Franchisor an initial franchise fee that is specified on the Summary Page (the "**Initial Franchise Fee**"), which must be paid in full prior to or upon execution of this Agreement.  The Initial Franchise Fee is not refundable under any circumstances and shall be deemed earned in full upon receipt, except if Franchisee's Operating Principal or Manager fails to successfully complete initial training in accordance with the requirements of **Section 5.6**.  If Franchisor terminates this Agreement due to any failure to successfully complete initial training pursuant to **Section 5.6**, Franchisor will refund the Initial Franchise Fee, less an amount equal to $5,000, subject to Franchisee' and its owners' execution of a General Release.

**4.2.** <u>Royalty Fees</u>.  Franchisee shall pay Franchisor continuing royalty fees ("**Royalty Fees**") at such time, for such periods, and in such manner as specified herein, or as otherwise specified in writing by Franchisor.  The term "**Gross Sales**" means amounts, less refunds, sales tax and chargebacks, derived from all products or services sold from or through the Franchise, including any sale of products or services made for cash or credit, or partly for cash and partly for credit. "**Gross Sales**" also includes the fair market value of any services or products received by the Franchisee in barter or in exchange for Franchisee's services and products.

Royalty Fees shall be paid weekly in an amount equal to 6.5% of Gross Sales during the first 6 calendar months of operations (which for clarity shall begin and include any portion of any month during which Franchisee first receives any Gross Sales). Beginning on the 7th month of operations, Royalty Fees shall be paid weekly in an amount that is the greater of the required Minimum Royalty, or 6.5% of Gross Sales for the first $1,000,000 in Gross Sales (see Table 1 below); then the Royalty Fee shall be reduced to 5% of Gross Sales for amounts between $1,000,000.01 and $1,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 4.5% of Gross Sales amounts between $2,000,000 and $2,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 3.5% of Gross Sales for all amounts over $3,000,000 annually for the remainder of the calendar year.

Table 1: Minimum Royalty Per Territory, Per week.

| Months After Opening | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5+ Territories |
|---|---|---|---|---|---|
| 7-12 | $250 | $225 | $200 | $175 | $150 |
| 13-24 | $350 | $325 | $300 | $275 | $250 |
| 25-36 | $500 | $475 | $425 | $400 | $375 |
| 37+ | $625 | $600 | $575 | $550 | $525 |

Franchisee expressly acknowledges and agrees that Franchisee's obligations for the full and timely payment of Royalty Fees, Brand Fund Contributions (as defined in Section 10.2), if any, and all other amounts provided for in this Agreement, shall be absolute and unconditional.  Franchisee shall not for any reason delay or withhold the payment of all or any part of those or any other payments due hereunder, put the same in escrow or setoff the same against any claims or alleged claims Franchisee may allege against Franchisor, the Brand Fund or others. Franchisee shall not, on grounds of any alleged nonperformance by Franchisor or others, withhold payment of any fee, including without limitation Royalty Fees, Brand Fund Contributions, nor withhold or delay submission of any reports due hereunder.  Royalty Fees shall be deemed earned in full upon receipt.  Franchisee and Franchisor expressly acknowledge that all services provided by Franchisor to Franchisee shall not exceed in cost the amount of the Royalty Fees received from Franchisee.

4.2.1 <u>Sales Reports.</u>  Franchisee shall deliver to Franchisor any and all reports, statements and/or other information regarding its Gross Sales and other metrics or data specified by Franchisor at the time(s) and in the format(s) reasonably requested by Franchisor from time to time ("Sales Reports").

Upon notice by Franchisor Franchisee must use, and pay the fees required to use, the Koala proprietary software or other software as specified by Franchisor, when made available, or other systems or methods as specified by Franchisor for the purposes of providing Sales Reports in compliance with this Section. All payments required by this Agreement to Franchisor, its affiliates, and/or the Brand Fund must be made by the method or methods that Franchisor specifies from time to time, which may include, without limitation, payment by deduction as specified in Section 3.8.2, payment via wire transfer or electronic debit to Franchisee's bank account.  Franchisee must furnish Franchisor and Franchisee's bank with all authorizations necessary to effect payment by the methods Franchisor specifies.

**4.3.** <u>Overdue Payments or Reports</u>.  Any payment, Sales Report or other required report not actually received by Franchisor on or before the date such payment or report is due (currently, no later than noon Eastern Time on Monday of each week) shall be deemed overdue.  If an attempt to electronically debit Franchisee's bank account fails or any other payment method is declined or returned, the payment shall be deemed not received.  Franchisor may at its option from time to time specify or change the date such reports are due upon 7 days' Notice to Franchisee.  If any payment or required report is overdue, Franchisor shall collect from Franchisee the greater of the Minimum Royalty amount, or 1.5 times the Royalty Fees and other fees or amounts due based on the prior report received ("Presumptive Fees").  The Presumptive Fees shall be credited towards the actual Royalty Fees due once the Sales Report is received.  Additionally, Franchisee shall pay Franchisor, a late payment/late report charge of $50 for each day (or portion thereof) that the payment or report is late (collectively "Late Fee").  Entitlement to such Late Fee shall be in addition to any other remedies Franchisor may have including without limitation the suspension of services as defined in §3.4.1 and elsewhere in this Agreement.

**4.4.** <u>Payments on Behalf of Franchisee</u>.  Franchisee shall pay to Franchisor, within 15 days after any written request by Franchisor which is accompanied by reasonable substantiating material, any monies (plus a fee equal to 10% of the amount paid by Franchisor on Franchisee's behalf) which Franchisor has paid, or has become obligated to pay, on behalf of Franchisee, by consent or otherwise under this Agreement.

5. <u>FRANCHISEE'S DUTIES</u>

**5.1.1.** Franchisee may operate from their home office, provided doing so would be in compliance with applicable laws and regulations.  If Franchisee choses to rent or lease a site, storage location or other physical site other than Franchisee's home, at which it will base or park Koala Rigs or from which it will operate the Franchise, Franchisee must provide notice to Franchisor at least 30 days in

advance.  Before Franchisee makes a binding commitment to lease, sublease or purchase a site, Franchisor must approve the location in writing and approve in writing the proposed lease for the location (the "**Lease**") or purchase agreement or any letter of intent between Franchisee and the third-party seller or lessor. FRANCHISEE ACKNOWLEDGES AND AGREES THAT FRANCHISOR'S APPROVAL OF A PROPOSED SITE IS NOT A WARRANTY OR REPRESENTATION OF ANY KIND AS TO THE POTENTIAL SUCCESS OR PROFITABILITY OF THE FRANCHISE.  If Franchisee leases the approved Franchise Location, unless Franchisor waives the requirement in writing, Franchisee must arrange for the execution of the Lease Rider in the form of **Exhibit B** by Franchisee and its landlord in connection with any Lease for the approved Franchise Location and any other provisions that Franchisor may reasonably require.  Franchisee must deliver to Franchisor the completely executed purchase agreement or Lease and Lease Rider within 10 days after execution of the Lease or purchase agreement.  Franchisee must comply with the terms and conditions of the Lease for the approved Franchise Location.  Franchisor is not obligated to execute Franchisee's Lease or guarantee a Lease for Franchisee.

**5.1.2.** Before commencing construction of the Franchise Location, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

**5.1.2.1.** Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations, including, without limitation, the applicable provisions of the American with Disabilities Act (as amended, the "ADA") regarding the construction and design of the Franchise Location.

**5.1.2.2.** If so requested by Franchisor, Franchisee shall submit to Franchisor, for Franchisor's approval, final plans for construction based upon the preliminary plans and specifications.  Franchisor shall not review, nor shall any approval be deemed to include, approval or acceptance of Franchisee's compliance with federal, state, or local laws and regulations, including the ADA.  Once approved by Franchisor, such final plans shall not thereafter be changed or modified without the prior written permission of Franchisor.

**5.1.2.3.** Franchisee shall obtain all permits and certifications required for the lawful construction of the Franchise Location. Franchisee shall be responsible for obtaining all zoning classifications and clearances which may be required by state or local laws, ordinances, or regulations or which may be necessary or advisable owing to any restrictive covenants relating to the Franchise Location.

**5.1.2.4.** Franchisee shall employ a qualified licensed general contractor who is acceptable to Franchisor to construct the Franchise Location and to complete all improvements.  Franchisee shall obtain and maintain in force during the entire period of construction the insurance required under Article 11. Franchisee shall deliver to Franchisor such proof of such insurance as Franchisor shall require.

**5.1.2.5.** During the construction of the Franchise Location, Franchisee will permit Franchisor to make such on-site inspections of the Franchise Location as Franchisor determines appropriate to evaluate the construction or remodeling of the Franchise Location for compliance with Franchisor's requirements. Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.

**5.1.2.6.** Within 30 days after the opening of the Franchise Location, Franchisee shall provide to Franchisor a full breakdown of all costs associated with the development and construction of the Franchise Location if so requested by Franchisor.

**5.1.3.** Franchisee shall use the Franchise Location solely for the operation of the Franchise; shall keep the Franchise open and in normal operation for such hours and days as Franchisor may from time to time specify in the Manuals or as Franchisor may otherwise approve in writing; and shall refrain from using or permitting the use of the Franchise Location for any other purpose or activity at any time. As used in this Section, the term Franchise Location shall include the grounds surrounding the Franchise.

**5.1.4.** Franchisee shall at all times maintain the Franchise Location in a high degree of sanitation, repair, and condition, and in connection therewith shall make such additions, alterations, repairs, and replacements thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting or replacement of obsolete signs, furnishings, equipment, and decor as Franchisor may reasonably direct. If at any time in Franchisor's judgment the general state of repair or the appearance of the Franchise Location or its equipment, fixtures, signs or decor does not meet Franchisor's quality control and standards therefor, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate, within 30 days after receipt of such notice, and thereafter diligently continue a bona fide program to complete any required maintenance, Franchisor shall have the right, in addition to all other remedies, to enter upon the Franchise Location and effect such repairs, painting, maintenance or replacements of equipment, fixtures or signs on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

**5.1.5.** In addition to the maintenance obligations set forth in above, Franchisee shall, at its expense, undertake such periodic and ongoing remodeling and upgrading of the Franchise Location, and the furniture, fixtures, equipment, décor, signage and trade dress of the Franchise Location, as required by Franchisor to cause the Franchise Location building design, exterior facade, trade dress, signage, fixtures, furnishings, equipment, decor, color schemes, and presentation of the Marks to be consistent with the then-current standards. Such remodeling and refurbishment may include structural changes, installation of new equipment and signs, remodeling, redecoration, and modifications to existing improvements,

DocuSign Envelope ID: 815543D5-680E-4668-BCF9-96A9F3875C89

and, shall be completed to Franchisor's satisfaction pursuant to such standards, specifications, and deadlines as Franchisor may specify.

**5.1.6.** Franchisee may not relocate its Franchise Location unless it receives Franchisee's prior written approval. Franchisee's relocation will be at its expense and Franchisor has the right to charge Franchisee for all reasonable costs and expenses it incurs to approve and implement the relocation.

**5.2.**  Koala Rigs.

**5.2.1.** Franchisee shall obtain that number of Koala Rigs prescribed by Franchisor from time to time, and ensure that its Koala Rigs are in proper working order.

**5.2.2.** Each Koala Rig shall consist of an enclosed trailer and certain proprietary equipment, and other items (the **"Koala Rig" or "Rig"**) installed in accordance with Franchisor's standards and requirements pursuant to the terms of an Equipment Sale Agreement. Currently Koala Rigs include blow-in rigs and spray-foam rigs but may include other equipment packages or otherwise be modified or substituted as specified from time to time by Franchisor. Franchisee acknowledges and agrees that Franchisor and its designees are the only approved suppliers of such Rigs, equipment and installation services. The Koala Rig must generally be moved by towing with an approved truck capable of and rated for the weight and requirements of the Koala Rig. When attached, the truck ("Truck") and trailer shall collectively constitute the Koala Rig.

**5.2.3.** Prior to Franchisee purchasing a Truck, Franchisee shall submit to Franchisor, in a form specified by Franchisor, information regarding the specifications and conditions of the Truck as Franchisor may reasonably require or Franchisee may comply with the then current guidelines as defined in the Manual. Franchisee may not purchase any Truck to be used with a Koala Rig unless and until it has received Franchisor's prior approval or ensures that the Truck complies with brand appearance standards in Franchisor's discretion. Franchisor may establish relationships with truck dealers and if it does so, Franchisee agrees to purchase solely from these approved dealers.

To the extent that other vehicles or equipment are used in the Franchise, including without limitation Manager or Salesperson vehicles, they must comply with the then current Brand Standards and Manual.

**5.2.4.** If the Franchise is not operated from a Franchise Location, Franchisee will make arrangements to store the Koala Rig(s) used in the operation of the Franchise in compliance with all applicable state and local laws and other restrictions.

**5.2.5.** Franchisee shall at all times maintain the Koala Rigs in a high degree of repair and condition, and in connection therewith shall make such repairs, replacements and refurbishment thereto (but no others without Franchisor's prior

written consent) as may be required for that purpose, including, without limitation, such periodic repainting, replacement of wraps or decals, replacement of equipment and parts or installation or refurbishment of signage as Franchisor may reasonably direct and pursuant to such standards, specifications and deadlines as Franchisor may specify.

**5.3.**  <u>System Standards</u>.  Franchisee understands and acknowledges that every detail of the Franchise is important to Franchisee, Franchisor, and other franchisees to develop and maintain high operating standards, to increase the demand for the Services sold by all franchisees, and to protect Franchisor's reputation and goodwill.

**5.4.**  <u>Pre-Opening Obligations</u>.  Before commencing operations, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

**5.4.1.** Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations.

**5.4.2.** Franchisee shall obtain all licenses, permits, and certifications required for the operation of the Franchise within the Territory and the parking and/or storage of Koala Rigs in the Territory.

**5.5.**  <u>Opening</u>.  Franchisee shall open the Franchise within four months after the Effective Date.  Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.  In addition, in connection with the opening of the Franchise:

**5.5.1.** Franchisee shall provide at least 14 days' prior notice to Franchisor of the date on which Franchisee proposes to first open the Franchise for business.

**5.5.2.** If the Franchise will operate from a Franchise Location, Franchisee shall not open the Franchise until Franchisor has determined that all construction has been substantially completed, and that such construction conforms to Franchisor's standards, and Franchisor has given Franchisee written approval to open, which approval shall not be unreasonably withheld.

**5.5.3.** Franchisee shall not open the Franchise until Franchisor has determined that Franchisee has obtained a sufficient number of Koala Rigs to Franchisor's standards in compliance with **Section 5.2** which shall be no less than one Blow-In and one Spray Foam rig.

**5.5.4.** Franchisee shall not open the Franchise until the Operating Principal, Salesperson and Manager have successfully completed all initial training required by Franchisor, and Franchisee has hired and trained, to Franchisor's standards, a sufficient number of employees to service the anticipated level of the Franchise's customers.

DocuSign Envelope ID: 815543D5-680F-4666-8CF9-96A8F3875C89

**5.6.**  Management and Training.  Franchisee must appoint an individual owner as its **"Operating Principal"** who has at least a 20% equity interest in Franchisee, must have authority over all business decisions related to the Franchise, and must have the power to bind Franchisee in all dealings with Franchisor.   The Operating Principal is specified on the Summary Page. Franchisee must also appoint a manager to manage the day-to-day business of the Franchise (the **"Manager"**).  Franchisee's Operating Principal may serve as its Manager, unless Franchisor believes that he or she does not have sufficient experience.   Franchisee must appoint a salesperson to manage the day-to-day customer service and sales functions in accordance with Franchisor's specifications (the "Salesperson").   Franchisee must provide Franchisor with written notice of its Manager and Salesperson at least 14 days prior to initial training.  Prior to the opening of the Franchise, the Manager, Salesperson and the Operating Principal must attend and successfully complete, to Franchisor's satisfaction, the initial training program offered by Franchisor, pursuant to **Section 3.2**.  If Franchisor determines, in its sole discretion, that the Operating Principal, Salesperson or Manager is unable to satisfactorily complete any phase of the training program, Franchisor shall have the right to: (i) require the Salesperson, Operating Principal or Manager, as the case may be, to attend such additional training as Franchisor may require, at Franchisee's expense; or (ii) terminate this Agreement, in which event neither Franchisor nor Franchisee shall have any further rights or obligations hereunder.  If Franchisor terminates this Agreement pursuant to the prior sentence, Franchisor shall refund a portion of the Initial Franchise Fee as provided in Section 4.1. The daily operations of the Franchise are at all times required to be supervised under the active full-time management of the Manager and Salesperson who have each successfully completed Franchisor's initial training program.

**5.6.1.** If the Manager or Salesperson ceases active management of the Franchise or in the event the Operating Principal is changed or is no longer a 20% equity owner of the Franchisee, Franchisee must hire a new Manager or Salesperson or appoint a new Operating Principal (as the case may be), who must be approved in writing by Franchisor. The new Manager, Salesperson or Operating Principal must undergo a certification training program that is prescribed by Franchisor, which may include training at the Franchise, another Franchise or such other place as Franchisor shall designate.  All expenses incurred by the new Manager, Salesperson or Operating Principal in attending such program including, without limitation, travel costs, room and board expenses and salaries and other benefits, shall be the sole responsibility of Franchisee.  In addition, Franchisee shall:  (a) pay Franchisor's then-current certification program fees; and (b) reimburse Franchisor for its out of pocket expenses, including without limitation, reasonable travel and room and board expenses.  If Franchisor determines, in its sole discretion, that the new Manager, Salesperson or Operating Principal is unable to satisfactorily complete the certification program, Franchisor shall have the right to:  (i) require the new Manager, Salesperson or Operating Principal, as applicable, to attend such additional training, at Franchisee's expense, so as to demonstrate his or her ability to operate the Franchise to Franchisor's satisfaction;

15

or (ii) require Franchisee to promptly hire a replacement New Manager, Salesperson or appoint a new Operating Principal among its equity owners (who must have at least 20% equity ownership) who shall be required to undergo the training and certification programs contemplated by this Section.

**5.6.2.** Franchisor from time to time may provide and, if it does, may require that the Operating Principal, Manager, Salesperson and/or other employee attend and successfully complete refresher training programs or seminars including without limitation an annual conference ("Annual Conference"), to be conducted at such location as may be designated by Franchisor. Franchisee shall pay to Franchisor the then current Annual Conference Fee for each person required to attend. All expenses incurred by Franchisee and its employees in attending such program including, without limitation, travel costs, room and board expenses and salaries and benefits, shall be the sole responsibility of Franchisee.

**5.6.3.** If Franchisee requests that Franchisor provide on-site training in addition to the opening assistance described in **Section 3.4**, and Franchisor chooses to do so, then Franchisee agrees that it shall pay Franchisor's then-current per diem charges and out-of-pocket expenses, which shall be as set forth in the Manuals or otherwise in writing.

**5.7.** <u>Personnel</u>. Franchisee agrees to maintain a competent, conscientious and trained staff in numbers sufficient to promptly provide the Services and to take such steps as are necessary to ensure that its employees preserve good customer relations and comply with such dress code as Franchisor may prescribe.

**5.8.** <u>Equipment Upgrades.</u> Franchisee shall make, from time to time, such upgrades and other changes to the equipment, Koala Rigs and electronic equipment utilized in the Franchise, the Technology System and Required Software as Franchisor may request in writing (collectively, "**Equipment Upgrades**"). Franchisor shall have the right to require any Equipment Upgrades it deems necessary for the Franchise.

**5.9.** <u>Standards and Specifications</u>. To insure that the highest degree of quality and service is maintained, Franchisee shall operate the Franchise in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing (as used in this Agreement, Franchisor's "**standards**", "**requirements**", "**specifications**" or "**Operating Standards**"). At a minimum, the Operating Standards shall include:

**5.9.1.** offering and selling at all times such services that conform to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming services without Franchisor's specific prior written consent

**5.9.2.** maintaining in sufficient supply, using, offering and selling at all times only such products, equipment, supplies, materials, and goods that conform

to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming products without Franchisor's specific prior written consent.

**5.9.3.** offering and selling only such products as have been expressly approved for sale in writing by Franchisor; offering all products and services as Franchisor may specify from time to time as required offerings at the Franchise; offering all products authorized for sale as specified by Franchisor; refraining from any deviation from Franchisor's standards, without Franchisor's prior written consent; and discontinuing the sale of any products which Franchisor has disapproved, in writing, at any time. If Franchisee deviates or proposes to deviate from Franchisor's standards, whether or not such deviation is approved by Franchisor, such deviation shall become the property of Franchisor.

**5.9.4.** operating the Franchise to fully comply with all applicable laws and regulations.

**5.9.5.** offering and selling the services and products in accordance with any minimum, maximum, and/or specific prices that Franchisor may determine from time to time (except to the extent determination of prices by Franchisor is limited or prohibited by applicable law).

**5.10.** <u>Non-Compliance</u>. If Franchisee violates an Operating Standard, and fails to bring the Franchise into compliance with such Operating Standard within 10 days after Franchisor has delivered to Franchisee written notice of the violation, Franchisee shall pay to Franchisor upon demand $100 for each day that Franchisee is not in compliance with the relevant Operating Standard. Franchisor's right to charge these amounts is in addition to any other remedy provided under this Agreement, including under **Section 13**. Franchisor's damages from Franchisee's failure to comply with this Section may include loss of good will and other damages, and are difficult to measure and quantify; such amount is, therefore, a reasonable approximation of damages, and not a penalty.

**5.11.** <u>Suppliers and Sourcing Requirements</u>. Franchisor has the right to require that services and products offered by Franchisee, and services, products and equipment used by Franchisee in the establishment and operation of the Franchise: (a) meet specifications that Franchisor establishes from time to time; and/or (b) be purchased only from manufacturers, vendors, distributors, and other suppliers that Franchisor has expressly approved; and/or (c) be purchased only from a single source (which may include Franchisor or its affiliates or other suppliers which provide a financial benefit to Franchisor and may not be the least expensive supplier). To the extent that Franchisor establishes specifications, requires approval of suppliers, or designates specific suppliers for particular items, Franchisor will notify Franchisee via the Manuals or otherwise in writing. In determining whether Franchisor will approve any particular supplier, Franchisor shall consider various factors, including a supplier who can demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then current standards and specifications for such items; who possesses adequate

quality controls and capacity to supply Franchisee's needs promptly and reliably; who would enable the System, in Franchisor's sole opinion, to take advantage of marketplace efficiencies; and who has been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved. For the purpose of this Agreement, the term **"supplier"** shall include, but not be limited to, manufacturers, distributors, resellers, and other vendors. Franchisee recognizes that Franchisor shall have the right to appoint only one supplier for any particular item, and that Franchisor may so designate itself or its affiliate.

      **5.11.1.** If Franchisee wishes to purchase any services, products, equipment or any items that Franchisor has not approved or to purchase from an unapproved supplier, Franchisee shall first submit to Franchisor a written request for such approval. Franchisee shall not purchase any products or services or make purchases from any supplier until, and unless, such item or supplier has been approved in writing by Franchisor. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, either to Franchisor or to an independent laboratory designated by Franchisor for testing or evaluation. Franchisor may require that Franchisee or supplier pay a reasonable fee charge for such testing or evaluation. Franchisor may also require that the supplier comply with such other requirements as Franchisor may deem appropriate, including payment of reasonable continuing inspection/evaluation fees and administrative costs. Franchisor reserves the right, at its option, to reinspect from time to time the facilities and products or equipment of any such approved supplier and to revoke its approval of any item or supplier upon the item's or supplier's failure to continue to meet any of Franchisor's then current criteria.

      **5.11.2.** Franchisee acknowledges and agrees that Franchisor shall have the right to collect and retain all manufacturing allowances, markups, marketing allowances, rebates, credits, monies, payments or benefits (collectively, "**Allowances**") offered by suppliers to Franchisee or to Franchisor or its affiliates based upon purchases of products, equipment and other goods and services made by the Brand Fund or Franchisees. These Allowances are based on System-wide purchases of products, services, merchandise and other items and shall be unrestricted income to Franchisor. Franchisee assigns to Franchisor or its designee all of Franchisee's right, title and interest in and to any and all such Allowances and authorizes Franchisor or its designee to collect and retain any or all such Allowances without restriction (unless otherwise instructed by the supplier). Franchisor may mark up or receive Allowances from any providers or vendors doing business with Franchisees, Franchisor or the Brand Fund including without limitation, equipment, supplies, advertising and marketing vendors. Franchisor may in its sole discretion retain as income with no further obligations, or utilize some or all of the Allowances for System-wide marketing, other brand enhancement activities or specific required or local area marketing, or such Allowance monies may be deposited into the Brand Fund for future use and expenditures by the Brand Fund.

**5.11.3.**         Compliance with laws regarding the chemicals, products, equipment and other supplies that Franchisee uses in its Franchise is Franchisee's sole responsibility.   Franchisor makes no warranty or representation that chemicals, products and other supplies that it recommends, approves or requires comply with applicable laws in Franchisee's jurisdiction. Franchisee must notify Franchisor in writing immediately if any recommended, approved or required chemical, product or supply is subject to regulation or laws in Franchisee's jurisdiction.   Franchisor will cooperate with Franchisee in identifying substitute equipment, products or supplies as appropriate.

**5.12.**   <u>Inspections</u>.  Franchisee grants Franchisor and its agents the right to enter upon the Franchise premises (if applicable) or attend and monitor Franchisee while performing services for customers at any time for the purpose of conducting inspections, for among other purposes, preserving the validity of the Marks, and verifying Franchisee's compliance with this Agreement and the Operating Standards and policies and procedures outlined in the Manuals.  Franchisee shall cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, Franchisee shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Franchisee shall reimburse Franchisor for the travel expenses and room and board of Franchisor's representatives for all inspections including subsequent inspections to ensure all deficiencies have been corrected.  Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right, but not the obligation, to correct any deficiencies which may be susceptible to correction by Franchisor and to charge Franchisee for Franchisor's actual expenses in taking such actions, payable by Franchisee upon demand.  The foregoing shall be in addition to such other remedies Franchisor may have.

**5.13.**   <u>Technology System</u>.  At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Technology System and Required Software, and Franchisee shall enter into all licenses or agreements and pay such licensing fees as necessary for Franchisee to obtain the rights to use the Technology System and Required Software.   Franchisee shall also pay to Franchisor the then-current amount of the Technology Fee ("Technology Fee"), currently $80 per Territory per week.  If Franchisee has more than one Territory, the total Technology Fee for up to 4 contiguous Territories shall be equal to the then-current Technology Fee for one Territory.  Franchisor shall have the right at any time to retrieve and use such data and information from Franchisee's Technology System that Franchisor deems necessary or desirable, including, without limitation, the uses identified in **Section 9.5**, and Franchisee agrees to do all things necessary to provide such access.  Franchisee expressly agrees that it shall strictly comply with Franchisor's standards and specifications for all item(s) associated with Franchisee's Technology System, and will otherwise operate its Technology System in accordance with Franchisor's standards and specifications.  Franchisee agrees it

19

shall keep its Technology System in good maintenance and repair, at its expense, and shall promptly install such additions, changes, modifications, substitutions and/or replacement to the Technology System and the Required Software as Franchisor directs periodically in writing.  Franchisee shall provide to Franchisor, upon Franchisor's request, all email lists and customer lists used or maintained by Franchisee on the Technology System, the Required Software or elsewhere. Franchisee must execute and pay any fees associated with any software license agreements or any related software maintenance agreements that Franchisor or the licensor of the Required Software require.  Franchisee must comply with all laws and payment card provider standards relating to the security of the Technology System, including, without limitation, the Payment Card Industry Data Security Standards.  Franchisee may not use any other cash registers or computer systems in the Franchise.

**5.14.**  Uniform Attire.  To promote a uniform System image, Franchisee shall require all of its personnel to dress during business hours in the attire specified in the Manuals.

**5.15.**  Participation in Promotions and Incentive Programs.  Franchisee shall participate in promotional programs developed by Franchisor for the System, in the manner directed by Franchisor in the Manuals or otherwise in writing.

**5.16.**  Franchisee Advisory Council.  Franchisor may establish an advisory council comprised of Franchisees for the purpose of fostering communication among and between franchisees and Franchisor, as well as to establish, modify or discuss various policies applicable to Franchise businesses operating under the System (the **"Franchisee Advisory Council"**). If Franchisor establishes the Franchisee Advisory Council, Franchisee may be required to become a member of the Franchisee Advisory Council, and participate in Franchisee Advisory Council meetings and programs as Franchisor shall designate.  Franchisor will not assess fees or dues for participation in or on the Franchisee Advisory Council, but Franchisee may be required to pay dues (which may be expended in any allocation in accordance with the vote of the Franchisee Advisory Council subject to the approval of Franchisor) to the Franchisee Advisory Council if the Franchisee Advisory Council, which is controlled by franchisees, determines that fees shall be assessed.  Franchisee may be required to pay all costs and expenses incurred in connection with participation in the Franchisee Advisory Council including, without limitation, the costs of transportation, lodging, and meals.

**5.17.**  Franchisee Structure.

**5.17.1.**    Except as otherwise approved in writing by Franchisor, if Franchisee is a corporation, it shall:  (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles or certificates of incorporation and bylaws, as well as such other documents as Franchisor may reasonably request, and any amendment thereto; (iii) maintain stop transfer instructions on its records against the transfer of any equity securities

20

and shall only issue securities upon the face of which a legend, in a form satisfactory to Franchisor, appears which references the transfer restrictions imposed by this Agreement; (iv) not issue any voting securities or securities convertible into voting securities; and (v) maintain a current list of all owners of record and all beneficial owners of any class of voting stock of Franchisee and furnish the list to Franchisor upon request, which list shall be amended to reflect changes in ownership, as permitted under this Agreement.

**5.17.2.**      If Franchisee is a partnership or limited liability partnership it shall:  (i)  confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with its partnership agreement as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all general and limited partners in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records and in its partnership agreement against the transfer of partnership interests and equity securities, and shall only issue securities or partnership interests with documentation which bears a notice or legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.17.3.**      If a Franchisee is a limited liability company, Franchisee shall: (i)  confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles of organization and operating agreement, as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all members and managers in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records against the transfer of equity securities and shall only issue securities upon the face of which bear a legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.18.**  <u>Guarantee of Performance</u>.  Each present and future:  (i) shareholder of a corporate Franchisee; (ii) member of a limited liability company Franchisee; (iii) partner of a partnership Franchisee; or (iv) partner of a limited liability partnership Franchisee; shall jointly and severally guarantee Franchisee's performance of each and every provision of this Agreement by executing the Guarantee, Indemnification and Acknowledgment in the form attached to this Agreement as **<u>Exhibit C</u>**. In addition, Franchisor may require that the spouse (or domestic partner or other immediate family member) of an owner of Franchisee sign the Guarantee, Indemnification and Acknowledgment however such Guarantee by a spouse shall only be pursued by Franchisor if there is a material transfer of assets from the spouse having an ownership interest in the Franchisee to the non-owning spouse.

**5.19.**  <u>System Modifications</u>.  Franchisee acknowledges and agrees that from time to time hereafter Franchisor may change or modify the System as Franchisor deems appropriate, including, without limitation, to reflect the changing market and/or to meet new and changing consumer demands, and that variations and additions to the System may be required from time to time to preserve and enhance the public image of the System and operations of Franchises.  Franchisor's changes to the System may include, without limitation, the adoption and use of new or modified products, services, equipment and furnishings and new techniques and methodologies relating to the sale, promotion and marketing of products and services, and new trademarks, service marks and copyrighted materials. Franchisee shall, upon reasonable notice, accept, implement, use and display in the operation of the Franchise any such changes in the System, as if they were part of this Agreement at the time of execution hereof, at Franchisee's sole expense. Additionally, Franchisor reserves the right, in its sole discretion, to vary the standards throughout the System, as well as the services and assistance that Franchisor may provide to some franchisees based upon the peculiarities of a particular site or circumstance, existing business practices, or other factors that Franchisor deems to be important to the operation of any Franchise or the System.

**5.20.**  Third-Party Management.  The Franchise shall be operated under the control and supervision of Franchisee (or if an entity, the Operating Principal) or its Manager. Franchisee shall not, without the prior written approval of Franchisor, which may be denied for any reason or no reason at all, hire or retain a management company, manager (other than an employee manager trained and approved by Franchisor), or third party to undertake any of the management or operational functions of the Franchise.

6.  PROPRIETARY MARKS

**6.1.**  Ownership of the Marks.  Franchisor represents that it is the owner of all right, title and interest in and to the Marks or otherwise maintains the right to use, license and sub-license such Marks.

**6.2.**  Use of the Marks.  With respect to Franchisee's use of the Marks, Franchisee agrees that:

**6.2.1.** Franchisee shall use only the Marks designated by Franchisor, and shall use them only in the manner authorized and permitted by Franchisor; all items bearing the Marks shall bear the then-current logo.

**6.2.2.** Franchisee shall use the Marks only for the operation of the business franchised hereunder and only at the location authorized hereunder, or in Franchisor approved advertising for the business conducted at or from that location.

**6.2.3.** Unless Franchisor otherwise directs Franchisee, in writing to do so, Franchisee shall operate and advertise the Franchise only under the name "Koala Insulation" or the name listed on the Summary Page to this Agreement.

**6.2.4.** During the term of this Agreement and any renewal of this Agreement, Franchisee shall identify itself to the public (in a manner reasonably acceptable to Franchisor) as an independent contractor operating the Franchise under a license from Franchisor, and to post a notice to that effect, and as Franchisor directs, in Franchisee's advertising, contracts, forms, stationery and promotional materials.

**6.2.5.** Franchisee's right to use the Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

**6.2.6.** Franchisee shall not use the Marks to incur any obligation or indebtedness on behalf of Franchisor.

**6.2.7.** Franchisee shall not use the Marks or the word Koala or any variant thereof as part of its corporate or other legal name, or as part of any e-mail address, domain name, or other identification of Franchisee in any electronic medium.

**6.2.8.** Franchisee shall execute any documents deemed necessary by Franchisor to obtain protection for the Marks or to maintain their continued validity and enforceability.

**6.2.9.** With respect to litigation involving the Marks, the parties agree that:

**6.2.9.1.** Franchisee shall promptly notify Franchisor of any suspected infringement of the Marks, any known challenge to the validity of the Marks, or any known challenge to Franchisor's ownership of, or Franchisee's right to use, the Marks licensed hereunder. Franchisee acknowledges that Franchisor shall have the right to direct and control any administrative proceeding or litigation involving the Marks, including any settlement thereof. Franchisor shall also have the right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks.

**6.2.9.2.** If Franchisor undertakes the defense or prosecution of any litigation relating to the Marks, Franchisee shall execute any and all documents and do such acts and things as may, in the opinion of counsel for Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action.

**6.3.** Franchisee Acknowledgments. Franchisee expressly understands and acknowledges that:

**6.3.1.** The Marks are valid, owned by Franchisor, and serve to identify the System and those who are authorized to operate under the System.

**6.3.2.** Neither Franchisee nor any owner of Franchisee shall directly or indirectly contest the validity of Franchisor's ownership of the Marks, nor shall

Franchisee, directly or indirectly, seek to register the Marks with any government agency, except with Franchisor's express prior written consent.

**6.3.3.** Franchisee's use of the Marks does not give Franchisee any ownership interest or other interest in or to the Marks, beyond the limited non-exclusive License granted by this Agreement.

**6.3.4.** Any and all goodwill arising from Franchisee's use of the Marks shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the License herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Marks.

**6.3.5.** The License of the Marks is nonexclusive, and Franchisor thus has and retains the rights, among others:

**6.3.5.1.** To use the Marks itself in connection with selling products and services;

**6.3.5.2.** To grant other licenses for the Marks, in addition to those licenses already granted to existing franchisees or other licensees authorized to operate using the Marks;

**6.3.5.3.** To develop and establish (or acquire or be acquired by) other systems using the same or similar Marks, or any other proprietary marks, and to grant licenses or franchises thereto without providing any rights therein to Franchisee.

**6.3.6.** Franchisor reserves the right to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder if the Marks no longer can be used, or if Franchisor, exercising its right to do so, determines that substitution of different proprietary marks will be beneficial to the System. In such circumstances, Franchisee shall implement, at Franchisee's expense, such substituted proprietary marks in such ways as Franchisor may direct, and the use of the substituted proprietary marks shall be governed by the terms of this Agreement.

7.   <u>CONFIDENTIAL OPERATING MANUALS</u>

**7.1.** <u>Manuals</u>. In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Marks, Franchisee shall conduct its business in accordance with the Manuals, one or more copies of which, or access to, Franchisee acknowledges having received on loan from Franchisor for the term of this Agreement. The Manuals may consist of multiple volumes of printed text, video and/or audio tapes and files, computer disks, and other electronically stored data, and Franchisee acknowledges and agrees that Franchisor may provide a portion or all of the Manuals (including updates and

amendments), and other instructional information and materials in, or via, electronic media, including without limitation, through the Internet.

**7.2.**    Confidentiality of the Manuals.  Franchisee shall at all times treat the Manuals, any other manuals created for or approved for use in the operation of the Franchise, and the information contained therein, as confidential, and shall use best efforts to maintain such information as secret and confidential, protect it from viewing by others, and treat the Manuals with the same degree of care as it would treat its most highly confidential documents.  Franchisee shall not at any time download, print, copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person.

**7.3.**    Protection of the Manuals.  The Manuals shall at all times remain the sole property of Franchisor and shall at all times be kept in a secure manner at the Franchise premises.  Franchisee shall ensure that the Manuals are kept current and up to date; and, in the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor at Franchisor's home office shall be controlling.

**7.4.**    Revisions to the Manuals.  Franchisor may from time to time revise the contents of the Manuals, and Franchisee expressly agrees to make corresponding revisions to its copy (to the extent Franchisor permits Franchisee to maintain a written copy) of the Manuals and to comply with each new or changed standard immediately upon receipt of such revision.

8.    **CONFIDENTIAL INFORMATION**

**8.1.**    Confidential Information.  Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised hereunder which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement.  Franchisee shall divulge such confidential information only to such of its employees as must have access to it in order to operate the Franchise.  Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others.  Any employee who may have access to any confidential information regarding the Franchise shall execute a covenant that s/he will maintain the confidentiality of information they receive in connection with their association with Franchisee.  Such covenants or non-disclosure/non-competition agreements shall be on a form provided by Franchisor, which form shall, among other things, designate Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.

**8.2.**  <u>Irreparable Injury</u>.  Franchisee acknowledges that any failure to comply with the requirements of this **Section 8** will cause Franchisor irreparable injury, and Franchisee agrees to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this **Section 8**.

**8.3.**  <u>Information Exchange</u>.  Franchisee agrees to disclose to Franchisor all ideas, concepts, methods, techniques, services, and products conceived or developed by Franchisee, its affiliates, owners, agents, or employees during the term of this Agreement relating to the development and/or operation of the Franchise.  Franchisee hereby grants to Franchisor and agrees to procure from its affiliates, owners, agents, or employees a perpetual, nonexclusive, and worldwide right to use any such ideas, concepts, methods, techniques, services and products.  Franchisor shall have no obligation to make any payments to Franchisee with respect to any such ideas, concepts, methods, techniques or products.  Franchisee agrees that Franchisee will not use or allow any other person or entity to use any such concept, method, technique or product without obtaining Franchisor's prior written approval.

9.  <u>ACCOUNTING AND RECORDS</u>

**9.1.**  <u>Records</u>.  With respect to the operation and financial condition of Franchisee and the Franchise, Franchisee shall adopt, until otherwise specified by Franchisor, a fiscal year and fiscal accounting periods which coincide with Franchisor's then-current fiscal year, as specified by Franchisor.  Franchisee shall maintain for a period of not less than three years during the term of this Agreement, and, for not less than three years following the termination, expiration, or non-renewal of this Agreement, full, complete, and accurate books, records, and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing.

**9.2.**  <u>Periodic Reports</u>.  In addition to the record keeping requirements of **Section 9.1**:

**9.2.1.** If requested by Franchisor, Franchisee shall, at its expense, provide to Franchisor, in a format specified by Franchisor, a complete annual financial statement (prepared according to generally accepted accounting principles, that includes a fiscal year-end balance sheet, an income statement of the Franchise for such fiscal year reflecting all year-end adjustments, and a statement of changes in cash flow of Franchisee), on a review basis, prepared by an independent certified public accountant satisfactory to Franchisor, no later than April 15 of each year for the preceding fiscal year of the Franchise, showing the results of operations of the Franchise during the most recently completed fiscal year.  Franchisee shall also provide Franchisor with a copy of Franchisee's federal and state tax returns, not more than 30 days following Franchisee's submission of the same to governmental authorities.  If Franchisee files any extension request with any taxation authority,

Franchisee shall within 30 days of filing such extension request provide a copy of the request and any confirmation or approval received by the taxing authority.

9.2.2. Within 45 days following the end of each calendar quarter during the term of this Agreement, after the opening of the Franchise, Franchisee shall submit to Franchisor, in a format acceptable to (or, at Franchisor's election, specified by) Franchisor, as amended from time to time:  (i) a fiscal quarter and fiscal year to date profit and loss statement and a quarterly balance sheet (which may be unaudited) for the Franchise; (ii) reports of those income and expense items of the Franchise which Franchisor specifies from time to time for use in any revenue, earnings, and/or cost summary it chooses to furnish to prospective franchisees and/or developers; and (iii) copies of all state sales tax returns for the Franchise. If required by Franchisor, Franchisee shall use on-line or other electronic accounting and reporting systems as Franchisor may specify periodically.

9.3.	Reporting Requirements.  Franchisee shall also submit to Franchisor in addition to the Sales Reports required pursuant to **Section 4.2**, for review or auditing, such other forms, reports, records, information, and data as and when Franchisor may reasonably designate, in the form and format, and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing, including, without limitation, via computer diskette, or otherwise in electronic format, and/or restated in accordance with Franchisor's financial reporting periods, consistent with Franchisor's then current financial reporting periods and accounting practices and standards.  Franchisee shall, without limitation, provide Franchisor with login, API and other access information as required from time to time to permit Franchisor to remotely access Franchisee's bookkeeping software (i.e. QuickBooks or other software designated by Franchisor) to pull reports, download data and perform any other action permitted under this Agreement.  Franchisee shall immediately, without further request from Franchisor, provide updated access information to Franchisor when the previously provided information is changed. The reporting requirements of this **Section 9.3** shall be in addition to, and not in lieu of, the electronic reporting that may be required in connection with the use of the required Technology System under **Section 5.13**.

9.4.	Audit.  Franchisor or its designated agents shall have the right at all reasonable times to examine, copy, and/or personally review or audit, at Franchisor's expense, all books, records, and sales and income tax returns of Franchisee.  Franchisor shall also have the right, at any time, to have an independent audit made of the books of Franchisee and Franchisee agrees that it shall pay Franchisor the costs of one audit each calendar quarter during the term of this Agreement, if an audit is necessitated because Franchisee fails to timely provide Sales Reports or if an audit discloses an understatement in any report by Franchisee of 5% or more, Franchisee shall, reimburse Franchisor for all costs and expenses connected with the audit (including, without limitation, travel, room and board and salaries and other benefits, and reasonable accounting and legal costs). If an inspection should reveal that any payments have been understated in any report to Franchisor, then Franchisee shall immediately pay Franchisor the

amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of 1.5% per month, or the maximum rate permitted by law, whichever is less. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

**9.5.** Data. Franchisor may, from time-to-time, specify in the Manuals or otherwise in writing the information that Franchisee shall collect and maintain on the Technology System installed at the Franchise, and Franchisee shall provide to Franchisor such reports as Franchisor may reasonably request from the data so collected and maintained. All data provided by Franchisee in any form, and whether required by this **Section 9.5** or any other requirement under the System or in the Manuals, including data uploaded to Franchisor's computer system from the Franchisee's Technology System, and/or downloaded from the Franchisee's Technology System to Franchisor's computer system, is and will be owned exclusively by Franchisor, including without limitation, customer lists and email lists, and Franchisor will have the right to use such data in any manner that Franchisor deems appropriate without compensation to Franchisee. In addition, all other data created or collected by Franchisee in connection with the System, or in connection with Franchisee's operation of the business (including but not limited to consumer and transaction data), is and will be owned exclusively by Franchisor during the term of, and following termination or expiration of, this Agreement. Copies and/or originals of such data must be provided to Franchisor upon Franchisor's request. Franchisor hereby licenses use of such data back to Franchisee, at no additional cost, solely for the term of this Agreement and solely for Franchisee's use in connection with the business franchised under this Agreement. Franchisor may use all such information, data, and reports in any manner, including, without limitation, providing financial and operating reports to franchisees and developers operating under the System.

10.  ADVERTISING

Recognizing the value of advertising, and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

**10.1.** Brand Funds. Franchisor shall have the right to establish, at any time, the Brand Fund as described in this **Section 10**.

**10.2.** Brand Fund Contributions and Local Marketing Expenditures. Franchisee shall, during each calendar month, spend on advertising and promotion the greater of $2,000 or 5% of Franchisee's Gross Sales to advertise and to promote the Franchise through methods, media and advertising approved by Franchisor (together, "Local Marketing"). If Franchisee has more than one Territory, the total combined Local Marketing minimum spending requirement for up to 4 contiguous Territories shall be equal to the then-current Local Marketing minimum spending requirement for one Territory. Franchisor shall have the right to designate in writing from time to time how, and in what proportions, Franchisee is to allocate its Local Marketing. Additionally, Franchisee shall contribute (i) 1% of Gross Sales

to the Brand Fund ("Brand Fund") as may be established pursuant to Section 10.3. The Brand Fund contribution may be increased to 2% upon notice to Franchisee.

**10.2.1.**    Franchisor shall provide Franchisee with not less than 60 days prior written notice of any change in the required Local Marketing (which will not exceed 5% of Gross Sales).  Franchisor shall not increase required Brand Fund contributions to an amount exceeding 2% of Gross Sales.

**10.2.2.**    Franchisee shall pay required Brand Fund Contributions in the manner required under **Section 4** (or as otherwise provided in this **Section 10**).

**10.2.3.**    For all company-owned Franchises, Franchisor shall contribute to the Brand Fund on the same basis as franchisees.

**10.3.**  Brand Fund.  Although it is under no obligation to do so, Franchisor may at any time establish a Brand Fund, as follows:

**10.3.1.**    Franchisor or its designee shall have the right to direct all advertising programs, as well as all aspects thereof, including without limitation, the concepts, materials, and media used in such programs and the placement and allocation thereof.  Franchisee agrees and acknowledges that the Brand Fund is intended to maximize general public recognition, acceptance, perception of, and use of the System; and that Franchisor and its designee are not obligated, in administering the Brand Fund, to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or pro rata from expenditures by the Brand Fund.  Franchisor may engage the services of a franchise sales organization for development of the franchise system, and Franchisee specifically acknowledges and agrees that such franchise sales organization may be compensated out of the Brand Fund in exchange for services and products that, while not intended solely to market the sale of franchises, benefit the franchise system through franchise development and brand marketing."

**10.3.2.**    The Brand Fund, all contributions thereto, and any earnings thereon, shall be used exclusively (except as otherwise provided in this **Section 10.3**) to meet any and all costs of maintaining, administering, directing, conducting, creating and/or otherwise preparing advertising, marketing, public relations and/or promotional programs and materials, research and design relating to branding and implementation of re-branding programs and strategies, and any other activities which Franchisor believes will enhance the image of the System, including, without limitation, the costs of: preparing and/or conducting media advertising campaigns; marketing surveys and other public relations activities; employing advertising and/or public relations agencies; purchasing promotional items; developing new or modified trade dress and marks; point-of-purchase (POP) materials; design and photographs; purchasing media space or time (including all associated fees and expenses); administering regional and multi-regional marketing and advertising programs; market research; developing

29

and implementing customer loyalty programs; the creative development of, and actual production associated with, premium items, give-aways, promotions, contests, public relation events, and charitable or non-profit events; developing, implementing and maintaining an electronic commerce website and/or related strategies; maintaining and developing one or more websites devoted to the System, the Marks and/or the "Koala" brand; providing promotional and other marketing materials and services to the Franchises operated under the System; and the salaries of Franchisor's employees to the extent such employees provide services in conjunction with System marketing activities. The Brand Fund may also be used to provide rebates or reimbursements to franchisees for local expenditures on products, services, or improvements, approved in advance by Franchisor, which products, services, or improvements Franchisor shall have the right to determine what will promote general public awareness and favorable support for the System.

10.3.3.    Franchisee shall contribute to the Brand Fund in the manner specified by Franchisor. All sums paid by Franchisee to the Brand Fund shall be maintained in an account separate from Franchisor's other monies. The Brand Fund will not be used to defray the general operating expenses of Franchisor except that Franchisor shall have the right to charge the Brand Fund for such reasonable administrative costs and overhead as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund and advertising programs for franchisees and the System. The Brand Fund and its earnings shall not otherwise inure to the benefit of Franchisor.

10.3.4.    The Brand Fund is not intended to be, nor will it be deemed to be a trust, and Franchisor does not assume any fiduciary obligation to Franchisee for maintaining, directing or administering the Brand Fund or for any other reason. A statement of the operations of the Brand Fund as shown on the books of Franchisor shall be prepared annually by Franchisor, and shall be made available to Franchisee on an annual basis upon Franchisee's written request.

10.3.5.    Although the Brand Fund is intended to be of perpetual duration, Franchisor maintains the right to terminate the Brand Fund. The Brand Fund shall not be terminated, however, until all monies in the Brand Fund have been expended for advertising and/or promotional purposes. If Franchisor terminates the Brand Fund, Franchisor shall have the right to require Franchisee to spend an amount equal to previous Brand Fund contribution amount on Local Marketing and allocate such spending as directed by Franchisor.

10.4.   Promotional Materials and Marketing Assistance.   Franchisor shall make available to Franchisee from time to time, at Franchisee's expense, advertising plans and promotional materials, including newspaper mats, coupons, merchandising materials, sales aids, point of purchase materials, special promotions, direct mail materials, community relations programs, and similar advertising and promotional materials for use in advertising and promotion. Franchisor may provide periodic marketing assistance to Franchisee.

**10.5.**  <u>Approvals</u>.  For all proposed advertising, marketing, and promotional plans, Franchisee shall submit samples of such plans and materials to Franchisor (by means described in **Section 20**), for Franchisor's review and prior written approval (except with respect to prices to be charged by Franchisee).  If written approval is not received by Franchisee from Franchisor within 30 days of the date of receipt by Franchisor of such samples or materials, Franchisor shall be deemed to have disapproved them. Franchisee acknowledges and agrees that any and all copyright in and to advertising and promotional materials developed by or on behalf of Franchisee shall be the sole property of Franchisor, and Franchisee agrees to execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Franchisor to give effect to this provision.

**10.6.**  <u>Minimum Requirements Only</u>.  Franchisee understands and acknowledges that the required Local Marketing and Brand Fund contributions are minimum requirements only, and that Franchisee may, and is encouraged by Franchisor to expend additional funds for local advertising and promotion of a local nature which will focus on disseminating advertising directly related to the Franchise.

**10.7.**  <u>Websites; Internet Use</u>.  Franchisee shall not, without Franchisor's prior written approval, offer, promote, or sell any products or services, or make any use of the Marks, through the Internet, including the use of websites, domain names, uniform resource locators, keywords, linking, search engines (and search engine optimization techniques), banner ads, meta-tags, marketing, auction sites, e-commerce (as defined below) and co-branding arrangements.  Any website shall be deemed "advertising" under this Agreement, and will be subject to (among other things) Franchisor's approval under **Section 10.6**.  Franchisor has the right to control or designate the manner of Franchisee's use of all URLs, domain names, website addresses, metatags, links, key words, e-mail addresses and any other means of electronic identification or origin ("**e-names**").  Franchisor also has the right to designate, approve, control or limit all aspects of Franchisee's use of the Internet, Intranet, World Wide Web, wireless technology, digital cable, use of e-names, e-mail, home pages, bulletin boards, chat rooms, social networking sites, linking, framing, online purchasing cooperatives, marketplaces, barter exchanges, and related technologies, methods, techniques, registrations, networking, and any electronic communication, commerce, computations, or any means of interactive electronic documents contained in a network of computers or similar devices linked by communications software or hardware (collectively, "**e-commerce**").  Franchisee agrees to follow all of Franchisor's policies and procedures related to the use and regulation of e-commerce.  Franchisee agrees to be bound by any terms of use, privacy policy and copyright notice and takedown policies and the like that Franchisor establishes from time to time.  Franchisor may require Franchisee, at Franchisee's expense, to coordinate its e-commerce activities with Franchisor, other Franchises, suppliers and/or affiliates. Other than any e-mail or any similar account provided to Franchisee by Franchisor, if any, Franchisee shall not establish any e-mail account using the Marks or similar names or marks. Franchisee agrees to use any e-mail or any similar account provided to Franchisee

by Franchisor solely for business purposes. Franchisee shall be required to follow Franchisor's intranet and Internet usage rules, policies and requirements. Franchisor retains the sole right to approve any linking to, or other use of, the Koala Website. Franchisee may not establish or participate in any Koala related blog or other discussion forum. Franchisee recognizes and agrees that Franchisor and its affiliates own all rights, title and interest in and to any and all websites and e-names that Franchisor commissions or utilizes, or requires or permits Franchisee to utilize, in connection with the System, which bear the Marks or any derivative of the Marks. Franchisee also recognizes and agrees that Franchisor and/or its affiliates own all rights, title and interest in and to any and all data or other information collected via e-commerce related to the System or the Marks, including any customer data, click-stream data, cookies, user data, hits and the like. Such data or other information also constitutes Franchisor's confidential information subject to **Article 8.**

**10.8.** <u>Limitations on Associations with the Marks</u>. Franchisee acknowledges and agrees that certain associations between Franchisee and/or the Franchise, and/or the Marks and/or the System, and/or businesses operating under or products sold under the Marks or the Koala brand names on the one hand, and certain political, religious, cultural or other types of groups, organizations, causes, or activities, on the other, however well-intentioned and/or legal, may create an unwelcome, unfair, or unpopular association with, and/or an adverse effect on, the reputation of Franchisor, the System, the Koala brand, or the good will associated with the Marks. Accordingly, Franchisee shall not, without the prior written approval of Franchisor, engage in any activities with, or donate any money, products, services, goods, or other items to, any charitable, political or religious organization, group, or activity, if such action is taken, or may be perceived by the public to be taken, in the name of, in connection with, or in association with Franchisee, the Marks, the Franchise, the Franchisor, or the System.

11.    <u>INSURANCE</u>

**11.1.** <u>Insurance Requirements</u>. Prior to the commencement of any activities or operations pursuant to this Agreement, Franchisee shall procure and maintain in full force and effect during the term of this Agreement (and for such period thereafter as is necessary to provide the coverages required hereunder for events having occurred during the term of this Agreement), at Franchisee's expense, the following insurance policy or policies in connection with the Franchise or other facilities on the premises, or by reason of the construction, operation, or occupancy of the Franchise or other facilities on premises. Such policy or policies shall be written by an insurance company or companies acceptable to Franchisor, having a rating of at least "A-7" in the most recent Key Rating Guide published by the A.M. Best Company (or another rating that Franchisor reasonably designates if A.M. Best Company no longer publishes the Key Rating Guide) and licensed to do business in the state in which the Franchise is located. Such policy or policies shall be in accordance with standards and specifications set forth in the Manuals or otherwise in writing and shall include, at a minimum (except as additional coverages and higher policy limits may reasonably be specified for all franchisees

from time to time by Franchisor in the Manuals or otherwise in writing to reflect inflation, identification of new risks, changes in the law or standards of liability, higher damage awards and other relevant changes in circumstances), the following:

**11.1.1.** Comprehensive general liability insurance, written on an occurrence basis, extended to include contractual liability, products and completed operations, and personal and advertising injury, with a combined bodily injury and property damage limit of not less than $1,000,000 per occurrence.

**11.1.2.** If any vehicles are used for business purposes, business automobile liability insurance, including a combined single bodily injury and property damage coverage for all owned, nonowned, and hired vehicles, with limits of liability not less than $1,000,000 per occurrence for both bodily injury and property damage.

**11.1.3.** Statutory workers' compensation insurance and employer's liability insurance for a minimum limit of at least $500,000, as well as such other disability benefits type insurance as may be required by statute or rule of the state in which the Franchise is located.

**11.1.4.** Commercial umbrella liability insurance with limits which bring the total of all primary underlying coverages to not less than $2,000,000 total limit of liability.

**11.1.5.** Property insurance providing coverage for direct physical loss or damage to real and personal property for all-risk perils, including the perils of flood and earthquake.

**11.1.6.** Any other insurance coverage that is required by federal, state, or municipal law.

**11.2.** Referenced in Manuals. All policies listed in **Section 11.1** (unless otherwise noted below) shall contain such endorsements as shall, from time to time, be provided in the Manuals.

**11.3.** Policy Cancellation. In the event of cancellation, material change, or nonrenewal of any policy, 60 days' advance written notice must be provided to Franchisor in the manner provided in **Article 20**. Franchisee shall arrange for a copy of such notification to be sent to Franchisor by the insurance company.

**11.4.** Construction and Remodeling Insurance. In connection with all significant construction, reconstruction, or remodeling of the Franchise during the term of this Agreement, Franchisee will cause the general contractor, its subcontractors, and any other contractor, to effect and maintain at general contractor's and all other contractor's own expense, such insurance policies and bonds with such endorsements as are set forth in the Manuals, all written by insurance or bonding companies approved by Franchisor, having a rating as set forth in **Section 11.1**.

**11.5.**  <u>No Waiver of Obligations</u>.  Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in **Section 17.4.**

**11.6.**  <u>Franchisor to be Additional Insured</u>.  All insurance policies shall list Franchisor and its affiliates, officers, directors, employees, and agents as additional insureds.

**11.7.**  <u>Certificates of Insurance</u>.  At least 30 days prior to the time any insurance is first required to be carried by Franchisee, and thereafter at least 30 days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor, certificates of insurance evidencing the proper coverage with limits not less than those required hereunder.  All certificates shall expressly provide that no less than 30 days' prior written notice shall be given Franchisor in the event of material alteration to, cancellation, or nonrenewal of the coverages evidenced by such certificates.  Further certificates evidencing the insurance required by **Section 11.1** shall name Franchisor, and each of its affiliates, directors, agents, and employees as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions for which such certificates evidence coverage.  In the event that Franchisee fails to provide evidence reasonably satisfactory to Franchisor of the insurance policies required by this **Article 11**, Franchisor may, but is not required to, obtain such required policies on Franchisee's behalf, and Franchisee agrees that it will promptly reimburse Franchisor for all costs related to obtaining such policies upon notice from Franchisor.

**11.8.**  <u>Proof of Insurance</u>.  In addition to its obligations under **Section 11.7**, on the first anniversary of the Effective Date, and on each subsequent anniversary thereof during the term of this Agreement and any renewal hereof, Franchisee shall provide Franchisor with proof of insurance evidencing the proper coverage with limits not less than those required hereunder, in such form as Franchisor may reasonably require.

**11.9.**  <u>Policy Limit Changes</u>.  Franchisor shall have the right, from time to time, to make such changes in minimum policy limits and endorsements as it may determine; provided, however, all changes shall apply, generally, to all franchisees of Franchisor who are similarly situated.

12.  <u>TRANSFER OF INTEREST</u>

**12.1.**  <u>Franchisor Transfers</u>.  Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations under this Agreement, or any interests in the assets of Franchisor, or any ownership or equity interests in Franchisor, to any person or entity, and any assignee of Franchisor shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment.

**12.2.**  Principals.  If Franchisee is an entity, each person or entity that is an owner of, or has an ownership interest in, Franchisee (each, a "**Principal**"), and the interest of each Principal in Franchisee, is identified on the Summary Page. Franchisee represents and warrants that its owners are as set forth on the Summary Page attached to this Agreement, and covenants that it will not permit the identity of such owners, or their respective interests in Franchisee, to change without complying with this Agreement.  Franchisor shall have the right to designate any person or entity which owns a direct or indirect interest in Franchisee as a Principal, and the Summary Page shall be so amended automatically upon notice thereof to Franchisee.

**12.3.**  Franchisee Transfers.  Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and its Principals, and that Franchisor has granted this License in reliance on Franchisee's or Franchisee's Principals' business skill, financial capacity, and personal character.  Accordingly:

**12.3.1.**    Franchisee shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber:  (a) this Agreement or any of the rights and obligations of Franchisee under this Agreement; or (b) any material asset of Franchisee or the Franchise; provided, however, that Franchisee may grant a security interest in, or otherwise encumber certain assets of the Franchise, excluding the Franchise Agreement, in connection with Franchisee obtaining financing for the development and/or operation of the Franchise or equipment leasing, if such financing satisfies the requirements of Franchisor, which may include, without limitation, execution of agreements by Franchisor, Franchisee, and/or such Principal, and any secured creditor of Franchisee, in a form satisfactory to Franchisor, acknowledging such creditor's obligations to be bound by the terms of this **Article 12**.

**12.3.2.**    If Franchisee is a corporation or limited liability company, Franchisee shall not, without the prior written consent of Franchisor, issue any voting securities or securities convertible into voting securities, and the recipient of any such securities shall become a Principal under this Agreement, if so designated by Franchisor.

**12.3.3.**    If Franchisee is a partnership or limited partnership, the partners of the partnership shall not, without the prior written consent of Franchisor, admit additional general partners, remove a general partner, or otherwise materially alter the powers of any general partner.  Each general partner shall automatically be deemed a Principal of Franchisee.

**12.3.4.**    A Principal shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber any interest of a Principal in Franchisee.

**12.4.**  Conditions for Approval.  Franchisor shall not unreasonably withhold any consent required by **Section 12.3**; provided, that if Franchisee proposes to

transfer its obligations hereunder or any interest in any material asset, or if a Principal proposes to transfer any direct or indirect interest in Franchisee, or if Franchisee or any Principal proposes to undertake any transfer that is subject to **Section 12.3**, Franchisor shall have the right to require any or all of the following as conditions of its approval (except as provided in **Section 12.9**):

**12.4.1.**    The transferor shall have executed a general release (which shall include a release from the transferor, Franchisee, Principals, and guarantors of Franchisee), in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, successors, and assigns, and their respective directors, officers, owners, members, managers, partners, agents, representatives, servants, and employees in their corporate and individual capacities including, without limitation, claims arising under this Agreement, any other agreement between Franchisee and Franchisor or its affiliates, and federal, state, and local laws and rules.

**12.4.2.**    The transferee of a Principal shall be designated as a Principal and each transferee who is designated a Principal shall enter into a written agreement, in a form satisfactory to Franchisor, agreeing to be bound as a Principal under the terms of this Agreement as long as such person or entity owns any interest in Franchisee; and, the Principal shall guarantee the performance of all such obligations in writing in a form satisfactory to Franchisor.

**12.4.3.**    Prior to, and after the transfer, Franchisee's new Principals shall meet Franchisor's educational, managerial, and business standards; each shall possess a good moral character, business reputation, and credit rating; have the aptitude and ability to operate the Franchise, as may be evidenced by prior related business experience or otherwise; and have adequate financial resources and capital to operate the Franchise.

**12.4.4.**    If a proposed transfer would result in a change in control of Franchisee, at Franchisor's option, Franchisee (or transferee) shall execute, for a term ending on the expiration date of this Agreement the form of franchise agreement then being offered to new System franchisees, and such other ancillary agreements required by Franchisor for the business franchised hereunder, which agreements shall supersede this Agreement and its ancillary documents in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, higher royalty and advertising fees.

**12.4.5.**    If a proposed transfer would result in a change in control of Franchisee, and if so requested by Franchisor, Franchisee, at its expense, shall upgrade the Franchise to conform to the then current standards and specifications of new Franchises then being established in the System, and shall complete the upgrading and other requirements set forth in **Sections 5.1.6** and **5.2.5** within the time period specified by Franchisor.

**12.4.6.**    All monetary obligations of Franchisee hereunder shall be paid in full on a current basis, and Franchisee must not be otherwise in default of

any of its obligations hereunder including, without limitation, its reporting obligations.

**12.4.7.** The transferor shall remain liable for all of the obligations to Franchisor in connection with the Franchise that arose prior to the effective date of the transfer, and any covenants that survive the termination or expiration of this Agreement, and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability.

**12.4.8.** At Franchisee's expense, the transferee's Manager and other employees designated by Franchisor shall successfully complete (to Franchisor's satisfaction) all training programs required by Franchisor upon such terms and conditions as Franchisor may reasonably require (and while Franchisor will not charge a fee for attendance at such training programs, the transferee shall be responsible for the salary and all expenses of the person who attends training).

**12.4.9.** If a proposed transfer would result in a change in control of Franchisee, and to compensate Franchisor for Franchisor's legal, accounting, training, and other expenses incurred in connection with the transfer, Franchisee shall pay Franchisor a non-refundable transfer fee in an amount equal to the greater of $10,000 or 20% of the then-current franchise fee applicable to the Territory. One-half of the transfer fee shall be paid at the time Franchisee submits its request to Franchisor for consideration of the proposed transfer, and such amount shall be non-refundable. The balance of the transfer fee shall be paid at the time the transfer is consummated or closes. In addition, in the event a proposed transfer is not consummated or closed, for any reason except for disapproval by Franchisor, Franchisee or the proposed transferee shall reimburse Franchisor for all of its costs and expenses incurred in connection with its evaluation of the proposed transfer, including, without limitation, attorneys' and accountants' fees, background checks, site evaluation, and training, if applicable, to the extent the portion of the transfer fee paid when the transfer approval request was made does not cover those costs and expenses.

**12.4.10.** If the proposed transfer will result in a change in control of Franchisee, the terms of the proposed transfer will not adversely impact the continued operations of the Franchise, as determined in Franchisor's sole discretion.

**12.4.11.** The transferor must acknowledge and agree that the transferor shall remain bound by the covenants contained in **Sections 15.2** and **15.3**.

12.4.12 Franchisee shall be solely responsible for paying any broker fees and/or commissions involved with the sale or transfer of the Franchise regardless of whether Franchisee directly engages such broker or if, at Franchisee's request, Franchisor engages such broker to assist with the sale or transfer of the Franchised Business.

**12.5.**  <u>Right of First Refusal</u>.

**12.5.1.**       If Franchisee or any Principal desires to accept any *bona fide* offer from a third party to purchase Franchisee, any material assets of Franchisee, or any direct or indirect interest in Franchisee, Franchisee or such Principal shall promptly notify Franchisor of such offer and shall provide such information and documentation relating to the offer as Franchisor may require.  Franchisor shall have the right and option, exercisable within 30 days after receipt of all such information, to send written notice (the "**Exercise Notice**") to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party.  If Franchisor elects to purchase the seller's interest, the contract to purchase the Franchise (or interests or assets) shall be executed within 60 days after the Exercise Notice and the closing shall occur at the principal offices of Franchisor; provided, however, that in no event shall the closing occur later than 90 days following the execution of the definitive purchase agreement.

**12.5.2.**       Any material change in the terms of the *bona fide* offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of the third party's initial offer.   Additionally, if Franchisor elects not to exercise its purchase right and Franchisee fails to complete the proposed sale within six months from the date Franchisor notifies Franchisee that Franchisor will not make the purchase, Franchisor shall again have the right of first refusal described in this **Section 12.5**.  Failure of Franchisor to exercise the option afforded by this **Section 12.5** shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this **Section 12**, with respect to a proposed transfer, or a waiver of any subsequent offer.

**12.5.3.**       In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, they must attempt to appoint a mutually-acceptable independent appraiser to make a binding determination.  If the parties are unable to agree upon one independent appraiser, then an independent appraiser shall be promptly designated by Franchisor and another independent appraiser shall be promptly designated by Franchisee, which two appraisers shall, in turn, promptly designate a third appraiser; all three appraisers shall promptly confer and reach a single determination, which determination shall be binding upon Franchisor and Franchisee.  The cost of any such appraisal shall be shared equally by Franchisor and Franchisee.  If Franchisor elects to exercise its right under this **Section 12.5**, Franchisor shall have the right to set off all amounts due from Franchisee, and one-half of the cost of the appraisal, if any, against any payment to the seller.

**12.6.**  <u>Transfer Upon Death</u>.  Upon the death of a Principal, the deceased's executor, administrator, or other personal representative shall transfer the

deceased's interest to a third party approved by Franchisor within 12 months after the death. If the distributee is not approved by Franchisor, then the distributee shall transfer the deceased's interest to a third party approved by Franchisor within 12 months after the deceased's death.

**12.7.** <u>Transfer Upon Permanent Disability</u>. Upon the permanent disability of any Principal with a controlling interest in Franchisee, Franchisor shall have the right to require such interest to be transferred to a third party in accordance with the conditions described in this **Section 12** within six months after notice to Franchisee, provided that no transfer fee shall be due for a transfer pursuant to this **Section 12.7.** "**Permanent Disability**" shall mean any physical, emotional, or mental injury, illness, or incapacity that would prevent a person from performing the obligations set forth in this Agreement for at least six consecutive months, and from which condition recovery within six consecutive months from the date of determination of disability is unlikely. Permanent disability shall be determined by a licensed practicing physician upon examination of such person or, if such person refuses to be examined, then such person shall automatically be deemed permanently disabled for the purposes of this **Section 12.7** as of the date of refusal. The licensed practicing physician making such determination shall be chosen by the mutual agreement of a doctor selected by Franchisor and a doctor selected by Franchisee. Franchisor shall pay the cost of the required examination.

**12.8.** <u>Notification Upon Death or Permanent Disability</u>. Upon the death or permanent disability any Principal of Franchisee, such person or his representative shall promptly notify Franchisor of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as any *inter vivos* transfer.

**12.9.** <u>Exceptions for Entity Formed Convenience of Ownership or Transfer to Family Member</u>. Notwithstanding anything to the contrary in this **Section 12**, if Franchisee is an individual and seeks to transfer this Agreement to an entity formed for the convenience of ownership or if Franchisee seeks to transfer this Agreement to a spouse, adult sibling or adult child (subject to compliance with all other provisions of the Transfer), the conditions of **Sections 12.4.4** (signing a new franchise agreement), **12.4.5** (upgrading the Franchise), **12.4.8** (initial training of new Manager), and **12.4.9** (transfer fee) shall not apply; provided however, that in lieu of a transfer fee, Franchisee shall reimburse Franchisor for its legal, accounting and other professional fees and other costs incurred in connection with the transfer if any, and Franchisee may undertake such transfer, provided that Franchisee (or their spouse, sibling or child as applicable above) owns 100% of the equity interest in the transferee entity, and the Franchisee and transferee personally guarantees, in a written guaranty satisfactory to Franchisor, the performance of the obligations of Franchisee under this Agreement.

**12.10.** <u>No Waiver of Claims</u>. Franchisor's consent to a transfer which is the subject of this **Section 12** shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to

demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

**12.11.** <u>Insolvency</u>.  If Franchisee or any person holding any interest (direct or indirect) in Franchisee becomes a debtor in a proceeding under the U.S. Bankruptcy Code or any similar law in the U.S. or elsewhere, it is the parties' understanding and agreement that any transfer of Franchisee, Franchisee's obligations and/or rights hereunder, any material assets of Franchisee, or any indirect or direct interest in Franchisee shall be subject to all of the terms of this **Section 12**.

**12.12.** <u>Securities Offerings</u>.  All materials for an offering of stock or partnership interests in Franchisee or any affiliate of Franchisee which are required by federal or state law shall be submitted to Franchisor for review as described below before such materials are filed with any government agency.  Any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use.  No offering by Franchisee or any affiliate of Franchisee shall imply (by use of the Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of the securities of Franchisee or Franchisee's affiliates; and Franchisor's review of any offering shall be limited solely to the relationship between Franchisor and Franchisee and affiliates, if applicable, and shall not constitute any opinion as to any legal requirement.  Franchisor may, at its option, require the offering materials to contain a written statement prescribed by Franchisor concerning the limitations stated in the preceding sentence.  Franchisee (and the offeror if not Franchisee), the Principals, and all other participants in the offering must fully indemnify Franchisor, its affiliates, successors, and assigns, and their respective directors, officers, shareholders, partners, agents, representatives, servants, and employees in connection with the offering and shall execute any and all documents required by Franchisor to endorse such indemnification.  For each proposed offering, Franchisee shall pay Franchisor an amount as is necessary to reimburse Franchisor for its reasonable costs and expenses (including legal and accounting fees) for reviewing the proposed offering.  Franchisee shall give Franchisor written notice at least 30 days before the date that any offering or other transaction described in this **Section 12.12** commences.  Any such offering shall be subject to all of the other provisions of this **Article 12**; and further, without limiting the foregoing, it is agreed that any such offering shall be subject to Franchisor's approval as to the structure and voting control of the offeror (and Franchisee, if Franchisee is not the offeror) after the financing is completed.

13.  <u>DEFAULT AND TERMINATION</u>

**13.1.**  <u>Automatic Termination</u>.  Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and not opposed by Franchisee; or if Franchisee is adjudicated as bankrupt or insolvent; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for

Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied or of record for 30 days or longer (unless unappealed or a supersedeas bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's business or property; or if suit to foreclose any lien or mortgage against the Franchise premises or equipment is instituted against Franchisee and not dismissed within 30 days; or if the real or personal property of Franchisee's Franchise shall be sold after levy thereupon by any sheriff, marshal, or constable.

**13.2.**  <u>Termination Upon Notice Without Opportunity to Cure</u>.  Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the delivery of written notice to Franchisee by Franchisor (in the manner set forth under **Section 20**), upon the occurrence of any of the following events:

**13.2.1.**     If Franchisee fails to open the Franchise as provided in **Section 5.5**;

**13.2.2.**     If Franchisee or other designated employee fails to complete the initial training program pursuant to **Sections 3.2** and **5.6** of this Agreement;

**13.2.3.**     If Franchisee at any time ceases to operate or otherwise abandons the Franchise for three consecutive business days, or loses the right to possession of the Franchise Location, any Koala Rig(s), or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchise is located;

**13.2.4.**     If Franchisee or any Principal is convicted of a felony or engages in any other activity that Franchisor believes is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or Franchisor's interest therein;

**13.2.5.**     If a threat or danger to public health or safety results from the construction, maintenance, or operation of the Franchise;

**13.2.6.**     If Franchisee or any Principal purports to transfer any rights or obligations under this Agreement or any interest to any third party in a manner that is contrary to the terms of **Section 12**;

**13.2.7.**     If Franchisee or any Principal fails to comply with the covenants in **Section 15.2**;

**13.2.8.**     If, contrary to the terms of **Sections 7** or **8**, Franchisee discloses or divulges confidential information provided to Franchisee by Franchisor;

**13.2.9.**    If Franchisee knowingly maintains false books or records, or submits any false reports (including, but not limited to, information provided as part of Franchisee's application for this franchise) to Franchisor, underreports Gross Sales by more than 5% or more for any period;

**13.2.10.**    If Franchisee commits three or more defaults under this Agreement in any 12-month period, whether or not each such default has been cured after notice;

**13.2.11.**    If Franchisee or any Principal makes any unauthorized or improper use of the Marks or contests the validity of Franchisor's ownership of the Marks or its right to use and to license others to use the Marks; and/or

13.2.12.    If Franchisee or any Principal is in breach or default under any other agreement (whether existing as of the date of this Agreement or subsequently made) with Franchisor or any of its subsidiaries or Affiliates, and if such default is curable, fails to cure the default as required within the time permitted.

**13.3.**  Termination With Opportunity to Cure.  Except as otherwise provided in **Sections 13.1** and **13.2**, upon any other default by Franchisee of its obligations hereunder, Franchisor may terminate this Agreement only by giving written notice of termination (in the manner set forth under **Article 20**) setting forth the nature of such default to Franchisee at least 30 days prior to the effective date of termination (or, with respect to monetary defaults, five days); provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor, all within the 30 day period (or five  day period with respect to monetary defaults).  If any such default is not cured within the specified time, this Agreement may, upon Franchisor's election, be terminated without further notice to Franchisee effective immediately upon the expiration of the 30 day period (or five day period with respect to monetary defaults) or such longer period as applicable law may require.

**13.4.**  Extended Notice of Termination.  If any law applicable to this **Section 13**, requires a longer notice period prior to termination of this Agreement, or prior to a refusal to enter into a successor or renewal franchise, than is required hereunder, a different standard of "good cause", or the taking of some other action not required hereunder, the prior notice, "good cause" standard, and/or other action required by such law shall be substituted for the comparable provisions hereof.

**13.5.**  Assignment Upon Bankruptcy.  If, for any reason, this Agreement is not terminated pursuant to this **Article 13**, and this Agreement is assumed, or assignment of the same to any person or entity who has made a *bona fide* offer to accept an assignment of this Agreement is contemplated, pursuant to the United States Bankruptcy Code, then notice of such proposed assignment or assumption, setting forth:  (i) the name and address of the proposed assignee; and (ii) all of the terms and conditions of the proposed assignment and assumption, shall be given to Franchisor within 20 days after receipt of such proposed assignee's offer to

accept assignment of this Agreement, and, in any event, within 10 days prior to the date application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Franchisor shall thereupon have the prior right and option, to be exercised by notice given at any time prior to the effective date of such proposed assignment and assumption, to accept an assignment of this Agreement to Franchisor itself upon the same terms and conditions and for the same consideration, if any, as in the *bona fide* offer made by the proposed assignee, less any brokerage commissions which may be payable by Franchisee out of the consideration to be paid by such assignee for the assignment of this Agreement.  In the event Franchisor does not elect to exercise the options described in this **Section 13.5**, any transfer or assignment pursuant to the United States Bankruptcy Code shall be subject to the same terms and conditions of any other transfer or assignment set forth in **Article 12**.

**13.6.**  Damages.  In addition to any other claims Franchisor may have (other than claims for lost future Royalty Fees and Brand Fund Contributions), if Franchisor terminates this Agreement based on Franchisee's default or if Franchisee terminates this Agreement in violation of its terms, Franchisee must pay Franchisor liquidated damages calculated as follows:  (a) the greater of (i) the average of Franchisee's monthly Royalty Fees and Brand Fund Contributions due for the last 12 months (or for such shorter period of time that the Franchise has been in operation) before termination, (ii) or the average monthly amount which would be due based on the minimum fees set forth in **Section 4.2** for a period 37+ months after the Effective Date,  (b) multiplied by the lesser of 24 or the number of months remaining in the then-current term under **Section 2.1**, (c) discounted to present value using the then-current prime rate of interest quoted by Franchisor's principal commercial bank.  The parties hereto agree that calculation of damages if Franchisor terminates due to default or if Franchisee terminates this Agreement in violation of its terms will be difficult to measure and quantify, and the damages described in this **Section 13.6** are a reasonable approximation of such damages, and are not a penalty.

14.    OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

**14.1.**  Cease Operations.  Franchisee shall immediately cease to operate the Franchise, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

**14.2.**  Cease Use of Marks.  Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures and techniques associated with the System, the mark "Koala Insulation" and all other Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System.  In particular, Franchisee shall cease to use, without limitation, the Koala Rigs, all signs, advertising materials, displays, stationery, forms, and any other articles that display the Marks.

**14.3.**  Cancellation of Assumed Names.  Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark "Koala Insulation" and all other Marks, and/or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five days after termination or expiration of this Agreement.

**14.4.**  Assign Lease; Modification of Premises.  Franchisor, or any affiliate of Franchisor, shall have the right and option, but not the obligation, in Franchisor's sole discretion, to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location (if applicable).  Franchisor may assign or delegate this right or option to any affiliate or designee of Franchisor, without notice to, or request for approval from, the landlord or lessor of the Franchise Location.  If Franchisor or its assignee or delegatee does not elect or is unable to exercise any option it may have to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location, Franchisee shall make such modifications or alterations to the Franchise Location operated hereunder immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of said premises from that of other Franchises, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  If Franchisee fails or refuses to comply with the requirements of this **Section 14.4**, Franchisor (or its designee) shall have the right to enter upon the premises of the Franchise, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

**14.5.**  Telephone, Etc.  Franchisee shall cease use of, and if Franchisor requests, shall transfer to Franchisor, all telephone numbers, customer lists, and any domain names, websites, email addresses, and any other identifiers, whether or not authorized by Franchisor, used by Franchisee while operating the Franchise.

**14.6.**  No Confusion.  Franchisee agrees, if it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit copy, or colorable imitation of the Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Marks, and further agrees not to utilize any designation of origin, description, trademark, service mark, or representation which suggests or represents a present or past association or connection with Franchisor, the System, or the Marks.

**14.7.**  Pay Monies Owed.  Franchisee shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates (regardless of whether those obligations arise under this Agreement or otherwise).  In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default.

**14.8.** <u>Damages and Costs</u>. Franchisee shall pay Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this **Section 14**.

**14.9.** <u>Return of Manuals</u>. Franchisee shall immediately deliver to Franchisor the Manuals and all other manuals, records, and instructions containing confidential information (including without limitation any copies thereof, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of Franchisor.

**14.10.** <u>Option to Purchase Furnishings and Equipment</u>. Franchisor shall have the option to purchase from Franchisee any or all of the Koala Rigs and other vehicles, furnishings, equipment, signs, fixtures, supplies, or inventory of Franchisee related to the operation of the Franchise, at the lesser of the fair market value or Franchisee's book value. Franchisor shall have 30 days from the expiration or termination of this Agreement to notify Franchisee that Franchisor will exercise its option under this Section 14.10, and another 60 days from such notice to complete such purchase. The book value of any such item shall be determined based upon a five-year straight-line depreciation of original costs. For equipment that is five or more years old, the parties agree that fair market value shall be deemed to be 10% of the equipment's original cost. If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee as well as all amounts due to Franchisor's affiliates from Franchisee. Franchisee shall take all actions as necessary to ensure that any items purchased by Franchisor shall be free of all liens or other encumbrances at the time Franchisee sells such items to Franchisor.

**14.11.** <u>Right to Enter and Operate</u>. In order to preserve the goodwill of the System following termination, Franchisor (or its designee) shall have the right to enter the Franchise Location (if applicable) (without liability to Franchisee, Franchisee's Principals, or otherwise) or to take possession of the Koala Vehicle(s) used by Franchisee for the purpose of continuing the Franchise's operation and maintaining the goodwill of the business.

**14.12.** <u>Close Vendor Accounts</u>. Franchisee must close all accounts with vendors which were opened in connection with the opening and operation of the Franchise. Franchisor has the right to notify Franchisee's vendors that this Agreement has expired or been terminated and to require them to close Franchisee's accounts, if Franchisee fails to do so.

**14.13.** <u>Security Interest</u>. For the purpose of securing its obligations under this Agreement, Franchisee hereby grants Franchisor a security interest in all personal property related to the operation of the Franchise of any nature now owned or hereinafter acquired by Franchisee, including, but not limited to, all signs, logos bearing any of the Marks, inventory, equipment, Koala Rigs(s), trade fixtures, furnishings and accounts, together with the proceeds therefrom (the **"Security Agreement"**). Any event of default by Franchisee under this Agreement shall be

45

deemed a breach of the Security Agreement. Franchisee covenants to execute and deliver to Franchisor any and all instruments Franchisor may reasonably request from time to time in order to perfect the security interest granted herein, including, without limitation, the appropriate UCC-1 Financing Statements.

15.    COVENANTS

**15.1.**    Full Time and Best Efforts.    Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee (or its Operating Principal if Franchisee is an entity) (or a Manager who will assume primary responsibility for the franchise operations and shall have been previously approved in writing by Franchisor) and a Salesperson shall devote full time, energy, and best efforts to the management and operation of the Franchise.

**15.2.**    In-Term Covenants.    Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.    Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

**15.2.1.**    Divert or attempt to divert any business or customer of the Franchise or of any Franchise using the System to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Marks and the System.

**15.2.2.**    Unless released in writing by the employer, (a) employ or seek to employ any person who (i) is at that time employed by Franchisor, or (ii) who was, within six months prior to his/her employ by Franchisee, or any person acting for, on behalf of, or at the directions of Franchisee employed by Franchisor, or (b) otherwise directly or indirectly induce such person to leave his or her employment.

**15.2.3.**    Except as otherwise approved in writing by Franchisor, own, maintain, operate, engage in, or have any interest in any "**Competitive Business**" in any location, which shall mean a business which offers insulation evaluation, installation or removal, energy efficiency evaluations and improvements, and related services.

**15.3.**    Post-Term Covenants.    Franchisee covenants that, except as otherwise approved in writing by Franchisor, it shall not, for a continuous uninterrupted period of two years from the date of:  (a) a transfer permitted under **Section 12**; (b) expiration or termination of this Agreement (regardless of the cause for termination); or (c) a final order of a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to the enforcement of this **Section 15.3**; either directly or indirectly (through, on behalf

of, or in conjunction with any persons or entity), own, maintain, operate, engage in, or have any interest in any Competitive Business which is, or is intended to be, located:  (a) at the Approved Location; (b) within a 100 mile radius of the Territory; or (c) within a 100 mile radius of the territory of any other Franchises or company or affiliate-owned Koala Insulation business in operation as of the time that the obligations under this **Section 15.3** commence.

**15.4.**  Publicly-Held Corporations.  **Section 15.3** shall not apply to ownership by Franchisee of less than 5% beneficial interest in the outstanding equity securities of any Publicly Held Corporation.  As used in this Agreement, the term "**Publicly Held Corporation**" shall be deemed to refer to a corporation which has securities that have been registered under the Securities Exchange Act of 1934.

**15.5.**  Individual Covenants.  Franchisee shall require and obtain execution of covenants similar to those set forth in **Section 8 and** this **Article 15** (as modified to apply to an individual) from any or all of Franchisee's Principals, the Manager, any replacement Manager and other highly trained personnel as designated by Franchisor.  The covenants required by this **Section 15.5** shall be in the form provided in **Exhibit D** to this Agreement.

**15.6.**  Severability.  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of the covenants in this **Section 15** is held to be unenforceable or unreasonable by any court, it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

**15.7.**  Scope of Covenants.   Franchisee understands and acknowledges that Franchisor shall have the right to reduce the scope of any covenant set forth in **Sections 15.2** and **15.3** in this Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified.

**15.8.**  Enforcement of Claims.  Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this **Section 15**.  Franchisee agrees to pay all costs and expenses (including without limitation reasonable attorneys' fees and all other costs) incurred by Franchisor in connection with the enforcement of this **Section 15**.

**15.9.**  Irreparable Injury.  Franchisee acknowledges that Franchisee's violation of the terms of this **Section 15** would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this **Section 15**.

16.    TAXES, PERMITS, AND INDEBTEDNESS

**16.1.**    Taxes.  Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, income, unemployment, and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement.  Franchisee shall pay Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

**16.2.**    Tax Disputes.  In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchise, or any improvements thereon.

**16.3.**    Compliance With Laws.  Franchisee shall comply with all federal, state, and local laws, rules, and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the business franchised under this Agreement, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, and fire clearances.

**16.4.**    Notification of Claims.  Franchisee shall notify Franchisor in writing within three days of receipt of notice of any health or safety violation, the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, or within three days occurrence of any accident or injury which may adversely affect the operation of the Franchise or the financial condition of Franchisee, or give rise to liability or a claim against Franchisee or Franchisor.

17.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION

**17.1.**    Independent Contractors.  It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

**17.2.**    Identification as Independent Contractor.  At all times during the term of this Agreement and any extensions hereof, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor.

**17.3.** <u>No Agency</u>.  It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be liable by reason of any act or omission of Franchisee in its conduct of the Franchise or for any claim or judgment arising therefrom against Franchisee or Franchisor.

**17.4.** <u>Indemnification and Advancement</u>.  Franchisee shall immediately and unconditionally advance costs and expenses, indemnify and hold Franchisor and its affiliates, and their respective officers, directors, members, managers, employees, and agents harmless against any and all claims, obligations, and damages (as well as the costs, including attorneys' fees, of defending against them) arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Franchise or Franchisee's breach of this Agreement, including, without limitation, those alleged to be caused by Franchisor's negligence or breach of this Agreement, but not including those claims, obligations, and damages that are determined to be caused solely by Franchisor's gross negligence or willful misconduct according to a final, unappealable ruling issued by a court with competent jurisdiction.  In addition to the above and without regard to the final ruling on any matter, Franchisee and its respective Principals hereby agree to immediately and unconditionally advance, or pay directly to designated parties, any amounts which are incurred in connection with any claim against Franchisor or its affiliates, and their respective officers, directors, members, managers, employees, and agents arising from or relating to, directly or indirectly, Franchisee's operation of the Franchise or Franchisee's breach of this Agreement without regard to any defenses based on errors, omissions or conduct of Franchisor or its members, managers, shareholders, directors, affiliates or agents.   If Franchisor incurs any costs or expenses, including, without limitation, legal fees, travel expenses, and other charges, in connection with any proceeding involving Franchisee in which Franchisor is not a party, Franchisee shall reimburse Franchisor for all such costs and expenses promptly upon presentation of invoices.  Franchisee acknowledges and agrees that Franchisee's indemnification and hold harmless obligations under this **Section 17.4** shall survive the termination or expiration of this Agreement.

18.   <u>FORCE MAJEURE</u>

Neither party shall be responsible to the other for non-performance or delay in performance occasioned by causes beyond its control, including without limiting the generality of the foregoing:  (a) acts of God; (b) acts of war, terrorism, or insurrection; (c) strikes, lockouts, labor actions, boycotts, floods, fires, hurricanes, tornadoes, and/or other casualties; (d) the inability of Franchisor and/or its affiliates or suppliers to manufacture, purchase, and/or cause delivery of any products used in the operation of the Franchise; and (e) legislative changes and/or governmental orders affecting the sale of the products from Franchises.  The inability of either party to obtain and/or remit funds shall be considered within control of such party.

19. <u>APPROVALS AND WAIVERS</u>

**19.1.** <u>Approvals</u>.   Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent must be obtained in writing.

**19.2.** <u>No Warranties</u>.   Franchisee acknowledges and agrees that Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

**19.3.** <u>Waivers</u>.   No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee or any other franchisee under any of the terms, provisions, covenants, or conditions of this Agreement, and no custom or practice by the parties at variance with the terms of this Agreement, shall constitute a waiver by Franchisor to enforce any such right, option, duty, or power as against Franchisee, or as to subsequent breach or default by Franchisee.   Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding or succeeding breach by Franchisee of any terms, provisions, covenants, or conditions of this Agreement.

20. <u>NOTICES</u>

All notices and other communications required or permitted under this Agreement will be in writing and will be given by one of the following methods of delivery: (i) personally; (ii) by certified or registered mail, postage prepaid; (iii) by overnight delivery service; or (iv) if to Franchisee, by email if an email address is designated on the Summary Page.  Notices to Franchisee will be sent to the address set forth on the Summary Page. Notices to Franchisor must be sent to:

> KOALA FRANCHISE, LLC
> 445 West Drive
> Melbourne, FL 32904
> Attention:  General Counsel

Either party may change its mailing address by giving notice to the other party. Notices will be deemed received the same day when delivered personally or upon actual or attempted delivery when sent by registered or certified mail or overnight delivery service.

21. <u>ENTIRE AGREEMENT AND AMENDMENT</u>

This Agreement and all exhibits to this Agreement, constitute the entire agreement between the parties. This Agreement supersedes any and all prior negotiations, understandings representations and agreements. No representations have induced You to execute this Agreement with Franchisor. Except for those permitted to be made

unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require You to waive reliance on any representation that Franchisor made in the most recent disclosure document (including its exhibits and amendments) (the "FDD") that Franchisor delivered to You or Your representative, subject to any agreed-upon changes to the contract terms and conditions described in that disclosure document and reflected in this Agreement (including any riders or addenda signed at the same time as this Agreement).

You acknowledge that you are entering into this Agreement as a result of your own independent investigation and not as a result of any representations (with the exception of those representations made in the FDD) made by Franchisor, its members, managers, officers, directors, employees, agents, representatives or independent contractors that are contrary to the terms set forth in this Agreement. You acknowledge that the FDD you received contained a copy of this Franchise Agreement and that you reviewed the FDD and Franchise Agreement at least fourteen (14) days (or such other time as applicable law requires) before you signed this Agreement. You further understand acknowledge and agree that any information you obtain from any Franchisor's franchisee, including relating to their sales, profit, cash flows, and/or expenses, does not constitute information obtained from Franchisor, nor does Franchisor make any representation as to the accuracy of any such information.

22.    SEVERABILITY AND CONSTRUCTION

**22.1.**  Severability.  If any of the provisions of this Agreement may be construed in more than one way, one of which would render the provision illegal or otherwise voidable or unenforceable, such provision shall have the meaning which renders it valid and enforceable.  The language of all provisions of this Agreement shall be construed according to its fair meaning and not strictly against any party.  In the event any court or other government authority shall determine any provision in this Agreement is not enforceable as written, the parties agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws and public policies of the jurisdiction in which enforcement is sought and affords the parties the same basic rights and obligations and has the same economic effect.  If any provision in this Agreement is held invalid or otherwise unenforceable by any court or other government authority or in any arbitration proceeding, such findings shall not invalidate the remainder of this Agreement unless in the reasonable opinion of Franchisor the effect of such determination has the effect of frustrating the purpose of this Agreement, whereupon Franchisor shall have the right by notice in writing to the other party to immediately terminate this Agreement.

**22.2.**  No Other Rights.  Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or entity other than Franchisee, Franchisor, and such of Franchisee's and

Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted by **Article 12**), any rights or remedies under or by reason of this Agreement.

**22.3.** Enforceability of Covenants.  Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

**22.4.** Construction.  All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

**22.5.** Importance of Timely Performance.  Time is of the essence in this Agreement.

**22.6.** Survival of Provisions.  All provisions of this Agreement which, by their terms or intent, are designed to survive the expiration or termination of this Agreement, shall so survive the expiration and/or termination of this Agreement.

**22.7.** Additional Terms; Inconsistent Terms.  The parties may provide additional terms by including the terms on the Summary Page.  To the extent that any provisions of the Summary Page are in direct conflict with the provisions of this Agreement, the provisions of the Summary Page shall control.

23.    APPLICABLE LAW AND DISPUTE RESOLUTION

**23.1.** Governing Law.  This Agreement takes effect upon its acceptance and execution by Franchisor, and shall be interpreted and construed exclusively under the laws of the State of Florida, which laws shall prevail in the event of any conflict of law (without regard to, and without giving effect to, the application of Florida choice-of-law rules).  Nothing in this **Section 23.1** is intended by the parties to subject this Agreement to any franchise, business opportunity, consumer protection, or similar law, rule, or regulation of the State of Florida to which this Agreement would not otherwise be subject.

**23.2.** Arbitration.

**23.2.1.**    Disputes Subject to Arbitration. Except as expressly provided to the contrary in this Agreement, any controversy or claim arising out of or relating to this Agreement or the relationship of the parties shall be settled by arbitration administered by the American Arbitration Association (the **"AAA"**) in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction. Any

dispute as to whether this arbitration clause applies or whether any particular claim is subject to arbitration shall be decided by arbitration in accordance with this Article 23.

**23.2.2.**    <u>Arbitration Claims</u>.  The parties agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. The parties further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is waived and forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either party. The parties agree that arbitration will be conducted on an individual basis, that neither party shall pursue class claims nor multi-plaintiff actions, and that an arbitration proceeding between Franchisor and its affiliates, or any of them, on the one hand, and Franchisee and its affiliates and any of their respective officers, directors, managers, agents, representatives, employees, successors and assigns, on the other hand, may not be consolidated with any other arbitration proceeding to which Franchisor and/or its affiliates are a party. Notwithstanding the foregoing, if any court determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section, then the parties agree that this arbitration clause shall not apply to that dispute and that such dispute shall be resolved in a judicial proceeding. For purposes of this Section, Franchisor and its affiliates includes their respective shareholders, partners, members and other owners, officers, directors, managers, agents, representatives, employees, successors and assigns.

**23.2.3.**    <u>Location</u>. The place of arbitration shall be the AAA office located nearest to Franchisor's principal place of business on the date the arbitration action is filed.

**23.2.4.**    <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration will be confidential, except as required by law or as required for Franchisor to comply with laws and regulations applicable to the sale of franchises.

**23.2.5.**    <u>Performance During Arbitration</u>. Franchisor and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration process.

**23.3.** <u>Venue</u>.  For any matter which is not subject to the arbitration provisions of **Section 23.2**, each party hereto consents to personal jurisdiction in the federal or state courts located in the county in which Franchisor's principal place of business is located at the time that the action commences.  Franchisee and its Principals hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.

**23.4.** <u>No Exclusive Remedies</u>.  No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

**23.5.** <u>Injunctive Relief</u>.  Notwithstanding anything contained herein, Franchisor reserves the right to seek and obtain temporary restraining orders or other emergency temporary or preliminary equitable injunctive relief and file actions to collect royalties and other amounts owed by Franchisee to Franchisor (collection actions) from federal or state courts located in the state in which the Franchise is located.  The parties acknowledge and agree that the rights of Franchisor under this Agreement with respect to the use of the Marks and the System and the enforcement of the in-term and post-term noncompetition covenants of Franchisor are of a specialized and unique nature and that immediate and irreparable damage will result to Franchisor if Franchisee fails or refuses to perform obligations under this Agreement, and, notwithstanding any election by Franchisor to claim damages from Franchisee as a result of such failure or refusal, Franchisor may, in addition to any other remedies and damages available, seek an injunction in any court of competent jurisdiction to restrain such failure or refusal.

**23.6.** <u>Waiver of Jury Trial</u>.  Franchisor and Franchisee irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action or proceeding.

**23.7.** <u>Limitation of Actions</u>.  Any and all claims and actions arising out of or relating to this agreement, the relationship of Franchisee and franchisor, or Franchisee's operation of the Franchise (including any defenses or any claims of set-off or recoupment) must be brought or asserted before the expiration of the earlier of (a) the time period for bringing an action under any applicable state or federal statute of limitations; (b) one  year after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim; or (c) two years after the first act or omission giving rise to an alleged claim; or it is expressly acknowledged and agreed by all parties that such claims or actions shall be irrevocably barred.  Claims of franchisor attributable to underreporting of sales, and claims of the parties for failure to pay monies owed and/or indemnification shall be subject only to the applicable state or federal statute of limitations.

**23.8.** <u>Limitation on Damages</u>.  Franchisor and Franchisee hereby waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other, and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.  In any action arising out of or relating to this Agreement or the relationship of the parties, in no event shall Franchisor be liable to Franchisee for more than the total Initial Franchise Fee.

**23.9.** <u>Costs and Attorneys' Fees</u>.  If either Franchisor or Franchisee seeks to enforce this Agreement in an arbitration or a judicial or other proceeding, the

prevailing party shall be entitled to recover its reasonable costs and expenses (including attorneys' fees, attorneys' assistants' fees, accountants' fees, expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel, room and board, salaries and benefits of those employees participating in such proceeding) incurred in connection with such judicial or other proceeding.

24.    <u>ACKNOWLEDGMENTS</u>

**24.1.**    <u>Acknowledgments</u>.    Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, recognizes that the business venture contemplated by this Agreement involves business risks, and that its success will be largely dependent upon the ability of Franchisee and, if an entity, its owners as independent businesspersons. Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received from Franchisor or any employee, representative or other party purporting to act on Franchisee's behalf, any warranty, promise or guarantee, express or implied, as to the potential sales volume, profits, or success of the business venture contemplated by this Agreement.

**24.2.**    <u>Receipt of Documents</u>.    Franchisee acknowledges that it received a copy of this Agreement, the exhibit(s) hereto, and agreements relating hereto, if any, with all of the blank lines therein filled in, prior to the date on which this Agreement was executed, and with sufficient time within which to review this Agreement, with advisors of its choosing. Franchisee further acknowledges that it received the franchise disclosure document required by the Federal Trade Commission's Franchise Rule at least 14 days prior to the date on which this Agreement was executed.

**24.3.**    <u>Representations and Warranties</u>. Franchisee and its Principals represent and warrant to Franchisor that: (a) neither Franchisee nor any of its Principals have made any untrue statement of any material fact nor omitted to state any material fact in obtaining the rights granted herein; (b) neither Franchisee nor any of its Principals have any direct or indirect legal or beneficial interest in any business that may be deemed a Competitive Business, except as otherwise completely and accurately disclosed in its franchise application materials; and (c) Franchisee and its Principals have a legal right to own and operate the Franchise. Franchisee recognizes that Franchisor approved Franchisee in reliance on all of the statements Franchisee and its Principals have made in connection therewith, and that Franchisee has a continuing obligation to advise Franchisor of any material changes in these statements and representations made to Franchisor in this Agreement or in the franchise application.

**24.4.**    <u>Compliance with Executive Order 13224</u>.    Under applicable U.S. law, including, without limitation, Executive Order 13224, signed on September 23, 2001 (**"Order"**), Franchisor is prohibited from engaging in any transaction with any person engaged in, or with a person aiding any person engaged in, acts of terrorism, as defined in the Order. Accordingly, Franchisee represents and

warrants to us that, as of the date of this Agreement, neither Franchisee nor any person holding any ownership interest in you, controlled by you, or under common control with Franchisee is designated under the Order as a person with whom business may not be transacted by Franchisor, and that Franchisee: (a) does not, and hereafter will not, engage in any terrorist activity; (b) are not affiliated with and do not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and (c) are not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity.

**24.5.** <u>No Other Obligations</u>.  Each party represents and warrants to the others that there are no other agreements, court orders, or any other legal obligations that would preclude or in any manner restrict such party from: (a) negotiating and entering into this Agreement; (b) exercising its rights under this Agreement; and/or (c) fulfilling its responsibilities under this Agreement.

**24.6.** <u>No Other Representations</u>.  Franchisee acknowledges Franchisor has not (and shall not be deemed to have) given any representation, promise, or guarantee of Franchisee's success.

**24.7.** <u>Business Judgment</u>.  Franchisee understands and agrees that Franchisor may operate and change the System and its business in any manner that is not expressly and specifically prohibited by this Agreement.  Whenever Franchisor has expressly reserved in this Agreement or is deemed to have a right and/or discretion to take or withhold an action, or to grant or decline to grant Franchisee a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement, Franchisor may make such decision or exercise its right and/or discretion on the basis of Franchisor's judgment of what is in Franchisor's best interests, including without limitation Franchisor's judgment of what is in the best interests of the franchise network, at the time Franchisor's decision is made or its right or discretion is exercised, without regard to whether: (a) other reasonable alternative decisions or actions, or even arguably preferable alternative decisions or actions, could have been made by Franchisor; (b) Franchisor's decision or the action taken promotes Franchisor's financial or other individual interest; (c) Franchisor's decision or the action it takes applies differently to Franchisee and one or more other franchisees or Franchisor's company-owned or affiliate-owned operations; or (d) Franchisor's decision or the exercise of its right or discretion is adverse to Franchisee's interests.   In the absence of an applicable statute, Franchisor will have no liability to Franchisee for any such decision or action. Franchisor and Franchisee intend that the exercise of Franchisor's right or discretion will not be subject to limitation or review.  If applicable law implies a covenant of good faith and fair dealing in this Agreement, Franchisor and Franchisee agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants Franchisor the right to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisee's rights and obligations hereunder.

**24.8.** <u>Consultation</u>.  Franchisee acknowledges that it has read and understands this Agreement, the exhibits hereto, and agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors (including attorneys) of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**
**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Agreement on the day and year first above written.

KOALA FRANCHISE, LLC

By: _Scott Marr_____
Name: Scott Marr
Title: CEO

Lotus & The Rooster Holdings Company

By:_____
Name: Salim Michel Makhlouf
Title:   CEO

## EXHIBIT A TO THE FRANCHISE AGREEMENT

## TRADEMARKS

| Mark | Registration Number | Registration Date |
|------|---------------------|-------------------|
| **KOALA INSULATION** | 6006546 | March 10, 2020 |
|  | 6007883 | March 10, 2020 |
|  | 6173027 | October 13, 2020 |
| **Delivering Efficiency. Improving Comfort.** | 6079379 | March 31, 2020 |

1

© COPYRIGHT 2021 KOALA FRANCHISE, LLC.  ALL RIGHTS RESERVED.
COMMERCIAL SALE PROHIBITED WITHOUT EXPRESS WRITTEN PERMISSION OF KOALA FRANCHISE, LLC.

## EXHIBIT B TO THE FRANCHISE AGREEMENT

LEASE RIDER TO LEASE AGREEMENT DATED _____

BY AND BETWEEN

_____, AS "LANDLORD"

AND

_____, AS "TENANT" FOR
THE DEMISED PREMISES ("PREMISES") DESCRIBED THEREIN

This Rider and the provisions hereof are hereby incorporated into the body of the lease to which this Rider is attached (the "Lease"), and the provisions hereof shall be cumulative of those set forth in the Lease, but to the extent of any conflict between any provisions of this Rider and the provisions of the Lease, this Rider shall govern and control.

1.    <u>Consent to Collateral Assignment to Franchisor</u>. If Franchisor takes possession of the Premises and confirms to Landlord that Franchisor has assumed the Lease as tenant thereunder, Landlord will recognize Franchisor as tenant under the Lease.  Landlord agrees that in such event Franchisor may further assign the Lease to or enter into a sublease with a person or entity who agrees to assume the tenant's obligations under the Lease and is reasonably acceptable to Landlord and that, upon that assignment, Franchisor will have no further liability or obligation under the Lease as assignee, tenant or otherwise, other than to certify that the additional assignee or sublessee operates the Premises as a Franchise.

2.    <u>Use of Premises</u>.   Without limitation of uses permitted under the Lease, but in expansion thereof, the Premises may be used for the purpose of operation of a Koala Insulation Franchise offering insulation installation, removal, evaluation and related services.

3.    <u>Compliance of Premises With Applicable Law</u>.  Landlord represents and warrants that as of the date hereof the Premises are in compliance with all applicable law.

4.    <u>Notice and Cure Rights to Franchisor</u>.  Prior to exercising any remedies under the Lease (except in the event of imminent danger to the Premises), Landlord shall give Franchisor written notice of any default thereunder by Tenant, and commencing upon receipt thereof by Franchisor, Franchisor shall have the same length cure period as is given to Tenant under the Lease for such default, provided that in no event shall Franchisor have a cure period of less than (i) 10 days after Franchisor's receipt of such notice as to monetary defaults or (ii) 30 days after Franchisor's receipt of such notice as to non-monetary defaults.  Landlord agrees to accept cure tendered by Franchisor as if

the same was tendered by Tenant, but Franchisor has no obligation to cure such default. The initial address for notices to Franchisor is as follows:

> KOALA FRANCHISE, LLC
> 445 West Drive
> Melbourne, FL 32904
> Attention:  General Counsel

5.      <u>Non-disturbance from Mortgage Lenders</u>. It is a condition of the Lease being subordinated to any mortgage, deed of trust, deed to secure debt or similar encumbrance on the Premises that the holder of such encumbrance agree not to disturb Tenant's rights under the Lease or Tenant's possession of the Premises, so long as Tenant is not in default of its obligations under the Lease beyond any applicable grace or cure period provided therein.

*CHECK THE FOLLOWING PARAGRAPH THAT APPLIES. CHECK ONLY ONE.  IF NONE IS CHECKED, THEN CLAUSE a) BELOW WILL BE APPLICABLE, AND CLAUSE b) BELOW WILL BE DEEMED DELETED*

        a)      ☐      Landlord represents and warrants that on the date hereof no mortgage, deed of trust, deed to secure debt or similar encumbrance encumbers the Premises.

        b)      ☐      A mortgage, deed of trust or deed to secure debt currently encumbers the Premises.  It is a condition precedent to Tenant's obligations under the Lease that the holder of such encumbrance enter into a written recordable form subordination and non-disturbance agreement with Tenant, in a form reasonably acceptable to Tenant, as described above.

6.      <u>Third Party Beneficiary</u>.  For so long as Franchisor holds a collateral assignment of the Lease, Franchisor is a third party beneficiary of the Lease.

7.      <u>Franchisor Right to Enter</u>.  Upon the expiration or earlier termination of the Lease or the Franchise Agreement, Franchisor or its designee may enter upon the Premises for the purpose of removing all signs and other material bearing the Koala name or trademarks, service marks or other commercial symbols of Franchisor.

 AGREED and executed and delivered under seal by the parties hereto as of the day and year of the Lease.

LANDLORD:                              TENANT:

_____              _____


By:                                   By:

_____              _____

_____              _____

Name:                                 _____

_____              Name:

_____              _____

Title:                                _____

_____              Title:

_____              _____

_____              _____

                                      _____

DocuSign Envelope ID: 815543D5-680E-46C6-8C50-96A853875CB9

# EXHIBIT C TO THE FRANCHISE AGREEMENT

## GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to KOALA FRANCHISE, LLC, a Florida limited liability company ("Franchisor") to execute the Franchise Agreement between Franchisor and Lotus & The Rooster Holdings Company, a corporation in Pennsylvania ("Franchisee"), dated _____, (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and Franchisor's successors and assigns that all of Franchisee's monetary and other obligations under the Agreement will be punctually paid and performed.

Each of the undersigned has had the opportunity to review the Agreement, and understands his or her obligations hereunder and thereunder.

Upon demand by Franchisor, the undersigned each hereby jointly and severally agree to immediately make each payment required of Franchisee under the Agreement and waive any right to require Franchisor to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee; or (d) give notice of demand for payment by Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee, and the undersigned each hereby jointly and severally waive notice of same and agree to remain and be bound by any and all such amendments and changes to the Agreement.

The undersigned each hereby jointly and severally agree to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorney's fees, reasonable costs of financial and other investigation, court costs, and fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned each hereby jointly and severally acknowledge and expressly agree to be individually bound by all of the covenants contained in Sections 8, 12, 14, 15 and 17.4 of the Agreement, and acknowledge and agree that this Guarantee does not grant the undersigned any right to use the "Koala" marks or system licensed to Franchisee under the Agreement. Each of the undersigned represents that he or she has received a copy of the Franchise Agreement and understands his or her obligations hereunder and thereunder.

Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

If Franchisor is required to enforce this Guarantee in a judicial or arbitration proceeding, and prevails in such proceeding, Franchisor shall be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, travel and room and board expenses, salaries and benefits of those of Franchisor's employee's participating in such proceeding, whether incurred prior to, in

preparation for, or in contemplation of the filing of any such proceeding.  If Franchisor is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guarantee, the undersigned shall reimburse Franchisor for any of the above-listed costs and expenses Franchisor incurs.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Sections 22 and 23 of the Agreement.  This Guarantee shall be interpreted and construed under the laws of the State of Florida.  In the event of any conflict of law, the laws of the State of Florida shall prevail (without regard to, and without giving effect to, the application of Florida conflict of law rules).  Jurisdiction and venue shall be in the state or federal courts located nearest Franchisor's principal place of business at the time that the action is commenced, and the undersigned hereby waives any objection to such jurisdiction and venue. The arbitration provisions of Section 23 of the Agreement shall apply to this Guaranty.

Non-Owner Spousal Guarantee. If this Guarantee is executed by a spouse (or domestic partner or immediate family member) of the owner of a franchisee entity and such person has no equity or ownership in the franchisee entity or franchise then this Guarantee shall only be enforceable against such non-owner spouse in the event that they receive a material transfer of assets from the spouse (or domestic partner or immediate family member) who has the ownership interest in the franchise or franchisee entity.  This section is intended to ensure that one spouse cannot avoid liability under their guarantee by simply transferring assets to the other spouse.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

GUARANTOR(S)

Signed: _____
(In his/her individual capacity)
Name: Salim Michel Makhlouf
Address: 251 S Pitt St, Carlisle, PA 17013

## EXHIBIT D TO THE FRANCHISE AGREEMENT

## NON-DISCLOSURE AND NON-COMPETITION
## AGREEMENT

**THIS AGREEMENT** ("**Agreement**") is made this_____ 3/15/2022 | 2:42 EDT _____, by and Between Lotus & The Rooster Holdings Company (the "**Franchisee**"), and Salim Michel Makhlouf, who is a principal, manager, supervisor, member, partner, or a person in a managerial position with, Franchisee (the "**Member**").

BACKGROUND:

A.    Koala Franchise, LLC, a Florida limited liability company ("**Franchisor**") owns a format and system (the "**System**") relating to the establishment, development and operation of an insulation and related services business that operate under the name "Koala Insulation" (or other names designated by Franchisor, the "**Marks**") and such additional or alternate services and/or products as Franchisor may designate from time to time (each a "**Franchise**").

B.    Franchisor and Franchisee have executed a Franchise Agreement ("**Franchise Agreement**") granting Franchisee the right to operate a Franchise (the "**Franchise**") and to produce and distribute products and services approved by Franchisor and use the Marks in connection therewith under the terms and conditions of the Franchise Agreement;

C.    The Member, by virtue of his or her position with Franchisee, will gain access to certain of Franchisor's Confidential Information, as defined herein, and must therefore be bound by the same confidentiality and non-competition agreement that Franchisee is bound by.

**IN CONSIDERATION** of these premises, the conditions stated herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.    <u>Confidential Information</u>. Member shall not, during the term of the Franchise Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity, persons, partnership, entity, association, or corporation any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised thereunder which may be communicated to Member or of which Member may be apprised by virtue of Franchisee's operation under the terms of the Franchise Agreement. Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others.

2.    <u>Covenants Not to Compete</u>.

(a)    Member specifically acknowledges that, pursuant to the Franchise Agreement, and by virtue of its position with Franchisee, Member will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.

(b)    Member covenants and agrees that during the term of Member's employment with, or ownership interest in, Franchisee, and except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity:

(i)    Divert or attempt to divert any business or customer of the Franchise or of any other System franchisee or unit operated by Franchisor (or an affiliate of Franchisor) to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and/or the System;

(ii)    Employ or seek to employ any person who is at that time employed by Franchisor or Franchisee, or otherwise directly or indirectly induce such person to leave his or her employment; or

(iii)    Own, maintain, operate, engage in, be employed by, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services.

(c)    Member covenants and agrees that during the Post-Term Period (defined below), except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity, own, maintain, operate, engage in, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services and which business is, or is intended to be, located: (a) at the Franchise location or within a 100 mile radius of the Territory of the Franchise, which Territory includes <u>the areas defined by the Summary Page of the Franchise Agreement and any amendments thereto</u>; or (b) within a 100 mile radius of the territory any other System franchisee or Koala Insulation business owned by Franchisor or its affiliate at the time that the obligations under this **Section 2(c)** commence;

(d)    As used in this Agreement, the term **"Post-Term Period"** shall mean a continuous uninterrupted period of two years from the date of: (a) a transfer permitted under **Section 12** of the Franchise Agreement with respect to Member; and/or (b) termination of Member's employment with, and/or ownership interest in, Franchisee.

3.    <u>Injunctive Relief.</u> Member acknowledges that any failure to comply with the requirements of this Agreement will cause Franchisor irreparable injury, and Member agrees

to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this Agreement.

4.    <u>Severability.</u> All agreements and covenants contained herein are severable. If all or any portion of the covenants in this Agreement is held to be unenforceable or unreasonable by any court, then it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

5.    <u>Delay.</u> No delay or failure by Franchisor or the Franchisee to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right provided herein, and no waiver of any violation of any terms and provisions of this Agreement shall be construed as a waiver of any succeeding violation of the same or any other provision of this Agreement.

6.    <u>Third-Party Beneficiary.</u> Member hereby acknowledges and agrees that Franchisor is an intended third-party beneficiary of this Agreement with the right to enforce it, independently or jointly with Franchisee.

**IN WITNESS WHEREOF**, Franchisee and the Member attest that each has read and understands the terms of this Agreement, and voluntarily signed this Agreement on this __ day of _____.

3/15/2022 | 2:42 EDT

**FRANCHISEE:**                                          **MEMBER:**

**Lotus & The Rooster Holdings Company**                 **Salim Michel Makhlouf**

Signature:_____              Signature:_____

**Salim Michel Makhlouf,** CEO

# EXHIBIT E TO THE FRANCHISE AGREEMENT

## EQUIPMENT SALES AGREEMENT

THIS EQUIPMENT SALES AGREEMENT is made on _____, 2021, by KOALA FRANCHISE LLC, a Florida limited liability company (hereinafter known as "Seller") and [Franchisee], a _____ (hereinafter known as "Buyer").  Buyer and Seller shall collectively be known herein as "the Parties".

## BACKGROUND

WHEREAS, Seller desires to sell the equipment described below, known herein as the "Acquired Equipment", under the terms and conditions set forth below;

WHEREAS, Buyer desires to purchase the Acquired Equipment offered for sale by Seller under the terms and conditions set forth below; and, therefore,

## TERMS AND CONDITIONS

IN CONSIDERATION of the mutual promises and other valuable consideration exchanged by the Parties as set forth herein, the Parties, intending to be legally bound, hereby agree as follows:

**1.  Description of Acquired Equipment.**

The following vehicle (and all equipment within or attached to such vehicle):

2. **Purchase Price.** The total purchase price to be paid by Buyer to Seller for the Acquired Equipment is _____ ("Purchase Price").

Payment is to be made by Buyer to Seller in cash, by certified funds, financed under the terms of a commercial finance agreement, or through another instrument acceptable to Seller. Buyer must receive permission in advance from Seller for use of a non-certified funds in payment of the Purchase Price.

3. Delivery of Acquired Equipment and Conveyance of Title.

(a). <u>Delivery of Acquired Vehicle</u>. Seller shall deliver the Acquired Equipment, and Buyer shall take possession of same, at Seller's premises or other premises as designated by Seller (either in person or through a third party) on or before that date that is within 10 days of the date hereof ("Delivery Date"). If delivery is to be made at a date after the execution of this contract, it is Seller's duty to ensure that the Acquired Equipment is delivered in the same condition as when last inspected by the Buyer (or, if no Buyer inspection, the execution date of this agreement). It is Buyer's duty, either in person or through a third party to appear at Seller's premises during standard business hours on or before the Delivery Date to remove the Acquired Equipment from Seller's premises. However, if Buyer fails to appear at Seller's premises on or before the Delivery Date to accept possession of the Acquired Equipment, then risk of loss passes to the Buyer on the Delivery Date.

(b). <u>Conveyance of Title</u>. Seller shall convey title to Buyer upon delivery of the equipment to

Buyer, which shall not occur until payment is made in full. Seller agrees and covenants to execute all documents presented by Buyer which are necessary to finalize transfer of title and registration upon the Acquired Equipment to Buyer.

**4.  Representations, Warranties, and Disclosures.**

(a)  Warranties.

THIS EQUIPMENT IS SOLD "AS IS", AND SELLER DOES NOT IN ANY WAY, OTHER THAN PARAGRAPH A §§ 1-7 ABOVE, EXPRESSLY OR IMPLIEDLY, GIVE ANY WARRANTIES TO BUYER. SELLER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE.

_____
Buyer Initials

(b)  Odometer Declaration. Seller hereby states that the odometer in the Acquired Equipment (if such equipment has an odometer) now reads as indicated above and, to the best of Seller's knowledge, it reflects the actual mileage of the equipment described herein.

**(c)  Buyer Representation**. The individual signing this agreement on behalf of Buyer hereby represents to Seller that he or she has the power and authority to do so on behalf of Buyer.

**5.  Buyer's Responsibility – Insurance, Tags and Inspections.** Buyer acknowledges that unless prohibited by applicable law, any insurance coverage, license, tags, plates or registration maintained by Seller on the Acquired Equipment shall be canceled upon delivery of the Acquired Equipment to, and the acceptance of, by Buyer. Buyer shall inspect and test all equipment and vehicles delivered under this agreement including the inspection of all workmanship performed by installation contractors, vehicle outfitters and other parties that performed any work on the conveyed equipment and vehicle.  Buyer accepts full responsibility for the condition, effectiveness, appropriateness, and use of the conveyed equipment and vehicle.  Buyer must inform Seller of any discovered problems or inspection failure prior to taking delivery of vehicle, and provide Seller at least 7 days to cure any flaw, at Seller's own expense. Upon acceptance of delivery, Buyer acknowledges compliance with these requirements and waives all rights of claim against Seller and agrees to indemnify Seller against all claims resulting from the ownership or use of conveyed equipment and vehicles.  Buyer agrees to ensure through due diligence and through its own inspection, assisted by professionals as it sees fit, that all equipment and vehicles comply with all applicable laws, regulations and rules including any weight and engineering requirements.

_____
Buyer Initials

**6. Continuation of Representations and Warranties**. All representations and warranties contained in this Agreement (if any) shall continue in full force and effect after execution of this agreement. If either party later learns that a warranty or representation that it made is untrue, it is under a duty to promptly disclose this information to the other party in writing. No representation or warranty contained herein shall be deemed to have been waived or impaired by any investigation made by or knowledge of the other party to this Agreement.

**7.  Indemnification of Attorneys' Fees and out-of-pocket costs.** Should any party materially breach this agreement (including representations and warranties made to the other side), the non-breaching party shall be indemnified by the breaching party for its reasonable

attorneys' fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach of this contract (including the breach of representations or warranties). This provision shall not limit in any way the remedies either party may have otherwise possessed in law or equity relative to a breach of this contract. The term "out- of-pocket costs", as used in this contract, shall not include lost profits.

**8. Severability**. In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

9.   Modification. Except as otherwise provided in this document, this agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.

**10.   Acknowledgements**. Each party acknowledges that he or she has had an adequate opportunity to read and study this Agreement, to consider it, to consult with attorneys if he or she has so desired.

**11.   Exclusive Jurisdiction for Suit in Case of Breach**. The Parties, by entering into this agreement, submit to jurisdiction in Melbourne, Florida for adjudication of any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts which have jurisdiction over Melbourne, Florida shall have **exclusive** jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sound in contract, tort, or other areas of the law.

12.   State Law. This Agreement shall be interpreted under, and governed by, the laws of the state of Florida.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, Seller and Buyer affix their signatures hereto.

SELLER

By: _____

Name: _____ Authorized Officer for Seller

Date: _____, 2021

BUYER

By: _____

Name: _____ Authorized Officer for Buyer

Date: _____, 2021

**EXHIBIT E**
**FRANCHISEE DISCLOSURE QUESTIONNAIRE**

**FRANCHISEE DISCLOSURE QUESTIONNAIRE**

Koala Franchise, LLC ("we", "us", or "our") and you are preparing to enter into a franchise agreement for the operation of a Koala Insulation Franchise. The purpose of this Questionnaire is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading and to be certain that you understand the limitations on legal claims you may make by reason of the purchase and operation of your franchise.  Please review each of the following questions carefully and provide honest responses to each question.

| | | |
|---|---|---|
| 1. | Yes __X__    No ____ | Have you received and personally reviewed the Franchise Agreement and each attachment or schedule attached to it? |
| 2. | Yes __X__    No ____ | Have you received and personally reviewed the Franchise Disclosure Document we provided |
| 3. | Yes __X__    No ____ | Did you sign a receipt for the Franchise Disclosure Document indicating the date you received it? |
| 4. | Yes __X__    No ____ | Do you understand all the information contained in the Franchise Disclosure Document and Franchise Agreement? |
| 5. | Yes __X__    No ____ | Have you reviewed the Franchise Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor or have you had the opportunity for such review and chosen not to engage such professionals? |
| 6. | Yes __X__    No ____ | Have you discussed the benefits and risks of developing and operating a Koala Insulation Business with an existing Koala Insulation franchisee? |
| 7. | Yes __X__    No ____ | Do you understand the risks of developing and operating a Koala Insulation Business? |
| 8. | Yes __X__    No ____ | Do you understand the success or failure of your franchise will depend in large part upon your skills, abilities and efforts and those of the persons you employ as well as many factors beyond your control such as competition, interest rates, the economy, inflation, labor, and supply costs, and other relevant factors? |
| 9. | Yes __X__    No ____ | Do you understand all disputes or claims you may have arising out of or relating to the Franchise Agreement must be litigated, mediated, and/or arbitrated in Florida, if not resolved informally or by mediation? |

10.  Yes __X__    No ____    Do you understand that you must satisfactorily complete the initial training course before we will allow your Business to open or consent to a transfer?

11.  Yes __X__    No ____    Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a Koala Insulation Business, that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

12.  Yes __X__    No ____    Do you agree that no employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

13.  Yes __X__    No ____    Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue a Koala Insulation Business will generate, that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

14.  Yes __X__    No ____    Do you understand that the Franchise Agreement and attachments to the Franchise Agreement contain the entire agreement between us and you concerning the franchise for the Koala Insulation Business, meaning any prior oral or written statements not set out in the Franchise Agreement or the attachments to the Franchise Agreement will not be binding?

15.  Yes __X__    No ____    Do you understand that we are relying on your answers to this questionnaire to ensure that the franchise sale was made in compliance of state and federal laws?

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.

## EXPLANATION OF ANY NEGATIVE RESPONSE
### (REFER TO QUESTION NUMBER)

| Questionnaire Number | Explanation of Negative Response |
|---|---|
|  |  |
|  |  |

**Do not sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document. Sign and date this Questionnaire the day you sign the Franchise Agreement and pay your franchise fee.**

FRANCHISEE:  Lotus & The Rooster Holdings Company

Signature: _____

Print Name: Salim Michel Makhlouf,    CEO

Date: _____
3/14/2022 | 1:50 PDT

SPECIAL NOTE FOR RESIDENTS OF THE STATE OF MARYLAND AND FRANCHISED BUSINESSES LOCATED IN MARYLAND:  Nothing in this Questionnaire will act as a release, estoppel, or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

# EXHIBIT F

# GENERAL RELEASE

This General Release ("Release") is executed by the undersigned ("Releasor") in favor of Koala Franchise, LLC., a Florida Limited Liability Company ("Franchisor").

**Background Statement**: Releasor wishes to dispose of all outstanding liabilities against Released Parties.

Releasor agrees as follows:

**1.     Release.** Releasor (on behalf of itself and its parents, subsidiaries and affiliates and their respective past and present officers, directors, shareholders, managers, members, partners, agents, and employees (collectively, the "Releasing Parties") hereby release Franchisor, its parent(s), affiliates, and each of their respective directors, officers, shareholders, members, employees, and agents (collectively, the "Released Parties") from any and all claims, causes of action, suits, debts, agreements, promises, demands, liabilities, contractual rights and/or obligations, of whatever nature, known or unknown, which any Releasing Party now has or ever had against any Released Party based upon and/or arising out of events that occurred through the date hereof, including without limitation, anything arising out of the Franchise Agreement (collectively, "Claims").

**2.     Covenant Not to Sue.** Releasor (on behalf of all Releasing Parties) covenant not to initiate, prosecute, encourage, assist, or (except as required by law) participate in any civil, criminal, or administrative proceeding or investigation in any court, agency, or other forum, either affirmatively or by way of cross-claim, defense, or counterclaim, against any Released Party with respect to any Claim.

**3.     Representations and Acknowledgments.** Releasor represents and warrants that: (i) Releasor is the sole owners of all Claims, and that no Releasing Party has assigned or transferred, or purported to assign or transfer, to any person or entity, any Claim; (ii) Releasor has full power and authority to sign this Release; and (iii) this Release has been voluntarily and knowingly signed after Releasor has had the opportunity to consult with counsel of Releasor's choice. Releasor acknowledges that the release in Section 1 is a complete defense to any Claim.

**4.     Miscellaneous.** If any of the provisions of this Release are held invalid for any reason, the remainder of this Release will not be affected and will remain in full force and effect. In the event of any dispute concerning this Release, the dispute resolution, governing law, and venue provisions of the Franchise Agreement shall apply. Releasor agrees to take any actions and sign any documents that Franchisor reasonably requests to effectuate the purposes of this Release. This Release contains the entire agreement of the parties concerning the subject matter hereof.

Executed by:

Date: _3/14/2022 | 1:50 PDT_

Name: Salim Michel Makhlouf, Personally

*[notary acknowledgement to follow]*

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-06A853875CB9

# EXHIBIT G
## STATE SPECIFIC ADDENDA AND RIDERS

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU**.

Each of the following provisions is void and unenforceable if contained in any documents relating to a franchise:

1. A prohibition on the right of a franchisee to join an association of franchisees.

2. A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

3. A provision that permits a franchisor to terminate a franchise before the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

4. A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchise's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

5. A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

6. A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

7.  A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(a) The failure of the proposed transferee to meet the franchisor's then-current reasonable qualifications or standards.

(b) The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(c) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(d) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

8.  A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in Section 3.

9.  A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000.00, the franchisee may request the franchisor to arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations, if any, of the franchisor to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.

Any questions regarding this notice should be directed to:

Michigan Department of Attorney General

G. Mennen Williams Building,

7th Floor 525 W. Ottawa St.

P.O. Box 30212

Lansing, MI 48909

(517) 373-7117

## <u>ILLINOIS ADDENDUM TO THE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT</u>

Illinois law governs the Franchise Agreement.

In conformance with Section 4 of the Illinois Franchise Disclosure Act, any provision in a franchise agreement that designates jurisdiction and venue in a forum outside of the State of Illinois is void.  However, arbitration may take place outside of Illinois.

Franchisees' rights upon Termination and Non-Renewal are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

In conformance with section 41 of the Illinois Franchise Disclosure Act, any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with Illinois Franchise Disclosure Act **or any other law of Illinois** is void.

# EXHIBIT I
# SMALL BUSINESS ADMINISTRATION ADDENDUM



**ADDENDUM TO** Franchise ⊘ ¹ **AGREEMENT**

**THIS ADDENDUM** ("Addendum") is made and entered into on _____, 20____, by and between Koala Franchise, LLC _____ (" Franchisor ⊘ "), located at 445 West Drive, Melbourne, FL 32904 _____, and _____ (" Franchisee ⊘ "), located at _____ .

Franchisor _____ and Franchisee _____ entered into a Franchise _____ Agreement on _____, 20___, (such Agreement, together with any amendments, the " Franchise _____ Agreement"). Franchisee _____ is applying for financing(s) from a lender in which funding is provided with the assistance of the U. S. Small Business Administration ("SBA"). SBA requires the execution of this Addendum as a condition for obtaining SBA-assisted financing.

In consideration of the mutual promises below and for good and valuable consideration, the receipt and sufficiency of which the parties acknowledge that notwithstanding any other terms in the Franchise _____ Agreement or any other document Licensor _____ requires Licensee _____ to sign:

### CHANGE OF OWNERSHIP

- If Licensee _____ is proposing to transfer a partial interest in Franchisee _____ and Franchisor _____ has an option to purchase or a right of first refusal with respect to that partial interest, Franchisor _____ may exercise such option or right only if the proposed transferee is not a current owner or family member of a current owner of Licensee _____ . If the Franchisor _____ 's consent is required for any transfer (full or partial), Franchisor _____ will not unreasonably withhold such consent. In the event of an approved transfer of the Franchise _____ interest or any portion thereof, the transferor will not be liable for the actions of the transferee Franchisee _____ .

### FORCED SALE OF ASSETS

- If Franchisor _____ has the option to purchase the business personal assets upon default or termination of the Franchise _____ Agreement and the parties are unable to agree on the value of the assets, the value will be determined by an appraiser chosen by both parties. If the Franchisee _____ owns the real estate where the Franchise _____ location is operating, Franchisee _____ will not be required to sell the real estate upon default or termination, but Franchisee _____ may be required to lease the real estate for the remainder of the Franchise _____ term (excluding additional renewals) for fair market value.

---

¹ While relationships established under license, jobber, dealer and similar agreements are not generally described as ''franchise'' relationships, if such relationships meet the Federal Trade Commission's (FTC's) definition of a franchise (see 16 CFR § 436), they are treated by SBA as franchise relationships for franchise affiliation determinations per 13 CFR § 121.301(f)(5).

Koala Franchise, LLC
FDD 2021.1

**COVENANTS**

- If the _____Franchisee_____ owns the real estate where the _____Franchisee_____ location is operating, _____Franchisor_____ has not and will not during the term of the _____Franchise_____ Agreement record against the real estate any restrictions on the use of the property, including any restrictive covenants, branding covenants or environmental use restrictions. If any such restrictions are currently recorded against the _____Franchisee_____'s real estate, they must be removed in order for the _____Franchisee_____ to obtain SBA-assisted financing.

**EMPLOYMENT**

- _____Franchisor_____ will not directly control (hire, fire or schedule) _____Franchisee_____'s employees. For temporary personnel franchises, the temporary employees will be employed by the _____Franchisee_____ not the _____Franchisor_____.

As to the referenced _____Franchise_____ Agreement, this Addendum automatically terminates when SBA no longer has any interest in any SBA-assisted financing provided to the _____Franchisee_____.

Except as amended by this Addendum, the _____Franchise_____ Agreement remains in full force and effect according to its terms.

_____Franchisor_____ and _____Franchisee_____ acknowledge that submission of false information to SBA, or the withholding of material information from SBA, can result in criminal prosecution under 18 U.S.C. 1001 and other provisions, including liability for treble damages under the False Claims Act, 31 U.S.C. §§ 3729 - 3733.

**Authorized Representative of FRANCHISOR_____:**

By: _____

Print Name: _____

Title:_____

**Authorized Representative of Franchisee_____:**

By: _____

Print Name: _____

Title:_____

**Note to Parties**: This Addendum only addresses "affiliation" between the _____Franchisor_____ and _____Franchisee_____. Additionally, the applicant _____Franchisee_____ and the _____Franchise_____ system must meet all SBA eligibility requirements.

SBA Form 2462 (01-2018)                                                Page 2

**<u>EXHIBIT B</u>**
**<u>FRANCHISE AGREEMENT AND EXHIBITS</u>**

*MULTISTATE FORM*



KOALA FRANCHISE, LLC

FRANCHISE AGREEMENT

<u>Lotus & The Rooster Holdings Company</u>
Franchisee Name

3/15/2022 | 2:42 EDT
_____
Date of Agreement

© COPYRIGHT 2021 KOALA FRANCHISE, LLC.  ALL RIGHTS RESERVED.
COMMERCIAL SALE PROHIBITED WITHOUT EXPRESS WRITTEN PERMISSION OF KOALA FRANCHISE, LLC.

## SUMMARY PAGE

1. Effective Date: _____3/15/2022 | 2:42 EDT_____

2. Franchisee's Name: Lotus & The Rooster Holdings Company

3. Franchisee's State of Organization (if applicable): Pennsylvania

4. Ownership of Franchisee:

   If the Franchisee is an entity, the following persons constitute all of the owners of a legal and/or beneficial interest in the franchisee:

   | Name | Percentage Ownership |
   |------|---------------------|
   | Salim Michel Makhlouf | 100% |

5. Territory (Section 1.1): Carlisle, PA

   Initial Geographic Area: 17007, 17011, 17013, 17015, 17025, 17027, 17050, 17055, 17072, 17081, 17375

   Population: 206,357

6. Initial Franchise Fee (Section 4.1): $40,000.00

7. Operating Principal (Section 5.6): Salim Michel Makhlouf

8. Franchisee's Address for Notices (Section 20): 251 S Pitt St, Carlisle, PA 17013

   Franchisee Email Address for Notices: salim.makhlouf@gmail.com

9. Additional Terms (if any): N/A

Initials: ___SM___(KOALA FRANCHISE, LLC)    _____(Franchisee)

Exhibits:
A   Trademarks
B   Lease Rider
C   Guarantee, Indemnification and Acknowledgment
D   Non-Disclosure and Non-Competition Agreement
E   Equipment Sale Agreement
F   General Release

1

© COPYRIGHT 2021 KOALA FRANCHISE, LLC.  ALL RIGHTS RESERVED.
COMMERCIAL SALE PROHIBITED WITHOUT EXPRESS WRITTEN PERMISSION OF KOALA FRANCHISE, LLC.

# FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into as of the date (the "Effective Date") set forth on the Summary Page, which appears after the cover page of this Agreement (the "Summary Page") (the Summary Page and all appendices and schedules attached to this Agreement are hereby incorporated by this reference), by and between KOALA FRANCHISE, LLC, a Florida limited liability company with its principal place of business at 445 West Drive, Melbourne, Florida 32904 ("Franchisor" or "we" or "us"), and the entity identified on the Summary Page as the franchisee ("Franchisee" or "you") with its principal place of business as set forth on the Summary Page.

## BACKGROUND:

A.      Franchisor owns a format and system (the "System") relating to the establishment, development and operation of franchises (each a "Franchise") that offer and provide insulation evaluation, removal, installation and related services that operate under the Marks (as defined below) using specially equipped Koala service vehicles and equipment (collectively "Koala Rigs").

B.      The distinguishing characteristics of the System include, without limitation, distinctive business formats; procedures; the Manual (as defined in Section 3.5); the Koala Rigs; procedures for operations, accounting, collections, management and inventory control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time;

C.      Franchisor identifies the System by mark Koala Insulation and associated logos, commercial symbols and such other trade names, mascots, service marks and trademarks as are now, or in the future, designated by Franchisor as an integral part of the System ("Marks") including but not limited to the currently registered Marks identified on Exhibit A some of which may be incorporated into other brands or other systems developed by Franchisor or its affiliates in the future;

D.      Franchisor continues to develop, use, and control the use of such Marks to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance, and service; and

E.      Franchisee desires to operate a Franchise under the System and using the Marks, and wishes to obtain a license from Franchisor for that purpose, as well as to receive the training and other assistance provided by Franchisor in connection therewith;

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-96A853875CB9

NOW, THEREFORE, the parties agree as follows:

1.      <u>GRANT</u>

**1.1.**    <u>Grant of Rights; Protected Territory</u>.  Upon the terms and conditions set forth in this Agreement, Franchisor hereby grants to Franchisee a non-exclusive license (the **"License"**) to operate a Franchise that specializes in providing insulation evaluation, removal, installation and related services (the **"Services"**) within the initial geographic area described on the Summary Page (the **"Territory"**).  Franchisee hereby accepts such License and undertakes the obligation to operate a Franchise in accordance with this Agreement during the entire initial term of the License (as specified in **Section 2.1**).  Franchisee acknowledges and agrees that this Territory is non-exclusive but subject to certain limited protections as defined below.

**1.2.**    Protected Territory.  The Territory, as listed on the Summary Page, shall be designated as "Protected" from the Effective Date of this agreement and shall remain Protected for the duration of the entire initial term plus any extensions thereof provided that the Territory may lose its Protected status through any default of this Agreement or any other agreement with Franchisor or its Affiliates, or by Franchisee's failure to maintain sufficient equipment and staff as required in Franchisor's discretion to provide, without substantial delay, all Services offered under the System to customers within the Territory.  Any of these events, without limitation, constitute cause for revocation of Protected status of the Territory.  Protected status may be revoked only with cause and upon notice.  Once the Territory loses its Protected status it may not be regained.

**1.2.1**    While the Territory is Protected Franchisor shall not provide the Services or grant other franchisees or others the right to provide the Services using the Koala Insulation System and Koala Insulation Marks to customers at any location within the Territory other than through the Revenue Sharing Program as hereafter defined.

**1.2.2**    Franchisor and other franchisees may advertise (subject to Franchisor approval) online or through any other medium without geographical limitations, including within the Protected Territory, but only Franchisee shall be permitted to provide the Services under the Koala Insulation System within the Protected Territory.

**1.3.**    Reservation of Rights.  Franchisor and its affiliates have the right to conduct any business activities, under any name, in any geographic area, and at any location, without any liability to Franchisee regardless of the proximity to or effect on the Franchise. By way of illustration, and without limiting the foregoing, Franchisor and its affiliates have the right:

**1.3.1.**  to operate and permit franchisees or others to establish and operate Franchises at any location within or outside the Territory (subject to the

3

Protections defined in section 1.2.1 above) notwithstanding their actual or threatened impact on sales of the Franchise;

**1.3.2.** to operate or permit franchisees or others to establish and operate businesses at any location under other systems or other Marks, including businesses that may offer or sell products or services that are the same or similar to the products or services offered from the Franchise, within or outside the Territory and notwithstanding their proximity to the Territory, Protected status of Territory, or their threatened or actual impact on sales of the Franchise;

**1.3.3.** to sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, within or outside of the Territory, products and services bearing the Marks or similar marks through other channels of distribution including, without limitation, the internet, catalogs, or commercial channels other than the on-site installation or removal of insulation; and

1.3.4. to acquire, be acquired by, or merge with other businesses and to convert them to the Marks or any other name at any location and such acquiring or acquired businesses shall not be bound by any Protections applicable to the Territory.

1.3.5. If the Territory is not Protected, the geographic area of the Territory may be revised by Franchisor from time to time, after the expiration of the initial term, to include only the Population listed as the actual population in the initial geographic area increases. If Franchisor reduces the Territory's geographic area due to a population increase after the expiration of the initial term, Franchisor shall first offer the right to purchase such additional population to Franchisee at the then-current rates, provided that Franchisee is and has been at all times in compliance with the terms hereunder.

Franchisee acknowledges that the activities described in Section 1.3. through 1.3.5 are only examples, and do not limit the business activities that Franchisor and its affiliates may undertake. Franchisee also acknowledges that, other than those rights expressly conveyed through this agreement and narrowly limited to same, Franchisor has made no other representations concerning Franchisee's rights in any geographic territory.

**1.4.** <u>Advertising and Promotional Materials</u>. Franchisor and Franchisee acknowledge that advertising and promotional materials created, placed, and/or distributed by Franchisor, other franchisees operating under the System, or other entities authorized by Franchisor, may appear in media distributed in, or may be directed to prospective customers located within, trade areas or market areas nearby or encompassing the Territory, including on Franchisor's website or any related website. Neither Franchisee, nor any other franchisee, is restricted from advertising or promoting products or services to any customers regardless of where they reside; provided, however, Franchisee may not perform Services outside of the Territory, except as expressly provided herein.

**1.5.**    Sale of Products and Services.  Unless otherwise permitted by Franchisor, Franchisee shall offer and sell only then-current products and services previously authorized by Franchisor, using Koala Rigs, and only within the Territory, only in accordance with the requirements of this Agreement and the then-current procedures set forth in the Manuals as they may be developed and/or modified from time to time.  Franchisee may not perform Services using equipment other than a Koala Rig that meets Franchisor's then-current specifications and standards.  Franchisee understands and acknowledges that certain other Koala franchisees were granted protected territories, and shall not perform Services in the protected territory of another Koala franchisee.

**1.5.1.** Franchisee may perform Services for customers that are located outside of the Territory provided (a) Franchisee has submitted to Franchisor a written request to provide Services for such customer giving the name of the customer and its location; and (b) Franchisor has approved such request in writing.  Franchisor may at any time revoke its approval effective upon giving written notice of the same to Franchisee.  Franchisor may require Franchisee to purchase any territory, at then-current rates, in which Franchisee requests permission to provide Services if (a) Franchisee requests permission to service customers in the area more than twice per 90-day period, or (b) if Franchisee has operated for at least 12 months and Gross Sales for Services performed outside the Territory constitute more than 10% of the prior 12 months' Gross Sales.  Any permission granted to operate outside of the Territory shall not constitute an ongoing grant of rights to the area and Franchisor retains all rights thereto.

**1.5.2.** Revenue Sharing Program.  Franchisee may at its option enter into a revenue sharing program ("Revenue Sharing Program") with any other franchisee which may permit the out of territory franchisee to operate within Franchisee's Territory for the purposes of servicing existing clients who have previously received services within the out of territory franchisee's own territory.  Franchisee may also enter into a revenue sharing agreement with any other franchisee as Franchisee deems appropriate to complete extraordinarily large jobs or for other purposes subject to Franchisor approval which must be received in writing in advance of any Revenue Sharing Program between franchisees.  Franchisor shall not be a party to any Revenue Sharing Program which shall be conducted solely between franchisees.

2.    TERM AND RENEWAL

**2.1.**    Term.  Except as otherwise provided herein and unless sooner terminated in accordance with the provisions hereof, the initial term of the License commences on the Effective Date and continues until that date which is 10 years after the Effective Date.

**2.2.**    Renewal.  Franchisee may, at its option, request to renew Franchisee's right to operate the Franchise for two additional terms of five years each.  Franchisee's option of renewal is subject to the following conditions, each of which must be met prior to the renewal:

**2.2.1.** Franchisee shall give Franchisor written notice of Franchisee's election to renew no fewer than six months, nor more than 12 months, prior to the end of the initial term;

**2.2.2.** Franchisee shall update, refurbish, or replace the Franchise Location (if applicable) and its Koala Rig(s) to comply, as determined solely by Franchisor, with Franchisor's then-current standards;

**2.2.3.** From the time of Franchisee's election to renew through the expiration of the original term, Franchisee and its affiliates shall not have been in default of any provision of this Agreement, any amendment to this Agreement, any successor to this Agreement, or any other agreement between Franchisee (and its affiliates) and Franchisor (and its affiliates); and, as determined in the sole discretion of Franchisor, Franchisee and its affiliates shall have complied with all the terms and conditions of this Agreement, such other agreements, as well as the Operating Standards (as defined in **Section 5.9**) prescribed by Franchisor during the term of this Agreement;

**2.2.4.** Franchisee shall have satisfied all monetary, reporting and other obligations owed by Franchisee to Franchisor and its affiliates, and shall have timely met those obligations throughout the term of this Agreement;

**2.2.5.** Franchisee shall execute Franchisor's then current form of franchise agreement; which agreement shall supersede this Agreement in all respects (except the renewal franchise agreement shall not require payment of an initial franchise fee or include the ability to renew for any years beyond the aggregate of those contained in the original term and extensions herein).  Franchisee acknowledges that the terms, conditions, and provisions of the renewal franchise agreement, and the obligations of the parties thereto, may differ substantially from the terms, conditions, provisions and obligations in this Agreement, including, without limitation, a higher percentage royalty fee and advertising contribution;

**2.2.6.** Franchisee shall pay, in lieu of an initial franchise fee, a renewal fee equal to 25% of the Initial Franchise Fee or $5,000, whichever is greater;

**2.2.7.** Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, agents, and employees; and

**2.2.8.** Franchisee and its personnel shall comply with Franchisor's then current qualification and training requirements, prior to commencement of operations under the renewal form of franchise agreement.

3.    <u>FRANCHISOR'S DUTIES</u>

**3.1.**    <u>Initial and On-Going Training</u>. Franchisor shall provide for Franchisee's Operating Principal (as defined in **Section 5.6**) Salesperson, and Manager (as defined in **Section 5.6**), such initial training programs as Franchisor may

designate, to be conducted at such time(s) and location(s) designated by Franchisor. Franchisor may charge a reasonable fee for additional individuals who attend training. Franchisor shall also provide such ongoing training as it may, from time to time, deem appropriate. Franchisor shall be responsible for the cost of instruction and materials, subject to **Section 5.6** for the training of the initial Operating Principal, Manager, and Salesperson. Franchisee shall be responsible for the cost of training any subsequently hired or replacement staff including without limitation Operating Principal, Manager and Salesperson.

**3.2.**  Opening Assistance and Training.  In addition to the initial training described in Section 3.1, should Franchisee request additional assistance from Franchisor to facilitate the opening of the Franchise and should Franchisor, in its discretion, deem it necessary, feasible and appropriate to comply with the request, Franchisee shall reimburse Franchisor for the expenses of Franchisor providing such additional assistance, which may include Franchisor's then-current service fee, as set forth in the Manuals or otherwise communicated to Franchisee in writing from time to time.  Franchisor will provide such additional on-site assistance as Franchisor deems advisable.

**3.3.**  Manuals.  Franchisor shall provide Franchisee access to the confidential operations manuals (which may include technical bulletins, and other written, video or audio materials (collectively the "**Manuals**"), as more fully described in **Section 7**.

**3.4.**  Advertising and Promotion.  Franchisor shall review, and shall have the right to approve or disapprove, all advertising and promotional materials that Franchisee proposes to use pursuant to **Section 10.6**.  In addition, during the term of this Agreement, Franchisor shall provide Franchisee with such other advertising assistance, sales advice, or related materials as Franchisor deems advisable.

    3.4.1  Electronic Advertising and Support Services.  Franchisor shall establish and maintain, during the Term of this agreement, a website and/or other such listings as Franchisor deems appropriate for the Koala brand which shall contain content deemed appropriate in its sole and unlimited discretion.  Franchisor may also maintain certain location specific or franchise specific sites ("Micro-Sites") in its sole discretion. Franchisor may establish and assign a phone number to the Franchise and if it does so, Franchisee must use this number as its only published and/or advertised phone number for the Franchise.  Franchisor shall retain full rights to control, suspend, redirect and transfer any web domains and phone numbers and other listings.  Franchisor shall have the right to suspend or revoke any or all of these services immediately and without further notice upon Franchisee's Default of any term of this Agreement, specifically but not limited to financial or reporting obligations.

**3.5.**  Brand Fund.  Franchisor may establish and administer a System-wide advertising, marketing, promotional, and creative fund, which is referred to as the

"**Brand Fund**", or such other name as Franchisor may designate, in the manner set forth in **Section 10.3.**

**3.6.**    Technology System.  Franchisor shall specify or require that certain brands, types, makes, and/or models of communications, computer systems, software and hardware be used by, between, or among the Franchises, including without limitation: (a) back office and point of sale systems, data, audio, video, and phone, voice storage, retrieval, and transmission systems for use at the Franchise, between or among Koala franchisees, the corporate units and Franchisor; (b) physical, electronic, and other security systems including without limitation vehicle and/or Koala Rig tracking devices; (c) printers and other peripheral devices; (d) archival back-up systems; (e) communication systems (including without limitation email and phone systems); and (f) Internet access mode and speed (collectively, the "**Technology System**").  Franchisor may also designate: (i) software programs that Franchisee must use in connection with the Technology System ("**Required Software**"), which Franchisee shall install; (ii) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee shall install; (iii) the tangible media upon which such Franchisee shall record data; (iv) the database file structure of the Technology System; and (v) additional Technology Systems that must be used.

**3.7.**    On-Going Assistance.  Franchisor shall provide periodic assistance to Franchisee in the marketing, management, and operation of the Franchise as Franchisor determines at the time(s) and in the manner determined by Franchisor.

**3.8.**    Additional Services.  Franchisor, at its option may provide Additional Services including a call center, recruiting assistance and other services at the then-current fees.  Franchisor shall have no ongoing obligation to offer these services and may discontinue them for any or all franchisees at any time.

4.    ROYALTY FEES; SALES REPORTING

**4.1.**    Initial Franchise Fee.  Franchisee shall pay Franchisor an initial franchise fee that is specified on the Summary Page (the "**Initial Franchise Fee**"), which must be paid in full prior to or upon execution of this Agreement.  The Initial Franchise Fee is not refundable under any circumstances and shall be deemed earned in full upon receipt, except if Franchisee's Operating Principal or Manager fails to successfully complete initial training in accordance with the requirements of **Section 5.6**.  If Franchisor terminates this Agreement due to any failure to successfully complete initial training pursuant to **Section 5.6**, Franchisor will refund the Initial Franchise Fee, less an amount equal to $5,000, subject to Franchisee' and its owners' execution of a General Release.

**4.2.** <u>Royalty Fees</u>. Franchisee shall pay Franchisor continuing royalty fees ("**Royalty Fees**") at such time, for such periods, and in such manner as specified herein, or as otherwise specified in writing by Franchisor. The term "**Gross Sales**" means amounts, less refunds, sales tax and chargebacks, derived from all products or services sold from or through the Franchise, including any sale of products or services made for cash or credit, or partly for cash and partly for credit. "**Gross Sales**" also includes the fair market value of any services or products received by the Franchisee in barter or in exchange for Franchisee's services and products.

Royalty Fees shall be paid weekly in an amount equal to 6.5% of Gross Sales during the first 6 calendar months of operations (which for clarity shall begin and include any portion of any month during which Franchisee first receives any Gross Sales). Beginning on the 7th month of operations, Royalty Fees shall be paid weekly in an amount that is the greater of the required Minimum Royalty, or 6.5% of Gross Sales for the first $1,000,000 in Gross Sales (see Table 1 below); then the Royalty Fee shall be reduced to 5% of Gross Sales for amounts between $1,000,000.01 and $1,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 4.5% of Gross Sales amounts between $2,000,000 and $2,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 3.5% of Gross Sales for all amounts over $3,000,000 annually for the remainder of the calendar year.

Table 1: Minimum Royalty Per Territory, Per week.

| Months After Opening | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5+ Territories |
|---|---|---|---|---|---|
| 7-12 | $250 | $225 | $200 | $175 | $150 |
| 13-24 | $350 | $325 | $300 | $275 | $250 |
| 25-36 | $500 | $475 | $425 | $400 | $375 |
| 37+ | $625 | $600 | $575 | $550 | $525 |

Franchisee expressly acknowledges and agrees that Franchisee's obligations for the full and timely payment of Royalty Fees, Brand Fund Contributions (as defined in Section 10.2), if any, and all other amounts provided for in this Agreement, shall be absolute and unconditional. Franchisee shall not for any reason delay or withhold the payment of all or any part of those or any other payments due hereunder, put the same in escrow or setoff the same against any claims or alleged claims Franchisee may allege against Franchisor, the Brand Fund or others. Franchisee shall not, on grounds of any alleged nonperformance by Franchisor or others, withhold payment of any fee, including without limitation Royalty Fees, Brand Fund Contributions, nor withhold or delay submission of any reports due hereunder. Royalty Fees shall be deemed earned in full upon receipt. Franchisee and Franchisor expressly acknowledge that all services provided by Franchisor to Franchisee shall not exceed in cost the amount of the Royalty Fees received from Franchisee.

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-06A853875CB9

4.2.1   Sales Reports.  Franchisee shall deliver to Franchisor any and all reports, statements and/or other information regarding its Gross Sales and other metrics or data specified by Franchisor at the time(s) and in the format(s) reasonably requested by Franchisor from time to time ("Sales Reports").

Upon notice by Franchisor Franchisee must use, and pay the fees required to use, the Koala proprietary software or other software as specified by Franchisor, when made available, or other systems or methods as specified by Franchisor for the purposes of providing Sales Reports in compliance with this Section. All payments required by this Agreement to Franchisor, its affiliates, and/or the Brand Fund must be made by the method or methods that Franchisor specifies from time to time, which may include, without limitation, payment by deduction as specified in Section 3.8.2, payment via wire transfer or electronic debit to Franchisee's bank account.  Franchisee must furnish Franchisor and Franchisee's bank with all authorizations necessary to effect payment by the methods Franchisor specifies.

**4.3.**   Overdue Payments or Reports.   Any payment, Sales Report or other required report not actually received by Franchisor on or before the date such payment or report is due (currently, no later than noon Eastern Time on Monday of each week) shall be deemed overdue.  If an attempt to electronically debit Franchisee's bank account fails or any other payment method is declined or returned, the payment shall be deemed not received.  Franchisor may at its option from time to time specify or change the date such reports are due upon 7 days' Notice to Franchisee.  If any payment or required report is overdue, Franchisor shall collect from Franchisee the greater of the Minimum Royalty amount, or 1.5 times the Royalty Fees and other fees or amounts due based on the prior report received ("Presumptive Fees").  The Presumptive Fees shall be credited towards the actual Royalty Fees due once the Sales Report is received.   Additionally, Franchisee shall pay Franchisor, a late payment/late report charge of $50 for each day (or portion thereof) that the payment or report is late (collectively "Late Fee"). Entitlement to such Late Fee shall be in addition to any other remedies Franchisor may have including without limitation the suspension of services as defined in §3.4.1 and elsewhere in this Agreement.

**4.4.**   Payments on Behalf of Franchisee.  Franchisee shall pay to Franchisor, within 15 days after any written request by Franchisor which is accompanied by reasonable substantiating material, any monies (plus a fee equal to 10% of the amount paid by Franchisor on Franchisee's behalf) which Franchisor has paid, or has become obligated to pay, on behalf of Franchisee, by consent or otherwise under this Agreement.

5.   <u>FRANCHISEE'S DUTIES</u>

**5.1.1.**  Franchisee may operate from their home office, provided doing so would be in compliance with applicable laws and regulations.  If Franchisee choses to rent or lease a site, storage location or other physical site other than Franchisee's home, at which it will base or park Koala Rigs or from which it will operate the Franchise, Franchisee must provide notice to Franchisor at least 30 days in

advance.  Before Franchisee makes a binding commitment to lease, sublease or purchase a site, Franchisor must approve the location in writing and approve in writing the proposed lease for the location (the "**Lease**") or purchase agreement or any letter of intent between Franchisee and the third-party seller or lessor. FRANCHISEE ACKNOWLEDGES AND AGREES THAT FRANCHISOR'S APPROVAL OF A PROPOSED SITE IS NOT A WARRANTY OR REPRESENTATION OF ANY KIND AS TO THE POTENTIAL SUCCESS OR PROFITABILITY OF THE FRANCHISE.  If Franchisee leases the approved Franchise Location, unless Franchisor waives the requirement in writing, Franchisee must arrange for the execution of the Lease Rider in the form of **Exhibit B** by Franchisee and its landlord in connection with any Lease for the approved Franchise Location and any other provisions that Franchisor may reasonably require.  Franchisee must deliver to Franchisor the completely executed purchase agreement or Lease and Lease Rider within 10 days after execution of the Lease or purchase agreement.  Franchisee must comply with the terms and conditions of the Lease for the approved Franchise Location.  Franchisor is not obligated to execute Franchisee's Lease or guarantee a Lease for Franchisee.

**5.1.2.** Before commencing construction of the Franchise Location, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

**5.1.2.1.** Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations, including, without limitation, the applicable provisions of the American with Disabilities Act (as amended, the "ADA") regarding the construction and design of the Franchise Location.

**5.1.2.2.** If so requested by Franchisor, Franchisee shall submit to Franchisor, for Franchisor's approval, final plans for construction based upon the preliminary plans and specifications.  Franchisor shall not review, nor shall any approval be deemed to include, approval or acceptance of Franchisee's compliance with federal, state, or local laws and regulations, including the ADA.  Once approved by Franchisor, such final plans shall not thereafter be changed or modified without the prior written permission of Franchisor.

**5.1.2.3.** Franchisee shall obtain all permits and certifications required for the lawful construction of the Franchise Location. Franchisee shall be responsible for obtaining all zoning classifications and clearances which may be required by state or local laws, ordinances, or regulations or which may be necessary or advisable owing to any restrictive covenants relating to the Franchise Location.

**5.1.2.4.** Franchisee shall employ a qualified licensed general contractor who is acceptable to Franchisor to construct the Franchise Location and to complete all improvements.  Franchisee shall obtain and maintain in force during the entire period of construction the insurance required under Article 11. Franchisee shall deliver to Franchisor such proof of such insurance as Franchisor shall require.

**5.1.2.5.** During the construction of the Franchise Location, Franchisee will permit Franchisor to make such on-site inspections of the Franchise Location as Franchisor determines appropriate to evaluate the construction or remodeling of the Franchise Location for compliance with Franchisor's requirements. Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.

**5.1.2.6.** Within 30 days after the opening of the Franchise Location, Franchisee shall provide to Franchisor a full breakdown of all costs associated with the development and construction of the Franchise Location if so requested by Franchisor.

**5.1.3.** Franchisee shall use the Franchise Location solely for the operation of the Franchise; shall keep the Franchise open and in normal operation for such hours and days as Franchisor may from time to time specify in the Manuals or as Franchisor may otherwise approve in writing; and shall refrain from using or permitting the use of the Franchise Location for any other purpose or activity at any time. As used in this Section, the term Franchise Location shall include the grounds surrounding the Franchise.

**5.1.4.** Franchisee shall at all times maintain the Franchise Location in a high degree of sanitation, repair, and condition, and in connection therewith shall make such additions, alterations, repairs, and replacements thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting or replacement of obsolete signs, furnishings, equipment, and decor as Franchisor may reasonably direct. If at any time in Franchisor's judgment the general state of repair or the appearance of the Franchise Location or its equipment, fixtures, signs or decor does not meet Franchisor's quality control and standards therefor, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate, within 30 days after receipt of such notice, and thereafter diligently continue a bona fide program to complete any required maintenance, Franchisor shall have the right, in addition to all other remedies, to enter upon the Franchise Location and effect such repairs, painting, maintenance or replacements of equipment, fixtures or signs on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

**5.1.5.** In addition to the maintenance obligations set forth in above, Franchisee shall, at its expense, undertake such periodic and ongoing remodeling and upgrading of the Franchise Location, and the furniture, fixtures, equipment, décor, signage and trade dress of the Franchise Location, as required by Franchisor to cause the Franchise Location building design, exterior facade, trade dress, signage, fixtures, furnishings, equipment, decor, color schemes, and presentation of the Marks to be consistent with the then-current standards. Such remodeling and refurbishment may include structural changes, installation of new equipment and signs, remodeling, redecoration, and modifications to existing improvements,

and, shall be completed to Franchisor's satisfaction pursuant to such standards, specifications, and deadlines as Franchisor may specify.

**5.1.6.** Franchisee may not relocate its Franchise Location unless it receives Franchisee's prior written approval. Franchisee's relocation will be at its expense and Franchisor has the right to charge Franchisee for all reasonable costs and expenses it incurs to approve and implement the relocation.

**5.2.** <u>Koala Rigs</u>.

**5.2.1.** Franchisee shall obtain that number of Koala Rigs prescribed by Franchisor from time to time, and ensure that its Koala Rigs are in proper working order.

**5.2.2.** Each Koala Rig shall consist of an enclosed trailer and certain proprietary equipment, and other items (the **"Koala Rig" or "Rig"**) installed in accordance with Franchisor's standards and requirements pursuant to the terms of an Equipment Sale Agreement. Currently Koala Rigs include blow-in rigs and spray-foam rigs but may include other equipment packages or otherwise be modified or substituted as specified from time to time by Franchisor. Franchisee acknowledges and agrees that Franchisor and its designees are the only approved suppliers of such Rigs, equipment and installation services. The Koala Rig must generally be moved by towing with an approved truck capable of and rated for the weight and requirements of the Koala Rig. When attached, the truck ("Truck") and trailer shall collectively constitute the Koala Rig.

**5.2.3.** Prior to Franchisee purchasing a Truck, Franchisee shall submit to Franchisor, in a form specified by Franchisor, information regarding the specifications and conditions of the Truck as Franchisor may reasonably require or Franchisee may comply with the then current guidelines as defined in the Manual. Franchisee may not purchase any Truck to be used with a Koala Rig unless and until it has received Franchisor's prior approval or ensures that the Truck complies with brand appearance standards in Franchisor's discretion. Franchisor may establish relationships with truck dealers and if it does so, Franchisee agrees to purchase solely from these approved dealers.

To the extent that other vehicles or equipment are used in the Franchise, including without limitation Manager or Salesperson vehicles, they must comply with the then current Brand Standards and Manual.

**5.2.4.** If the Franchise is not operated from a Franchise Location, Franchisee will make arrangements to store the Koala Rig(s) used in the operation of the Franchise in compliance with all applicable state and local laws and other restrictions.

**5.2.5.** Franchisee shall at all times maintain the Koala Rigs in a high degree of repair and condition, and in connection therewith shall make such repairs, replacements and refurbishment thereto (but no others without Franchisor's prior

written consent) as may be required for that purpose, including, without limitation, such periodic repainting, replacement of wraps or decals, replacement of equipment and parts or installation or refurbishment of signage as Franchisor may reasonably direct and pursuant to such standards, specifications and deadlines as Franchisor may specify.

**5.3.**   System Standards.   Franchisee understands and acknowledges that every detail of the Franchise is important to Franchisee, Franchisor, and other franchisees to develop and maintain high operating standards, to increase the demand for the Services sold by all franchisees, and to protect Franchisor's reputation and goodwill.

**5.4.**   Pre-Opening Obligations.   Before commencing operations, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

   **5.4.1.** Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations.

   **5.4.2.** Franchisee shall obtain all licenses, permits, and certifications required for the operation of the Franchise within the Territory and the parking and/or storage of Koala Rigs in the Territory.

**5.5.**   Opening.   Franchisee shall open the Franchise within four months after the Effective Date.   Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.   In addition, in connection with the opening of the Franchise:

   **5.5.1.** Franchisee shall provide at least 14 days' prior notice to Franchisor of the date on which Franchisee proposes to first open the Franchise for business.

   **5.5.2.** If the Franchise will operate from a Franchise Location, Franchisee shall not open the Franchise until Franchisor has determined that all construction has been substantially completed, and that such construction conforms to Franchisor's standards, and Franchisor has given Franchisee written approval to open, which approval shall not be unreasonably withheld.

   **5.5.3.** Franchisee shall not open the Franchise until Franchisor has determined that Franchisee has obtained a sufficient number of Koala Rigs to Franchisor's standards in compliance with **Section 5.2** which shall be no less than one Blow-In and one Spray Foam rig.

   **5.5.4.** Franchisee shall not open the Franchise until the Operating Principal, Salesperson and Manager have successfully completed all initial training required by Franchisor, and Franchisee has hired and trained, to Franchisor's standards, a sufficient number of employees to service the anticipated level of the Franchise's customers.

14

**5.6.**    Management and Training.  Franchisee must appoint an individual owner as its **"Operating Principal"** who has at least a 20% equity interest in Franchisee, must have authority over all business decisions related to the Franchise, and must have the power to bind Franchisee in all dealings with Franchisor.    The Operating Principal is specified on the Summary Page. Franchisee must also appoint a manager to manage the day-to-day business of the Franchise (the **"Manager"**).  Franchisee's Operating Principal may serve as its Manager, unless Franchisor believes that he or she does not have sufficient experience.    Franchisee must appoint a salesperson to manage the day-to-day customer service and sales functions in accordance with Franchisor's specifications (the "Salesperson").   Franchisee must provide Franchisor with written notice of its Manager and Salesperson at least 14 days prior to initial training.  Prior to the opening of the Franchise, the Manager, Salesperson and the Operating Principal must attend and successfully complete, to Franchisor's satisfaction, the initial training program offered by Franchisor, pursuant to **Section 3.2**.  If Franchisor determines, in its sole discretion, that the Operating Principal, Salesperson or Manager is unable to satisfactorily complete any phase of the training program, Franchisor shall have the right to: (i) require the Salesperson, Operating Principal or Manager, as the case may be, to attend such additional training as Franchisor may require, at Franchisee's expense; or (ii) terminate this Agreement, in which event neither Franchisor nor Franchisee shall have any further rights or obligations hereunder.  If Franchisor terminates this Agreement pursuant to the prior sentence, Franchisor shall refund a portion of the Initial Franchise Fee as provided in Section 4.1. The daily operations of the Franchise are at all times required to be supervised under the active full-time management of the Manager and Salesperson who have each successfully completed Franchisor's initial training program.

**5.6.1.** If the Manager or Salesperson ceases active management of the Franchise or in the event the Operating Principal is changed or is no longer a 20% equity owner of the Franchisee, Franchisee must hire a new Manager or Salesperson or appoint a new Operating Principal (as the case may be), who must be approved in writing by Franchisor. The new Manager, Salesperson or Operating Principal must undergo a certification training program that is prescribed by Franchisor, which may include training at the Franchise, another Franchise or such other place as Franchisor shall designate.  All expenses incurred by the new Manager, Salesperson or Operating Principal in attending such program including, without limitation, travel costs, room and board expenses and salaries and other benefits, shall be the sole responsibility of Franchisee.  In addition, Franchisee shall:  (a) pay Franchisor's then-current certification program fees; and (b) reimburse Franchisor for its out of pocket expenses, including without limitation, reasonable travel and room and board expenses.  If Franchisor determines, in its sole discretion, that the new Manager, Salesperson or Operating Principal is unable to satisfactorily complete the certification program, Franchisor shall have the right to:  (i) require the new Manager, Salesperson or Operating Principal, as applicable, to attend such additional training, at Franchisee's expense, so as to demonstrate his or her ability to operate the Franchise to Franchisor's satisfaction;

15

or (ii) require Franchisee to promptly hire a replacement New Manager, Salesperson or appoint a new Operating Principal among its equity owners (who must have at least 20% equity ownership) who shall be required to undergo the training and certification programs contemplated by this Section.

**5.6.2.** Franchisor from time to time may provide and, if it does, may require that the Operating Principal, Manager, Salesperson and/or other employee attend and successfully complete refresher training programs or seminars including without limitation an annual conference ("Annual Conference"), to be conducted at such location as may be designated by Franchisor.  Franchisee shall pay to Franchisor the then current Annual Conference Fee for each person required to attend.  All expenses incurred by Franchisee and its employees in attending such program including, without limitation, travel costs, room and board expenses and salaries and benefits, shall be the sole responsibility of Franchisee.

**5.6.3.** If Franchisee requests that Franchisor provide on-site training in addition to the opening assistance described in **Section 3.4**, and Franchisor chooses to do so, then Franchisee agrees that it shall pay Franchisor's then-current per diem charges and out-of-pocket expenses, which shall be as set forth in the Manuals or otherwise in writing.

**5.7.**   Personnel.  Franchisee agrees to maintain a competent, conscientious and trained staff in numbers sufficient to promptly provide the Services and to take such steps as are necessary to ensure that its employees preserve good customer relations and comply with such dress code as Franchisor may prescribe.

**5.8.**   Equipment Upgrades. Franchisee shall make, from time to time, such upgrades and other changes to the equipment, Koala Rigs and electronic equipment utilized in the Franchise, the Technology System and Required Software as Franchisor may request in writing (collectively, "**Equipment Upgrades**").  Franchisor shall have the right to require any Equipment Upgrades it deems necessary for the Franchise.

**5.9.**   Standards and Specifications.  To insure that the highest degree of quality and service is maintained, Franchisee shall operate the Franchise in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing (as used in this Agreement, Franchisor's "**standards**", "**requirements**", "**specifications**" or "**Operating Standards**").   At a minimum, the Operating Standards shall include:

**5.9.1.** offering and selling at all times such services that conform to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming services without Franchisor's specific prior written consent

**5.9.2.** maintaining in sufficient supply, using, offering and selling at all times only such products, equipment, supplies, materials, and goods that conform

to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming products without Franchisor's specific prior written consent.

**5.9.3.** offering and selling only such products as have been expressly approved for sale in writing by Franchisor; offering all products and services as Franchisor may specify from time to time as required offerings at the Franchise; offering all products authorized for sale as specified by Franchisor; refraining from any deviation from Franchisor's standards, without Franchisor's prior written consent; and discontinuing the sale of any products which Franchisor has disapproved, in writing, at any time.  If Franchisee deviates or proposes to deviate from Franchisor's standards, whether or not such deviation is approved by Franchisor, such deviation shall become the property of Franchisor.

**5.9.4.** operating the Franchise to fully comply with all applicable laws and regulations.

**5.9.5.** offering and selling the services and products in accordance with any minimum, maximum, and/or specific prices that Franchisor may determine from time to time (except to the extent determination of prices by Franchisor is limited or prohibited by applicable law).

**5.10.**  <u>Non-Compliance</u>.  If Franchisee violates an Operating Standard, and fails to bring the Franchise into compliance with such Operating Standard within 10 days after Franchisor has delivered to Franchisee written notice of the violation, Franchisee shall pay to Franchisor upon demand $100 for each day that Franchisee is not in compliance with the relevant Operating Standard.  Franchisor's right to charge these amounts is in addition to any other remedy provided under this Agreement, including under **Section 13**.  Franchisor's damages from Franchisee's failure to comply with this Section may include loss of good will and other damages, and are difficult to measure and quantify; such amount is, therefore, a reasonable approximation of damages, and not a penalty.

**5.11.**  <u>Suppliers and Sourcing Requirements</u>.  Franchisor has the right to require that services and products offered by Franchisee, and services, products and equipment used by Franchisee in the establishment and operation of the Franchise:  (a) meet specifications that Franchisor establishes from time to time; and/or (b) be purchased only from manufacturers, vendors, distributors, and other suppliers that Franchisor has expressly approved; and/or (c) be purchased only from a single source (which may include Franchisor or its affiliates or other suppliers which provide a financial benefit to Franchisor and may not be the least expensive supplier).  To the extent that Franchisor establishes specifications, requires approval of suppliers, or designates specific suppliers for particular items, Franchisor will notify Franchisee via the Manuals or otherwise in writing.  In determining whether Franchisor will approve any particular supplier, Franchisor shall consider various factors, including a supplier who can demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then current standards and specifications for such items; who possesses adequate

quality controls and capacity to supply Franchisee's needs promptly and reliably; who would enable the System, in Franchisor's sole opinion, to take advantage of marketplace efficiencies; and who has been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved. For the purpose of this Agreement, the term **"supplier"** shall include, but not be limited to, manufacturers, distributors, resellers, and other vendors. Franchisee recognizes that Franchisor shall have the right to appoint only one supplier for any particular item, and that Franchisor may so designate itself or its affiliate.

**5.11.1.**    If Franchisee wishes to purchase any services, products, equipment or any items that Franchisor has not approved or to purchase from an unapproved supplier, Franchisee shall first submit to Franchisor a written request for such approval. Franchisee shall not purchase any products or services or make purchases from any supplier until, and unless, such item or supplier has been approved in writing by Franchisor. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, either to Franchisor or to an independent laboratory designated by Franchisor for testing or evaluation. Franchisor may require that Franchisee or supplier pay a reasonable fee charge for such testing or evaluation. Franchisor may also require that the supplier comply with such other requirements as Franchisor may deem appropriate, including payment of reasonable continuing inspection/evaluation fees and administrative costs. Franchisor reserves the right, at its option, to reinspect from time to time the facilities and products or equipment of any such approved supplier and to revoke its approval of any item or supplier upon the item's or supplier's failure to continue to meet any of Franchisor's then current criteria.

**5.11.2.**    Franchisee acknowledges and agrees that Franchisor shall have the right to collect and retain all manufacturing allowances, markups, marketing allowances, rebates, credits, monies, payments or benefits (collectively, "**Allowances**") offered by suppliers to Franchisee or to Franchisor or its affiliates based upon purchases of products, equipment and other goods and services made by the Brand Fund or Franchisees. These Allowances are based on System-wide purchases of products, services, merchandise and other items and shall be unrestricted income to Franchisor. Franchisee assigns to Franchisor or its designee all of Franchisee's right, title and interest in and to any and all such Allowances and authorizes Franchisor or its designee to collect and retain any or all such Allowances without restriction (unless otherwise instructed by the supplier). Franchisor may mark up or receive Allowances from any providers or vendors doing business with Franchisees, Franchisor or the Brand Fund including without limitation, equipment, supplies, advertising and marketing vendors. Franchisor may in its sole discretion retain as income with no further obligations, or utilize some or all of the Allowances for System-wide marketing, other brand enhancement activities or specific required or local area marketing, or such Allowance monies may be deposited into the Brand Fund for future use and expenditures by the Brand Fund.

**5.11.3.**    Compliance with laws regarding the chemicals, products, equipment and other supplies that Franchisee uses in its Franchise is Franchisee's sole responsibility.    Franchisor makes no warranty or representation that chemicals, products and other supplies that it recommends, approves or requires comply with applicable laws in Franchisee's jurisdiction. Franchisee must notify Franchisor in writing immediately if any recommended, approved or required chemical, product or supply is subject to regulation or laws in Franchisee's jurisdiction.    Franchisor will cooperate with Franchisee in identifying substitute equipment, products or supplies as appropriate.

**5.12.**    <u>Inspections</u>.  Franchisee grants Franchisor and its agents the right to enter upon the Franchise premises (if applicable) or attend and monitor Franchisee while performing services for customers at any time for the purpose of conducting inspections, for among other purposes, preserving the validity of the Marks, and verifying Franchisee's compliance with this Agreement and the Operating Standards and policies and procedures outlined in the Manuals.  Franchisee shall cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, Franchisee shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Franchisee shall reimburse Franchisor for the travel expenses and room and board of Franchisor's representatives for all inspections including subsequent inspections to ensure all deficiencies have been corrected.  Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right, but not the obligation, to correct any deficiencies which may be susceptible to correction by Franchisor and to charge Franchisee for Franchisor's actual expenses in taking such actions, payable by Franchisee upon demand.  The foregoing shall be in addition to such other remedies Franchisor may have.

**5.13.**    <u>Technology System</u>.  At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Technology System and Required Software, and Franchisee shall enter into all licenses or agreements and pay such licensing fees as necessary for Franchisee to obtain the rights to use the Technology System and Required Software.  Franchisee shall also pay to Franchisor the then-current amount of the Technology Fee ("Technology Fee"), currently $80 per Territory per week.  If Franchisee has more than one Territory, the total Technology Fee for up to 4 contiguous Territories shall be equal to the then-current Technology Fee for one Territory.  Franchisor shall have the right at any time to retrieve and use such data and information from Franchisee's Technology System that Franchisor deems necessary or desirable, including, without limitation, the uses identified in **Section 9.5**, and Franchisee agrees to do all things necessary to provide such access.  Franchisee expressly agrees that it shall strictly comply with Franchisor's standards and specifications for all item(s) associated with Franchisee's Technology System, and will otherwise operate its Technology System in accordance with Franchisor's standards and specifications.  Franchisee agrees it

19

DocuSign Envelope ID: 815543D5-680E-46C6-8C50-96A853875CB9

shall keep its Technology System in good maintenance and repair, at its expense, and shall promptly install such additions, changes, modifications, substitutions and/or replacement to the Technology System and the Required Software as Franchisor directs periodically in writing. Franchisee shall provide to Franchisor, upon Franchisor's request, all email lists and customer lists used or maintained by Franchisee on the Technology System, the Required Software or elsewhere. Franchisee must execute and pay any fees associated with any software license agreements or any related software maintenance agreements that Franchisor or the licensor of the Required Software require. Franchisee must comply with all laws and payment card provider standards relating to the security of the Technology System, including, without limitation, the Payment Card Industry Data Security Standards. Franchisee may not use any other cash registers or computer systems in the Franchise.

**5.14.** <u>Uniform Attire</u>. To promote a uniform System image, Franchisee shall require all of its personnel to dress during business hours in the attire specified in the Manuals.

**5.15.** <u>Participation in Promotions and Incentive Programs</u>. Franchisee shall participate in promotional programs developed by Franchisor for the System, in the manner directed by Franchisor in the Manuals or otherwise in writing.

**5.16.** <u>Franchisee Advisory Council</u>. Franchisor may establish an advisory council comprised of Franchisees for the purpose of fostering communication among and between franchisees and Franchisor, as well as to establish, modify or discuss various policies applicable to Franchise businesses operating under the System (the **"Franchisee Advisory Council"**). If Franchisor establishes the Franchisee Advisory Council, Franchisee may be required to become a member of the Franchisee Advisory Council, and participate in Franchisee Advisory Council meetings and programs as Franchisor shall designate. Franchisor will not assess fees or dues for participation in or on the Franchisee Advisory Council, but Franchisee may be required to pay dues (which may be expended in any allocation in accordance with the vote of the Franchisee Advisory Council subject to the approval of Franchisor) to the Franchisee Advisory Council if the Franchisee Advisory Council, which is controlled by franchisees, determines that fees shall be assessed. Franchisee may be required to pay all costs and expenses incurred in connection with participation in the Franchisee Advisory Council including, without limitation, the costs of transportation, lodging, and meals.

**5.17.** <u>Franchisee Structure</u>.

    **5.17.1.** Except as otherwise approved in writing by Franchisor, if Franchisee is a corporation, it shall: (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles or certificates of incorporation and bylaws, as well as such other documents as Franchisor may reasonably request, and any amendment thereto; (iii) maintain stop transfer instructions on its records against the transfer of any equity securities

and shall only issue securities upon the face of which a legend, in a form satisfactory to Franchisor, appears which references the transfer restrictions imposed by this Agreement; (iv) not issue any voting securities or securities convertible into voting securities; and (v) maintain a current list of all owners of record and all beneficial owners of any class of voting stock of Franchisee and furnish the list to Franchisor upon request, which list shall be amended to reflect changes in ownership, as permitted under this Agreement.

**5.17.2.**    If Franchisee is a partnership or limited liability partnership it shall:  (i)  confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with its partnership agreement as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all general and limited partners in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records and in its partnership agreement against the transfer of partnership interests and equity securities, and shall only issue securities or partnership interests with documentation which bears a notice or legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.17.3.**    If a Franchisee is a limited liability company, Franchisee shall: (i)  confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles of organization and operating agreement, as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all members and managers in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records against the transfer of equity securities and shall only issue securities upon the face of which bear a legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.18.**  Guarantee of Performance.  Each present and future: (i) shareholder of a corporate Franchisee; (ii) member of a limited liability company Franchisee; (iii) partner of a partnership Franchisee; or (iv) partner of a limited liability partnership Franchisee; shall jointly and severally guarantee Franchisee's performance of each and every provision of this Agreement by executing the Guarantee, Indemnification and Acknowledgment in the form attached to this Agreement as **<u>Exhibit C</u>**. In addition, Franchisor may require that the spouse (or domestic partner or other immediate family member) of an owner of Franchisee sign the Guarantee, Indemnification and Acknowledgment however such Guarantee by a spouse shall only be pursued by Franchisor if there is a material transfer of assets from the spouse having an ownership interest in the Franchisee to the non-owning spouse.

**5.19.** <u>System Modifications</u>.  Franchisee acknowledges and agrees that from time to time hereafter Franchisor may change or modify the System as Franchisor deems appropriate, including, without limitation, to reflect the changing market and/or to meet new and changing consumer demands, and that variations and additions to the System may be required from time to time to preserve and enhance the public image of the System and operations of Franchises.  Franchisor's changes to the System may include, without limitation, the adoption and use of new or modified products, services, equipment and furnishings and new techniques and methodologies relating to the sale, promotion and marketing of products and services, and new trademarks, service marks and copyrighted materials. Franchisee shall, upon reasonable notice, accept, implement, use and display in the operation of the Franchise any such changes in the System, as if they were part of this Agreement at the time of execution hereof, at Franchisee's sole expense. Additionally, Franchisor reserves the right, in its sole discretion, to vary the standards throughout the System, as well as the services and assistance that Franchisor may provide to some franchisees based upon the peculiarities of a particular site or circumstance, existing business practices, or other factors that Franchisor deems to be important to the operation of any Franchise or the System.

**5.20.** <u>Third-Party Management</u>.  The Franchise shall be operated under the control and supervision of Franchisee (or if an entity, the Operating Principal) or its Manager. Franchisee shall not, without the prior written approval of Franchisor, which may be denied for any reason or no reason at all, hire or retain a management company, manager (other than an employee manager trained and approved by Franchisor), or third party to undertake any of the management or operational functions of the Franchise.

6.   <u>PROPRIETARY MARKS</u>

**6.1.** <u>Ownership of the Marks</u>.  Franchisor represents that it is the owner of all right, title and interest in and to the Marks or otherwise maintains the right to use, license and sub-license such Marks.

**6.2.** <u>Use of the Marks</u>. With respect to Franchisee's use of the Marks, Franchisee agrees that:

**6.2.1.** Franchisee shall use only the Marks designated by Franchisor, and shall use them only in the manner authorized and permitted by Franchisor; all items bearing the Marks shall bear the then-current logo.

**6.2.2.** Franchisee shall use the Marks only for the operation of the business franchised hereunder and only at the location authorized hereunder, or in Franchisor approved advertising for the business conducted at or from that location.

**6.2.3.** Unless Franchisor otherwise directs Franchisee, in writing to do so, Franchisee shall operate and advertise the Franchise only under the name "Koala Insulation" or the name listed on the Summary Page to this Agreement.

**6.2.4.** During the term of this Agreement and any renewal of this Agreement, Franchisee shall identify itself to the public (in a manner reasonably acceptable to Franchisor) as an independent contractor operating the Franchise under a license from Franchisor, and to post a notice to that effect, and as Franchisor directs, in Franchisee's advertising, contracts, forms, stationery and promotional materials.

**6.2.5.** Franchisee's right to use the Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

**6.2.6.** Franchisee shall not use the Marks to incur any obligation or indebtedness on behalf of Franchisor.

**6.2.7.** Franchisee shall not use the Marks or the word Koala or any variant thereof as part of its corporate or other legal name, or as part of any e-mail address, domain name, or other identification of Franchisee in any electronic medium.

**6.2.8.** Franchisee shall execute any documents deemed necessary by Franchisor to obtain protection for the Marks or to maintain their continued validity and enforceability.

**6.2.9.** With respect to litigation involving the Marks, the parties agree that:

**6.2.9.1.** Franchisee shall promptly notify Franchisor of any suspected infringement of the Marks, any known challenge to the validity of the Marks, or any known challenge to Franchisor's ownership of, or Franchisee's right to use, the Marks licensed hereunder. Franchisee acknowledges that Franchisor shall have the right to direct and control any administrative proceeding or litigation involving the Marks, including any settlement thereof. Franchisor shall also have the right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks.

**6.2.9.2.** If Franchisor undertakes the defense or prosecution of any litigation relating to the Marks, Franchisee shall execute any and all documents and do such acts and things as may, in the opinion of counsel for Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action.

**6.3.** Franchisee Acknowledgments. Franchisee expressly understands and acknowledges that:

**6.3.1.** The Marks are valid, owned by Franchisor, and serve to identify the System and those who are authorized to operate under the System.

**6.3.2.** Neither Franchisee nor any owner of Franchisee shall directly or indirectly contest the validity of Franchisor's ownership of the Marks, nor shall

Franchisee, directly or indirectly, seek to register the Marks with any government agency, except with Franchisor's express prior written consent.

**6.3.3.** Franchisee's use of the Marks does not give Franchisee any ownership interest or other interest in or to the Marks, beyond the limited non-exclusive License granted by this Agreement.

**6.3.4.** Any and all goodwill arising from Franchisee's use of the Marks shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the License herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Marks.

**6.3.5.** The License of the Marks is nonexclusive, and Franchisor thus has and retains the rights, among others:

**6.3.5.1.** To use the Marks itself in connection with selling products and services;

**6.3.5.2.** To grant other licenses for the Marks, in addition to those licenses already granted to existing franchisees or other licensees authorized to operate using the Marks;

**6.3.5.3.** To develop and establish (or acquire or be acquired by) other systems using the same or similar Marks, or any other proprietary marks, and to grant licenses or franchises thereto without providing any rights therein to Franchisee.

**6.3.6.** Franchisor reserves the right to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder if the Marks no longer can be used, or if Franchisor, exercising its right to do so, determines that substitution of different proprietary marks will be beneficial to the System. In such circumstances, Franchisee shall implement, at Franchisee's expense, such substituted proprietary marks in such ways as Franchisor may direct, and the use of the substituted proprietary marks shall be governed by the terms of this Agreement.

7.   <u>CONFIDENTIAL OPERATING MANUALS</u>

**7.1.** <u>Manuals</u>. In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Marks, Franchisee shall conduct its business in accordance with the Manuals, one or more copies of which, or access to, Franchisee acknowledges having received on loan from Franchisor for the term of this Agreement. The Manuals may consist of multiple volumes of printed text, video and/or audio tapes and files, computer disks, and other electronically stored data, and Franchisee acknowledges and agrees that Franchisor may provide a portion or all of the Manuals (including updates and

amendments), and other instructional information and materials in, or via, electronic media, including without limitation, through the Internet.

**7.2.**   Confidentiality of the Manuals.   Franchisee shall at all times treat the Manuals, any other manuals created for or approved for use in the operation of the Franchise, and the information contained therein, as confidential, and shall use best efforts to maintain such information as secret and confidential, protect it from viewing by others, and treat the Manuals with the same degree of care as it would treat its most highly confidential documents.   Franchisee shall not at any time download, print, copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person.

**7.3.**   Protection of the Manuals.   The Manuals shall at all times remain the sole property of Franchisor and shall at all times be kept in a secure manner at the Franchise premises.   Franchisee shall ensure that the Manuals are kept current and up to date; and, in the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor at Franchisor's home office shall be controlling.

**7.4.**   Revisions to the Manuals.   Franchisor may from time to time revise the contents of the Manuals, and Franchisee expressly agrees to make corresponding revisions to its copy (to the extent Franchisor permits Franchisee to maintain a written copy) of the Manuals and to comply with each new or changed standard immediately upon receipt of such revision.

8.   CONFIDENTIAL INFORMATION

**8.1.**   Confidential Information.   Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised hereunder which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement.   Franchisee shall divulge such confidential information only to such of its employees as must have access to it in order to operate the Franchise.   Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others.   Any employee who may have access to any confidential information regarding the Franchise shall execute a covenant that s/he will maintain the confidentiality of information they receive in connection with their association with Franchisee.   Such covenants or non-disclosure/non-competition agreements shall be on a form provided by Franchisor, which form shall, among other things, designate Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.

**8.2.**   Irreparable Injury.   Franchisee acknowledges that any failure to comply with the requirements of this **Section 8** will cause Franchisor irreparable injury, and Franchisee agrees to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this **Section 8**.

**8.3.**   Information Exchange.   Franchisee agrees to disclose to Franchisor all ideas, concepts, methods, techniques, services, and products conceived or developed by Franchisee, its affiliates, owners, agents, or employees during the term of this Agreement relating to the development and/or operation of the Franchise.  Franchisee hereby grants to Franchisor and agrees to procure from its affiliates, owners, agents, or employees a perpetual, nonexclusive, and worldwide right to use any such ideas, concepts, methods, techniques, services and products.  Franchisor shall have no obligation to make any payments to Franchisee with respect to any such ideas, concepts, methods, techniques or products.  Franchisee agrees that Franchisee will not use or allow any other person or entity to use any such concept, method, technique or product without obtaining Franchisor's prior written approval.

9.   ACCOUNTING AND RECORDS

**9.1.**   Records.   With respect to the operation and financial condition of Franchisee and the Franchise, Franchisee shall adopt, until otherwise specified by Franchisor, a fiscal year and fiscal accounting periods which coincide with Franchisor's then-current fiscal year, as specified by Franchisor.  Franchisee shall maintain for a period of not less than three years during the term of this Agreement, and, for not less than three years following the termination, expiration, or non-renewal of this Agreement, full, complete, and accurate books, records, and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing.

**9.2.**   Periodic Reports.   In addition to the record keeping requirements of **Section 9.1**:

**9.2.1.** If requested by Franchisor, Franchisee shall, at its expense, provide to Franchisor, in a format specified by Franchisor, a complete annual financial statement (prepared according to generally accepted accounting principles, that includes a fiscal year-end balance sheet, an income statement of the Franchise for such fiscal year reflecting all year-end adjustments, and a statement of changes in cash flow of Franchisee), on a review basis, prepared by an independent certified public accountant satisfactory to Franchisor, no later than April 15 of each year for the preceding fiscal year of the Franchise, showing the results of operations of the Franchise during the most recently completed fiscal year.  Franchisee shall also provide Franchisor with a copy of Franchisee's federal and state tax returns, not more than 30 days following Franchisee's submission of the same to governmental authorities.  If Franchisee files any extension request with any taxation authority,

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-06A853875CB9

Franchisee shall within 30 days of filing such extension request provide a copy of the request and any confirmation or approval received by the taxing authority.

**9.2.2.** Within 45 days following the end of each calendar quarter during the term of this Agreement, after the opening of the Franchise, Franchisee shall submit to Franchisor, in a format acceptable to (or, at Franchisor's election, specified by) Franchisor, as amended from time to time: (i) a fiscal quarter and fiscal year to date profit and loss statement and a quarterly balance sheet (which may be unaudited) for the Franchise; (ii) reports of those income and expense items of the Franchise which Franchisor specifies from time to time for use in any revenue, earnings, and/or cost summary it chooses to furnish to prospective franchisees and/or developers; and (iii) copies of all state sales tax returns for the Franchise. If required by Franchisor, Franchisee shall use on-line or other electronic accounting and reporting systems as Franchisor may specify periodically.

**9.3.** <u>Reporting Requirements</u>. Franchisee shall also submit to Franchisor in addition to the Sales Reports required pursuant to **Section 4.2**, for review or auditing, such other forms, reports, records, information, and data as and when Franchisor may reasonably designate, in the form and format, and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing, including, without limitation, via computer diskette, or otherwise in electronic format, and/or restated in accordance with Franchisor's financial reporting periods, consistent with Franchisor's then current financial reporting periods and accounting practices and standards. Franchisee shall, without limitation, provide Franchisor with login, API and other access information as required from time to time to permit Franchisor to remotely access Franchisee's bookkeeping software (i.e. QuickBooks or other software designated by Franchisor) to pull reports, download data and perform any other action permitted under this Agreement. Franchisee shall immediately, without further request from Franchisor, provide updated access information to Franchisor when the previously provided information is changed. The reporting requirements of this **Section 9.3** shall be in addition to, and not in lieu of, the electronic reporting that may be required in connection with the use of the required Technology System under **Section 5.13**.

**9.4.** <u>Audit</u>. Franchisor or its designated agents shall have the right at all reasonable times to examine, copy, and/or personally review or audit, at Franchisor's expense, all books, records, and sales and income tax returns of Franchisee. Franchisor shall also have the right, at any time, to have an independent audit made of the books of Franchisee and Franchisee agrees that it shall pay Franchisor the costs of one audit each calendar quarter during the term of this Agreement, if an audit is necessitated because Franchisee fails to timely provide Sales Reports or if an audit discloses an understatement in any report by Franchisee of 5% or more, Franchisee shall, reimburse Franchisor for all costs and expenses connected with the audit (including, without limitation, travel, room and board and salaries and other benefits, and reasonable accounting and legal costs). If an inspection should reveal that any payments have been understated in any report to Franchisor, then Franchisee shall immediately pay Franchisor the

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-96A8E3875CB9

amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of 1.5% per month, or the maximum rate permitted by law, whichever is less. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

**9.5.** <u>Data</u>. Franchisor may, from time-to-time, specify in the Manuals or otherwise in writing the information that Franchisee shall collect and maintain on the Technology System installed at the Franchise, and Franchisee shall provide to Franchisor such reports as Franchisor may reasonably request from the data so collected and maintained. All data provided by Franchisee in any form, and whether required by this **Section 9.5** or any other requirement under the System or in the Manuals, including data uploaded to Franchisor's computer system from the Franchisee's Technology System, and/or downloaded from the Franchisee's Technology System to Franchisor's computer system, is and will be owned exclusively by Franchisor, including without limitation, customer lists and email lists, and Franchisor will have the right to use such data in any manner that Franchisor deems appropriate without compensation to Franchisee. In addition, all other data created or collected by Franchisee in connection with the System, or in connection with Franchisee's operation of the business (including but not limited to consumer and transaction data), is and will be owned exclusively by Franchisor during the term of, and following termination or expiration of, this Agreement. Copies and/or originals of such data must be provided to Franchisor upon Franchisor's request. Franchisor hereby licenses use of such data back to Franchisee, at no additional cost, solely for the term of this Agreement and solely for Franchisee's use in connection with the business franchised under this Agreement. Franchisor may use all such information, data, and reports in any manner, including, without limitation, providing financial and operating reports to franchisees and developers operating under the System.

10. <u>ADVERTISING</u>

Recognizing the value of advertising, and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

**10.1.** <u>Brand Funds</u>. Franchisor shall have the right to establish, at any time, the Brand Fund as described in this **Section 10**.

**10.2.** <u>Brand Fund Contributions and Local Marketing Expenditures</u>. Franchisee shall, during each calendar month, spend on advertising and promotion the greater of $2,000 or 5% of Franchisee's Gross Sales to advertise and to promote the Franchise through methods, media and advertising approved by Franchisor (together, "Local Marketing"). If Franchisee has more than one Territory, the total combined Local Marketing minimum spending requirement for up to 4 contiguous Territories shall be equal to the then-current Local Marketing minimum spending requirement for one Territory. Franchisor shall have the right to designate in writing from time to time how, and in what proportions, Franchisee is to allocate its Local Marketing. Additionally, Franchisee shall contribute (i) 1% of Gross Sales

to the Brand Fund ("Brand Fund") as may be established pursuant to Section 10.3. The Brand Fund contribution may be increased to 2% upon notice to Franchisee.

    **10.2.1.**    Franchisor shall provide Franchisee with not less than 60 days prior written notice of any change in the required Local Marketing (which will not exceed 5% of Gross Sales). Franchisor shall not increase required Brand Fund contributions to an amount exceeding 2% of Gross Sales.

    **10.2.2.**    Franchisee shall pay required Brand Fund Contributions in the manner required under **Section 4** (or as otherwise provided in this **Section 10**).

    **10.2.3.**    For all company-owned Franchises, Franchisor shall contribute to the Brand Fund on the same basis as franchisees.

**10.3.**  <u>Brand Fund</u>. Although it is under no obligation to do so, Franchisor may at any time establish a Brand Fund, as follows:

    **10.3.1.**    Franchisor or its designee shall have the right to direct all advertising programs, as well as all aspects thereof, including without limitation, the concepts, materials, and media used in such programs and the placement and allocation thereof. Franchisee agrees and acknowledges that the Brand Fund is intended to maximize general public recognition, acceptance, perception of, and use of the System; and that Franchisor and its designee are not obligated, in administering the Brand Fund, to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or pro rata from expenditures by the Brand Fund. Franchisor may engage the services of a franchise sales organization for development of the franchise system, and Franchisee specifically acknowledges and agrees that such franchise sales organization may be compensated out of the Brand Fund in exchange for services and products that, while not intended solely to market the sale of franchises, benefit the franchise system through franchise development and brand marketing."

    **10.3.2.**    The Brand Fund, all contributions thereto, and any earnings thereon, shall be used exclusively (except as otherwise provided in this **Section 10.3**) to meet any and all costs of maintaining, administering, directing, conducting, creating and/or otherwise preparing advertising, marketing, public relations and/or promotional programs and materials, research and design relating to branding and implementation of re-branding programs and strategies, and any other activities which Franchisor believes will enhance the image of the System, including, without limitation, the costs of: preparing and/or conducting media advertising campaigns; marketing surveys and other public relations activities; employing advertising and/or public relations agencies; purchasing promotional items; developing new or modified trade dress and marks; point-of-purchase (POP) materials; design and photographs; purchasing media space or time (including all associated fees and expenses); administering regional and multi-regional marketing and advertising programs; market research; developing

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-96A8F3875CB9

and implementing customer loyalty programs; the creative development of, and actual production associated with, premium items, give-aways, promotions, contests, public relation events, and charitable or non-profit events; developing, implementing and maintaining an electronic commerce website and/or related strategies; maintaining and developing one or more websites devoted to the System, the Marks and/or the "Koala" brand; providing promotional and other marketing materials and services to the Franchises operated under the System; and the salaries of Franchisor's employees to the extent such employees provide services in conjunction with System marketing activities.  The Brand Fund may also be used to provide rebates or reimbursements to franchisees for local expenditures on products, services, or improvements, approved in advance by Franchisor, which products, services, or improvements Franchisor shall have the right to determine what will promote general public awareness and favorable support for the System.

10.3.3.    Franchisee shall contribute to the Brand Fund in the manner specified by Franchisor.  All sums paid by Franchisee to the Brand Fund shall be maintained in an account separate from Franchisor's other monies.  The Brand Fund will not be used to defray the general operating expenses of Franchisor except that Franchisor shall have the right to charge the Brand Fund for such reasonable administrative costs and overhead as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund and advertising programs for franchisees and the System.  The Brand Fund and its earnings shall not otherwise inure to the benefit of Franchisor.

10.3.4.    The Brand Fund is not intended to be, nor will it be deemed to be a trust, and Franchisor does not assume any fiduciary obligation to Franchisee for maintaining, directing or administering the Brand Fund or for any other reason.  A statement of the operations of the Brand Fund as shown on the books of Franchisor shall be prepared annually by Franchisor, and shall be made available to Franchisee on an annual basis upon Franchisee's written request.

10.3.5.    Although the Brand Fund is intended to be of perpetual duration, Franchisor maintains the right to terminate the Brand Fund.  The Brand Fund shall not be terminated, however, until all monies in the Brand Fund have been expended for advertising and/or promotional purposes.   If Franchisor terminates the Brand Fund, Franchisor shall have the right to require Franchisee to spend an amount equal to previous Brand Fund contribution amount on Local Marketing and allocate such spending as directed by Franchisor.

**10.4.**  Promotional Materials and Marketing Assistance.  Franchisor shall make available to Franchisee from time to time, at Franchisee's expense, advertising plans and promotional materials, including newspaper mats, coupons, merchandising materials, sales aids, point of purchase materials, special promotions, direct mail materials, community relations programs, and similar advertising and promotional materials for use in advertising and promotion. Franchisor may provide periodic marketing assistance to Franchisee.

**10.5.**  Approvals.  For all proposed advertising, marketing, and promotional plans, Franchisee shall submit samples of such plans and materials to Franchisor (by means described in **Section 20**), for Franchisor's review and prior written approval (except with respect to prices to be charged by Franchisee).  If written approval is not received by Franchisee from Franchisor within 30 days of the date of receipt by Franchisor of such samples or materials, Franchisor shall be deemed to have disapproved them. Franchisee acknowledges and agrees that any and all copyright in and to advertising and promotional materials developed by or on behalf of Franchisee shall be the sole property of Franchisor, and Franchisee agrees to execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Franchisor to give effect to this provision.

**10.6.**  Minimum Requirements Only.  Franchisee understands and acknowledges that the required Local Marketing and Brand Fund contributions are minimum requirements only, and that Franchisee may, and is encouraged by Franchisor to expend additional funds for local advertising and promotion of a local nature which will focus on disseminating advertising directly related to the Franchise.

**10.7.**  Websites; Internet Use.  Franchisee shall not, without Franchisor's prior written approval, offer, promote, or sell any products or services, or make any use of the Marks, through the Internet, including the use of websites, domain names, uniform resource locators, keywords, linking, search engines (and search engine optimization techniques), banner ads, meta-tags, marketing, auction sites, e-commerce (as defined below) and co-branding arrangements.  Any website shall be deemed "advertising" under this Agreement, and will be subject to (among other things) Franchisor's approval under **Section 10.6**.  Franchisor has the right to control or designate the manner of Franchisee's use of all URLs, domain names, website addresses, metatags, links, key words, e-mail addresses and any other means of electronic identification or origin ("**e-names**").  Franchisor also has the right to designate, approve, control or limit all aspects of Franchisee's use of the Internet, Intranet, World Wide Web, wireless technology, digital cable, use of e-names, e-mail, home pages, bulletin boards, chat rooms, social networking sites, linking, framing, online purchasing cooperatives, marketplaces, barter exchanges, and related technologies, methods, techniques, registrations, networking, and any electronic communication, commerce, computations, or any means of interactive electronic documents contained in a network of computers or similar devices linked by communications software or hardware (collectively, "**e-commerce**").  Franchisee agrees to follow all of Franchisor's policies and procedures related to the use and regulation of e-commerce.  Franchisee agrees to be bound by any terms of use, privacy policy and copyright notice and takedown policies and the like that Franchisor establishes from time to time.  Franchisor may require Franchisee, at Franchisee's expense, to coordinate its e-commerce activities with Franchisor, other Franchises, suppliers and/or affiliates. Other than any e-mail or any similar account provided to Franchisee by Franchisor, if any, Franchisee shall not establish any e-mail account using the Marks or similar names or marks. Franchisee agrees to use any e-mail or any similar account provided to Franchisee

by Franchisor solely for business purposes. Franchisee shall be required to follow Franchisor's intranet and Internet usage rules, policies and requirements. Franchisor retains the sole right to approve any linking to, or other use of, the Koala Website.  Franchisee may not establish or participate in any Koala related blog or other discussion forum.  Franchisee recognizes and agrees that Franchisor and its affiliates own all rights, title and interest in and to any and all websites and e-names that Franchisor commissions or utilizes, or requires or permits Franchisee to utilize, in connection with the System, which bear the Marks or any derivative of the Marks.  Franchisee also recognizes and agrees that Franchisor and/or its affiliates own all rights, title and interest in and to any and all data or other information collected via e-commerce related to the System or the Marks, including any customer data, click-stream data, cookies, user data, hits and the like.  Such data or other information also constitutes Franchisor's confidential information subject to **Article 8.**

**10.8.**  Limitations on Associations with the Marks. Franchisee acknowledges and agrees that certain associations between Franchisee and/or the Franchise, and/or the Marks and/or the System, and/or businesses operating under or products sold under the Marks or the Koala brand names on the one hand, and certain political, religious, cultural or other types of groups, organizations, causes, or activities, on the other, however well-intentioned and/or legal, may create an unwelcome, unfair, or unpopular association with, and/or an adverse effect on, the reputation of Franchisor, the System, the Koala brand, or the good will associated with the Marks.  Accordingly, Franchisee shall not, without the prior written approval of Franchisor, engage in any activities with, or donate any money, products, services, goods, or other items to, any charitable, political or religious organization, group, or activity, if such action is taken, or may be perceived by the public to be taken, in the name of, in connection with, or in association with Franchisee, the Marks, the Franchise, the Franchisor, or the System.

11.    INSURANCE

**11.1.**  Insurance Requirements.  Prior to the commencement of any activities or operations pursuant to this Agreement, Franchisee shall procure and maintain in full force and effect during the term of this Agreement (and for such period thereafter as is necessary to provide the coverages required hereunder for events having occurred during the term of this Agreement), at Franchisee's expense, the following insurance policy or policies in connection with the Franchise or other facilities on the premises, or by reason of the construction, operation, or occupancy of the Franchise or other facilities on premises.  Such policy or policies shall be written by an insurance company or companies acceptable to Franchisor, having a rating of at least "A-7" in the most recent Key Rating Guide published by the A.M. Best Company (or another rating that Franchisor reasonably designates if A.M. Best Company no longer publishes the Key Rating Guide) and licensed to do business in the state in which the Franchise is located.  Such policy or policies shall be in accordance with standards and specifications set forth in the Manuals or otherwise in writing and shall include, at a minimum (except as additional coverages and higher policy limits may reasonably be specified for all franchisees

from time to time by Franchisor in the Manuals or otherwise in writing to reflect inflation, identification of new risks, changes in the law or standards of liability, higher damage awards and other relevant changes in circumstances), the following:

**11.1.1.** Comprehensive general liability insurance, written on an occurrence basis, extended to include contractual liability, products and completed operations, and personal and advertising injury, with a combined bodily injury and property damage limit of not less than $1,000,000 per occurrence.

**11.1.2.** If any vehicles are used for business purposes, business automobile liability insurance, including a combined single bodily injury and property damage coverage for all owned, nonowned, and hired vehicles, with limits of liability not less than $1,000,000 per occurrence for both bodily injury and property damage.

**11.1.3.** Statutory workers' compensation insurance and employer's liability insurance for a minimum limit of at least $500,000, as well as such other disability benefits type insurance as may be required by statute or rule of the state in which the Franchise is located.

**11.1.4.** Commercial umbrella liability insurance with limits which bring the total of all primary underlying coverages to not less than $2,000,000 total limit of liability.

**11.1.5.** Property insurance providing coverage for direct physical loss or damage to real and personal property for all-risk perils, including the perils of flood and earthquake.

**11.1.6.** Any other insurance coverage that is required by federal, state, or municipal law.

**11.2.** <u>Referenced in Manuals</u>. All policies listed in **Section 11.1** (unless otherwise noted below) shall contain such endorsements as shall, from time to time, be provided in the Manuals.

**11.3.** <u>Policy Cancellation</u>. In the event of cancellation, material change, or nonrenewal of any policy, 60 days' advance written notice must be provided to Franchisor in the manner provided in **Article 20**. Franchisee shall arrange for a copy of such notification to be sent to Franchisor by the insurance company.

**11.4.** <u>Construction and Remodeling Insurance</u>. In connection with all significant construction, reconstruction, or remodeling of the Franchise during the term of this Agreement, Franchisee will cause the general contractor, its subcontractors, and any other contractor, to effect and maintain at general contractor's and all other contractor's own expense, such insurance policies and bonds with such endorsements as are set forth in the Manuals, all written by insurance or bonding companies approved by Franchisor, having a rating as set forth in **Section 11.1**.

**11.5.**  No Waiver of Obligations.  Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in **Section 17.4.**

**11.6.**  Franchisor to be Additional Insured.  All insurance policies shall list Franchisor and its affiliates, officers, directors, employees, and agents as additional insureds.

**11.7.**  Certificates of Insurance.  At least 30 days prior to the time any insurance is first required to be carried by Franchisee, and thereafter at least 30 days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor, certificates of insurance evidencing the proper coverage with limits not less than those required hereunder.  All certificates shall expressly provide that no less than 30 days' prior written notice shall be given Franchisor in the event of material alteration to, cancellation, or nonrenewal of the coverages evidenced by such certificates.    Further certificates evidencing the insurance required by **Section 11.1** shall name Franchisor, and each of its affiliates, directors, agents, and employees as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions for which such certificates evidence coverage.    In the event that Franchisee fails to provide evidence reasonably satisfactory to Franchisor of the insurance policies required by this **Article 11**, Franchisor may, but is not required to, obtain such required policies on Franchisee's behalf, and Franchisee agrees that it will promptly reimburse Franchisor for all costs related to obtaining such policies upon notice from Franchisor.

**11.8.**  Proof of Insurance.  In addition to its obligations under **Section 11.7**, on the first anniversary of the Effective Date, and on each subsequent anniversary thereof during the term of this Agreement and any renewal hereof, Franchisee shall provide Franchisor with proof of insurance evidencing the proper coverage with limits not less than those required hereunder, in such form as Franchisor may reasonably require.

**11.9.**  Policy Limit Changes.  Franchisor shall have the right, from time to time, to make such changes in minimum policy limits and endorsements as it may determine; provided, however, all changes shall apply, generally, to all franchisees of Franchisor who are similarly situated.

12.    TRANSFER OF INTEREST

**12.1.**  Franchisor Transfers.  Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations under this Agreement, or any interests in the assets of Franchisor, or any ownership or equity interests in Franchisor, to any person or entity, and any assignee of Franchisor shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment.

**12.2.**  <u>Principals</u>.  If Franchisee is an entity, each person or entity that is an owner of, or has an ownership interest in, Franchisee (each, a "**Principal**"), and the interest of each Principal in Franchisee, is identified on the Summary Page. Franchisee represents and warrants that its owners are as set forth on the Summary Page attached to this Agreement, and covenants that it will not permit the identity of such owners, or their respective interests in Franchisee, to change without complying with this Agreement.  Franchisor shall have the right to designate any person or entity which owns a direct or indirect interest in Franchisee as a Principal, and the Summary Page shall be so amended automatically upon notice thereof to Franchisee.

**12.3.**  <u>Franchisee Transfers</u>.  Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and its Principals, and that Franchisor has granted this License in reliance on Franchisee's or Franchisee's Principals' business skill, financial capacity, and personal character.  Accordingly:

**12.3.1.**       Franchisee shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber:  (a) this Agreement or any of the rights and obligations of Franchisee under this Agreement; or (b) any material asset of Franchisee or the Franchise; provided, however, that Franchisee may grant a security interest in, or otherwise encumber certain assets of the Franchise, excluding the Franchise Agreement, in connection with Franchisee obtaining financing for the development and/or operation of the Franchise or equipment leasing, if such financing satisfies the requirements of Franchisor, which may include, without limitation, execution of agreements by Franchisor, Franchisee, and/or such Principal, and any secured creditor of Franchisee, in a form satisfactory to Franchisor, acknowledging such creditor's obligations to be bound by the terms of this **Article 12**.

**12.3.2.**       If Franchisee is a corporation or limited liability company, Franchisee shall not, without the prior written consent of Franchisor, issue any voting securities or securities convertible into voting securities, and the recipient of any such securities shall become a Principal under this Agreement, if so designated by Franchisor.

**12.3.3.**       If Franchisee is a partnership or limited partnership, the partners of the partnership shall not, without the prior written consent of Franchisor, admit additional general partners, remove a general partner, or otherwise materially alter the powers of any general partner.  Each general partner shall automatically be deemed a Principal of Franchisee.

**12.3.4.**       A Principal shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber any interest of a Principal in Franchisee.

**12.4.**  <u>Conditions for Approval</u>.  Franchisor shall not unreasonably withhold any consent required by **Section 12.3**; provided, that if Franchisee proposes to

transfer its obligations hereunder or any interest in any material asset, or if a Principal proposes to transfer any direct or indirect interest in Franchisee, or if Franchisee or any Principal proposes to undertake any transfer that is subject to **Section 12.3**, Franchisor shall have the right to require any or all of the following as conditions of its approval (except as provided in **Section 12.9**):

**12.4.1.**     The transferor shall have executed a general release (which shall include a release from the transferor, Franchisee, Principals, and guarantors of Franchisee), in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, successors, and assigns, and their respective directors, officers, owners, members, managers, partners, agents, representatives, servants, and employees in their corporate and individual capacities including, without limitation, claims arising under this Agreement, any other agreement between Franchisee and Franchisor or its affiliates, and federal, state, and local laws and rules.

**12.4.2.**     The transferee of a Principal shall be designated as a Principal and each transferee who is designated a Principal shall enter into a written agreement, in a form satisfactory to Franchisor, agreeing to be bound as a Principal under the terms of this Agreement as long as such person or entity owns any interest in Franchisee; and, the Principal shall guarantee the performance of all such obligations in writing in a form satisfactory to Franchisor.

**12.4.3.**     Prior to, and after the transfer, Franchisee's new Principals shall meet Franchisor's educational, managerial, and business standards; each shall possess a good moral character, business reputation, and credit rating; have the aptitude and ability to operate the Franchise, as may be evidenced by prior related business experience or otherwise; and have adequate financial resources and capital to operate the Franchise.

**12.4.4.**     If a proposed transfer would result in a change in control of Franchisee, at Franchisor's option, Franchisee (or transferee) shall execute, for a term ending on the expiration date of this Agreement the form of franchise agreement then being offered to new System franchisees, and such other ancillary agreements required by Franchisor for the business franchised hereunder, which agreements shall supersede this Agreement and its ancillary documents in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, higher royalty and advertising fees.

**12.4.5.**     If a proposed transfer would result in a change in control of Franchisee, and if so requested by Franchisor, Franchisee, at its expense, shall upgrade the Franchise to conform to the then current standards and specifications of new Franchises then being established in the System, and shall complete the upgrading and other requirements set forth in **Sections 5.1.6** and **5.2.5** within the time period specified by Franchisor.

**12.4.6.**     All monetary obligations of Franchisee hereunder shall be paid in full on a current basis, and Franchisee must not be otherwise in default of

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-96A8E3875CB9

any of its obligations hereunder including, without limitation, its reporting obligations.

**12.4.7.** The transferor shall remain liable for all of the obligations to Franchisor in connection with the Franchise that arose prior to the effective date of the transfer, and any covenants that survive the termination or expiration of this Agreement, and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability.

**12.4.8.** At Franchisee's expense, the transferee's Manager and other employees designated by Franchisor shall successfully complete (to Franchisor's satisfaction) all training programs required by Franchisor upon such terms and conditions as Franchisor may reasonably require (and while Franchisor will not charge a fee for attendance at such training programs, the transferee shall be responsible for the salary and all expenses of the person who attends training).

**12.4.9.** If a proposed transfer would result in a change in control of Franchisee, and to compensate Franchisor for Franchisor's legal, accounting, training, and other expenses incurred in connection with the transfer, Franchisee shall pay Franchisor a non-refundable transfer fee in an amount equal to the greater of $10,000 or 20% of the then-current franchise fee applicable to the Territory. One-half of the transfer fee shall be paid at the time Franchisee submits its request to Franchisor for consideration of the proposed transfer, and such amount shall be non-refundable. The balance of the transfer fee shall be paid at the time the transfer is consummated or closes. In addition, in the event a proposed transfer is not consummated or closed, for any reason except for disapproval by Franchisor, Franchisee or the proposed transferee shall reimburse Franchisor for all of its costs and expenses incurred in connection with its evaluation of the proposed transfer, including, without limitation, attorneys' and accountants' fees, background checks, site evaluation, and training, if applicable, to the extent the portion of the transfer fee paid when the transfer approval request was made does not cover those costs and expenses.

**12.4.10.** If the proposed transfer will result in a change in control of Franchisee, the terms of the proposed transfer will not adversely impact the continued operations of the Franchise, as determined in Franchisor's sole discretion.

**12.4.11.** The transferor must acknowledge and agree that the transferor shall remain bound by the covenants contained in **Sections 15.2** and **15.3**.

12.4.12 Franchisee shall be solely responsible for paying any broker fees and/or commissions involved with the sale or transfer of the Franchise regardless of whether Franchisee directly engages such broker or if, at Franchisee's request, Franchisor engages such broker to assist with the sale or transfer of the Franchised Business.

**12.5.**  Right of First Refusal.

**12.5.1.**    If Franchisee or any Principal desires to accept any *bona fide* offer from a third party to purchase Franchisee, any material assets of Franchisee, or any direct or indirect interest in Franchisee, Franchisee or such Principal shall promptly notify Franchisor of such offer and shall provide such information and documentation relating to the offer as Franchisor may require.  Franchisor shall have the right and option, exercisable within 30 days after receipt of all such information, to send written notice (the "**Exercise Notice**") to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party.  If Franchisor elects to purchase the seller's interest, the contract to purchase the Franchise (or interests or assets) shall be executed within 60 days after the Exercise Notice and the closing shall occur at the principal offices of Franchisor; provided, however, that in no event shall the closing occur later than 90 days following the execution of the definitive purchase agreement.

**12.5.2.**    Any material change in the terms of the *bona fide* offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of the third party's initial offer.  Additionally, if Franchisor elects not to exercise its purchase right and Franchisee fails to complete the proposed sale within six months from the date Franchisor notifies Franchisee that Franchisor will not make the purchase, Franchisor shall again have the right of first refusal described in this **Section 12.5.**  Failure of Franchisor to exercise the option afforded by this **Section 12.5** shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this **Section 12**, with respect to a proposed transfer, or a waiver of any subsequent offer.

**12.5.3.**    In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, they must attempt to appoint a mutually-acceptable independent appraiser to make a binding determination.  If the parties are unable to agree upon one independent appraiser, then an independent appraiser shall be promptly designated by Franchisor and another independent appraiser shall be promptly designated by Franchisee, which two appraisers shall, in turn, promptly designate a third appraiser; all three appraisers shall promptly confer and reach a single determination, which determination shall be binding upon Franchisor and Franchisee.  The cost of any such appraisal shall be shared equally by Franchisor and Franchisee.  If Franchisor elects to exercise its right under this **Section 12.5**, Franchisor shall have the right to set off all amounts due from Franchisee, and one-half of the cost of the appraisal, if any, against any payment to the seller.

**12.6.**  Transfer Upon Death.  Upon the death of a Principal, the deceased's executor, administrator, or other personal representative shall transfer the

deceased's interest to a third party approved by Franchisor within 12 months after the death. If the distributee is not approved by Franchisor, then the distributee shall transfer the deceased's interest to a third party approved by Franchisor within 12 months after the deceased's death.

**12.7.** <u>Transfer Upon Permanent Disability</u>. Upon the permanent disability of any Principal with a controlling interest in Franchisee, Franchisor shall have the right to require such interest to be transferred to a third party in accordance with the conditions described in this **Section 12** within six months after notice to Franchisee, provided that no transfer fee shall be due for a transfer pursuant to this **Section 12.7**. "**Permanent Disability**" shall mean any physical, emotional, or mental injury, illness, or incapacity that would prevent a person from performing the obligations set forth in this Agreement for at least six consecutive months, and from which condition recovery within six consecutive months from the date of determination of disability is unlikely. Permanent disability shall be determined by a licensed practicing physician upon examination of such person or, if such person refuses to be examined, then such person shall automatically be deemed permanently disabled for the purposes of this **Section 12.7** as of the date of refusal. The licensed practicing physician making such determination shall be chosen by the mutual agreement of a doctor selected by Franchisor and a doctor selected by Franchisee. Franchisor shall pay the cost of the required examination.

**12.8.** <u>Notification Upon Death or Permanent Disability</u>. Upon the death or permanent disability any Principal of Franchisee, such person or his representative shall promptly notify Franchisor of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as any *inter vivos* transfer.

**12.9.** <u>Exceptions for Entity Formed Convenience of Ownership or Transfer to Family Member</u>. Notwithstanding anything to the contrary in this **Section 12**, if Franchisee is an individual and seeks to transfer this Agreement to an entity formed for the convenience of ownership or if Franchisee seeks to transfer this Agreement to a spouse, adult sibling or adult child (subject to compliance with all other provisions of the Transfer), the conditions of **Sections 12.4.4** (signing a new franchise agreement), **12.4.5** (upgrading the Franchise), **12.4.8** (initial training of new Manager), and **12.4.9** (transfer fee) shall not apply; provided however, that in lieu of a transfer fee, Franchisee shall reimburse Franchisor for its legal, accounting and other professional fees and other costs incurred in connection with the transfer if any, and Franchisee may undertake such transfer, provided that Franchisee (or their spouse, sibling or child as applicable above) owns 100% of the equity interest in the transferee entity, and the Franchisee and transferee personally guarantees, in a written guaranty satisfactory to Franchisor, the performance of the obligations of Franchisee under this Agreement.

**12.10.** <u>No Waiver of Claims</u>. Franchisor's consent to a transfer which is the subject of this **Section 12** shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-06A853875CB9

demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

**12.11.** Insolvency.  If Franchisee or any person holding any interest (direct or indirect) in Franchisee becomes a debtor in a proceeding under the U.S. Bankruptcy Code or any similar law in the U.S. or elsewhere, it is the parties' understanding and agreement that any transfer of Franchisee, Franchisee's obligations and/or rights hereunder, any material assets of Franchisee, or any indirect or direct interest in Franchisee shall be subject to all of the terms of this **Section 12**.

**12.12.** Securities Offerings.  All materials for an offering of stock or partnership interests in Franchisee or any affiliate of Franchisee which are required by federal or state law shall be submitted to Franchisor for review as described below before such materials are filed with any government agency.  Any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use.  No offering by Franchisee or any affiliate of Franchisee shall imply (by use of the Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of the securities of Franchisee or Franchisee's affiliates; and Franchisor's review of any offering shall be limited solely to the relationship between Franchisor and Franchisee and affiliates, if applicable, and shall not constitute any opinion as to any legal requirement.  Franchisor may, at its option, require the offering materials to contain a written statement prescribed by Franchisor concerning the limitations stated in the preceding sentence.  Franchisee (and the offeror if not Franchisee), the Principals, and all other participants in the offering must fully indemnify Franchisor, its affiliates, successors, and assigns, and their respective directors, officers, shareholders, partners, agents, representatives, servants, and employees in connection with the offering and shall execute any and all documents required by Franchisor to endorse such indemnification.  For each proposed offering, Franchisee shall pay Franchisor an amount as is necessary to reimburse Franchisor for its reasonable costs and expenses (including legal and accounting fees) for reviewing the proposed offering.  Franchisee shall give Franchisor written notice at least 30 days before the date that any offering or other transaction described in this **Section 12.12** commences.  Any such offering shall be subject to all of the other provisions of this **Article 12**; and further, without limiting the foregoing, it is agreed that any such offering shall be subject to Franchisor's approval as to the structure and voting control of the offeror (and Franchisee, if Franchisee is not the offeror) after the financing is completed.

13.    DEFAULT AND TERMINATION

**13.1.**  Automatic Termination.  Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and not opposed by Franchisee; or if Franchisee is adjudicated as bankrupt or insolvent; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for

Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied or of record for 30 days or longer (unless unappealed or a supersedeas bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's business or property; or if suit to foreclose any lien or mortgage against the Franchise premises or equipment is instituted against Franchisee and not dismissed within 30 days; or if the real or personal property of Franchisee's Franchise shall be sold after levy thereupon by any sheriff, marshal, or constable.

**13.2.**  <u>Termination Upon Notice Without Opportunity to Cure</u>.  Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the delivery of written notice to Franchisee by Franchisor (in the manner set forth under **Section 20**), upon the occurrence of any of the following events:

**13.2.1.**  If Franchisee fails to open the Franchise as provided in **Section 5.5**;

**13.2.2.**  If Franchisee or other designated employee fails to complete the initial training program pursuant to **Sections 3.2** and **5.6** of this Agreement;

**13.2.3.**  If Franchisee at any time ceases to operate or otherwise abandons the Franchise for three consecutive business days, or loses the right to possession of the Franchise Location, any Koala Rig(s), or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchise is located;

**13.2.4.**  If Franchisee or any Principal is convicted of a felony or engages in any other activity that Franchisor believes is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or Franchisor's interest therein;

**13.2.5.**  If a threat or danger to public health or safety results from the construction, maintenance, or operation of the Franchise;

**13.2.6.**  If Franchisee or any Principal purports to transfer any rights or obligations under this Agreement or any interest to any third party in a manner that is contrary to the terms of **Section 12**;

**13.2.7.**  If Franchisee or any Principal fails to comply with the covenants in **Section 15.2**;

**13.2.8.**  If, contrary to the terms of **Sections 7** or **8**, Franchisee discloses or divulges confidential information provided to Franchisee by Franchisor;

41

**13.2.9.**    If Franchisee knowingly maintains false books or records, or submits any false reports (including, but not limited to, information provided as part of Franchisee's application for this franchise) to Franchisor, underreports Gross Sales by more than 5% or more for any period;

**13.2.10.**    If Franchisee commits three or more defaults under this Agreement in any 12-month period, whether or not each such default has been cured after notice;

**13.2.11.**    If Franchisee or any Principal makes any unauthorized or improper use of the Marks or contests the validity of Franchisor's ownership of the Marks or its right to use and to license others to use the Marks; and/or

13.2.12.    If Franchisee or any Principal is in breach or default under any other agreement (whether existing as of the date of this Agreement or subsequently made) with Franchisor or any of its subsidiaries or Affiliates, and if such default is curable, fails to cure the default as required within the time permitted.

**13.3.**    Termination With Opportunity to Cure.  Except as otherwise provided in **Sections 13.1** and **13.2**, upon any other default by Franchisee of its obligations hereunder, Franchisor may terminate this Agreement only by giving written notice of termination (in the manner set forth under **Article 20**) setting forth the nature of such default to Franchisee at least 30 days prior to the effective date of termination (or, with respect to monetary defaults, five days); provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor, all within the 30 day period (or five day period with respect to monetary defaults).  If any such default is not cured within the specified time, this Agreement may, upon Franchisor's election, be terminated without further notice to Franchisee effective immediately upon the expiration of the 30 day period (or five day period with respect to monetary defaults) or such longer period as applicable law may require.

**13.4.**    Extended Notice of Termination.  If any law applicable to this **Section 13**, requires a longer notice period prior to termination of this Agreement, or prior to a refusal to enter into a successor or renewal franchise, than is required hereunder, a different standard of "good cause", or the taking of some other action not required hereunder, the prior notice, "good cause" standard, and/or other action required by such law shall be substituted for the comparable provisions hereof.

**13.5.**    Assignment Upon Bankruptcy.  If, for any reason, this Agreement is not terminated pursuant to this **Article 13**, and this Agreement is assumed, or assignment of the same to any person or entity who has made a *bona fide* offer to accept an assignment of this Agreement is contemplated, pursuant to the United States Bankruptcy Code, then notice of such proposed assignment or assumption, setting forth:  (i) the name and address of the proposed assignee; and (ii) all of the terms and conditions of the proposed assignment and assumption, shall be given to Franchisor within 20 days after receipt of such proposed assignee's offer to

accept assignment of this Agreement, and, in any event, within 10 days prior to the date application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Franchisor shall thereupon have the prior right and option, to be exercised by notice given at any time prior to the effective date of such proposed assignment and assumption, to accept an assignment of this Agreement to Franchisor itself upon the same terms and conditions and for the same consideration, if any, as in the *bona fide* offer made by the proposed assignee, less any brokerage commissions which may be payable by Franchisee out of the consideration to be paid by such assignee for the assignment of this Agreement.  In the event Franchisor does not elect to exercise the options described in this **Section 13.5**, any transfer or assignment pursuant to the United States Bankruptcy Code shall be subject to the same terms and conditions of any other transfer or assignment set forth in **Article 12**.

**13.6.**  Damages.  In addition to any other claims Franchisor may have (other than claims for lost future Royalty Fees and Brand Fund Contributions), if Franchisor terminates this Agreement based on Franchisee's default or if Franchisee terminates this Agreement in violation of its terms, Franchisee must pay Franchisor liquidated damages calculated as follows:  (a) the greater of (i) the average of Franchisee's monthly Royalty Fees and Brand Fund Contributions due for the last 12 months (or for such shorter period of time that the Franchise has been in operation) before termination, (ii) or the average monthly amount which would be due based on the minimum fees set forth in **Section 4.2** for a period 37+ months after the Effective Date,  (b) multiplied by the lesser of 24 or the number of months remaining in the then-current term under **Section 2.1**, (c) discounted to present value using the then-current prime rate of interest quoted by Franchisor's principal commercial bank.  The parties hereto agree that calculation of damages if Franchisor terminates due to default or if Franchisee terminates this Agreement in violation of its terms will be difficult to measure and quantify, and the damages described in this **Section 13.6** are a reasonable approximation of such damages, and are not a penalty.

14.    OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

**14.1.**  Cease Operations.   Franchisee shall immediately cease to operate the Franchise, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

**14.2.**  Cease Use of Marks.  Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures and techniques associated with the System, the mark "Koala Insulation" and all other Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System.  In particular, Franchisee shall cease to use, without limitation, the Koala Rigs, all signs, advertising materials, displays, stationery, forms, and any other articles that display the Marks.

**14.3.**  Cancellation of Assumed Names.  Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark "Koala Insulation" and all other Marks, and/or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five days after termination or expiration of this Agreement.

**14.4.**  Assign Lease; Modification of Premises.  Franchisor, or any affiliate of Franchisor, shall have the right and option, but not the obligation, in Franchisor's sole discretion, to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location (if applicable).  Franchisor may assign or delegate this right or option to any affiliate or designee of Franchisor, without notice to, or request for approval from, the landlord or lessor of the Franchise Location.  If Franchisor or its assignee or delegatee does not elect or is unable to exercise any option it may have to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location, Franchisee shall make such modifications or alterations to the Franchise Location operated hereunder immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of said premises from that of other Franchises, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  If Franchisee fails or refuses to comply with the requirements of this **Section 14.4**, Franchisor (or its designee) shall have the right to enter upon the premises of the Franchise, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

**14.5.**  Telephone, Etc.  Franchisee shall cease use of, and if Franchisor requests, shall transfer to Franchisor, all telephone numbers, customer lists, and any domain names, websites, email addresses, and any other identifiers, whether or not authorized by Franchisor, used by Franchisee while operating the Franchise.

**14.6.**  No Confusion.  Franchisee agrees, if it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit copy, or colorable imitation of the Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Marks, and further agrees not to utilize any designation of origin, description, trademark, service mark, or representation which suggests or represents a present or past association or connection with Franchisor, the System, or the Marks.

**14.7.**  Pay Monies Owed.  Franchisee shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates (regardless of whether those obligations arise under this Agreement or otherwise).  In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default.

**14.8.**  Damages and Costs.  Franchisee shall pay Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this **Section 14**.

**14.9.**  Return of Manuals.  Franchisee shall immediately deliver to Franchisor the Manuals and all other manuals, records, and instructions containing confidential information (including without limitation any copies thereof, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of Franchisor.

**14.10.** Option to Purchase Furnishings and Equipment.  Franchisor shall have the option to purchase from Franchisee any or all of the Koala Rigs and other vehicles, furnishings, equipment, signs, fixtures, supplies, or inventory of Franchisee related to the operation of the Franchise, at the lesser of the fair market value or Franchisee's book value.  Franchisor shall have 30 days from the expiration or termination of this Agreement to notify Franchisee that Franchisor will exercise its option under this Section 14.10, and another 60 days from such notice to complete such purchase.  The book value of any such item shall be determined based upon a five-year straight-line depreciation of original costs.  For equipment that is five or more years old, the parties agree that fair market value shall be deemed to be 10% of the equipment's original cost.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee as well as all amounts due to Franchisor's affiliates from Franchisee.  Franchisee shall take all actions as necessary to ensure that any items purchased by Franchisor shall be free of all liens or other encumbrances at the time Franchisee sells such items to Franchisor.

**14.11.**  Right to Enter and Operate.  In order to preserve the goodwill of the System following termination, Franchisor (or its designee) shall have the right to enter the Franchise Location (if applicable) (without liability to Franchisee, Franchisee's Principals, or otherwise) or to take possession of the Koala Vehicle(s) used by Franchisee for the purpose of continuing the Franchise's operation and maintaining the goodwill of the business.

**14.12.** Close Vendor Accounts.  Franchisee must close all accounts with vendors which were opened in connection with the opening and operation of the Franchise. Franchisor has the right to notify Franchisee's vendors that this Agreement has expired or been terminated and to require them to close Franchisee's accounts, if Franchisee fails to do so.

**14.13.** Security Interest.  For the purpose of securing its obligations under this Agreement, Franchisee hereby grants Franchisor a security interest in all personal property related to the operation of the Franchise of any nature now owned or hereinafter acquired by Franchisee, including, but not limited to, all signs, logos bearing any of the Marks, inventory, equipment, Koala Rigs(s), trade fixtures, furnishings and accounts, together with the proceeds therefrom (the **"Security Agreement"**).  Any event of default by Franchisee under this Agreement shall be

45

deemed a breach of the Security Agreement.  Franchisee covenants to execute and deliver to Franchisor any and all instruments Franchisor may reasonably request from time to time in order to perfect the security interest granted herein, including, without limitation, the appropriate UCC-1 Financing Statements.

15.    <u>COVENANTS</u>

**15.1.**    <u>Full Time and Best Efforts</u>.  Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee (or its Operating Principal if Franchisee is an entity) (or a Manager who will assume primary responsibility for the franchise operations and shall have been previously approved in writing by Franchisor) and a Salesperson shall devote full time, energy, and best efforts to the management and operation of the Franchise.

**15.2.**    <u>In-Term Covenants</u>.  Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.  Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

**15.2.1.**    Divert or attempt to divert any business or customer of the Franchise or of any Franchise using the System to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Marks and the System.

**15.2.2.**    Unless released in writing by the employer, (a) employ or seek to employ any person who (i) is at that time employed by Franchisor, or (ii) who was, within six months prior to his/her employ by Franchisee, or any person acting for, on behalf of, or at the directions of Franchisee employed by Franchisor, or (b) otherwise directly or indirectly induce such person to leave his or her employment.

**15.2.3.**    Except as otherwise approved in writing by Franchisor, own, maintain, operate, engage in, or have any interest in any "**Competitive Business**" in any location, which shall mean a business which offers insulation evaluation, installation or removal, energy efficiency evaluations and improvements, and related services.

**15.3.**    <u>Post-Term Covenants</u>.  Franchisee covenants that, except as otherwise approved in writing by Franchisor, it shall not, for a continuous uninterrupted period of two years from the date of:  (a) a transfer permitted under **Section 12**; (b) expiration or termination of this Agreement (regardless of the cause for termination); or (c) a final order of a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to the enforcement of this **Section 15.3**; either directly or indirectly (through, on behalf

46

of, or in conjunction with any persons or entity), own, maintain, operate, engage in, or have any interest in any Competitive Business which is, or is intended to be, located: (a) at the Approved Location; (b) within a 100 mile radius of the Territory; or (c) within a 100 mile radius of the territory of any other Franchises or company or affiliate-owned Koala Insulation business in operation as of the time that the obligations under this **Section 15.3** commence.

**15.4.** Publicly-Held Corporations. **Section 15.3** shall not apply to ownership by Franchisee of less than 5% beneficial interest in the outstanding equity securities of any Publicly Held Corporation. As used in this Agreement, the term "**Publicly Held Corporation**" shall be deemed to refer to a corporation which has securities that have been registered under the Securities Exchange Act of 1934.

**15.5.** Individual Covenants. Franchisee shall require and obtain execution of covenants similar to those set forth in **Section 8 and** this **Article 15** (as modified to apply to an individual) from any or all of Franchisee's Principals, the Manager, any replacement Manager and other highly trained personnel as designated by Franchisor. The covenants required by this **Section 15.5** shall be in the form provided in **Exhibit D** to this Agreement.

**15.6.** Severability. The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this **Section 15** is held to be unenforceable or unreasonable by any court, it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

**15.7.** Scope of Covenants. Franchisee understands and acknowledges that Franchisor shall have the right to reduce the scope of any covenant set forth in **Sections 15.2** and **15.3** in this Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified.

**15.8.** Enforcement of Claims. Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this **Section 15**. Franchisee agrees to pay all costs and expenses (including without limitation reasonable attorneys' fees and all other costs) incurred by Franchisor in connection with the enforcement of this **Section 15**.

**15.9.** Irreparable Injury. Franchisee acknowledges that Franchisee's violation of the terms of this **Section 15** would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this **Section 15**.

16.     <u>TAXES, PERMITS, AND INDEBTEDNESS</u>

    **16.1.**   <u>Taxes</u>. Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, income, unemployment, and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement. Franchisee shall pay Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

    **16.2.**   <u>Tax Disputes</u>. In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchise, or any improvements thereon.

    **16.3.**   <u>Compliance With Laws</u>. Franchisee shall comply with all federal, state, and local laws, rules, and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the business franchised under this Agreement, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, and fire clearances.

    **16.4.**   <u>Notification of Claims</u>. Franchisee shall notify Franchisor in writing within three days of receipt of notice of any health or safety violation, the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, or within three days occurrence of any accident or injury which may adversely affect the operation of the Franchise or the financial condition of Franchisee, or give rise to liability or a claim against Franchisee or Franchisor.

17.     <u>INDEPENDENT CONTRACTOR AND INDEMNIFICATION</u>

    **17.1.**   <u>Independent Contractors</u>. It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

    **17.2.**   <u>Identification as Independent Contractor</u>. At all times during the term of this Agreement and any extensions hereof, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor.

**17.3.** <u>No Agency</u>.  It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be liable by reason of any act or omission of Franchisee in its conduct of the Franchise or for any claim or judgment arising therefrom against Franchisee or Franchisor.

**17.4.** <u>Indemnification and Advancement</u>.  Franchisee shall immediately and unconditionally advance costs and expenses, indemnify and hold Franchisor and its affiliates, and their respective officers, directors, members, managers, employees, and agents harmless against any and all claims, obligations, and damages (as well as the costs, including attorneys' fees, of defending against them) arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Franchise or Franchisee's breach of this Agreement, including, without limitation, those alleged to be caused by Franchisor's negligence or breach of this Agreement, but not including those claims, obligations, and damages that are determined to be caused solely by Franchisor's gross negligence or willful misconduct according to a final, unappealable ruling issued by a court with competent jurisdiction.  In addition to the above and without regard to the final ruling on any matter, Franchisee and its respective Principals hereby agree to immediately and unconditionally advance, or pay directly to designated parties, any amounts which are incurred in connection with any claim against Franchisor or its affiliates, and their respective officers, directors, members, managers, employees, and agents arising from or relating to, directly or indirectly, Franchisee's operation of the Franchise or Franchisee's breach of this Agreement without regard to any defenses based on errors, omissions or conduct of Franchisor or its members, managers, shareholders, directors, affiliates or agents.   If Franchisor incurs any costs or expenses, including, without limitation, legal fees, travel expenses, and other charges, in connection with any proceeding involving Franchisee in which Franchisor is not a party, Franchisee shall reimburse Franchisor for all such costs and expenses promptly upon presentation of invoices.  Franchisee acknowledges and agrees that Franchisee's indemnification and hold harmless obligations under this **Section 17.4** shall survive the termination or expiration of this Agreement.

18.    <u>FORCE MAJEURE</u>

Neither party shall be responsible to the other for non-performance or delay in performance occasioned by causes beyond its control, including without limiting the generality of the foregoing:  (a) acts of God; (b) acts of war, terrorism, or insurrection; (c) strikes, lockouts, labor actions, boycotts, floods, fires, hurricanes, tornadoes, and/or other casualties; (d) the inability of Franchisor and/or its affiliates or suppliers to manufacture, purchase, and/or cause delivery of any products used in the operation of the Franchise; and (e) legislative changes and/or governmental orders affecting the sale of the products from Franchises.  The inability of either party to obtain and/or remit funds shall be considered within control of such party.

19.  APPROVALS AND WAIVERS

**19.1.**  Approvals.  Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent must be obtained in writing.

**19.2.**  No Warranties.  Franchisee acknowledges and agrees that Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

**19.3.**  Waivers.  No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee or any other franchisee under any of the terms, provisions, covenants, or conditions of this Agreement, and no custom or practice by the parties at variance with the terms of this Agreement, shall constitute a waiver by Franchisor to enforce any such right, option, duty, or power as against Franchisee, or as to subsequent breach or default by Franchisee.  Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding or succeeding breach by Franchisee of any terms, provisions, covenants, or conditions of this Agreement.

20.  NOTICES

All notices and other communications required or permitted under this Agreement will be in writing and will be given by one of the following methods of delivery: (i) personally; (ii) by certified or registered mail, postage prepaid; (iii) by overnight delivery service; or (iv) if to Franchisee, by email if an email address is designated on the Summary Page.  Notices to Franchisee will be sent to the address set forth on the Summary Page. Notices to Franchisor must be sent to:

> KOALA FRANCHISE, LLC
> 445 West Drive
> Melbourne, FL 32904
> Attention:  General Counsel

Either party may change its mailing address by giving notice to the other party. Notices will be deemed received the same day when delivered personally or upon actual or attempted delivery when sent by registered or certified mail or overnight delivery service.

21.  ENTIRE AGREEMENT AND AMENDMENT

This Agreement and all exhibits to this Agreement, constitute the entire agreement between the parties. This Agreement supersedes any and all prior negotiations, understandings representations and agreements. No representations have induced You to execute this Agreement with Franchisor. Except for those permitted to be made

unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require You to waive reliance on any representation that Franchisor made in the most recent disclosure document (including its exhibits and amendments) (the "FDD") that Franchisor delivered to You or Your representative, subject to any agreed-upon changes to the contract terms and conditions described in that disclosure document and reflected in this Agreement (including any riders or addenda signed at the same time as this Agreement).

You acknowledge that you are entering into this Agreement as a result of your own independent investigation and not as a result of any representations (with the exception of those representations made in the FDD) made by Franchisor, its members, managers, officers, directors, employees, agents, representatives or independent contractors that are contrary to the terms set forth in this Agreement. You acknowledge that the FDD you received contained a copy of this Franchise Agreement and that you reviewed the FDD and Franchise Agreement at least fourteen (14) days (or such other time as applicable law requires) before you signed this Agreement. You further understand acknowledge and agree that any information you obtain from any Franchisor's franchisee, including relating to their sales, profit, cash flows, and/or expenses, does not constitute information obtained from Franchisor, nor does Franchisor make any representation as to the accuracy of any such information.

22.    SEVERABILITY AND CONSTRUCTION

**22.1.**  Severability.  If any of the provisions of this Agreement may be construed in more than one way, one of which would render the provision illegal or otherwise voidable or unenforceable, such provision shall have the meaning which renders it valid and enforceable.  The language of all provisions of this Agreement shall be construed according to its fair meaning and not strictly against any party.  In the event any court or other government authority shall determine any provision in this Agreement is not enforceable as written, the parties agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws and public policies of the jurisdiction in which enforcement is sought and affords the parties the same basic rights and obligations and has the same economic effect.  If any provision in this Agreement is held invalid or otherwise unenforceable by any court or other government authority or in any arbitration proceeding, such findings shall not invalidate the remainder of this Agreement unless in the reasonable opinion of Franchisor the effect of such determination has the effect of frustrating the purpose of this Agreement, whereupon Franchisor shall have the right by notice in writing to the other party to immediately terminate this Agreement.

**22.2.**  No Other Rights.  Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or entity other than Franchisee, Franchisor, and such of Franchisee's and

Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted by **Article 12**), any rights or remedies under or by reason of this Agreement.

**22.3.** <u>Enforceability of Covenants</u>.  Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

**22.4.** <u>Construction</u>.  All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

**22.5.** <u>Importance of Timely Performance</u>.  Time is of the essence in this Agreement.

**22.6.** <u>Survival of Provisions</u>.  All provisions of this Agreement which, by their terms or intent, are designed to survive the expiration or termination of this Agreement, shall so survive the expiration and/or termination of this Agreement.

**22.7.** <u>Additional Terms; Inconsistent Terms</u>.  The parties may provide additional terms by including the terms on the Summary Page.  To the extent that any provisions of the Summary Page are in direct conflict with the provisions of this Agreement, the provisions of the Summary Page shall control.

23.   <u>APPLICABLE LAW AND DISPUTE RESOLUTION</u>

**23.1.** <u>Governing Law</u>.  This Agreement takes effect upon its acceptance and execution by Franchisor, and shall be interpreted and construed exclusively under the laws of the State of Florida, which laws shall prevail in the event of any conflict of law (without regard to, and without giving effect to, the application of Florida choice-of-law rules).  Nothing in this **Section 23.1** is intended by the parties to subject this Agreement to any franchise, business opportunity, consumer protection, or similar law, rule, or regulation of the State of Florida to which this Agreement would not otherwise be subject.

**23.2.** <u>Arbitration</u>.

   **23.2.1.**      <u>Disputes Subject to Arbitration</u>. Except as expressly provided to the contrary in this Agreement, any controversy or claim arising out of or relating to this Agreement or the relationship of the parties shall be settled by arbitration administered by the American Arbitration Association (the **"AAA"**) in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction. Any

dispute as to whether this arbitration clause applies or whether any particular claim is subject to arbitration shall be decided by arbitration in accordance with this Article 23.

**23.2.2.** <u>Arbitration Claims</u>. The parties agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. The parties further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is waived and forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either party. The parties agree that arbitration will be conducted on an individual basis, that neither party shall pursue class claims nor multi-plaintiff actions, and that an arbitration proceeding between Franchisor and its affiliates, or any of them, on the one hand, and Franchisee and its affiliates and any of their respective officers, directors, managers, agents, representatives, employees, successors and assigns, on the other hand, may not be consolidated with any other arbitration proceeding to which Franchisor and/or its affiliates are a party. Notwithstanding the foregoing, if any court determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section, then the parties agree that this arbitration clause shall not apply to that dispute and that such dispute shall be resolved in a judicial proceeding. For purposes of this Section, Franchisor and its affiliates includes their respective shareholders, partners, members and other owners, officers, directors, managers, agents, representatives, employees, successors and assigns.

**23.2.3.** <u>Location</u>. The place of arbitration shall be the AAA office located nearest to Franchisor's principal place of business on the date the arbitration action is filed.

**23.2.4.** <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration will be confidential, except as required by law or as required for Franchisor to comply with laws and regulations applicable to the sale of franchises.

**23.2.5.** <u>Performance During Arbitration</u>. Franchisor and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration process.

**23.3.** <u>Venue</u>. For any matter which is not subject to the arbitration provisions of **Section 23.2**, each party hereto consents to personal jurisdiction in the federal or state courts located in the county in which Franchisor's principal place of business is located at the time that the action commences. Franchisee and its Principals hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.

**23.4.** <u>No Exclusive Remedies</u>.  No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

**23.5.** <u>Injunctive Relief</u>.  Notwithstanding anything contained herein, Franchisor reserves the right to seek and obtain temporary restraining orders or other emergency temporary or preliminary equitable injunctive relief and file actions to collect royalties and other amounts owed by Franchisee to Franchisor (collection actions) from federal or state courts located in the state in which the Franchise is located.  The parties acknowledge and agree that the rights of Franchisor under this Agreement with respect to the use of the Marks and the System and the enforcement of the in-term and post-term noncompetition covenants of Franchisor are of a specialized and unique nature and that immediate and irreparable damage will result to Franchisor if Franchisee fails or refuses to perform obligations under this Agreement, and, notwithstanding any election by Franchisor to claim damages from Franchisee as a result of such failure or refusal, Franchisor may, in addition to any other remedies and damages available, seek an injunction in any court of competent jurisdiction to restrain such failure or refusal.

**23.6.** <u>Waiver of Jury Trial</u>.  Franchisor and Franchisee irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action or proceeding.

**23.7.** <u>Limitation of Actions</u>.  Any and all claims and actions arising out of or relating to this agreement, the relationship of Franchisee and franchisor, or Franchisee's operation of the Franchise (including any defenses or any claims of set-off or recoupment) must be brought or asserted before the expiration of the earlier of (a) the time period for bringing an action under any applicable state or federal statute of limitations; (b) one  year after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim; or (c) two years after the first act or omission giving rise to an alleged claim; or it is expressly acknowledged and agreed by all parties that such claims or actions shall be irrevocably barred.  Claims of franchisor attributable to underreporting of sales, and claims of the parties for failure to pay monies owed and/or indemnification shall be subject only to the applicable state or federal statute of limitations.

**23.8.** <u>Limitation on Damages</u>.  Franchisor and Franchisee hereby waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other, and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.  In any action arising out of or relating to this Agreement or the relationship of the parties, in no event shall Franchisor be liable to Franchisee for more than the total Initial Franchise Fee.

**23.9.** <u>Costs and Attorneys' Fees</u>.  If either Franchisor or Franchisee seeks to enforce this Agreement in an arbitration or a judicial or other proceeding, the

prevailing party shall be entitled to recover its reasonable costs and expenses (including attorneys' fees, attorneys' assistants' fees, accountants' fees, expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel, room and board, salaries and benefits of those employees participating in such proceeding) incurred in connection with such judicial or other proceeding.

24. <u>ACKNOWLEDGMENTS</u>

**24.1.** <u>Acknowledgments</u>.  Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, recognizes that the business venture contemplated by this Agreement involves business risks, and that its success will be largely dependent upon the ability of Franchisee and, if an entity, its owners as independent businesspersons.  Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received from Franchisor or any employee, representative or other party purporting to act on Franchisee's behalf, any warranty, promise or guarantee, express or implied, as to the potential sales volume, profits, or success of the business venture contemplated by this Agreement.

**24.2.** <u>Receipt of Documents</u>.  Franchisee acknowledges that it received a copy of this Agreement, the exhibit(s) hereto, and agreements relating hereto, if any, with all of the blank lines therein filled in, prior to the date on which this Agreement was executed, and with sufficient time within which to review this Agreement, with advisors of its choosing.  Franchisee further acknowledges that it received the franchise disclosure document required by the Federal Trade Commission's Franchise Rule at least 14 days prior to the date on which this Agreement was executed.

**24.3.** <u>Representations and Warranties</u>. Franchisee and its Principals represent and warrant to Franchisor that:  (a) neither Franchisee nor any of its Principals have made any untrue statement of any material fact nor omitted to state any material fact in obtaining the rights granted herein; (b) neither Franchisee nor any of its Principals have any direct or indirect legal or beneficial interest in any business that may be deemed a Competitive Business, except as otherwise completely and accurately disclosed in its franchise application materials; and (c) Franchisee and its Principals have a legal right to own and operate the Franchise. Franchisee recognizes that Franchisor approved Franchisee in reliance on all of the statements Franchisee and its Principals have made in connection therewith, and that Franchisee has a continuing obligation to advise Franchisor of any material changes in these statements and representations made to Franchisor in this Agreement or in the franchise application.

**24.4.** <u>Compliance with Executive Order 13224</u>.  Under applicable U.S. law, including, without limitation, Executive Order 13224, signed on September 23, 2001 (**"Order"**), Franchisor is prohibited from engaging in any transaction with any person engaged in, or with a person aiding any person engaged in, acts of terrorism, as defined in the Order.  Accordingly, Franchisee represents and

warrants to us that, as of the date of this Agreement, neither Franchisee nor any person holding any ownership interest in you, controlled by you, or under common control with Franchisee is designated under the Order as a person with whom business may not be transacted by Franchisor, and that Franchisee: (a) does not, and hereafter will not, engage in any terrorist activity; (b) are not affiliated with and do not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and (c) are not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity.

**24.5.** <u>No Other Obligations</u>.  Each party represents and warrants to the others that there are no other agreements, court orders, or any other legal obligations that would preclude or in any manner restrict such party from: (a) negotiating and entering into this Agreement; (b) exercising its rights under this Agreement; and/or (c) fulfilling its responsibilities under this Agreement.

**24.6.** <u>No Other Representations</u>.  Franchisee acknowledges Franchisor has not (and shall not be deemed to have) given any representation, promise, or guarantee of Franchisee's success.

**24.7.** <u>Business Judgment</u>.  Franchisee understands and agrees that Franchisor may operate and change the System and its business in any manner that is not expressly and specifically prohibited by this Agreement.  Whenever Franchisor has expressly reserved in this Agreement or is deemed to have a right and/or discretion to take or withhold an action, or to grant or decline to grant Franchisee a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement, Franchisor may make such decision or exercise its right and/or discretion on the basis of Franchisor's judgment of what is in Franchisor's best interests, including without limitation Franchisor's judgment of what is in the best interests of the franchise network, at the time Franchisor's decision is made or its right or discretion is exercised, without regard to whether: (a) other reasonable alternative decisions or actions, or even arguably preferable alternative decisions or actions, could have been made by Franchisor; (b) Franchisor's decision or the action taken promotes Franchisor's financial or other individual interest; (c) Franchisor's decision or the action it takes applies differently to Franchisee and one or more other franchisees or Franchisor's company-owned or affiliate-owned operations; or (d) Franchisor's decision or the exercise of its right or discretion is adverse to Franchisee's interests.  In the absence of an applicable statute, Franchisor will have no liability to Franchisee for any such decision or action. Franchisor and Franchisee intend that the exercise of Franchisor's right or discretion will not be subject to limitation or review.  If applicable law implies a covenant of good faith and fair dealing in this Agreement, Franchisor and Franchisee agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants Franchisor the right to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisee's rights and obligations hereunder.

**24.8.** <u>Consultation</u>.  Franchisee acknowledges that it has read and understands this Agreement, the exhibits hereto, and agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors (including attorneys) of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**
**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Agreement on the day and year first above written.

KOALA FRANCHISE, LLC

By: _Scott Marr_____
Name: Scott Marr
Title: CEO

Lotus & The Rooster Holdings Company

By: _____
Name: Salim Michel Makhlouf
Title:   CEO

## EXHIBIT A TO THE FRANCHISE AGREEMENT

## TRADEMARKS

| Mark | Registration Number | Registration Date |
|---|---|---|
| **KOALA INSULATION** | 6006546 | March 10, 2020 |
|  | 6007883 | March 10, 2020 |
|  | 6173027 | October 13, 2020 |
| **Delivering Efficiency. Improving Comfort.** | 6079379 | March 31, 2020 |

1

© COPYRIGHT 2021 KOALA FRANCHISE, LLC.  ALL RIGHTS RESERVED.
COMMERCIAL SALE PROHIBITED WITHOUT EXPRESS WRITTEN PERMISSION OF KOALA FRANCHISE, LLC.

## EXHIBIT B TO THE FRANCHISE AGREEMENT

LEASE RIDER TO LEASE AGREEMENT DATED _____

BY AND BETWEEN

_____, AS "LANDLORD"

AND

_____, AS "TENANT" FOR
THE DEMISED PREMISES ("PREMISES") DESCRIBED THEREIN

_____

This Rider and the provisions hereof are hereby incorporated into the body of the lease to which this Rider is attached (the "Lease"), and the provisions hereof shall be cumulative of those set forth in the Lease, but to the extent of any conflict between any provisions of this Rider and the provisions of the Lease, this Rider shall govern and control.

1.      <u>Consent to Collateral Assignment to Franchisor</u>. If Franchisor takes possession of the Premises and confirms to Landlord that Franchisor has assumed the Lease as tenant thereunder, Landlord will recognize Franchisor as tenant under the Lease.  Landlord agrees that in such event Franchisor may further assign the Lease to or enter into a sublease with a person or entity who agrees to assume the tenant's obligations under the Lease and is reasonably acceptable to Landlord and that, upon that assignment, Franchisor will have no further liability or obligation under the Lease as assignee, tenant or otherwise, other than to certify that the additional assignee or sublessee operates the Premises as a Franchise.

2.      <u>Use of Premises</u>.   Without limitation of uses permitted under the Lease, but in expansion thereof, the Premises may be used for the purpose of operation of a Koala Insulation Franchise offering insulation installation, removal, evaluation and related services.

3.      <u>Compliance of Premises With Applicable Law</u>.  Landlord represents and warrants that as of the date hereof the Premises are in compliance with all applicable law.

4.      <u>Notice and Cure Rights to Franchisor</u>.  Prior to exercising any remedies under the Lease (except in the event of imminent danger to the Premises), Landlord shall give Franchisor written notice of any default thereunder by Tenant, and commencing upon receipt thereof by Franchisor, Franchisor shall have the same length cure period as is given to Tenant under the Lease for such default, provided that in no event shall Franchisor have a cure period of less than (i) 10 days after Franchisor's receipt of such notice as to monetary defaults or (ii) 30 days after Franchisor's receipt of such notice as to non-monetary defaults.  Landlord agrees to accept cure tendered by Franchisor as if

the same was tendered by Tenant, but Franchisor has no obligation to cure such default. The initial address for notices to Franchisor is as follows:

> KOALA FRANCHISE, LLC
> 445 West Drive
> Melbourne, FL 32904
> Attention: General Counsel

5.      <u>Non-disturbance from Mortgage Lenders</u>. It is a condition of the Lease being subordinated to any mortgage, deed of trust, deed to secure debt or similar encumbrance on the Premises that the holder of such encumbrance agree not to disturb Tenant's rights under the Lease or Tenant's possession of the Premises, so long as Tenant is not in default of its obligations under the Lease beyond any applicable grace or cure period provided therein.

*CHECK THE FOLLOWING PARAGRAPH THAT APPLIES. CHECK ONLY ONE. IF NONE IS CHECKED, THEN CLAUSE a) BELOW WILL BE APPLICABLE, AND CLAUSE b) BELOW WILL BE DEEMED DELETED*

        a)      ☐      Landlord represents and warrants that on the date hereof no mortgage, deed of trust, deed to secure debt or similar encumbrance encumbers the Premises.

        b)      ☐      A mortgage, deed of trust or deed to secure debt currently encumbers the Premises.  It is a condition precedent to Tenant's obligations under the Lease that the holder of such encumbrance enter into a written recordable form subordination and non-disturbance agreement with Tenant, in a form reasonably acceptable to Tenant, as described above.

6.      <u>Third Party Beneficiary</u>.  For so long as Franchisor holds a collateral assignment of the Lease, Franchisor is a third party beneficiary of the Lease.

7.      <u>Franchisor Right to Enter</u>.  Upon the expiration or earlier termination of the Lease or the Franchise Agreement, Franchisor or its designee may enter upon the Premises for the purpose of removing all signs and other material bearing the Koala name or trademarks, service marks or other commercial symbols of Franchisor.

 AGREED and executed and delivered under seal by the parties hereto as of the day and year of the Lease.

3

LANDLORD:                              TENANT:

_____              _____

By:                                    By:

_____              _____

_____              _____

Name:                                  _____

_____              Name:

_____              _____

Title:                                 _____

_____              Title:

_____              _____

_____              _____

## EXHIBIT C TO THE FRANCHISE AGREEMENT

GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to KOALA FRANCHISE, LLC, a Florida limited liability company ("Franchisor") to execute the Franchise Agreement between Franchisor and Lotus & The Rooster Holdings Company, a corporation in Pennsylvania ("Franchisee"), dated _____, (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and Franchisor's successors and assigns that all of Franchisee's monetary and other obligations under the Agreement will be punctually paid and performed.

3/15/2022 | 2:42 EDT

Each of the undersigned has had the opportunity to review the Agreement, and understands his or her obligations hereunder and thereunder.

Upon demand by Franchisor, the undersigned each hereby jointly and severally agree to immediately make each payment required of Franchisee under the Agreement and waive any right to require Franchisor to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee; or (d) give notice of demand for payment by Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee, and the undersigned each hereby jointly and severally waive notice of same and agree to remain and be bound by any and all such amendments and changes to the Agreement.

The undersigned each hereby jointly and severally agree to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorney's fees, reasonable costs of financial and other investigation, court costs, and fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned each hereby jointly and severally acknowledge and expressly agree to be individually bound by all of the covenants contained in Sections 8, 12, 14, 15 and 17.4 of the Agreement, and acknowledge and agree that this Guarantee does not grant the undersigned any right to use the "Koala" marks or system licensed to Franchisee under the Agreement. Each of the undersigned represents that he or she has received a copy of the Franchise Agreement and understands his or her obligations hereunder and thereunder.

Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

If Franchisor is required to enforce this Guarantee in a judicial or arbitration proceeding, and prevails in such proceeding, Franchisor shall be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, travel and room and board expenses, salaries and benefits of those of Franchisor's employee's participating in such proceeding, whether incurred prior to, in

preparation for, or in contemplation of the filing of any such proceeding.  If Franchisor is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guarantee, the undersigned shall reimburse Franchisor for any of the above-listed costs and expenses Franchisor incurs.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Sections 22 and 23 of the Agreement.  This Guarantee shall be interpreted and construed under the laws of the State of Florida.  In the event of any conflict of law, the laws of the State of Florida shall prevail (without regard to, and without giving effect to, the application of Florida conflict of law rules).  Jurisdiction and venue shall be in the state or federal courts located nearest Franchisor's principal place of business at the time that the action is commenced, and the undersigned hereby waives any objection to such jurisdiction and venue. The arbitration provisions of Section 23 of the Agreement shall apply to this Guaranty.

Non-Owner Spousal Guarantee. If this Guarantee is executed by a spouse (or domestic partner or immediate family member) of the owner of a franchisee entity and such person has no equity or ownership in the franchisee entity or franchise then this Guarantee shall only be enforceable against such non-owner spouse in the event that they receive a material transfer of assets from the spouse (or domestic partner or immediate family member) who has the ownership interest in the franchise or franchisee entity.  This section is intended to ensure that one spouse cannot avoid liability under their guarantee by simply transferring assets to the other spouse.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

GUARANTOR(S)

Signed: _____
(In his/her individual capacity)
Name: Salim Michel Makhlouf
Address: 251 S Pitt St, Carlisle, PA 17013

## EXHIBIT D TO THE FRANCHISE AGREEMENT

## NON-DISCLOSURE AND NON-COMPETITION
## AGREEMENT

**THIS AGREEMENT** ("**Agreement**") is made this ____3/15/2022 | 2:42 EDT____, by and Between Lotus & The Rooster Holdings Company (the "**Franchisee**"), and Salim Michel Makhlouf, who is a principal, manager, supervisor, member, partner, or a person in a managerial position with, Franchisee (the "**Member**").

BACKGROUND:

A.      Koala Franchise, LLC, a Florida limited liability company ("**Franchisor**") owns a format and system (the "**System**") relating to the establishment, development and operation of an insulation and related services business that operate under the name "Koala Insulation" (or other names designated by Franchisor, the "**Marks**") and such additional or alternate services and/or products as Franchisor may designate from time to time (each a "**Franchise**").

B.      Franchisor and Franchisee have executed a Franchise Agreement ("**Franchise Agreement**") granting Franchisee the right to operate a Franchise (the "**Franchise**") and to produce and distribute products and services approved by Franchisor and use the Marks in connection therewith under the terms and conditions of the Franchise Agreement;

C.      The Member, by virtue of his or her position with Franchisee, will gain access to certain of Franchisor's Confidential Information, as defined herein, and must therefore be bound by the same confidentiality and non-competition agreement that Franchisee is bound by.

**IN CONSIDERATION** of these premises, the conditions stated herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.      <u>Confidential Information</u>. Member shall not, during the term of the Franchise Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity, persons, partnership, entity, association, or corporation any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised thereunder which may be communicated to Member or of which Member may be apprised by virtue of Franchisee's operation under the terms of the Franchise Agreement. Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others.

2.    <u>Covenants Not to Compete</u>.

(a)    Member specifically acknowledges that, pursuant to the Franchise Agreement, and by virtue of its position with Franchisee, Member will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.

(b)    Member covenants and agrees that during the term of Member's employment with, or ownership interest in, Franchisee, and except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity:

(i)    Divert or attempt to divert any business or customer of the Franchise or of any other System franchisee or unit operated by Franchisor (or an affiliate of Franchisor) to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and/or the System;

(ii)    Employ or seek to employ any person who is at that time employed by Franchisor or Franchisee, or otherwise directly or indirectly induce such person to leave his or her employment; or

(iii)    Own, maintain, operate, engage in, be employed by, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services.

(c)    Member covenants and agrees that during the Post-Term Period (defined below), except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity, own, maintain, operate, engage in, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services and which business is, or is intended to be, located: (a) at the Franchise location or within a 100 mile radius of the Territory of the Franchise, which Territory includes <u>the areas defined by the Summary Page of the Franchise Agreement and any amendments thereto</u>; or (b) within a 100 mile radius of the territory any other System franchisee or Koala Insulation business owned by Franchisor or its affiliate at the time that the obligations under this **Section 2(c)** commence;

(d)    As used in this Agreement, the term **"Post-Term Period"** shall mean a continuous uninterrupted period of two years from the date of: (a) a transfer permitted under **Section 12** of the Franchise Agreement with respect to Member; and/or (b) termination of Member's employment with, and/or ownership interest in, Franchisee.

3.    <u>Injunctive Relief.</u> Member acknowledges that any failure to comply with the requirements of this Agreement will cause Franchisor irreparable injury, and Member agrees

to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this Agreement.

      4.    <u>Severability.</u> All agreements and covenants contained herein are severable. If all or any portion of the covenants in this Agreement is held to be unenforceable or unreasonable by any court, then it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

      5.    <u>Delay.</u> No delay or failure by Franchisor or the Franchisee to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right provided herein, and no waiver of any violation of any terms and provisions of this Agreement shall be construed as a waiver of any succeeding violation of the same or any other provision of this Agreement.

      6.    <u>Third-Party Beneficiary</u>. Member hereby acknowledges and agrees that Franchisor is an intended third-party beneficiary of this Agreement with the right to enforce it, independently or jointly with Franchisee.

      **IN WITNESS WHEREOF**, Franchisee and the Member attest that each has read and understands the terms of this Agreement, and voluntarily signed this Agreement on this__ day of_____.

              3/15/2022 | 2:42 EDT

**FRANCHISEE:**                   **MEMBER:**

**Lotus & The Rooster Holdings Company**        **Salim Michel Makhlouf**

Signature:_____     Signature:_____

**Salim Michel Makhlouf,** <sup>CEO</sup>

# EXHIBIT E TO THE FRANCHISE AGREEMENT

## EQUIPMENT SALES AGREEMENT

THIS EQUIPMENT SALES AGREEMENT is made on _____, 2021, by KOALA FRANCHISE LLC, a Florida limited liability company (hereinafter known as "Seller") and [Franchisee], a _____ (hereinafter known as "Buyer").  Buyer and Seller shall collectively be known herein as "the Parties".

### BACKGROUND

WHEREAS, Seller desires to sell the equipment described below, known herein as the "Acquired Equipment", under the terms and conditions set forth below;

WHEREAS, Buyer desires to purchase the Acquired Equipment offered for sale by Seller under the terms and conditions set forth below; and, therefore,

### TERMS AND CONDITIONS

IN CONSIDERATION of the mutual promises and other valuable consideration exchanged by the Parties as set forth herein, the Parties, intending to be legally bound, hereby agree as follows:

**1.  Description of Acquired Equipment.**

The following vehicle (and all equipment within or attached to such vehicle):

2. **Purchase Price.** The total purchase price to be paid by Buyer to Seller for the Acquired Equipment is _____ ("Purchase Price").

Payment is to be made by Buyer to Seller in cash, by certified funds, financed under the terms of a commercial finance agreement, or through another instrument acceptable to Seller. Buyer must receive permission in advance from Seller for use of a non-certified funds in payment of the Purchase Price.

3. Delivery of Acquired Equipment and Conveyance of Title.

(a). <u>Delivery of Acquired Vehicle</u>. Seller shall deliver the Acquired Equipment, and Buyer shall take possession of same, at Seller's premises or other premises as designated by Seller (either in person or through a third party) on or before that date that is within 10 days of the date hereof ("Delivery Date"). If delivery is to be made at a date after the execution of this contract, it is Seller's duty to ensure that the Acquired Equipment is delivered in the same condition as when last inspected by the Buyer (or, if no Buyer inspection, the execution date of this agreement). It is Buyer's duty, either in person or through a third party to appear at Seller's premises during standard business hours on or before the Delivery Date to remove the Acquired Equipment from Seller's premises. However, if Buyer fails to appear at Seller's premises on or before the Delivery Date to accept possession of the Acquired Equipment, then risk of loss passes to the Buyer on the Delivery Date.

(b). <u>Conveyance of Title</u>. Seller shall convey title to Buyer upon delivery of the equipment to

10

Buyer, which shall not occur until payment is made in full. Seller agrees and covenants to execute all documents presented by Buyer which are necessary to finalize transfer of title and registration upon the Acquired Equipment to Buyer.

**4.  Representations, Warranties, and Disclosures.**

(a)  Warranties.

THIS EQUIPMENT IS SOLD "AS IS", AND SELLER DOES NOT IN ANY WAY, OTHER THAN PARAGRAPH A §§ 1-7 ABOVE, EXPRESSLY OR IMPLIEDLY, GIVE ANY WARRANTIES TO BUYER.  SELLER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE.

_____
Buyer Initials

(b)  Odometer Declaration. Seller hereby states that the odometer in the Acquired Equipment (if such equipment has an odometer) now reads as indicated above and, to the best of Seller's knowledge, it reflects the actual mileage of the equipment described herein.

**(c)  Buyer Representation**. The individual signing this agreement on behalf of Buyer hereby represents to Seller that he or she has the power and authority to do so on behalf of Buyer.

**5.  Buyer's Responsibility – Insurance, Tags and Inspections.** Buyer acknowledges that unless prohibited by applicable law, any insurance coverage, license, tags, plates or registration maintained by Seller on the Acquired Equipment shall be canceled upon delivery of the Acquired Equipment to, and the acceptance of, by Buyer. Buyer shall inspect and test all equipment and vehicles delivered under this agreement including the inspection of all workmanship performed by installation contractors, vehicle outfitters and other parties that performed any work on the conveyed equipment and vehicle.  Buyer accepts full responsibility for the condition, effectiveness, appropriateness, and use of the conveyed equipment and vehicle.  Buyer must inform Seller of any discovered problems or inspection failure prior to taking delivery of vehicle, and provide Seller at least 7 days to cure any flaw, at Seller's own expense. Upon acceptance of delivery, Buyer acknowledges compliance with these requirements and waives all rights of claim against Seller and agrees to indemnify Seller against all claims resulting from the ownership or use of conveyed equipment and vehicles.  Buyer agrees to ensure through due diligence and through its own inspection, assisted by professionals as it sees fit, that all equipment and vehicles comply with all applicable laws, regulations and rules including any weight and engineering requirements.

_____
Buyer Initials

**6.  Continuation of Representations and Warranties**. All representations and warranties contained in this Agreement (if any) shall continue in full force and effect after execution of this agreement. If either party later learns that a warranty or representation that it made is untrue, it is under a duty to promptly disclose this information to the other party in writing. No representation or warranty contained herein shall be deemed to have been waived or impaired by any investigation made by or knowledge of the other party to this Agreement.

**7.  Indemnification of Attorneys' Fees and out-of-pocket costs.** Should any party materially breach this agreement (including representations and warranties made to the other side), the non-breaching party shall be indemnified by the breaching party for its reasonable

attorneys' fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach of this contract (including the breach of representations or warranties). This provision shall not limit in any way the remedies either party may have otherwise possessed in law or equity relative to a breach of this contract. The term "out- of-pocket costs", as used in this contract, shall not include lost profits.

**8. Severability**. In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

9. Modification. Except as otherwise provided in this document, this agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.

**10. Acknowledgements**. Each party acknowledges that he or she has had an adequate opportunity to read and study this Agreement, to consider it, to consult with attorneys if he or she has so desired.

**11. Exclusive Jurisdiction for Suit in Case of Breach**. The Parties, by entering into this agreement, submit to jurisdiction in Melbourne, Florida for adjudication of any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts which have jurisdiction over Melbourne, Florida shall have **exclusive** jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sound in contract, tort, or other areas of the law.

12. State Law. This Agreement shall be interpreted under, and governed by, the laws of the state of Florida.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, Seller and Buyer affix their signatures hereto.


SELLER

By: _____

Name: _____ Authorized Officer for Seller

Date: _____, 2021


BUYER


By: _____

Name: _____ Authorized Officer for Buyer

Date: _____, 2021

**EXHIBIT E**
**FRANCHISEE DISCLOSURE QUESTIONNAIRE**

**FRANCHISEE DISCLOSURE QUESTIONNAIRE**

Koala Franchise, LLC ("we", "us", or "our") and you are preparing to enter into a franchise agreement for the operation of a Koala Insulation Franchise. The purpose of this Questionnaire is to determine whether any statements or promises were made to you that we have not authorized or that may be untrue, inaccurate or misleading and to be certain that you understand the limitations on legal claims you may make by reason of the purchase and operation of your franchise. Please review each of the following questions carefully and provide honest responses to each question.

1.  Yes __X__   No ____   Have you received and personally reviewed the Franchise Agreement and each attachment or schedule attached to it?

2.  Yes __X__   No ____   Have you received and personally reviewed the Franchise Disclosure Document we provided

3.  Yes __X__   No ____   Did you sign a receipt for the Franchise Disclosure Document indicating the date you received it?

4.  Yes __X__   No ____   Do you understand all the information contained in the Franchise Disclosure Document and Franchise Agreement?

5.  Yes __X__   No ____   Have you reviewed the Franchise Disclosure Document and Franchise Agreement with a lawyer, accountant or other professional advisor or have you had the opportunity for such review and chosen not to engage such professionals?

6.  Yes __X__   No ____   Have you discussed the benefits and risks of developing and operating a Koala Insulation Business with an existing Koala Insulation franchisee?

7.  Yes __X__   No ____   Do you understand the risks of developing and operating a Koala Insulation Business?

8.  Yes __X__   No ____   Do you understand the success or failure of your franchise will depend in large part upon your skills, abilities and efforts and those of the persons you employ as well as many factors beyond your control such as competition, interest rates, the economy, inflation, labor, and supply costs, and other relevant factors?

9.  Yes __X__   No ____   Do you understand all disputes or claims you may have arising out of or relating to the Franchise Agreement must be litigated, mediated, and/or arbitrated in Florida, if not resolved informally or by mediation?

10.  Yes __X__    No ____    Do you understand that you must satisfactorily complete the initial training course before we will allow your Business to open or consent to a transfer?

11.  Yes __X__    No ____    Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the costs involved in operating a Koala Insulation Business, that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

12.  Yes __X__    No ____    Do you agree that no employee or other person speaking on our behalf made any statement or promise or agreement, other than those matters addressed in your Franchise Agreement concerning advertising, marketing, media support, marketing penetration, training, support service or assistance that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

13.  Yes __X__    No ____    Do you agree that no employee or other person speaking on our behalf made any statement or promise regarding the actual, average or projected profits or earnings, the likelihood of success, the amount of money you may earn, or the total amount of revenue a Koala Insulation Business will generate, that is not contained in the Franchise Disclosure Document or that is contrary to, or different from, the information contained in the Franchise Disclosure Document?

14.  Yes __X__    No ____    Do you understand that the Franchise Agreement and attachments to the Franchise Agreement contain the entire agreement between us and you concerning the franchise for the Koala Insulation Business, meaning any prior oral or written statements not set out in the Franchise Agreement or the attachments to the Franchise Agreement will not be binding?

15.  Yes __X__    No ____    Do you understand that we are relying on your answers to this questionnaire to ensure that the franchise sale was made in compliance of state and federal laws?

YOU UNDERSTAND THAT YOUR ANSWERS ARE IMPORTANT TO US AND THAT WE WILL RELY ON THEM. BY SIGNING THIS QUESTIONNAIRE, YOU ARE REPRESENTING THAT YOU HAVE CONSIDERED EACH QUESTION CAREFULLY AND RESPONDED TRUTHFULLY TO THE ABOVE QUESTIONS.

<u>EXPLANATION OF ANY NEGATIVE RESPONSE</u>
(REFER TO QUESTION NUMBER)

| Questionnaire Number | Explanation of Negative Response |
|---|---|
|  |  |
|  |  |

**Do not sign or date this Questionnaire the same day as the Receipt for the Franchise Disclosure Document. Sign and date this Questionnaire the day you sign the Franchise Agreement and pay your franchise fee.**

FRANCHISEE:

Signature: _____

Print Name: Salim Michel Makhlouf, CEO

Date: 3/14/2022 | 1:50 PDT _____


SPECIAL NOTE FOR RESIDENTS OF THE STATE OF MARYLAND AND FRANCHISED BUSINESSES LOCATED IN MARYLAND:  Nothing in this Questionnaire will act as a release, estoppel, or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

## EXHIBIT F

## GENERAL RELEASE

This General Release ("Release") is executed by the undersigned ("Releasor") in favor of Koala Franchise, LLC., a Florida Limited Liability Company ("Franchisor").

**Background Statement**: Releasor wishes to dispose of all outstanding liabilities against Released Parties.

Releasor agrees as follows:

**1.    Release.** Releasor (on behalf of itself and its parents, subsidiaries and affiliates and their respective past and present officers, directors, shareholders, managers, members, partners, agents, and employees (collectively, the "Releasing Parties") hereby release Franchisor, its parent(s), affiliates, and each of their respective directors, officers, shareholders, members, employees, and agents (collectively, the "Released Parties") from any and all claims, causes of action, suits, debts, agreements, promises, demands, liabilities, contractual rights and/or obligations, of whatever nature, known or unknown, which any Releasing Party now has or ever had against any Released Party based upon and/or arising out of events that occurred through the date hereof, including without limitation, anything arising out of the Franchise Agreement (collectively, "Claims").

**2.    Covenant Not to Sue.** Releasor (on behalf of all Releasing Parties) covenant not to initiate, prosecute, encourage, assist, or (except as required by law) participate in any civil, criminal, or administrative proceeding or investigation in any court, agency, or other forum, either affirmatively or by way of cross-claim, defense, or counterclaim, against any Released Party with respect to any Claim.

**3.    Representations and Acknowledgments.** Releasor represents and warrants that: (i) Releasor is the sole owners of all Claims, and that no Releasing Party has assigned or transferred, or purported to assign or transfer, to any person or entity, any Claim; (ii) Releasor has full power and authority to sign this Release; and (iii) this Release has been voluntarily and knowingly signed after Releasor has had the opportunity to consult with counsel of Releasor's choice. Releasor acknowledges that the release in Section 1 is a complete defense to any Claim.

**4.    Miscellaneous.** If any of the provisions of this Release are held invalid for any reason, the remainder of this Release will not be affected and will remain in full force and effect. In the event of any dispute concerning this Release, the dispute resolution, governing law, and venue provisions of the Franchise Agreement shall apply. Releasor agrees to take any actions and sign any documents that Franchisor reasonably requests to effectuate the purposes of this Release. This Release contains the entire agreement of the parties concerning the subject matter hereof.

Executed by:

Date: _3/14/2022 | 1:50 PDT_

Name: Salim Michel Makhlouf, Personally

*[notary acknowledgement to follow]*

# EXHIBIT G
## STATE SPECIFIC ADDENDA AND RIDERS

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS. IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU**.

Each of the following provisions is void and unenforceable if contained in any documents relating to a franchise:

1. A prohibition on the right of a franchisee to join an association of franchisees.

2. A requirement that a franchisee assent to a release, assignment, novation, waiver, or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

3. A provision that permits a franchisor to terminate a franchise before the expiration of its term except for good cause. Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure.

4. A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchise's inventory, supplies, equipment, fixtures, and furnishings. Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures, and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation. This subsection applies only if: (i) the term of the franchise is less than 5 years and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logotype, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least 6 months advance notice of franchisor's intent not to renew the franchise.

5. A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances. This section does not require a renewal provision.

6. A provision requiring that arbitration or litigation be conducted outside this state. This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

7. A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise. Good cause shall include, but is not limited to:

(a) The failure of the proposed transferee to meet the franchisor's then-current reasonable qualifications or standards.

(b) The fact that the proposed transferee is a competitor of the franchisor or subfranchisor.

(c) The unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations.

(d) The failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

8. A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor. This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of a franchise on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in the manner provided in Section 3.

9. A provision which permits the franchisor to directly or indirectly convey, assign, or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

If the franchisor's most recent financial statements are unaudited and show a net worth of less than $100,000.00, the franchisee may request the franchisor to arrange for the escrow of initial investment and other funds paid by the franchisee until the obligations, if any, of the franchisor to provide real estate, improvements, equipment, inventory, training or other items included in the franchise offering are fulfilled. At the option of the franchisor, a surety bond may be provided in place of escrow.

THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.

Any questions regarding this notice should be directed to:

Michigan Department of Attorney General

G. Mennen Williams Building,

7th Floor 525 W. Ottawa St.

P.O. Box 30212

Lansing, MI 48909

(517) 373-7117

# ILLINOIS ADDENDUM TO THE DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT

Illinois law governs the Franchise Agreement.

In conformance with Section 4 of the Illinois Franchise Disclosure Act, any provision in a franchise agreement that designates jurisdiction and venue in a forum outside of the State of Illinois is void.  However, arbitration may take place outside of Illinois.

Franchisees' rights upon Termination and Non-Renewal are set forth in sections 19 and 20 of the Illinois Franchise Disclosure Act.

In conformance with section 41 of the Illinois Franchise Disclosure Act, any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with Illinois Franchise Disclosure Act **or any other law of Illinois** is void.

# EXHIBIT I
# SMALL BUSINESS ADMINISTRATION ADDENDUM



**ADDENDUM TO** Franchise    ⊘ ¹ **AGREEMENT**

**THIS ADDENDUM** ("Addendum") is made and entered into on _____, 20____, by and between Koala Franchise, LLC _____ (" Franchisor ⊘ "), located at 445 West Drive, Melbourne, FL 32904 _____, and _____ (" Franchisee ⊘ "), located at _____.

Franchisor and Franchisor entered into a Franchise Agreement on _____, 20___, (such Agreement, together with any amendments, the " Franchise Agreement"). Franchisee is applying for financing(s) from a lender in which funding is provided with the assistance of the U. S. Small Business Administration ("SBA"). SBA requires the execution of this Addendum as a condition for obtaining SBA-assisted financing.

In consideration of the mutual promises below and for good and valuable consideration, the receipt and sufficiency of which the parties acknowledge that notwithstanding any other terms in the Franchise Agreement or any other document Licensor requires Licensee to sign:

**CHANGE OF OWNERSHIP**

- If Licensee is proposing to transfer a partial interest in Franchisee and Franchisor has an option to purchase or a right of first refusal with respect to that partial interest, Franchisor may exercise such option or right only if the proposed transferee is not a current owner or family member of a current owner of Licensee . If the Franchisor 's consent is required for any transfer (full or partial), Franchisor will not unreasonably withhold such consent. In the event of an approved transfer of the Franchise interest or any portion thereof, the transferor will not be liable for the actions of the transferee Franchisee .

**FORCED SALE OF ASSETS**

- If Franchisor has the option to purchase the business personal assets upon default or termination of the Franchise Agreement and the parties are unable to agree on the value of the assets, the value will be determined by an appraiser chosen by both parties. If the Franchisee owns the real estate where the Franchise location is operating, Franchisee will not be required to sell the real estate upon default or termination, but Franchisee may be required to lease the real estate for the remainder of the Franchise term (excluding additional renewals) for fair market value.

---

¹ While relationships established under license, jobber, dealer and similar agreements are not generally described as ''franchise'' relationships, if such relationships meet the Federal Trade Commission's (FTC's) definition of a franchise (see 16 CFR § 436), they are treated by SBA as franchise relationships for franchise affiliation determinations per 13 CFR § 121.301(f)(5).

DocuSign Envelope ID: 815543D5-680F-46C6-8C50-06A8E3875CB9

**COVENANTS**

- If the ____Franchisee____ owns the real estate where the ____Franchisee____ location is operating, ____Franchisor____ has not and will not during the term of the ____Franchise____ Agreement record against the real estate any restrictions on the use of the property, including any restrictive covenants, branding covenants or environmental use restrictions. If any such restrictions are currently recorded against the ____Franchisee____'s real estate, they must be removed in order for the ____Franchisee____ to obtain SBA-assisted financing.

**EMPLOYMENT**

- ____Franchisor____ will not directly control (hire, fire or schedule) ____Franchisee____'s employees. For temporary personnel franchises, the temporary employees will be employed by the ____Franchisee____ not the ____Franchisor____.

As to the referenced ____Franchise____ Agreement, this Addendum automatically terminates when SBA no longer has any interest in any SBA-assisted financing provided to the ____Franchisee____.

Except as amended by this Addendum, the ____Franchise____ Agreement remains in full force and effect according to its terms.

____Franchisor____ and ____Franchisee____ acknowledge that submission of false information to SBA, or the withholding of material information from SBA, can result in criminal prosecution under 18 U.S.C. 1001 and other provisions, including liability for treble damages under the False Claims Act, 31 U.S.C. §§ 3729 - 3733.

**Authorized Representative of FRANCHISOR_____:**

By: _____

Print Name: _____

Title:_____

**Authorized Representative of Franchisee_____:**

By: _____

Print Name: _____

Title:_____

**Note to Parties**: This Addendum only addresses "affiliation" between the ____Franchisor____ and ____Franchisee____. Additionally, the applicant ____Franchisee____ and the ____Franchise____ system must meet all SBA eligibility requirements.

## EXHIBIT B
## FRANCHISE AGREEMENT AND EXHIBITS

*MULTISTATE FORM*



KOALA INSULATION FRANCHISOR, LLC

FRANCHISE AGREEMENT

<u>Lotus & The Rooster Holdings Company</u>
Franchisee Name

10/11/2023 | 7:26 AM PDT
—————————————————————
Date of Agreement

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | GRANT | 5 |
| 2. | TERM AND RENEWAL | 7 |
| 3. | FRANCHISOR'S DUTIES | 8 |
| 4. | ROYALTY FEES; SALES REPORTING | 10 |
| 5. | FRANCHISEE'S DUTIES | 12 |
| 6. | PROPRIETARY MARKS | 24 |
| 7. | CONFIDENTIAL OPERATING MANUALS | 27 |
| 8. | CONFIDENTIAL INFORMATION | 27 |
| 9. | ACCOUNTING AND RECORDS | 28 |
| 10. | ADVERTISING | 30 |
| 11. | INSURANCE | 35 |
| 12. | TRANSFER OF INTEREST | 37 |
| 13. | DEFAULT AND TERMINATION | 43 |
| 14. | OBLIGATIONS UPON TERMINATION OR EXPIRATION | 46 |
| 15. | COVENANTS | 48 |
| 16. | TAXES, PERMITS, AND INDEBTEDNESS | 50 |
| 17. | INDEPENDENT CONTRACTOR AND INDEMNIFICATION | 51 |
| 18. | FORCE MAJEURE | 52 |
| 19. | APPROVALS AND WAIVERS | 52 |
| 20. | NOTICES | 52 |
| 21. | ENTIRE AGREEMENT AND AMENDMENT | 53 |
| 22. | SEVERABILITY AND CONSTRUCTION | 53 |
| 23. | APPLICABLE LAW AND DISPUTE RESOLUTION | 55 |
| 24. | ACKNOWLEDGMENTS | 57 |

<u>PAGE</u>

1. Effective Date: <u>10/11/2023 | 7:26 AM PDT</u>

2. Franchisee's Name: Lotus & The Rooster Holdings Company

3. Franchisee's State of Organization (if applicable): Pennsylvania

4. Ownership of Franchisee:

    If the Franchisee is an entity, the following persons constitute all of the owners of a legal and/or beneficial interest in the franchisee:

| <u>Name</u> | <u>Percentage Ownership</u> |
|---|---|
| Salim Michel Makhlouf | 100% |

5. Territory (Section 1.1):  Lancaster, PA

Initial Geographic Area: 17505, 17512, 17554, 17601, 17602, 17603

Population: 201,529

6. Initial Franchise Fee (Section 4.1): $30,000.00

7. Operating Principal (Section 5.6): Salim Michel Makhlouf

8. Franchisee's Address for Notices (Section 20): 251 S. Pitt St, Carlisle, PA 17013

    Franchisee Email Address for Notices: salim.makhlouf@gmail.com

9. Additional Terms (if any): N/A



Initials: _____ (KOALA INSULATION FRANCHISOR, LLC) _____ (Franchisee)

<u>Exhibits:</u>
A    Trademarks
B    Lease Rider
C    Guarantee, Indemnification and Acknowledgment
D    Non-Disclosure and Non-Competition Agreement
E    Equipment Sale Agreement
F    General Release

## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into as of the date (the "Effective Date") set forth on the Summary Page, which appears after the cover page of this Agreement (the "Summary Page") (the Summary Page and all appendices and schedules attached to this Agreement are hereby incorporated by this reference), by and between KOALA INSULATION FRANCHISOR, LLC, a Delaware limited liability company with its principal place of business at 2426 Old Brick Road, Glen Allen, VA 23060 ("Franchisor" or "we" or "us"), and the entity identified on the Summary Page as the franchisee ("Franchisee" or "you") with its principal place of business as set forth on the Summary Page.

## BACKGROUND:

A.      Franchisor owns a format and system (the "System") relating to the establishment, development and operation of franchises (each a "Franchise") that offer and provide insulation evaluation, removal, installation and related services that operate under the Marks (as defined below) using specially equipped Koala service vehicles and equipment (collectively "Koala Rigs").

B.      The distinguishing characteristics of the System include, without limitation, distinctive business formats; procedures; the Manual (as defined in Section 3.5); the Koala Rigs; procedures for operations, accounting, collections, management and inventory control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time;

C.      Franchisor identifies the System by mark Koala Insulation and associated logos, commercial symbols and such other trade names, mascots, service marks and trademarks as are now, or in the future, designated by Franchisor as an integral part of the System ("Marks") including but not limited to the currently registered Marks identified on Exhibit A some of which may be incorporated into other brands or other systems developed by Franchisor or its affiliates in the future;

D.      Franchisor continues to develop, use, and control the use of such Marks to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance, and service; and

E.      Franchisee desires to operate a Franchise under the System and using the Marks, and wishes to obtain a license from Franchisor for that purpose, as well as to receive the training and other assistance provided by Franchisor in connection therewith;

NOW, THEREFORE, the parties agree as follows:

1.    GRANT

**1.1.**    Grant of Rights; Protected Territory.  Upon the terms and conditions set forth in this Agreement, Franchisor hereby grants to Franchisee a non-exclusive license (the **"License"**) to operate a Franchise that specializes in providing insulation evaluation, removal, installation and related services (the **"Services"**) within the initial geographic area described on the Summary Page (the **"Territory"**).  Franchisee hereby accepts such License and undertakes the obligation to operate a Franchise in accordance with this Agreement during the entire initial term of the License (as specified in **Section 2.1**).  Franchisee acknowledges and agrees that this Territory is non-exclusive but subject to certain limited protections as defined below.

**1.2.**    Protected Territory.  The Territory, as listed on the Summary Page, shall be designated as "Protected" from the Effective Date of this agreement and shall remain Protected for the duration of the entire initial term plus any extensions thereof provided that the Territory may lose its Protected status through any default of this Agreement or any other agreement with Franchisor or its Affiliates, or by Franchisee's failure to maintain sufficient equipment and staff as required in Franchisor's discretion to provide, without substantial delay, all Services offered under the System to customers within the Territory.  Any of these events, without limitation, constitute cause for revocation of Protected status of the Territory. Protected status may be revoked only with cause and upon notice.  Once the Territory loses its Protected status it may not be regained.

**1.2.1.**    While the Territory is Protected Franchisor shall not provide the Services or grant other franchisees or others the right to provide the Services using the Koala Insulation System and Koala Insulation Marks to customers at any location within the Territory other than through the Revenue Sharing Program as hereafter defined.

**1.2.2.**    Franchisor and other franchisees may advertise (subject to Franchisor approval) online or through any other medium without geographical limitations, including within the Protected Territory, but only Franchisee shall be permitted to provide the Services under the Koala Insulation System within the Protected Territory.

**1.3.**    Reservation of Rights.  Franchisor and its affiliates have the right to conduct any business activities, under any name, in any geographic area, and at any location, without any liability to Franchisee regardless of the proximity to or effect on the Franchise. By way of illustration, and without limiting the foregoing, Franchisor and its affiliates have the right:

**1.3.1.**    to operate and permit franchisees or others to establish and operate Franchises at any location within or outside the Territory (subject to the

Protections defined in section 1.2.1 above) notwithstanding their actual or threatened impact on sales of the Franchise;

**1.3.2.**   to operate or permit franchisees or others to establish and operate businesses at any location under other systems or other Marks, including businesses that may offer or sell products or services that are the same or similar to the products or services offered from the Franchise, within or outside the Territory and notwithstanding their proximity to the Territory, Protected status of Territory, or their threatened or actual impact on sales of the Franchise;

**1.3.3.**   to sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, within or outside of the Territory, products and services bearing the Marks or similar marks through other channels of distribution including, without limitation, the internet, catalogs, or commercial channels other than the on-site installation or removal of insulation; and

**1.3.4.**   to acquire, be acquired by, or merge with other businesses and to convert them to the Marks or any other name at any location and such acquiring or acquired businesses shall not be bound by any Protections applicable to the Territory.

**1.3.5.**   If the Territory is not Protected, the geographic area of the Territory may be revised by Franchisor from time to time, after the expiration of the initial term, to include only the Population listed as the actual population in the initial geographic area increases.  If Franchisor reduces the Territory's geographic area due to a population increase after the expiration of the initial term, Franchisor shall first offer the right to purchase such additional population to Franchisee at the then-current rates, provided that Franchisee is and has been at all times in compliance with the terms hereunder.

Franchisee acknowledges that the activities described in Section 1.3. through 1.3.5 are only examples, and do not limit the business activities that Franchisor and its affiliates may undertake.  Franchisee also acknowledges that, other than those rights expressly conveyed through this agreement and narrowly limited to same, Franchisor has made no other representations  concerning Franchisee's rights in any geographic territory.

**1.4.**   <u>Advertising and Promotional Materials</u>.   Franchisor and Franchisee acknowledge that advertising and promotional materials created, placed, and/or distributed by Franchisor, other franchisees operating under the System, or other entities authorized by Franchisor, may appear in media distributed in, or may be directed to prospective customers located within, trade areas or market areas nearby or encompassing the Territory, including on Franchisor's website or any related website.  Neither Franchisee, nor any other franchisee, is restricted from advertising or promoting products or services to any customers regardless of where they reside; provided, however, Franchisee may not perform Services outside of the Territory, except as expressly provided herein.

**1.5.**  Sale of Products and Services.  Unless otherwise permitted by Franchisor, Franchisee shall offer and sell only then-current products and services previously authorized by Franchisor, using Koala Rigs, and only within the Territory, only in accordance with the requirements of this Agreement and the then-current procedures set forth in the Manuals as they may be developed and/or modified from time to time.  Franchisee may not perform Services using equipment other than a Koala Rig that meets Franchisor's then-current specifications and standards.  Franchisee understands and acknowledges that certain other Koala franchisees were granted protected territories, and shall not perform Services in the protected territory of another Koala franchisee.

**1.5.1.**  Franchisee may perform Services for customers that are located outside of the Territory provided (a) Franchisee has submitted to Franchisor a written request to provide Services for such customer giving the name of the customer and its location; and (b) Franchisor has approved such request in writing.  Franchisor may at any time revoke its approval effective upon giving written notice of the same to Franchisee.  Franchisor may require Franchisee to purchase any territory, at then-current rates, in which Franchisee requests permission to provide Services if (a) Franchisee requests permission to service customers in the area more than twice per 90-day period, or (b) if Franchisee has operated for at least 12 months and Gross Sales for Services performed outside the Territory constitute more than 10% of the prior 12 months' Gross Sales.  Any permission granted to operate outside of the Territory shall not constitute an ongoing grant of rights to the area and Franchisor retains all rights thereto.

**1.5.2.**  Revenue Sharing Program.  Franchisee may at its option enter into a revenue sharing program ("Revenue Sharing Program") with any other franchisee which may permit the out of territory franchisee to operate within Franchisee's Territory for the purposes of servicing existing clients who have previously received services within the out of territory franchisee's own territory. Franchisee may also enter into a revenue sharing agreement with any other franchisee as Franchisee deems appropriate to complete extraordinarily large jobs or for other purposes subject to Franchisor approval which must be received in writing in advance of any Revenue Sharing Program between franchisees. Franchisor shall not be a party to any Revenue Sharing Program which shall be conducted solely between franchisees.

2.    TERM AND RENEWAL

**2.1.**  Term.  Except as otherwise provided herein and unless sooner terminated in accordance with the provisions hereof, the initial term of the License commences on the Effective Date and continues until that date which is 10 years after the Effective Date.

**2.2.**  Renewal.  Franchisee may, at its option, request to renew Franchisee's right to operate the Franchise for two additional terms of five years each.  Franchisee's option of renewal is subject to the following conditions, each of which must be met prior to the renewal:

**2.2.1.**  Franchisee shall give Franchisor written notice of Franchisee's election to renew no fewer than six months, nor more than 12 months, prior to the end of the initial term;

**2.2.2.**  Franchisee shall update, refurbish, or replace the Franchise Location (if applicable) and its Koala Rig(s) to comply, as determined solely by Franchisor, with Franchisor's then-current standards;

**2.2.3.**  From the time of Franchisee's election to renew through the expiration of the original term, Franchisee and its affiliates shall not have been in default of any provision of this Agreement, any amendment to this Agreement, any successor to this Agreement, or any other agreement between Franchisee (and its affiliates) and Franchisor (and its affiliates); and, as determined in the sole discretion of Franchisor, Franchisee and its affiliates shall have complied with all the terms and conditions of this Agreement, such other agreements, as well as the Operating Standards (as defined in **Section 5.9**) prescribed by Franchisor during the term of this Agreement;

**2.2.4.**  Franchisee shall have satisfied all monetary, reporting and other obligations owed by Franchisee to Franchisor and its affiliates, and shall have timely met those obligations throughout the term of this Agreement;

**2.2.5.**  Franchisee shall execute Franchisor's then current form of franchise agreement; which agreement shall supersede this Agreement in all respects (except the renewal franchise agreement shall not require payment of an initial franchise fee or include the ability to renew for any years beyond the aggregate of those contained in the original term and extensions herein). Franchisee acknowledges that the terms, conditions, and provisions of the renewal franchise agreement, and the obligations of the parties thereto, may differ substantially from the terms, conditions, provisions and obligations in this Agreement, including, without limitation, a higher percentage royalty fee and advertising contribution;

**2.2.6.**  Franchisee shall pay, in lieu of an initial franchise fee, a renewal fee equal to 25% of the Initial Franchise Fee or $5,000, whichever is greater;

**2.2.7.**  Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, agents, and employees; and

**2.2.8.**  Franchisee and its personnel shall comply with Franchisor's then current qualification and training requirements, prior to commencement of operations under the renewal form of franchise agreement.

3.  <u>FRANCHISOR'S DUTIES</u>

**3.1.**  <u>Initial and On-Going Training</u>. Franchisor shall provide for Franchisee's Operating Principal (as defined in **Section 5.6**) Salesperson, and Manager (as

defined in **Section 5.6**), such initial training programs as Franchisor may designate, to be conducted at such time(s) and location(s) designated by Franchisor. Franchisor may charge a reasonable fee for additional individuals who attend training. Franchisor shall also provide such ongoing training as it may, from time to time, deem appropriate. Franchisor shall be responsible for the cost of instruction and materials, subject to **Section 5.6** for the training of the initial Operating Principal, Manager, and Salesperson. Franchisee shall be responsible for the cost of training any subsequently hired or replacement staff including without limitation Operating Principal, Manager and Salesperson.

**3.2.**    Opening Assistance and Training.    In addition to the initial training described in Section 3.1, should Franchisee request additional assistance from Franchisor to facilitate the opening of the Franchise and should Franchisor, in its discretion, deem it necessary, feasible and appropriate to comply with the request, Franchisee shall reimburse Franchisor for the expenses of Franchisor providing such additional assistance, which may include Franchisor's then-current service fee, as set forth in the Manuals or otherwise communicated to Franchisee in writing from time to time. Franchisor will provide such additional on-site assistance as Franchisor deems advisable.

**3.3.**    Manuals.    Franchisor shall provide Franchisee access to the confidential operations manuals (which may include technical bulletins, and other written, video or audio materials (collectively the "**Manuals**"), as more fully described in **Section 7**.

**3.4.**    Advertising and Promotion.    Franchisor shall review, and shall have the right to approve or disapprove, all advertising and promotional materials that Franchisee proposes to use pursuant to **Section 10.6**. In addition, during the term of this Agreement, Franchisor shall provide Franchisee with such other advertising assistance, sales advice, or related materials as Franchisor deems advisable.

**3.4.1.**    Electronic Advertising and Support Services.    Franchisor shall establish and maintain, during the Term of this agreement, a website and/or other such listings as Franchisor deems appropriate for the Koala brand which shall contain content deemed appropriate in its sole and unlimited discretion. Franchisor may also maintain certain location specific or franchise specific sites ("Micro-Sites") in its sole discretion. Franchisor may establish and assign a phone number to the Franchise and if it does so, Franchisee must use this number as its only published and/or advertised phone number for the Franchise. Franchisor shall retain full rights to control, suspend, redirect and transfer any web domains and phone numbers and other listings. Franchisor shall have the right to suspend or revoke any or all of these services immediately and without further notice upon Franchisee's Default of any term of this Agreement, specifically but not limited to financial or reporting obligations.

**3.5.**    Brand Fund.    Franchisor may establish and administer a System-wide advertising, marketing, promotional, and creative fund, which is referred to as the

"**Brand Fund**", or such other name as Franchisor may designate, in the manner set forth in **Section 10.3.**

**3.6.**  Technology System.  Franchisor shall specify or require that certain brands, types, makes, and/or models of communications, computer systems, software and hardware be used by, between, or among the Franchises, including without limitation:  (a) back office and point of sale systems, data, audio, video, and phone, voice storage, retrieval, and transmission systems for use at the Franchise, between or among Koala franchisees, the corporate units and Franchisor; (b) physical, electronic, and other security systems including without limitation vehicle and/or Koala Rig tracking devices; (c) printers and other peripheral devices; (d) archival back-up systems; (e) communication systems (including without limitation email and phone systems); and (f) Internet access mode and speed (collectively, the "**Technology System**").  Franchisor may also designate: (i) software programs that Franchisee must use in connection with the Technology System ("**Required Software**"), which Franchisee shall install; (ii) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee shall install; (iii) the tangible media upon which such Franchisee shall record data; (iv) the database file structure of the Technology System; and (v) additional Technology Systems that must be used.

**3.7.**  On-Going Assistance.  Franchisor shall provide periodic assistance to Franchisee in the marketing, management, and operation of the Franchise as Franchisor determines at the time(s) and in the manner determined by Franchisor.

**3.8.**  Additional Services.  Franchisor, at its option may provide Additional Services including a call center, recruiting assistance and other services at the then-current fees.  Franchisor shall have no ongoing obligation to offer these services and may discontinue them for any or all franchisees at any time.

4.    ROYALTY FEES; SALES REPORTING

**4.1.**  Initial Franchise Fee.  Franchisee shall pay Franchisor an initial franchise fee that is specified on the Summary Page (the "**Initial Franchise Fee**"), which must be paid in full prior to or upon execution of this Agreement.  The Initial Franchise Fee is not refundable under any circumstances and shall be deemed earned in full upon receipt, except if Franchisee's Operating Principal or Manager fails to successfully complete initial training in accordance with the requirements of **Section 5.6**.  If Franchisor terminates this Agreement due to any failure to successfully complete initial training pursuant to **Section 5.6**, Franchisor will refund the Initial Franchise Fee, less an amount equal to $5,000, subject to Franchisee' and its owners' execution of a General Release.

**4.2.**  Royalty Fees.  Franchisee shall pay Franchisor continuing royalty fees ("**Royalty Fees**") at such time, for such periods, and in such manner as specified herein, or as otherwise specified in writing by Franchisor.  The term "**Gross Sales**" means amounts, less refunds, sales tax and chargebacks, derived from all products or services sold from or through the Franchise, including any sale of

products or services made for cash or credit, or partly for cash and partly for credit. **"Gross Sales"** also includes the fair market value of any services or products received by the Franchisee in barter or in exchange for Franchisee's services and products.

Royalty Fees shall be paid weekly in an amount equal to 6.5% of Gross Sales during the first 6 calendar months of operations (which for clarity shall begin and include any portion of any month during which Franchisee first receives any Gross Sales). Beginning on the 7th month of operations, Royalty Fees shall be paid weekly in an amount that is the greater of the required Minimum Royalty, or 6.5% of Gross Sales for the first $1,000,000 in Gross Sales (see Table 1 below); then the Royalty Fee shall be reduced to 5% of Gross Sales for amounts between $1,000,000.01 and $1,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 4.5% of Gross Sales amounts between $2,000,000 and $2,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 3.5% of Gross Sales for all amounts over $3,000,000 annually for the remainder of the calendar year.

Table 1: Minimum Royalty Per Territory, Per week.

| Months After Opening | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5+ Territories |
|---|---|---|---|---|---|
| 7-12 | $250 | $225 | $200 | $175 | $150 |
| 13-24 | $350 | $325 | $300 | $275 | $250 |
| 25-36 | $500 | $475 | $425 | $400 | $375 |
| 37+ | $625 | $600 | $575 | $550 | $525 |

Franchisee expressly acknowledges and agrees that Franchisee's obligations for the full and timely payment of Royalty Fees, Brand Fund Contributions (as defined in Section 10.2), if any, and all other amounts provided for in this Agreement, shall be absolute and unconditional. Franchisee shall not for any reason delay or withhold the payment of all or any part of those or any other payments due hereunder, put the same in escrow or setoff the same against any claims or alleged claims Franchisee may allege against Franchisor, the Brand Fund or others. Franchisee shall not, on grounds of any alleged nonperformance by Franchisor or others, withhold payment of any fee, including without limitation Royalty Fees, Brand Fund Contributions, nor withhold or delay submission of any reports due hereunder. Royalty Fees shall be deemed earned in full upon receipt. Franchisee and Franchisor expressly acknowledge that all services provided by Franchisor to Franchisee shall not exceed in cost the amount of the Royalty Fees received from Franchisee.

    **4.2.1.** <u>Sales Reports.</u> Franchisee shall deliver to Franchisor any and all reports, statements and/or other information regarding its Gross Sales and other metrics or data specified by Franchisor at the time(s) and in the format(s) reasonably requested by Franchisor from time to time ("Sales Reports").

Upon notice by Franchisor Franchisee must use, and pay the fees required to use, the Koala proprietary software or other software as specified by Franchisor, when made available, or other systems or methods as specified by Franchisor for the purposes of providing Sales Reports in compliance with this Section. All payments required by this Agreement to Franchisor, its affiliates, and/or the Brand Fund must be made by the method or methods that Franchisor specifies from time to time, which may include, without limitation, payment by deduction as specified in Section 3.8.2, payment via wire transfer or electronic debit to Franchisee's bank account. Franchisee must furnish Franchisor and Franchisee's bank with all authorizations necessary to effect payment by the methods Franchisor specifies.

**4.3.** <u>Overdue Payments or Reports</u>. Any payment, Sales Report or other required report not actually received by Franchisor on or before the date such payment or report is due (currently, no later than noon Eastern Time on Monday of each week) shall be deemed overdue. If an attempt to electronically debit Franchisee's bank account fails or any other payment method is declined or returned, the payment shall be deemed not received. Franchisor may at its option from time to time specify or change the date such reports are due upon 7 days' Notice to Franchisee. If any payment or required report is overdue, Franchisor shall collect from Franchisee the greater of the Minimum Royalty amount, or 1.5 times the Royalty Fees and other fees or amounts due based on the prior report received ("Presumptive Fees"). The Presumptive Fees shall be credited towards the actual Royalty Fees due once the Sales Report is received. Additionally, Franchisee shall pay Franchisor, a late payment/late report charge of $50 for each day (or portion thereof) that the payment or report is late (collectively "Late Fee"). Entitlement to such Late Fee shall be in addition to any other remedies Franchisor may have including without limitation the suspension of services as defined in §3.4.1 and elsewhere in this Agreement.

**4.4.** <u>Payments on Behalf of Franchisee</u>. Franchisee shall pay to Franchisor, within 15 days after any written request by Franchisor which is accompanied by reasonable substantiating material, any monies (plus a fee equal to 10% of the amount paid by Franchisor on Franchisee's behalf) which Franchisor has paid, or has become obligated to pay, on behalf of Franchisee, by consent or otherwise under this Agreement.

5.    <u>FRANCHISEE'S DUTIES</u>

**5.1.1.** Franchisee may operate from their home office, provided doing so would be in compliance with applicable laws and regulations. If Franchisee choses to rent or lease a site, storage location or other physical site other than Franchisee's home, at which it will base or park Koala Rigs or from which it will operate the Franchise, Franchisee must provide notice to Franchisor at least 30 days in advance. Before Franchisee makes a binding commitment to lease, sublease or purchase a site, Franchisor must approve the location in writing and approve in writing the proposed lease for the location (the "**Lease**") or purchase agreement or any letter of intent between Franchisee and the third-party seller or lessor. FRANCHISEE ACKNOWLEDGES AND AGREES THAT FRANCHISOR'S

APPROVAL OF A PROPOSED SITE IS NOT A WARRANTY OR REPRESENTATION OF ANY KIND AS TO THE POTENTIAL SUCCESS OR PROFITABILITY OF THE FRANCHISE. If Franchisee leases the approved Franchise Location, unless Franchisor waives the requirement in writing, Franchisee must arrange for the execution of the Lease Rider in the form of **Exhibit B** by Franchisee and its landlord in connection with any Lease for the approved Franchise Location and any other provisions that Franchisor may reasonably require. Franchisee must deliver to Franchisor the completely executed purchase agreement or Lease and Lease Rider within 10 days after execution of the Lease or purchase agreement. Franchisee must comply with the terms and conditions of the Lease for the approved Franchise Location. Franchisor is not obligated to execute Franchisee's Lease or guarantee a Lease for Franchisee.

**5.1.2.** Before commencing construction of the Franchise Location, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

**5.1.2.1.** Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations, including, without limitation, the applicable provisions of the American with Disabilities Act (as amended, the "ADA") regarding the construction and design of the Franchise Location.

**5.1.2.2.** If so requested by Franchisor, Franchisee shall submit to Franchisor, for Franchisor's approval, final plans for construction based upon the preliminary plans and specifications. Franchisor shall not review, nor shall any approval be deemed to include, approval or acceptance of Franchisee's compliance with federal, state, or local laws and regulations, including the ADA. Once approved by Franchisor, such final plans shall not thereafter be changed or modified without the prior written permission of Franchisor.

**5.1.2.3.** Franchisee shall obtain all permits and certifications required for the lawful construction of the Franchise Location. Franchisee shall be responsible for obtaining all zoning classifications and clearances which may be required by state or local laws, ordinances, or regulations or which may be necessary or advisable owing to any restrictive covenants relating to the Franchise Location.

**5.1.2.4.** Franchisee shall employ a qualified licensed general contractor who is acceptable to Franchisor to construct the Franchise Location and to complete all improvements. Franchisee shall obtain and maintain in force during the entire period of construction the insurance required under Article 11. Franchisee shall deliver to Franchisor such proof of such insurance as Franchisor shall require.

**5.1.2.5.** During the construction of the Franchise Location, Franchisee will permit Franchisor to make such on-site inspections of the Franchise Location as Franchisor determines appropriate to evaluate the construction or remodeling of the Franchise Location for compliance with

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D9F560771821

Franchisor's requirements. Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.

**5.1.2.6.** Within 30 days after the opening of the Franchise Location, Franchisee shall provide to Franchisor a full breakdown of all costs associated with the development and construction of the Franchise Location if so requested by Franchisor.

**5.1.3.** Franchisee shall use the Franchise Location solely for the operation of the Franchise; shall keep the Franchise open and in normal operation for such hours and days as Franchisor may from time to time specify in the Manuals or as Franchisor may otherwise approve in writing; and shall refrain from using or permitting the use of the Franchise Location for any other purpose or activity at any time. As used in this Section, the term Franchise Location shall include the grounds surrounding the Franchise.

**5.1.4.** Franchisee shall at all times maintain the Franchise Location in a high degree of sanitation, repair, and condition, and in connection therewith shall make such additions, alterations, repairs, and replacements thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting or replacement of obsolete signs, furnishings, equipment, and decor as Franchisor may reasonably direct. If at any time in Franchisor's judgment the general state of repair or the appearance of the Franchise Location or its equipment, fixtures, signs or decor does not meet Franchisor's quality control and standards therefor, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate, within 30 days after receipt of such notice, and thereafter diligently continue a bona fide program to complete any required maintenance, Franchisor shall have the right, in addition to all other remedies, to enter upon the Franchise Location and effect such repairs, painting, maintenance or replacements of equipment, fixtures or signs on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

**5.1.5.** In addition to the maintenance obligations set forth in above, Franchisee shall, at its expense, undertake such periodic and ongoing remodeling and upgrading of the Franchise Location, and the furniture, fixtures, equipment, décor, signage and trade dress of the Franchise Location, as required by Franchisor to cause the Franchise Location building design, exterior facade, trade dress, signage, fixtures, furnishings, equipment, decor, color schemes, and presentation of the Marks to be consistent with the then-current standards. Such remodeling and refurbishment may include structural changes, installation of new equipment and signs, remodeling, redecoration, and modifications to existing improvements, and, shall be completed to Franchisor's satisfaction pursuant to such standards, specifications, and deadlines as Franchisor may specify.

**5.1.6.** Franchisee may not relocate its Franchise Location unless it receives Franchisee's prior written approval. Franchisee's relocation will be at its

expense and Franchisor has the right to charge Franchisee for all reasonable costs and expenses it incurs to approve and implement the relocation.

**5.2.    Koala Rigs.**

**5.2.1.**    Franchisee shall obtain that number of Koala Rigs prescribed by Franchisor from time to time, and ensure that its Koala Rigs are in proper working order.

**5.2.2.**    Each Koala Rig shall consist of an enclosed trailer and certain proprietary equipment, and other items (the **"Koala Rig" or "Rig"**) installed in accordance with Franchisor's standards and requirements pursuant to the terms of an Equipment Sale Agreement.  Currently Koala Rigs include blow-in rigs and spray-foam rigs but may include other equipment packages or otherwise be modified or substituted as specified from time to time by Franchisor.  Franchisee acknowledges and agrees that Franchisor and its designees are the only approved suppliers of such Rigs, equipment and installation services.  The Koala Rig must generally be moved by towing with an approved truck capable of and rated for the weight and requirements of the Koala Rig.  When attached, the truck ("Truck") and trailer shall collectively constitute the Koala Rig.

**5.2.3.**    Prior to Franchisee purchasing a Truck, Franchisee shall submit to Franchisor, in a form specified by Franchisor, information regarding the specifications and conditions of the Truck as Franchisor may reasonably require or Franchisee may comply with the then current guidelines as defined in the Manual.  Franchisee may not purchase any Truck to be used with a Koala Rig unless and until it has received Franchisor's prior approval or ensures that the Truck complies with brand appearance standards in Franchisor's discretion.  Franchisor may establish relationships with truck dealers and if it does so, Franchisee agrees to purchase solely from these approved dealers.

To the extent that other vehicles or equipment are used in the Franchise, including without limitation Manager or Salesperson vehicles, they must comply with the then current Brand Standards and Manual.

**5.2.4.**    If the Franchise is not operated from a Franchise Location, Franchisee will make arrangements to store the Koala Rig(s) used in the operation of the Franchise in compliance with all applicable state and local laws and other restrictions.

**5.2.5.**    Franchisee shall at all times maintain the Koala Rigs in a high degree of repair and condition, and in connection therewith shall make such repairs, replacements and refurbishment thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting, replacement of wraps or decals, replacement of equipment and parts or installation or refurbishment of signage as Franchisor may reasonably direct and pursuant to such standards, specifications and deadlines as Franchisor may specify.

**5.3.**   System Standards.  Franchisee understands and acknowledges that every detail of the Franchise is important to Franchisee, Franchisor, and other franchisees to develop and maintain high operating standards, to increase the demand for the Services sold by all franchisees, and to protect Franchisor's reputation and goodwill.

**5.4.**   Pre-Opening Obligations.  Before commencing operations, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

    **5.4.1.**   Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations.

    **5.4.2.**   Franchisee shall obtain all licenses, permits, and certifications required for the operation of the Franchise within the Territory and the parking and/or storage of Koala Rigs in the Territory.

    **5.4.3.** Franchisee shall pay a Technology Activation Fee in the amount of $5,000, due within ten days of receipt of an invoice from us.

**5.5.**   Opening.  Franchisee shall open the Franchise within four months after the Effective Date.  Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.  In addition, in connection with the opening of the Franchise:

    **5.5.1.**   Franchisee shall provide at least 14 days' prior notice to Franchisor of the date on which Franchisee proposes to first open the Franchise for business.

    **5.5.2.**   If the Franchise will operate from a Franchise Location, Franchisee shall not open the Franchise until Franchisor has determined that all construction has been substantially completed, and that such construction conforms to Franchisor's standards, and Franchisor has given Franchisee written approval to open, which approval shall not be unreasonably withheld.

    **5.5.3.**   Franchisee shall not open the Franchise until Franchisor has determined that Franchisee has obtained a sufficient number of Koala Rigs to Franchisor's standards in compliance with **Section 5.2** which shall be no less than one Blow-In and one Spray Foam rig.

    **5.5.4.**   Franchisee shall not open the Franchise until the Operating Principal, Salesperson and Manager have successfully completed all initial training required by Franchisor, and Franchisee has hired and trained, to Franchisor's standards, a sufficient number of employees to service the anticipated level of the Franchise's customers.

**5.6.**   Management and Training.  Franchisee must appoint an individual owner as its **"Operating Principal"** who has at least a 20% equity interest in

Franchisee, must have authority over all business decisions related to the Franchise, and must have the power to bind Franchisee in all dealings with Franchisor.  The Operating Principal is specified on the Summary Page. Franchisee must also appoint a manager to manage the day-to-day business of the Franchise (the **"Manager"**).  Franchisee's Operating Principal may serve as its Manager, unless Franchisor believes that he or she does not have sufficient experience.  Franchisee must appoint a salesperson to manage the day-to-day customer service and sales functions in accordance with Franchisor's specifications (the "Salesperson").  Franchisee must provide Franchisor with written notice of its Manager and Salesperson at least 14 days prior to initial training.  Prior to the opening of the Franchise, the Manager, Salesperson and the Operating Principal must attend and successfully complete, to Franchisor's satisfaction, the initial training program offered by Franchisor, pursuant to **Section 3.2**.  If Franchisor determines, in its sole discretion, that the Operating Principal, Salesperson or Manager is unable to satisfactorily complete any phase of the training program, Franchisor shall have the right to: (i) require the Salesperson, Operating Principal or Manager, as the case may be, to attend such additional training as Franchisor may require, at Franchisee's expense; or (ii) terminate this Agreement, in which event neither Franchisor nor Franchisee shall have any further rights or obligations hereunder.  If Franchisor terminates this Agreement pursuant to the prior sentence, Franchisor shall refund a portion of the Initial Franchise Fee as provided in Section 4.1. The daily operations of the Franchise are at all times required to be supervised under the active full-time management of the Manager and Salesperson who have each successfully completed Franchisor's initial training program.

**5.6.1.**    If the Manager or Salesperson ceases active management of the Franchise or in the event the Operating Principal is changed or is no longer a 20% equity owner of the Franchisee, Franchisee must hire a new Manager or Salesperson or appoint a new Operating Principal (as the case may be), who must be approved in writing by Franchisor.  The new Manager, Salesperson or Operating Principal must undergo a certification training program that is prescribed by Franchisor, which may include training at the Franchise, another Franchise or such other place as Franchisor shall designate.  All expenses incurred by the new Manager, Salesperson or Operating Principal in attending such program including, without limitation, travel costs, room and board expenses and salaries and other benefits, shall be the sole responsibility of Franchisee.  In addition, Franchisee shall:  (a) pay Franchisor's then-current certification program fees; and (b) reimburse Franchisor for its out of pocket expenses, including without limitation, reasonable travel and room and board expenses.  If Franchisor determines, in its sole discretion, that the new Manager, Salesperson or Operating Principal is unable to satisfactorily complete the certification program, Franchisor shall have the right to:  (i) require the new Manager, Salesperson or Operating Principal, as applicable, to attend such additional training, at Franchisee's expense, so as to demonstrate his or her ability to operate the Franchise to Franchisor's satisfaction; or (ii) require Franchisee to promptly hire a replacement New Manager, Salesperson or appoint a new Operating Principal among its equity owners (who

must have at least 20% equity ownership) who shall be required to undergo the training and certification programs contemplated by this Section.

**5.6.2.**   Franchisor from time to time may provide and, if it does, may require that the Operating Principal, Manager, Salesperson and/or other employee attend and successfully complete refresher training programs or seminars including without limitation an annual conference ("Annual Conference"), to be conducted at such location as may be designated by Franchisor.  Franchisee shall pay to Franchisor the then current Annual Conference Fee for each person required to attend.  All expenses incurred by Franchisee and its employees in attending such program including, without limitation, travel costs, room and board expenses and salaries and benefits, shall be the sole responsibility of Franchisee.

**5.6.3.**   If Franchisee requests that Franchisor provide on-site training in addition to the opening assistance described in **Section 3.4**, and Franchisor chooses to do so, then Franchisee agrees that it shall pay Franchisor's then-current per diem charges and out-of-pocket expenses, which shall be as set forth in the Manuals or otherwise in writing.

**5.7.**   Personnel.  Franchisee agrees to maintain a competent, conscientious and trained staff in numbers sufficient to promptly provide the Services and to take such steps as are necessary to ensure that its employees preserve good customer relations and comply with such dress code as Franchisor may prescribe. Franchisee will be solely responsible to locate, interview, hire, schedule, supervise, compensate and discipline all employees of the Business and be exclusively responsible for all terms of their employment, compensation and other personnel-related matters without influence from Franchisor. All employees hired by or working for Franchisee shall be the employees of Franchisee and shall not, for any purpose, be deemed employees of Franchisor or subject to Franchisor's supervision or control.

**5.8.**   Equipment Upgrades.  Franchisee shall make, from time to time, such upgrades and other changes to the equipment, Koala Rigs and electronic equipment utilized in the Franchise, the Technology System and Required Software as Franchisor may request in writing (collectively, "**Equipment Upgrades**").  Franchisor shall have the right to require any Equipment Upgrades it deems necessary for the Franchise.

**5.9.**   Standards and Specifications.  To insure that the highest degree of quality and service is maintained, Franchisee shall operate the Franchise in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing (as used in this Agreement, Franchisor's "**standards**", "**requirements**", "**specifications**" or "**Operating Standards**").  At a minimum, the Operating Standards shall include:

**5.9.1.**    offering and selling at all times such services that conform to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming services without Franchisor's specific prior written consent

**5.9.2.**    maintaining in sufficient supply, using, offering and selling at all times only such products, equipment, supplies, materials, and goods that conform to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming products without Franchisor's specific prior written consent.

**5.9.3.**    offering and selling only such products as have been expressly approved for sale in writing by Franchisor; offering all products and services as Franchisor may specify from time to time as required offerings at the Franchise; offering all products authorized for sale as specified by Franchisor; refraining from any deviation from Franchisor's standards, without Franchisor's prior written consent; and discontinuing the sale of any products which Franchisor has disapproved, in writing, at any time. If Franchisee deviates or proposes to deviate from Franchisor's standards, whether or not such deviation is approved by Franchisor, such deviation shall become the property of Franchisor.

**5.9.4.**    operating the Franchise to fully comply with all applicable laws and regulations.

**5.9.5.**    offering and selling the services and products in accordance with any minimum, maximum, and/or specific prices that Franchisor may determine from time to time (except to the extent determination of prices by Franchisor is limited or prohibited by applicable law).

**5.10.**    <u>Non-Compliance</u>. If Franchisee violates an Operating Standard, and fails to bring the Franchise into compliance with such Operating Standard within 10 days after Franchisor has delivered to Franchisee written notice of the violation, Franchisee shall pay to Franchisor upon demand $100 for each day that Franchisee is not in compliance with the relevant Operating Standard. Franchisor's right to charge these amounts is in addition to any other remedy provided under this Agreement, including under **Section 13**. Franchisor's damages from Franchisee's failure to comply with this Section may include loss of good will and other damages, and are difficult to measure and quantify; such amount is, therefore, a reasonable approximation of damages, and not a penalty.

**5.11.**    <u>Suppliers and Sourcing Requirements</u>. Franchisor has the right to require that services and products offered by Franchisee, and services, products and equipment used by Franchisee in the establishment and operation of the Franchise: (a) meet specifications that Franchisor establishes from time to time; and/or (b) be purchased only from manufacturers, vendors, distributors, and other suppliers that Franchisor has expressly approved; and/or (c) be purchased only from a single source (which may include Franchisor or its affiliates or other suppliers which provide a financial benefit to Franchisor and may not be the least

expensive supplier). To the extent that Franchisor establishes specifications, requires approval of suppliers, or designates specific suppliers for particular items, Franchisor will notify Franchisee via the Manuals or otherwise in writing. In determining whether Franchisor will approve any particular supplier, Franchisor shall consider various factors, including a supplier who can demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then current standards and specifications for such items; who possesses adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; who would enable the System, in Franchisor's sole opinion, to take advantage of marketplace efficiencies; and who has been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved. For the purpose of this Agreement, the term **"supplier"** shall include, but not be limited to, manufacturers, distributors, resellers, and other vendors. Franchisee recognizes that Franchisor shall have the right to appoint only one supplier for any particular item, and that Franchisor may so designate itself or its affiliate.

 **5.11.1.** If Franchisee wishes to purchase any services, products, equipment or any items that Franchisor has not approved or to purchase from an unapproved supplier, Franchisee shall first submit to Franchisor a written request for such approval. Franchisee shall not purchase any products or services or make purchases from any supplier until, and unless, such item or supplier has been approved in writing by Franchisor. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, either to Franchisor or to an independent laboratory designated by Franchisor for testing or evaluation. Franchisor may require that Franchisee or supplier pay a reasonable fee charge for such testing or evaluation. Franchisor may also require that the supplier comply with such other requirements as Franchisor may deem appropriate, including payment of reasonable continuing inspection/evaluation fees and administrative costs. Franchisor reserves the right, at its option, to reinspect from time to time the facilities and products or equipment of any such approved supplier and to revoke its approval of any item or supplier upon the item's or supplier's failure to continue to meet any of Franchisor's then current criteria.

 **5.11.2.** Franchisee acknowledges and agrees that Franchisor shall have the right to collect and retain all manufacturing allowances, markups, marketing allowances, rebates, credits, monies, payments or benefits (collectively, **"Allowances"**) offered by suppliers to Franchisee or to Franchisor or its affiliates based upon purchases of products, equipment and other goods and services made by the Brand Fund or Franchisees. These Allowances are based on System-wide purchases of products, services, merchandise and other items and shall be unrestricted income to Franchisor. Franchisee assigns to Franchisor or its designee all of Franchisee's right, title and interest in and to any and all such Allowances and authorizes Franchisor or its designee to collect and retain any or all such Allowances without restriction (unless otherwise instructed by the supplier). Franchisor may mark up or receive Allowances from any providers or

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D95560771B21

vendors doing business with Franchisees, Franchisor or the Brand Fund including without limitation, equipment, supplies, advertising and marketing vendors. Franchisor may in its sole discretion retain as income with no further obligations, or utilize some or all of the Allowances for System-wide marketing, other brand enhancement activities or specific required or local area marketing, or such Allowance monies may be deposited into the Brand Fund for future use and expenditures by the Brand Fund.

**5.11.3.** Compliance with laws regarding the chemicals, products, equipment and other supplies that Franchisee uses in its Franchise is Franchisee's sole responsibility. Franchisor makes no warranty or representation that chemicals, products and other supplies that it recommends, approves or requires comply with applicable laws in Franchisee's jurisdiction. Franchisee must notify Franchisor in writing immediately if any recommended, approved or required chemical, product or supply is subject to regulation or laws in Franchisee's jurisdiction. Franchisor will cooperate with Franchisee in identifying substitute equipment, products or supplies as appropriate.

**5.12.** <u>Inspections</u>. Franchisee grants Franchisor and its agents the right to enter upon the Franchise premises (if applicable) or attend and monitor Franchisee while performing services for customers at any time for the purpose of conducting inspections, for among other purposes, preserving the validity of the Marks, and verifying Franchisee's compliance with this Agreement and the Operating Standards and policies and procedures outlined in the Manuals. Franchisee shall cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, Franchisee shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Franchisee shall reimburse Franchisor for the travel expenses and room and board of Franchisor's representatives for all inspections including subsequent inspections to ensure all deficiencies have been corrected. Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right, but not the obligation, to correct any deficiencies which may be susceptible to correction by Franchisor and to charge Franchisee for Franchisor's actual expenses in taking such actions, payable by Franchisee upon demand. The foregoing shall be in addition to such other remedies Franchisor may have.

**5.13.** <u>Technology System</u>. At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Technology System and Required Software, and Franchisee shall enter into all licenses or agreements and pay such licensing fees as necessary for Franchisee to obtain the rights to use the Technology System and Required Software. Franchisee shall also pay to Franchisor the then-current amount of the Technology Fee ("Technology Fee"), currently $80 per Territory per week. If Franchisee has more than one Territory, the total Technology Fee for up to 4 contiguous Territories shall be equal to the then-current Technology Fee for

one Territory. Franchisor shall have the right at any time to retrieve and use such data and information from Franchisee's Technology System that Franchisor deems necessary or desirable, including, without limitation, the uses identified in **Section 9.5**, and Franchisee agrees to do all things necessary to provide such access. Franchisee expressly agrees that it shall strictly comply with Franchisor's standards and specifications for all item(s) associated with Franchisee's Technology System, and will otherwise operate its Technology System in accordance with Franchisor's standards and specifications. Franchisee agrees it shall keep its Technology System in good maintenance and repair, at its expense, and shall promptly install such additions, changes, modifications, substitutions and/or replacement to the Technology System and the Required Software as Franchisor directs periodically in writing. Franchisee shall provide to Franchisor, upon Franchisor's request, all email lists and customer lists used or maintained by Franchisee on the Technology System, the Required Software or elsewhere. Franchisee must execute and pay any fees associated with any software license agreements or any related software maintenance agreements that Franchisor or the licensor of the Required Software require. Franchisee must comply with all laws and payment card provider standards relating to the security of the Technology System, including, without limitation, the Payment Card Industry Data Security Standards. Franchisee may not use any other cash registers or computer systems in the Franchise.

**5.14.** Uniform Attire. To promote a uniform System image, Franchisee shall require all of its personnel to dress during business hours in the attire specified in the Manuals.

**5.15.** Participation in Promotions and Incentive Programs. Franchisee shall participate in promotional programs developed by Franchisor for the System, in the manner directed by Franchisor in the Manuals or otherwise in writing.

**5.16.** Franchisee Advisory Council. Franchisor may establish an advisory council comprised of Franchisees for the purpose of fostering communication among and between franchisees and Franchisor, as well as to establish, modify or discuss various policies applicable to Franchise businesses operating under the System (the **"Franchisee Advisory Council"**). If Franchisor establishes the Franchisee Advisory Council, Franchisee may be required to become a member of the Franchisee Advisory Council, and participate in Franchisee Advisory Council meetings and programs as Franchisor shall designate. Franchisor will not assess fees or dues for participation in or on the Franchisee Advisory Council, but Franchisee may be required to pay dues (which may be expended in any allocation in accordance with the vote of the Franchisee Advisory Council subject to the approval of Franchisor) to the Franchisee Advisory Council if the Franchisee Advisory Council, which is controlled by franchisees, determines that fees shall be assessed. Franchisee may be required to pay all costs and expenses incurred in connection with participation in the Franchisee Advisory Council including, without limitation, the costs of transportation, lodging, and meals.

**5.17.** Franchisee Structure.

**5.17.1.** Except as otherwise approved in writing by Franchisor, if Franchisee is a corporation, it shall: (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles or certificates of incorporation and bylaws, as well as such other documents as Franchisor may reasonably request, and any amendment thereto; (iii) maintain stop transfer instructions on its records against the transfer of any equity securities and shall only issue securities upon the face of which a legend, in a form satisfactory to Franchisor, appears which references the transfer restrictions imposed by this Agreement; (iv) not issue any voting securities or securities convertible into voting securities; and (v) maintain a current list of all owners of record and all beneficial owners of any class of voting stock of Franchisee and furnish the list to Franchisor upon request, which list shall be amended to reflect changes in ownership, as permitted under this Agreement.

**5.17.2.** If Franchisee is a partnership or limited liability partnership it shall: (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with its partnership agreement as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all general and limited partners in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records and in its partnership agreement against the transfer of partnership interests and equity securities, and shall only issue securities or partnership interests with documentation which bears a notice or legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.17.3.** If a Franchisee is a limited liability company, Franchisee shall: (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles of organization and operating agreement, as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all members and managers in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records against the transfer of equity securities and shall only issue securities upon the face of which bear a legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.18.** Guarantee of Performance. Each present and future: (i) shareholder of a corporate Franchisee; (ii) member of a limited liability company Franchisee; (iii) partner of a partnership Franchisee; or (iv) partner of a limited liability partnership Franchisee; shall jointly and severally guarantee Franchisee's

performance of each and every provision of this Agreement by executing the Guarantee, Indemnification and Acknowledgment in the form attached to this Agreement as **Exhibit C**. In addition, Franchisor may require that the spouse (or domestic partner or other immediate family member) of an owner of Franchisee sign the Guarantee, Indemnification and Acknowledgment however such Guarantee by a spouse shall only be pursued by Franchisor if there is a material transfer of assets from the spouse having an ownership interest in the Franchisee to the non-owning spouse.

**5.19.** <u>System Modifications</u>. Franchisee acknowledges and agrees that from time to time hereafter Franchisor may change or modify the System as Franchisor deems appropriate, including, without limitation, to reflect the changing market and/or to meet new and changing consumer demands, and that variations and additions to the System may be required from time to time to preserve and enhance the public image of the System and operations of Franchises. Franchisor's changes to the System may include, without limitation, the adoption and use of new or modified products, services, equipment and furnishings and new techniques and methodologies relating to the sale, promotion and marketing of products and services, and new trademarks, service marks and copyrighted materials. Franchisee shall, upon reasonable notice, accept, implement, use and display in the operation of the Franchise any such changes in the System, as if they were part of this Agreement at the time of execution hereof, at Franchisee's sole expense. Additionally, Franchisor reserves the right, in its sole discretion, to vary the standards throughout the System, as well as the services and assistance that Franchisor may provide to some franchisees based upon the peculiarities of a particular site or circumstance, existing business practices, or other factors that Franchisor deems to be important to the operation of any Franchise or the System.

**5.20.** <u>Third-Party Management</u>. The Franchise shall be operated under the control and supervision of Franchisee (or if an entity, the Operating Principal) or its Manager. Franchisee shall not, without the prior written approval of Franchisor, which may be denied for any reason or no reason at all, hire or retain a management company, manager (other than an employee manager trained and approved by Franchisor), or third party to undertake any of the management or operational functions of the Franchise.

6.    <u>PROPRIETARY MARKS</u>

**6.1.** <u>Ownership of the Marks</u>. Franchisor represents that it is the owner of all right, title and interest in and to the Marks or otherwise maintains the right to use, license and sub-license such Marks.

**6.2.** <u>Use of the Marks</u>. With respect to Franchisee's use of the Marks, Franchisee agrees that:

**6.2.1.** Franchisee shall use only the Marks designated by Franchisor, and shall use them only in the manner authorized and permitted by Franchisor; all items bearing the Marks shall bear the then-current logo.

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D9F560771B21

**6.2.2.** Franchisee shall use the Marks only for the operation of the business franchised hereunder and only at the location authorized hereunder, or in Franchisor approved advertising for the business conducted at or from that location.

**6.2.3.** Unless Franchisor otherwise directs Franchisee, in writing to do so, Franchisee shall operate and advertise the Franchise only under the name "Koala Insulation" or the name listed on the Summary Page to this Agreement.

**6.2.4.** During the term of this Agreement and any renewal of this Agreement, Franchisee shall identify itself to the public (in a manner reasonably acceptable to Franchisor) as an independent contractor operating the Franchise under a license from Franchisor, and to post a notice to that effect, and as Franchisor directs, in Franchisee's advertising, contracts, forms, stationery and promotional materials.

**6.2.5.** Franchisee's right to use the Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

**6.2.6.** Franchisee shall not use the Marks to incur any obligation or indebtedness on behalf of Franchisor.

**6.2.7.** Franchisee shall not use the Marks or the word Koala or any variant thereof as part of its corporate or other legal name, or as part of any e-mail address, domain name, or other identification of Franchisee in any electronic medium.

**6.2.8.** Franchisee shall execute any documents deemed necessary by Franchisor to obtain protection for the Marks or to maintain their continued validity and enforceability.

**6.2.9.** With respect to litigation involving the Marks, the parties agree that:

**6.2.9.1.** Franchisee shall promptly notify Franchisor of any suspected infringement of the Marks, any known challenge to the validity of the Marks, or any known challenge to Franchisor's ownership of, or Franchisee's right to use, the Marks licensed hereunder. Franchisee acknowledges that Franchisor shall have the right to direct and control any administrative proceeding or litigation involving the Marks, including any settlement thereof. Franchisor shall also have the right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks.

**6.2.9.2.** If Franchisor undertakes the defense or prosecution of any litigation relating to the Marks, Franchisee shall execute any and all documents and do such acts and things as may, in the opinion of counsel for Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action.

**6.3.**    Franchisee Acknowledgments. Franchisee expressly understands and acknowledges that:

**6.3.1.**    The Marks are valid, owned by Franchisor, and serve to identify the System and those who are authorized to operate under the System.

**6.3.2.**    Neither Franchisee nor any owner of Franchisee shall directly or indirectly contest the validity of Franchisor's ownership of the Marks, nor shall Franchisee, directly or indirectly, seek to register the Marks with any government agency, except with Franchisor's express prior written consent.

**6.3.3.**    Franchisee's use of the Marks does not give Franchisee any ownership interest or other interest in or to the Marks, beyond the limited non-exclusive License granted by this Agreement.

**6.3.4.**    Any and all goodwill arising from Franchisee's use of the Marks shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the License herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Marks.

**6.3.5.**    The License of the Marks is nonexclusive, and Franchisor thus has and retains the rights, among others:

**6.3.5.1.**    To use the Marks itself in connection with selling products and services;

**6.3.5.2.**    To grant other licenses for the Marks, in addition to those licenses already granted to existing franchisees or other licensees authorized to operate using the Marks;

**6.3.5.3.**    To develop and establish (or acquire or be acquired by) other systems using the same or similar Marks, or any other proprietary marks, and to grant licenses or franchises thereto without providing any rights therein to Franchisee.

**6.3.6.**    Franchisor reserves the right to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder if the Marks no longer can be used, or if Franchisor, exercising its right to do so, determines that substitution of different proprietary marks will be beneficial to the System.  In such circumstances, Franchisee shall implement, at Franchisee's expense, such substituted proprietary marks in such ways as Franchisor may direct, and the use of the substituted proprietary marks shall be governed by the terms of this Agreement.

7.    CONFIDENTIAL OPERATING MANUALS

**7.1.**    Manuals.  In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Marks, Franchisee shall conduct its business in accordance with the Manuals, one or more copies of which, or access to, Franchisee acknowledges having received on loan from Franchisor for the term of this Agreement.  The Manuals may consist of multiple volumes of printed text, video and/or audio tapes and files, computer disks, and other electronically stored data, and Franchisee acknowledges and agrees that Franchisor may provide a portion or all of the Manuals (including updates and amendments), and other instructional information and materials in, or via, electronic media, including without limitation, through the Internet.

**7.2.**    Confidentiality of the Manuals.  Franchisee shall at all times treat the Manuals, any other manuals created for or approved for use in the operation of the Franchise, and the information contained therein, as confidential, and shall use best efforts to maintain such information as secret and confidential, protect it from viewing by others, and treat the Manuals with the same degree of care as it would treat its most highly confidential documents.  Franchisee shall not at any time download, print, copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person.

**7.3.**    Protection of the Manuals.  The Manuals shall at all times remain the sole property of Franchisor and shall at all times be kept in a secure manner at the Franchise premises.  Franchisee shall ensure that the Manuals are kept current and up to date; and, in the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor at Franchisor's home office shall be controlling.

**7.4.**    Revisions to the Manuals.  Franchisor may from time to time revise the contents of the Manuals, and Franchisee expressly agrees to make corresponding revisions to its copy (to the extent Franchisor permits Franchisee to maintain a written copy) of the Manuals and to comply with each new or changed standard immediately upon receipt of such revision.

8.    CONFIDENTIAL INFORMATION

**8.1.**    Confidential Information.  Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised hereunder which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement.  Franchisee shall divulge such confidential information only to such of its employees as must have access to it in order to operate the Franchise.  Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which

Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others. Any employee who may have access to any confidential information regarding the Franchise shall execute a covenant that s/he will maintain the confidentiality of information they receive in connection with their association with Franchisee. Such covenants or non-disclosure/non-competition agreements shall be on a form provided by Franchisor, which form shall, among other things, designate Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.

**8.2.** Irreparable Injury. Franchisee acknowledges that any failure to comply with the requirements of this **Section 8** will cause Franchisor irreparable injury, and Franchisee agrees to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this **Section 8**.

**8.3.** Information Exchange. Franchisee agrees to disclose to Franchisor all ideas, concepts, methods, techniques, services, and products conceived or developed by Franchisee, its affiliates, owners, agents, or employees during the term of this Agreement relating to the development and/or operation of the Franchise. Franchisee hereby grants to Franchisor and agrees to procure from its affiliates, owners, agents, or employees a perpetual, nonexclusive, and worldwide right to use any such ideas, concepts, methods, techniques, services and products. Franchisor shall have no obligation to make any payments to Franchisee with respect to any such ideas, concepts, methods, techniques or products. Franchisee agrees that Franchisee will not use or allow any other person or entity to use any such concept, method, technique or product without obtaining Franchisor's prior written approval.

9.    ACCOUNTING AND RECORDS

**9.1.** Records. With respect to the operation and financial condition of Franchisee and the Franchise, Franchisee shall adopt, until otherwise specified by Franchisor, a fiscal year and fiscal accounting periods which coincide with Franchisor's then-current fiscal year, as specified by Franchisor. Franchisee shall maintain for a period of not less than three years during the term of this Agreement, and, for not less than three years following the termination, expiration, or non-renewal of this Agreement, full, complete, and accurate books, records, and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing.

**9.2.** Periodic Reports. In addition to the record keeping requirements of **Section 9.1**:

**9.2.1.** If requested by Franchisor, Franchisee shall, at its expense, provide to Franchisor, in a format specified by Franchisor, a complete annual financial

statement (prepared according to generally accepted accounting principles, that includes a fiscal year-end balance sheet, an income statement of the Franchise for such fiscal year reflecting all year-end adjustments, and a statement of changes in cash flow of Franchisee), on a review basis, prepared by an independent certified public accountant satisfactory to Franchisor, no later than April 15 of each year for the preceding fiscal year of the Franchise, showing the results of operations of the Franchise during the most recently completed fiscal year. Franchisee shall also provide Franchisor with a copy of Franchisee's federal and state tax returns, not more than 30 days following Franchisee's submission of the same to governmental authorities. If Franchisee files any extension request with any taxation authority, Franchisee shall within 30 days of filing such extension request provide a copy of the request and any confirmation or approval received by the taxing authority.

**9.2.2.** Within 45 days following the end of each calendar quarter during the term of this Agreement, after the opening of the Franchise, Franchisee shall submit to Franchisor, in a format acceptable to (or, at Franchisor's election, specified by) Franchisor, as amended from time to time: (i) a fiscal quarter and fiscal year to date profit and loss statement and a quarterly balance sheet (which may be unaudited) for the Franchise; (ii) reports of those income and expense items of the Franchise which Franchisor specifies from time to time for use in any revenue, earnings, and/or cost summary it chooses to furnish to prospective franchisees and/or developers; and (iii) copies of all state sales tax returns for the Franchise. If required by Franchisor, Franchisee shall use on-line or other electronic accounting and reporting systems as Franchisor may specify periodically.

**9.3.** <u>Reporting Requirements</u>. Franchisee shall also submit to Franchisor in addition to the Sales Reports required pursuant to **Section 4.2**, for review or auditing, such other forms, reports, records, information, and data as and when Franchisor may reasonably designate, in the form and format, and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing, including, without limitation, via computer diskette, or otherwise in electronic format, and/or restated in accordance with Franchisor's financial reporting periods, consistent with Franchisor's then current financial reporting periods and accounting practices and standards. Franchisee shall, without limitation, provide Franchisor with login, API and other access information as required from time to time to permit Franchisor to remotely access Franchisee's bookkeeping software (i.e. QuickBooks or other software designated by Franchisor) to pull reports, download data and perform any other action permitted under this Agreement. Franchisee shall immediately, without further request from Franchisor, provide updated access information to Franchisor when the previously provided information is changed. The reporting requirements of this **Section 9.3** shall be in addition to, and not in lieu of, the electronic reporting that may be required in connection with the use of the required Technology System under **Section 5.13**.

**9.4.** <u>Audit</u>. Franchisor or its designated agents shall have the right at all reasonable times to examine, copy, and/or personally review or audit, at Franchisor's expense, all books, records, and sales and income tax returns of Franchisee. Franchisor shall also have the right, at any time, to have an independent audit made of the books of Franchisee and Franchisee agrees that it shall pay Franchisor the costs of one audit each calendar quarter during the term of this Agreement, if an audit is necessitated because Franchisee fails to timely provide Sales Reports or if an audit discloses an understatement in any report by Franchisee of 5% or more, Franchisee shall, reimburse Franchisor for all costs and expenses connected with the audit (including, without limitation, travel, room and board and salaries and other benefits, and reasonable accounting and legal costs). If an inspection should reveal that any payments have been understated in any report to Franchisor, then Franchisee shall immediately pay Franchisor the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of 1.5% per month, or the maximum rate permitted by law, whichever is less. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

**9.5.** <u>Data</u>. Franchisor may, from time-to-time, specify in the Manuals or otherwise in writing the information that Franchisee shall collect and maintain on the Technology System installed at the Franchise, and Franchisee shall provide to Franchisor such reports as Franchisor may reasonably request from the data so collected and maintained. All data provided by Franchisee in any form, and whether required by this **Section 9.5** or any other requirement under the System or in the Manuals, including data uploaded to Franchisor's computer system from the Franchisee's Technology System, and/or downloaded from the Franchisee's Technology System to Franchisor's computer system, is and will be owned exclusively by Franchisor, including without limitation, customer lists and email lists, and Franchisor will have the right to use such data in any manner that Franchisor deems appropriate without compensation to Franchisee. In addition, all other data created or collected by Franchisee in connection with the System, or in connection with Franchisee's operation of the business (including but not limited to consumer and transaction data), is and will be owned exclusively by Franchisor during the term of, and following termination or expiration of, this Agreement. Copies and/or originals of such data must be provided to Franchisor upon Franchisor's request. Franchisor hereby licenses use of such data back to Franchisee, at no additional cost, solely for the term of this Agreement and solely for Franchisee's use in connection with the business franchised under this Agreement. Franchisor may use all such information, data, and reports in any manner, including, without limitation, providing financial and operating reports to franchisees and developers operating under the System.

10.    <u>ADVERTISING</u>

Recognizing the value of advertising, and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

**10.1.** <u>Brand Funds</u>. Franchisor shall have the right to establish, at any time, the Brand Fund as described in this **Section 10**.

**10.2.** <u>Brand Fund Contributions and Local Marketing Expenditures</u>. Franchisee shall, during each calendar month, spend on advertising and promotion the greater of $2,000 or 5% of Franchisee's Gross Sales to advertise and to promote the Franchise through methods, media and advertising approved by Franchisor (together, "Local Marketing"). If Franchisee has more than one Territory, the total combined Local Marketing minimum spending requirement for up to 4 contiguous Territories shall be equal to the then-current Local Marketing minimum spending requirement for one Territory. Franchisor shall have the right to designate in writing from time to time how, and in what proportions, Franchisee is to allocate its Local Marketing. Additionally, Franchisee shall contribute (i) 1% of Gross Sales to the Brand Fund ("Brand Fund") as may be established pursuant to Section 10.3. The Brand Fund contribution may be increased to 2% upon notice to Franchisee.

**10.2.1.1.** Franchisor shall provide Franchisee with not less than 60 days prior written notice of any change in the required Local Marketing (which will not exceed 5% of Gross Sales). Franchisor shall not increase required Brand Fund contributions to an amount exceeding 2% of Gross Sales.

**10.2.1.2.** Franchisee shall pay required Brand Fund Contributions in the manner required under **Section 4** (or as otherwise provided in this **Section 10**).

**10.2.1.3.** For all company-owned Franchises, Franchisor shall contribute to the Brand Fund on the same basis as franchisees.

**10.3.** <u>Brand Fund</u>. Although it is under no obligation to do so, Franchisor may at any time establish a Brand Fund, as follows:

**10.3.1.** Franchisor or its designee shall have the right to direct all advertising programs, as well as all aspects thereof, including without limitation, the concepts, materials, and media used in such programs and the placement and allocation thereof. Franchisee agrees and acknowledges that the Brand Fund is intended to maximize general public recognition, acceptance, perception of, and use of the System; and that Franchisor and its designee are not obligated, in administering the Brand Fund, to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or pro rata from expenditures by the Brand Fund. Franchisor may engage the services of a franchise sales organization for development of the franchise system, and Franchisee specifically acknowledges and agrees that such franchise sales organization may be compensated out of the Brand Fund in exchange for services and products that, while not intended solely to market the sale of franchises, benefit the franchise system through franchise development and brand marketing."

**10.3.2.** The Brand Fund, all contributions thereto, and any earnings thereon, shall be used exclusively (except as otherwise provided in this **Section 10.3**) to meet any and all costs of maintaining, administering, directing, conducting, creating and/or otherwise preparing advertising, marketing, public relations and/or promotional programs and materials, research and design relating to branding and implementation of re-branding programs and strategies, and any other activities which Franchisor believes will enhance the image of the System, including, without limitation, the costs of: preparing and/or conducting media advertising campaigns; marketing surveys and other public relations activities; employing advertising and/or public relations agencies; purchasing promotional items; developing new or modified trade dress and marks; point-of-purchase (POP) materials; design and photographs; purchasing media space or time (including all associated fees and expenses); administering regional and multi-regional marketing and advertising programs; market research; developing and implementing customer loyalty programs; the creative development of, and actual production associated with, premium items, give-aways, promotions, contests, public relation events, and charitable or non-profit events; developing, implementing and maintaining an electronic commerce website and/or related strategies; maintaining and developing one or more websites devoted to the System, the Marks and/or the "Koala" brand; providing promotional and other marketing materials and services to the Franchises operated under the System; and the salaries of Franchisor's employees to the extent such employees provide services in conjunction with System marketing activities. The Brand Fund may also be used to provide rebates or reimbursements to franchisees for local expenditures on products, services, or improvements, approved in advance by Franchisor, which products, services, or improvements Franchisor shall have the right to determine what will promote general public awareness and favorable support for the System.

**10.3.3.** Franchisee shall contribute to the Brand Fund in the manner specified by Franchisor. All sums paid by Franchisee to the Brand Fund shall be maintained in an account separate from Franchisor's other monies. The Brand Fund will not be used to defray the general operating expenses of Franchisor except that Franchisor shall have the right to charge the Brand Fund for such reasonable administrative costs and overhead as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund and advertising programs for franchisees and the System. The Brand Fund and its earnings shall not otherwise inure to the benefit of Franchisor.

**10.3.4.** The Brand Fund is not intended to be, nor will it be deemed to be a trust, and Franchisor does not assume any fiduciary obligation to Franchisee for maintaining, directing or administering the Brand Fund or for any other reason. A statement of the operations of the Brand Fund as shown on the books of Franchisor shall be prepared annually by Franchisor, and shall be made available to Franchisee on an annual basis upon Franchisee's written request.

**10.3.5.** Although the Brand Fund is intended to be of perpetual duration, Franchisor maintains the right to terminate the Brand Fund. The Brand Fund shall not be terminated, however, until all monies in the Brand Fund have been expended for advertising and/or promotional purposes. If Franchisor terminates the Brand Fund, Franchisor shall have the right to require Franchisee to spend an amount equal to previous Brand Fund contribution amount on Local Marketing and allocate such spending as directed by Franchisor.

**10.4.** <u>Promotional Materials and Marketing Assistance</u>. Franchisor shall make available to Franchisee from time to time, at Franchisee's expense, advertising plans and promotional materials, including newspaper mats, coupons, merchandising materials, sales aids, point of purchase materials, special promotions, direct mail materials, community relations programs, and similar advertising and promotional materials for use in advertising and promotion. Franchisor may provide periodic marketing assistance to Franchisee.

**10.5.** <u>Approvals</u>. For all proposed advertising, marketing, and promotional plans, Franchisee shall submit samples of such plans and materials to Franchisor (by means described in **Section 20**), for Franchisor's review and prior written approval (except with respect to prices to be charged by Franchisee). If written approval is not received by Franchisee from Franchisor within 30 days of the date of receipt by Franchisor of such samples or materials, Franchisor shall be deemed to have disapproved them. Franchisee acknowledges and agrees that any and all copyright in and to advertising and promotional materials developed by or on behalf of Franchisee shall be the sole property of Franchisor, and Franchisee agrees to execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Franchisor to give effect to this provision.

**10.6.** <u>Minimum Requirements Only</u>. Franchisee understands and acknowledges that the required Local Marketing and Brand Fund contributions are minimum requirements only, and that Franchisee may, and is encouraged by Franchisor to expend additional funds for local advertising and promotion of a local nature which will focus on disseminating advertising directly related to the Franchise.

**10.7.** <u>Websites; Internet Use</u>. Franchisee shall not, without Franchisor's prior written approval, offer, promote, or sell any products or services, or make any use of the Marks, through the Internet, including the use of websites, domain names, uniform resource locators, keywords, linking, search engines (and search engine optimization techniques), banner ads, meta-tags, marketing, auction sites, e-commerce (as defined below) and co-branding arrangements. Any website shall be deemed "advertising" under this Agreement, and will be subject to (among other things) Franchisor's approval under **Section 10.6**. Franchisor has the right to control or designate the manner of Franchisee's use of all URLs, domain names, website addresses, metatags, links, key words, e-mail addresses and any other means of electronic identification or origin ("**e-names**"). Franchisor also has the right to designate, approve, control or limit all aspects of Franchisee's use of the Internet, Intranet, World Wide Web, wireless technology, digital cable, use of e-

names, e-mail, home pages, bulletin boards, chat rooms, social networking sites, linking, framing, online purchasing cooperatives, marketplaces, barter exchanges, and related technologies, methods, techniques, registrations, networking, and any electronic communication, commerce, computations, or any means of interactive electronic documents contained in a network of computers or similar devices linked by communications software or hardware (collectively, "**e-commerce**"). Franchisee agrees to follow all of Franchisor's policies and procedures related to the use and regulation of e-commerce. Franchisee agrees to be bound by any terms of use, privacy policy and copyright notice and takedown policies and the like that Franchisor establishes from time to time. Franchisor may require Franchisee, at Franchisee's expense, to coordinate its e-commerce activities with Franchisor, other Franchises, suppliers and/or affiliates. Other than any e-mail or any similar account provided to Franchisee by Franchisor, if any, Franchisee shall not establish any e-mail account using the Marks or similar names or marks. Franchisee agrees to use any e-mail or any similar account provided to Franchisee by Franchisor solely for business purposes. Franchisee shall be required to follow Franchisor's intranet and Internet usage rules, policies and requirements. Franchisor retains the sole right to approve any linking to, or other use of, the Koala Website. Franchisee may not establish or participate in any Koala related blog or other discussion forum. Franchisee recognizes and agrees that Franchisor and its affiliates own all rights, title and interest in and to any and all websites and e-names that Franchisor commissions or utilizes, or requires or permits Franchisee to utilize, in connection with the System, which bear the Marks or any derivative of the Marks. Franchisee also recognizes and agrees that Franchisor and/or its affiliates own all rights, title and interest in and to any and all data or other information collected via e-commerce related to the System or the Marks, including any customer data, click-stream data, cookies, user data, hits and the like. Such data or other information also constitutes Franchisor's confidential information subject to **Article 8.**

**10.8.** <u>Limitations on Associations with the Marks</u>. Franchisee acknowledges and agrees that certain associations between Franchisee and/or the Franchise, and/or the Marks and/or the System, and/or businesses operating under or products sold under the Marks or the Koala brand names on the one hand, and certain political, religious, cultural or other types of groups, organizations, causes, or activities, on the other, however well-intentioned and/or legal, may create an unwelcome, unfair, or unpopular association with, and/or an adverse effect on, the reputation of Franchisor, the System, the Koala brand, or the good will associated with the Marks. Accordingly, Franchisee shall not, without the prior written approval of Franchisor, engage in any activities with, or donate any money, products, services, goods, or other items to, any charitable, political or religious organization, group, or activity, if such action is taken, or may be perceived by the public to be taken, in the name of, in connection with, or in association with Franchisee, the Marks, the Franchise, the Franchisor, or the System.

11. **INSURANCE**

**11.1.** Insurance Requirements. Prior to the commencement of any activities or operations pursuant to this Agreement, Franchisee shall procure and maintain in full force and effect during the term of this Agreement (and for such period thereafter as is necessary to provide the coverages required hereunder for events having occurred during the term of this Agreement), at Franchisee's expense, the following insurance policy or policies in connection with the Franchise or other facilities on the premises, or by reason of the construction, operation, or occupancy of the Franchise or other facilities on premises. Such policy or policies shall be written by an insurance company or companies acceptable to Franchisor, having a rating of at least "A-7" in the most recent Key Rating Guide published by the A.M. Best Company (or another rating that Franchisor reasonably designates if A.M. Best Company no longer publishes the Key Rating Guide) and licensed to do business in the state in which the Franchise is located. Such policy or policies shall be in accordance with standards and specifications set forth in the Manuals or otherwise in writing and shall include, at a minimum (except as additional coverages and higher policy limits may reasonably be specified for all franchisees from time to time by Franchisor in the Manuals or otherwise in writing to reflect inflation, identification of new risks, changes in the law or standards of liability, higher damage awards and other relevant changes in circumstances), the following:

**11.1.1.** Comprehensive general liability insurance, written on an occurrence basis, extended to include contractual liability, products and completed operations, and personal and advertising injury, with a combined bodily injury and property damage limit of not less than $1,000,000 per occurrence.

**11.1.2.** If any vehicles are used for business purposes, business automobile liability insurance, including a combined single bodily injury and property damage coverage for all owned, nonowned, and hired vehicles, with limits of liability not less than $1,000,000 per occurrence for both bodily injury and property damage.

**11.1.3.** Statutory workers' compensation insurance and employer's liability insurance for a minimum limit of at least $500,000, as well as such other disability benefits type insurance as may be required by statute or rule of the state in which the Franchise is located.

**11.1.4.** Commercial umbrella liability insurance with limits which bring the total of all primary underlying coverages to not less than $2,000,000 total limit of liability.

**11.1.5.** Property insurance providing coverage for direct physical loss or damage to real and personal property for all-risk perils, including the perils of flood and earthquake.

**11.1.6.** Any other insurance coverage that is required by federal, state, or municipal law.

**11.2.**  <u>Referenced in Manuals</u>.  All policies listed in **Section 11.1** (unless otherwise noted below) shall contain such endorsements as shall, from time to time, be provided in the Manuals.

**11.3.**  <u>Policy Cancellation</u>.  In the event of cancellation, material change, or nonrenewal of any policy, 60 days' advance written notice must be provided to Franchisor in the manner provided in **Article 20**.  Franchisee shall arrange for a copy of such notification to be sent to Franchisor by the insurance company.

**11.4.**  <u>Construction and Remodeling Insurance</u>.  In connection with all significant construction, reconstruction, or remodeling of the Franchise during the term of this Agreement, Franchisee will cause the general contractor, its subcontractors, and any other contractor, to effect and maintain at general contractor's and all other contractor's own expense, such insurance policies and bonds with such endorsements as are set forth in the Manuals, all written by insurance or bonding companies approved by Franchisor, having a rating as set forth in **Section 11.1**.

**11.5.**  <u>No Waiver of Obligations</u>.  Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in **Section 17.4**.

**11.6.**  <u>Franchisor to be Additional Insured</u>.  All insurance policies shall list Franchisor and its affiliates, officers, directors, employees, and agents as additional insureds.

**11.7.**  <u>Certificates of Insurance</u>.  At least 30 days prior to the time any insurance is first required to be carried by Franchisee, and thereafter at least 30 days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor, certificates of insurance evidencing the proper coverage with limits not less than those required hereunder.  All certificates shall expressly provide that no less than 30 days' prior written notice shall be given Franchisor in the event of material alteration to, cancellation, or nonrenewal of the coverages evidenced by such certificates.    Further certificates evidencing the insurance required by **Section 11.1** shall name Franchisor, and each of its affiliates, directors, agents, and employees as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions for which such certificates evidence coverage.   In the event that Franchisee fails to provide evidence reasonably satisfactory to Franchisor of the insurance policies required by this **Article 11**, Franchisor may, but is not required to, obtain such required policies on Franchisee's behalf, and Franchisee agrees that it will promptly reimburse Franchisor for all costs related to obtaining such policies upon notice from Franchisor.

**11.8.**  <u>Proof of Insurance</u>.  In addition to its obligations under **Section 11.7**, on the first anniversary of the Effective Date, and on each subsequent anniversary thereof during the term of this Agreement and any renewal hereof, Franchisee shall

provide Franchisor with proof of insurance evidencing the proper coverage with limits not less than those required hereunder, in such form as Franchisor may reasonably require.

**11.9.**  Policy Limit Changes.  Franchisor shall have the right, from time to time, to make such changes in minimum policy limits and endorsements as it may determine; provided, however, all changes shall apply, generally, to all franchisees of Franchisor who are similarly situated.

12.    TRANSFER OF INTEREST

**12.1.**  Franchisor Transfers.  Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations under this Agreement, or any interests in the assets of Franchisor, or any ownership or equity interests in Franchisor, to any person or entity, and any assignee of Franchisor shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment.

**12.2.**  Principals.  If Franchisee is an entity, each person or entity that is an owner of, or has an ownership interest in, Franchisee (each, a "**Principal**"), and the interest of each Principal in Franchisee, is identified on the Summary Page. Franchisee represents and warrants that its owners are as set forth on the Summary Page attached to this Agreement, and covenants that it will not permit the identity of such owners, or their respective interests in Franchisee, to change without complying with this Agreement.  Franchisor shall have the right to designate any person or entity which owns a direct or indirect interest in Franchisee as a Principal, and the Summary Page shall be so amended automatically upon notice thereof to Franchisee.

**12.3.**  Franchisee Transfers.  Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and its Principals, and that Franchisor has granted this License in reliance on Franchisee's or Franchisee's Principals' business skill, financial capacity, and personal character.  Accordingly:

**12.3.1.** Franchisee shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber:  (a) this Agreement or any of the rights and obligations of Franchisee under this Agreement; or (b) any material asset of Franchisee or the Franchise; provided, however, that Franchisee may grant a security interest in, or otherwise encumber certain assets of the Franchise, excluding the Franchise Agreement, in connection with Franchisee obtaining financing for the development and/or operation of the Franchise or equipment leasing, if such financing satisfies the requirements of Franchisor, which may include, without limitation, execution of agreements by Franchisor, Franchisee, and/or such Principal, and any secured creditor of Franchisee, in a form satisfactory to Franchisor, acknowledging such creditor's obligations to be bound by the terms of this **Article 12**.

**12.3.2.** If Franchisee is a corporation or limited liability company, Franchisee shall not, without the prior written consent of Franchisor, issue any voting securities or securities convertible into voting securities, and the recipient of any such securities shall become a Principal under this Agreement, if so designated by Franchisor.

**12.3.3.** If Franchisee is a partnership or limited partnership, the partners of the partnership shall not, without the prior written consent of Franchisor, admit additional general partners, remove a general partner, or otherwise materially alter the powers of any general partner. Each general partner shall automatically be deemed a Principal of Franchisee.

**12.3.4.** A Principal shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber any interest of a Principal in Franchisee.

**12.4.** <u>Conditions for Approval</u>. Franchisor shall not unreasonably withhold any consent required by **Section 12.3**; provided, that if Franchisee proposes to transfer its obligations hereunder or any interest in any material asset, or if a Principal proposes to transfer any direct or indirect interest in Franchisee, or if Franchisee or any Principal proposes to undertake any transfer that is subject to **Section 12.3**, Franchisor shall have the right to require any or all of the following as conditions of its approval (except as provided in **Section 12.9**):

**12.4.1.** The transferor shall have executed a general release (which shall include a release from the transferor, Franchisee, Principals, and guarantors of Franchisee), in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, successors, and assigns, and their respective directors, officers, owners, members, managers, partners, agents, representatives, servants, and employees in their corporate and individual capacities including, without limitation, claims arising under this Agreement, any other agreement between Franchisee and Franchisor or its affiliates, and federal, state, and local laws and rules.

**12.4.2.** The transferee of a Principal shall be designated as a Principal and each transferee who is designated a Principal shall enter into a written agreement, in a form satisfactory to Franchisor, agreeing to be bound as a Principal under the terms of this Agreement as long as such person or entity owns any interest in Franchisee; and, the Principal shall guarantee the performance of all such obligations in writing in a form satisfactory to Franchisor.

**12.4.3.** Prior to, and after the transfer, Franchisee's new Principals shall meet Franchisor's educational, managerial, and business standards; each shall possess a good moral character, business reputation, and credit rating; have the aptitude and ability to operate the Franchise, as may be evidenced by prior related business experience or otherwise; and have adequate financial resources and capital to operate the Franchise.

**12.4.4.** If a proposed transfer would result in a change in control of Franchisee, at Franchisor's option, Franchisee (or transferee) shall execute, for a term ending on the expiration date of this Agreement the form of franchise agreement then being offered to new System franchisees, and such other ancillary agreements required by Franchisor for the business franchised hereunder, which agreements shall supersede this Agreement and its ancillary documents in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, higher royalty and advertising fees.

**12.4.5.** If a proposed transfer would result in a change in control of Franchisee, and if so requested by Franchisor, Franchisee, at its expense, shall upgrade the Franchise to conform to the then current standards and specifications of new Franchises then being established in the System, and shall complete the upgrading and other requirements set forth in **Sections 5.1.6** and **5.2.5** within the time period specified by Franchisor.

**12.4.6.** All monetary obligations of Franchisee hereunder shall be paid in full on a current basis, and Franchisee must not be otherwise in default of any of its obligations hereunder including, without limitation, its reporting obligations.

**12.4.7.** The transferor shall remain liable for all of the obligations to Franchisor in connection with the Franchise that arose prior to the effective date of the transfer, and any covenants that survive the termination or expiration of this Agreement, and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability.

**12.4.8.** At Franchisee's expense, the transferee's Manager and other employees designated by Franchisor shall successfully complete (to Franchisor's satisfaction) all training programs required by Franchisor upon such terms and conditions as Franchisor may reasonably require (and while Franchisor will not charge a fee for attendance at such training programs, the transferee shall be responsible for the salary and all expenses of the person who attends training).

**12.4.9.** If a proposed transfer would result in a change in control of Franchisee, and to compensate Franchisor for Franchisor's legal, accounting, training, and other expenses incurred in connection with the transfer, Franchisee shall pay Franchisor a non-refundable transfer fee in an amount equal to the greater of $10,000 or 20% of the then-current franchise fee applicable to the Territory. One-half of the transfer fee shall be paid at the time Franchisee submits its request to Franchisor for consideration of the proposed transfer, and such amount shall be non-refundable. The balance of the transfer fee shall be paid at the time the transfer is consummated or closes. In addition, in the event a proposed transfer is not consummated or closed, for any reason except for disapproval by Franchisor, Franchisee or the proposed transferee shall reimburse Franchisor for all of its costs and expenses incurred in connection with its evaluation of the proposed transfer, including, without limitation, attorneys' and accountants' fees, background checks, site evaluation, and training, if applicable,

to the extent the portion of the transfer fee paid when the transfer approval request was made does not cover those costs and expenses.

**12.4.10.** If the proposed transfer will result in a change in control of Franchisee, the terms of the proposed transfer will not adversely impact the continued operations of the Franchise, as determined in Franchisor's sole discretion.

**12.4.11.** The transferor must acknowledge and agree that the transferor shall remain bound by the covenants contained in **Sections 15.2** and **15.3**.

**12.4.12.** Franchisee shall be solely responsible for paying any broker fees and/or commissions involved with the sale or transfer of the Franchise regardless of whether Franchisee directly engages such broker or if, at Franchisee's request, Franchisor engages such broker to assist with the sale or transfer of the Franchised Business.

**12.5.** Right of First Refusal.

**12.5.1.** If Franchisee or any Principal desires to accept any *bona fide* offer from a third party to purchase Franchisee, any material assets of Franchisee, or any direct or indirect interest in Franchisee, Franchisee or such Principal shall promptly notify Franchisor of such offer and shall provide such information and documentation relating to the offer as Franchisor may require. Franchisor shall have the right and option, exercisable within 30 days after receipt of all such information, to send written notice (the "**Exercise Notice**") to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party. If Franchisor elects to purchase the seller's interest, the contract to purchase the Franchise (or interests or assets) shall be executed within 60 days after the Exercise Notice and the closing shall occur at the principal offices of Franchisor; provided, however, that in no event shall the closing occur later than 90 days following the execution of the definitive purchase agreement.

**12.5.2.** Any material change in the terms of the *bona fide* offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of the third party's initial offer. Additionally, if Franchisor elects not to exercise its purchase right and Franchisee fails to complete the proposed sale within six months from the date Franchisor notifies Franchisee that Franchisor will not make the purchase, Franchisor shall again have the right of first refusal described in this **Section 12.5**. Failure of Franchisor to exercise the option afforded by this **Section 12.5** shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this **Section 12**, with respect to a proposed transfer, or a waiver of any subsequent offer.

**12.5.3.** In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase

the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, they must attempt to appoint a mutually-acceptable independent appraiser to make a binding determination. If the parties are unable to agree upon one independent appraiser, then an independent appraiser shall be promptly designated by Franchisor and another independent appraiser shall be promptly designated by Franchisee, which two appraisers shall, in turn, promptly designate a third appraiser; all three appraisers shall promptly confer and reach a single determination, which determination shall be binding upon Franchisor and Franchisee. The cost of any such appraisal shall be shared equally by Franchisor and Franchisee. If Franchisor elects to exercise its right under this **Section 12.5**, Franchisor shall have the right to set off all amounts due from Franchisee, and one-half of the cost of the appraisal, if any, against any payment to the seller.

**12.6.** <u>Transfer Upon Death</u>. Upon the death of a Principal, the deceased's executor, administrator, or other personal representative shall transfer the deceased's interest to a third party approved by Franchisor within 12 months after the death. If the distributee is not approved by Franchisor, then the distributee shall transfer the deceased's interest to a third party approved by Franchisor within 12 months after the deceased's death.

**12.7.** <u>Transfer Upon Permanent Disability</u>. Upon the permanent disability of any Principal with a controlling interest in Franchisee, Franchisor shall have the right to require such interest to be transferred to a third party in accordance with the conditions described in this **Section 12** within six months after notice to Franchisee, provided that no transfer fee shall be due for a transfer pursuant to this **Section 12.7**. "**Permanent Disability**" shall mean any physical, emotional, or mental injury, illness, or incapacity that would prevent a person from performing the obligations set forth in this Agreement for at least six consecutive months, and from which condition recovery within six consecutive months from the date of determination of disability is unlikely. Permanent disability shall be determined by a licensed practicing physician upon examination of such person or, if such person refuses to be examined, then such person shall automatically be deemed permanently disabled for the purposes of this **Section 12.7** as of the date of refusal. The licensed practicing physician making such determination shall be chosen by the mutual agreement of a doctor selected by Franchisor and a doctor selected by Franchisee. Franchisor shall pay the cost of the required examination.

**12.8.** <u>Notification Upon Death or Permanent Disability</u>. Upon the death or permanent disability any Principal of Franchisee, such person or his representative shall promptly notify Franchisor of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as any *inter vivos* transfer.

**12.9.** <u>Exceptions for Entity Formed Convenience of Ownership or Transfer to Family Member</u>. Notwithstanding anything to the contrary in this **Section 12**, if Franchisee is an individual and seeks to transfer this Agreement to an entity

formed for the convenience of ownership or if Franchisee seeks to transfer this Agreement to a spouse, adult sibling or adult child (subject to compliance with all other provisions of the Transfer), the conditions of **Sections 12.4.4** (signing a new franchise agreement), **12.4.5** (upgrading the Franchise), **12.4.8** (initial training of new Manager), and **12.4.9** (transfer fee) shall not apply; provided however, that in lieu of a transfer fee, Franchisee shall reimburse Franchisor for its legal, accounting and other professional fees and other costs incurred in connection with the transfer if any, and Franchisee may undertake such transfer, provided that Franchisee (or their spouse, sibling or child as applicable above) owns 100% of the equity interest in the transferee entity, and the Franchisee and transferee personally guarantees, in a written guaranty satisfactory to Franchisor, the performance of the obligations of Franchisee under this Agreement.

**12.10.** No Waiver of Claims. Franchisor's consent to a transfer which is the subject of this **Section 12** shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

**12.11.** Insolvency. If Franchisee or any person holding any interest (direct or indirect) in Franchisee becomes a debtor in a proceeding under the U.S. Bankruptcy Code or any similar law in the U.S. or elsewhere, it is the parties' understanding and agreement that any transfer of Franchisee, Franchisee's obligations and/or rights hereunder, any material assets of Franchisee, or any indirect or direct interest in Franchisee shall be subject to all of the terms of this **Section 12**.

**12.12.** Securities Offerings. All materials for an offering of stock or partnership interests in Franchisee or any affiliate of Franchisee which are required by federal or state law shall be submitted to Franchisor for review as described below before such materials are filed with any government agency. Any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use. No offering by Franchisee or any affiliate of Franchisee shall imply (by use of the Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of the securities of Franchisee or Franchisee's affiliates; and Franchisor's review of any offering shall be limited solely to the relationship between Franchisor and Franchisee and affiliates, if applicable, and shall not constitute any opinion as to any legal requirement. Franchisor may, at its option, require the offering materials to contain a written statement prescribed by Franchisor concerning the limitations stated in the preceding sentence. Franchisee (and the offeror if not Franchisee), the Principals, and all other participants in the offering must fully indemnify Franchisor, its affiliates, successors, and assigns, and their respective directors, officers, shareholders, partners, agents, representatives, servants, and employees in connection with the offering and shall execute any and all documents required by Franchisor to endorse such indemnification. For each proposed offering, Franchisee shall pay Franchisor an amount as is necessary to reimburse Franchisor for its reasonable costs and

expenses (including legal and accounting fees) for reviewing the proposed offering. Franchisee shall give Franchisor written notice at least 30 days before the date that any offering or other transaction described in this **Section 12.12** commences. Any such offering shall be subject to all of the other provisions of this **Article 12**; and further, without limiting the foregoing, it is agreed that any such offering shall be subject to Franchisor's approval as to the structure and voting control of the offeror (and Franchisee, if Franchisee is not the offeror) after the financing is completed.

13.  DEFAULT AND TERMINATION

**13.1.**  Automatic Termination.  Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and not opposed by Franchisee; or if Franchisee is adjudicated as bankrupt or insolvent; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied or of record for 30 days or longer (unless unappealed or a supersedeas bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's business or property; or if suit to foreclose any lien or mortgage against the Franchise premises or equipment is instituted against Franchisee and not dismissed within 30 days; or if the real or personal property of Franchisee's Franchise shall be sold after levy thereupon by any sheriff, marshal, or constable.

**13.2.**  Termination Upon Notice Without Opportunity to Cure.  Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the delivery of written notice to Franchisee by Franchisor (in the manner set forth under **Section 20**), upon the occurrence of any of the following events:

**13.2.1.**  If Franchisee fails to open the Franchise as provided in **Section 5.5**;

**13.2.2.**  If Franchisee or other designated employee fails to complete the initial training program pursuant to **Sections 3.2** and **5.6** of this Agreement;

**13.2.3.**  If Franchisee at any time ceases to operate or otherwise abandons the Franchise for three consecutive business days, or loses the right to possession of the Franchise Location, any Koala Rig(s), or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchise is located;

**13.2.4.** If Franchisee or any Principal is convicted of a felony or engages in any other activity that Franchisor believes is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or Franchisor's interest therein;

**13.2.5.** If a threat or danger to public health or safety results from the construction, maintenance, or operation of the Franchise;

**13.2.6.** If Franchisee or any Principal purports to transfer any rights or obligations under this Agreement or any interest to any third party in a manner that is contrary to the terms of **Section 12**;

**13.2.7.** If Franchisee or any Principal fails to comply with the covenants in **Section 15.2**;

**13.2.8.** If, contrary to the terms of **Sections 7** or **8**, Franchisee discloses or divulges confidential information provided to Franchisee by Franchisor;

**13.2.9.** If Franchisee knowingly maintains false books or records, or submits any false reports (including, but not limited to, information provided as part of Franchisee's application for this franchise) to Franchisor, underreports Gross Sales by more than 5% or more for any period;

**13.2.10.** If Franchisee commits three or more defaults under this Agreement in any 12-month period, whether or not each such default has been cured after notice;

**13.2.11.** If Franchisee or any Principal makes any unauthorized or improper use of the Marks or contests the validity of Franchisor's ownership of the Marks or its right to use and to license others to use the Marks; and/or

**13.2.12.** If Franchisee or any Principal is in breach or default under any other agreement (whether existing as of the date of this Agreement or subsequently made) with Franchisor or any of its subsidiaries or Affiliates, and if such default is curable, fails to cure the default as required within the time permitted.

**13.3.** Termination With Opportunity to Cure. Except as otherwise provided in **Sections 13.1** and **13.2**, upon any other default by Franchisee of its obligations hereunder, Franchisor may terminate this Agreement only by giving written notice of termination (in the manner set forth under **Article 20**) setting forth the nature of such default to Franchisee at least 30 days prior to the effective date of termination (or, with respect to monetary defaults, five days); provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor, all within the 30 day period (or five day period with respect to monetary defaults). If any such default is not cured within the specified time, this Agreement may, upon Franchisor's election, be terminated without further notice to Franchisee effective immediately upon the expiration of the 30

day period (or five day period with respect to monetary defaults) or such longer period as applicable law may require.

**13.4.**  <u>Extended Notice of Termination</u>.  If any law applicable to this **Section 13**, requires a longer notice period prior to termination of this Agreement, or prior to a refusal to enter into a successor or renewal franchise, than is required hereunder, a different standard of "good cause", or the taking of some other action not required hereunder, the prior notice, "good cause" standard, and/or other action required by such law shall be substituted for the comparable provisions hereof.

**13.5.**  <u>Assignment Upon Bankruptcy</u>.  If, for any reason, this Agreement is not terminated pursuant to this **Article 13**, and this Agreement is assumed, or assignment of the same to any person or entity who has made a *bona fide* offer to accept an assignment of this Agreement is contemplated, pursuant to the United States Bankruptcy Code, then notice of such proposed assignment or assumption, setting forth:  (i) the name and address of the proposed assignee; and (ii) all of the terms and conditions of the proposed assignment and assumption, shall be given to Franchisor within 20 days after receipt of such proposed assignee's offer to accept assignment of this Agreement, and, in any event, within 10 days prior to the date application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Franchisor shall thereupon have the prior right and option, to be exercised by notice given at any time prior to the effective date of such proposed assignment and assumption, to accept an assignment of this Agreement to Franchisor itself upon the same terms and conditions and for the same consideration, if any, as in the *bona fide* offer made by the proposed assignee, less any brokerage commissions which may be payable by Franchisee out of the consideration to be paid by such assignee for the assignment of this Agreement.  In the event Franchisor does not elect to exercise the options described in this **Section 13.5**, any transfer or assignment pursuant to the United States Bankruptcy Code shall be subject to the same terms and conditions of any other transfer or assignment set forth in **Article 12**.

**13.6.**  <u>Damages</u>.  In addition to any other claims Franchisor may have (other than claims for lost future Royalty Fees and Brand Fund Contributions), if Franchisor terminates this Agreement based on Franchisee's default or if Franchisee terminates this Agreement in violation of its terms, Franchisee must pay Franchisor liquidated damages calculated as follows:  (a) the greater of (i) the average of Franchisee's monthly Royalty Fees and Brand Fund Contributions due for the last 12 months (or for such shorter period of time that the Franchise has been in operation) before termination, (ii) or the average monthly amount which would be due based on the minimum fees set forth in **Section 4.2** for a period 37+ months after the Effective Date,  (b) multiplied by the lesser of 24 or the number of months remaining in the then-current term under **Section 2.1**, (c) discounted to present value using the then-current prime rate of interest quoted by Franchisor's principal commercial bank.  The parties hereto agree that calculation of damages if Franchisor terminates due to default or if Franchisee terminates this Agreement in violation of its terms will be difficult to measure and quantify, and

the damages described in this **Section 13.6** are a reasonable approximation of such damages, and are not a penalty.

14.    OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

**14.1.**    Cease Operations.    Franchisee shall immediately cease to operate the Franchise, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

**14.2.**    Cease Use of Marks.    Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures and techniques associated with the System, the mark "Koala Insulation" and all other Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System.    In particular, Franchisee shall cease to use, without limitation, the Koala Rigs, all signs, advertising materials, displays, stationery, forms, and any other articles that display the Marks.

**14.3.**    Cancellation of Assumed Names.    Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark "Koala Insulation" and all other Marks, and/or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five days after termination or expiration of this Agreement.

**14.4.**    Assign Lease; Modification of Premises.    Franchisor, or any affiliate of Franchisor, shall have the right and option, but not the obligation, in Franchisor's sole discretion, to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location (if applicable).    Franchisor may assign or delegate this right or option to any affiliate or designee of Franchisor, without notice to, or request for approval from, the landlord or lessor of the Franchise Location.    If Franchisor or its assignee or delegatee does not elect or is unable to exercise any option it may have to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location, Franchisee shall make such modifications or alterations to the Franchise Location operated hereunder immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of said premises from that of other Franchises, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.    If Franchisee fails or refuses to comply with the requirements of this **Section 14.4**, Franchisor (or its designee) shall have the right to enter upon the premises of the Franchise, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

**14.5.**    Telephone, Etc.    Franchisee shall cease use of, and if Franchisor requests, shall transfer to Franchisor, all telephone numbers, customer lists, and any

domain names, websites, email addresses, and any other identifiers, whether or not authorized by Franchisor, used by Franchisee while operating the Franchise.

**14.6.** <u>No Confusion</u>.  Franchisee agrees, if it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit copy, or colorable imitation of the Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Marks, and further agrees not to utilize any designation of origin, description, trademark, service mark, or representation which suggests or represents a present or past association or connection with Franchisor, the System, or the Marks.

**14.7.** <u>Pay Monies Owed</u>.  Franchisee shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates (regardless of whether those obligations arise under this Agreement or otherwise).  In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default.

**14.8.** <u>Damages and Costs</u>.  Franchisee shall pay Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this **Section 14**.

**14.9.** <u>Return of Manuals</u>.  Franchisee shall immediately deliver to Franchisor the Manuals and all other manuals, records, and instructions containing confidential information (including without limitation any copies thereof, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of Franchisor.

**14.10.** <u>Option to Purchase Furnishings and Equipment</u>.  Franchisor shall have the option to purchase from Franchisee any or all of the Koala Rigs and other vehicles, furnishings, equipment, signs, fixtures, supplies, or inventory of Franchisee related to the operation of the Franchise, at the lesser of the fair market value or Franchisee's book value.  Franchisor shall have 30 days from the expiration or termination of this Agreement to notify Franchisee that Franchisor will exercise its option under this Section 14.10, and another 60 days from such notice to complete such purchase.  The book value of any such item shall be determined based upon a five-year straight-line depreciation of original costs.  For equipment that is five or more years old, the parties agree that fair market value shall be deemed to be 10% of the equipment's original cost.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee as well as all amounts due to Franchisor's affiliates from Franchisee.  Franchisee shall take all actions as necessary to ensure that any items purchased by Franchisor shall be free of all liens or other encumbrances at the time Franchisee sells such items to Franchisor.

**14.11.** Right to Enter and Operate. In order to preserve the goodwill of the System following termination, Franchisor (or its designee) shall have the right to enter the Franchise Location (if applicable) (without liability to Franchisee, Franchisee's Principals, or otherwise) or to take possession of the Koala Vehicle(s) used by Franchisee for the purpose of continuing the Franchise's operation and maintaining the goodwill of the business.

**14.12.** Close Vendor Accounts. Franchisee must close all accounts with vendors which were opened in connection with the opening and operation of the Franchise. Franchisor has the right to notify Franchisee's vendors that this Agreement has expired or been terminated and to require them to close Franchisee's accounts, if Franchisee fails to do so.

**14.13.** Security Interest. For the purpose of securing its obligations under this Agreement, Franchisee hereby grants Franchisor a security interest in all personal property related to the operation of the Franchise of any nature now owned or hereinafter acquired by Franchisee, including, but not limited to, all signs, logos bearing any of the Marks, inventory, equipment, Koala Rigs(s), trade fixtures, furnishings and accounts, together with the proceeds therefrom (the **"Security Agreement"**). Any event of default by Franchisee under this Agreement shall be deemed a breach of the Security Agreement. Franchisee covenants to execute and deliver to Franchisor any and all instruments Franchisor may reasonably request from time to time in order to perfect the security interest granted herein, including, without limitation, the appropriate UCC-1 Financing Statements.

15. COVENANTS

**15.1.** Full Time and Best Efforts. Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee (or its Operating Principal if Franchisee is an entity) (or a Manager who will assume primary responsibility for the franchise operations and shall have been previously approved in writing by Franchisor) and a Salesperson shall devote full time, energy, and best efforts to the management and operation of the Franchise.

**15.2.** In-Term Covenants. Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System. Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

**15.2.1.** Divert or attempt to divert any business or customer of the Franchise or of any Franchise using the System to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Marks and the System.

**15.2.2.** Unless released in writing by the employer, (a) employ or seek to employ any person who (i) is at that time employed by Franchisor, or (ii) who was, within six months prior to his/her employ by Franchisee, or any person acting for, on behalf of, or at the directions of Franchisee employed by Franchisor, or (b) otherwise directly or indirectly induce such person to leave his or her employment.

**15.2.3.** Except as otherwise approved in writing by Franchisor, own, maintain, operate, engage in, or have any interest in any "**Competitive Business**" in any location, which shall mean a business which offers insulation evaluation, installation or removal, energy efficiency evaluations and improvements, and related services.

**15.3.**  Post-Term Covenants.  Franchisee covenants that, except as otherwise approved in writing by Franchisor, it shall not, for a continuous uninterrupted period of two years from the date of:  (a) a transfer permitted under **Section 12**; (b) expiration or termination of this Agreement (regardless of the cause for termination); or (c) a final order of a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to the enforcement of this **Section 15.3**; either directly or indirectly (through, on behalf of, or in conjunction with any persons or entity), own, maintain, operate, engage in, or have any interest in any Competitive Business which is, or is intended to be, located:  (a) at the Approved Location; (b) within the Territory; (c) within a 25-mile radius of the Territory; or (d) within a 25-mile radius of the territory of any other Franchises or company or affiliate-owned Koala Insulation business in operation as of the time that the obligations under this **Section 15.3** commence.

**15.4.**  Publicly-Held Corporations.  **Section 15.3** shall not apply to ownership by Franchisee of less than 5% beneficial interest in the outstanding equity securities of any Publicly Held Corporation.  As used in this Agreement, the term "**Publicly Held Corporation**" shall be deemed to refer to a corporation which has securities that have been registered under the Securities Exchange Act of 1934.

**15.5.**  Individual Covenants.  Franchisee shall require and obtain execution of covenants similar to those set forth in **Section 8 and** this **Article 15** (as modified to apply to an individual) from any or all of Franchisee's Principals, the Manager, any replacement Manager and other highly trained personnel as designated by Franchisor.  The covenants required by this **Section 15.5** shall be in the form provided in **Exhibit D** to this Agreement.

**15.6.**  Severability.  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of the covenants in this **Section 15** is held to be unenforceable or unreasonable by any court, it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

**15.7.**  Scope of Covenants.  Franchisee understands and acknowledges that Franchisor shall have the right to reduce the scope of any covenant set forth in

**Sections 15.2** and **15.3** in this Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified.

**15.8.** Enforcement of Claims. Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this **Section 15**. Franchisee agrees to pay all costs and expenses (including without limitation reasonable attorneys' fees and all other costs) incurred by Franchisor in connection with the enforcement of this **Section 15**.

**15.9.** Irreparable Injury. Franchisee acknowledges that Franchisee's violation of the terms of this **Section 15** would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this **Section 15**.

16.    TAXES, PERMITS, AND INDEBTEDNESS

**16.1.** Taxes. Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, income, unemployment, and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement. Franchisee shall pay Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

**16.2.** Tax Disputes. In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchise, or any improvements thereon.

**16.3.** Compliance With Laws. Franchisee shall comply with all federal, state, and local laws, rules, and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the business franchised under this Agreement, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, and fire clearances.

**16.4.** Notification of Claims. Franchisee shall notify Franchisor in writing within three days of receipt of notice of any health or safety violation, the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, or within three days occurrence of any accident or injury which may adversely affect

the operation of the Franchise or the financial condition of Franchisee, or give rise to liability or a claim against Franchisee or Franchisor.

17.    **INDEPENDENT CONTRACTOR AND INDEMNIFICATION**

**17.1.**    Independent Contractors.  It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

**17.2.**    Identification as Independent Contractor.  At all times during the term of this Agreement and any extensions hereof, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor.

**17.3.**    No Agency.  It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be liable by reason of any act or omission of Franchisee in its conduct of the Franchise or for any claim or judgment arising therefrom against Franchisee or Franchisor.

**17.4.**    Indemnification and Advancement.  Franchisee shall immediately and unconditionally advance costs and expenses, indemnify and hold Franchisor and its affiliates, and their respective officers, directors, members, managers, employees, and agents harmless against any and all claims, obligations, and damages (as well as the costs, including attorneys' fees, of defending against them) arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Franchise or Franchisee's breach of this Agreement, including, without limitation, those alleged to be caused by Franchisor's negligence or breach of this Agreement, but not including those claims, obligations, and damages that are determined to be caused solely by Franchisor's gross negligence or willful misconduct according to a final, unappealable ruling issued by a court with competent jurisdiction. In addition to the above and without regard to the final ruling on any matter, Franchisee and its respective Principals hereby agree to immediately and unconditionally advance, or pay directly to designated parties, any amounts which are incurred in connection with any claim against Franchisor or its affiliates, and their respective officers, directors, members, managers, employees, and agents arising from or relating to, directly or indirectly, Franchisee's operation of the Franchise or Franchisee's breach of this Agreement without regard to any defenses based on errors, omissions or conduct of Franchisor or its members, managers, shareholders, directors, affiliates or agents. If Franchisor incurs any costs or expenses, including, without limitation, legal fees, travel expenses, and other charges, in connection with any proceeding involving Franchisee in which Franchisor is not a party, Franchisee shall reimburse

Franchisor for all such costs and expenses promptly upon presentation of invoices. Franchisee acknowledges and agrees that Franchisee's indemnification and hold harmless obligations under this **Section 17.4** shall survive the termination or expiration of this Agreement.

18.    FORCE MAJEURE

Neither party shall be responsible to the other for non-performance or delay in performance occasioned by causes beyond its control, including without limiting the generality of the foregoing:  (a) acts of God; (b) acts of war, terrorism, or insurrection; (c) strikes, lockouts, labor actions, boycotts, floods, fires, hurricanes, tornadoes, and/or other casualties; (d) the inability of Franchisor and/or its affiliates or suppliers to manufacture, purchase, and/or cause delivery of any products used in the operation of the Franchise; and (e) legislative changes and/or governmental orders affecting the sale of the products from Franchises.  The inability of either party to obtain and/or remit funds shall be considered within control of such party.

19.    APPROVALS AND WAIVERS

**19.1.**   Approvals.   Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent must be obtained in writing.

**19.2.**   No Warranties.   Franchisee acknowledges and agrees that Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

**19.3.**   Waivers.   No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee or any other franchisee under any of the terms, provisions, covenants, or conditions of this Agreement, and no custom or practice by the parties at variance with the terms of this Agreement, shall constitute a waiver by Franchisor to enforce any such right, option, duty, or power as against Franchisee, or as to subsequent breach or default by Franchisee.  Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding or succeeding breach by Franchisee of any terms, provisions, covenants, or conditions of this Agreement.

20.    NOTICES

All notices and other communications required or permitted under this Agreement will be in writing and will be given by one of the following methods of delivery: (i) personally; (ii) by certified or registered mail, postage prepaid; (iii) by overnight delivery service; or (iv) if to Franchisee, by email if an email address is designated on the Summary Page.  Notices to Franchisee will be sent to the address set forth on the Summary Page. Notices to Franchisor must be sent to:

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D95F60771B21

KOALA INSULATION FRANCHISOR, LLC
2426 Old Brick Road,
Glen Allen, VA 23060
Attention: General Counsel

Either party may change its mailing address by giving notice to the other party. Notices will be deemed received the same day when delivered personally or upon actual or attempted delivery when sent by registered or certified mail or overnight delivery service.

21.    ENTIRE AGREEMENT AND AMENDMENT

This Agreement and all exhibits to this Agreement, constitute the entire agreement between the parties. This Agreement supersedes any and all prior negotiations, understandings representations and agreements. No representations have induced You to execute this Agreement with Franchisor. Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require You to waive reliance on any representation that Franchisor made in the most recent disclosure document (including its exhibits and amendments) (the "FDD") that Franchisor delivered to You or Your representative, subject to any agreed-upon changes to the contract terms and conditions described in that disclosure document and reflected in this Agreement (including any riders or addenda signed at the same time as this Agreement).

You acknowledge that you are entering into this Agreement as a result of your own independent investigation and not as a result of any representations (with the exception of those representations made in the FDD) made by Franchisor, its members, managers, officers, directors, employees, agents, representatives or independent contractors that are contrary to the terms set forth in this Agreement. You acknowledge that the FDD you received contained a copy of this Franchise Agreement and that you reviewed the FDD and Franchise Agreement at least fourteen (14) days (or such other time as applicable law requires) before you signed this Agreement. You further understand acknowledge and agree that any information you obtain from any Franchisor's franchisee, including relating to their sales, profit, cash flows, and/or expenses, does not constitute information obtained from Franchisor, nor does Franchisor make any representation as to the accuracy of any such information.

22.    SEVERABILITY AND CONSTRUCTION

**22.1.**    Severability. If any of the provisions of this Agreement may be construed in more than one way, one of which would render the provision illegal or otherwise voidable or unenforceable, such provision shall have the meaning which renders it valid and enforceable. The language of all provisions of this Agreement shall be

construed according to its fair meaning and not strictly against any party. In the event any court or other government authority shall determine any provision in this Agreement is not enforceable as written, the parties agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws and public policies of the jurisdiction in which enforcement is sought and affords the parties the same basic rights and obligations and has the same economic effect. If any provision in this Agreement is held invalid or otherwise unenforceable by any court or other government authority or in any arbitration proceeding, such findings shall not invalidate the remainder of this Agreement unless in the reasonable opinion of Franchisor the effect of such determination has the effect of frustrating the purpose of this Agreement, whereupon Franchisor shall have the right by notice in writing to the other party to immediately terminate this Agreement.

**22.2.** <u>No Other Rights</u>. Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or entity other than Franchisee, Franchisor, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted by **Article 12**), any rights or remedies under or by reason of this Agreement.

**22.3.** <u>Enforceability of Covenants</u>. Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

**22.4.** <u>Construction</u>. All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

**22.5.** <u>Importance of Timely Performance</u>. Time is of the essence in this Agreement.

**22.6.** <u>Survival of Provisions</u>. All provisions of this Agreement which, by their terms or intent, are designed to survive the expiration or termination of this Agreement, shall so survive the expiration and/or termination of this Agreement.

**22.7.** <u>Additional Terms; Inconsistent Terms</u>. The parties may provide additional terms by including the terms on the Summary Page. To the extent that any provisions of the Summary Page are in direct conflict with the provisions of this Agreement, the provisions of the Summary Page shall control.

23.  <u>APPLICABLE LAW AND DISPUTE RESOLUTION</u>

**23.1.** <u>Governing Law</u>.  This Agreement takes effect upon its acceptance and execution by Franchisor, and shall be interpreted and construed exclusively under the laws of the Commonwealth of Virginia, which laws shall prevail in the event of any conflict of law (without regard to, and without giving effect to, the application of Virginia choice-of-law rules).  Nothing in this **Section 23.1** is intended by the parties to subject this Agreement to any franchise, business opportunity, consumer protection, or similar law, rule, or regulation of the Commonwealth of Virginia to which this Agreement would not otherwise be subject.

**23.2.** <u>Arbitration</u>.

**23.2.1.** <u>Disputes Subject to Arbitration</u>. Except as expressly provided to the contrary in this Agreement, any controversy or claim arising out of or relating to this Agreement or the relationship of the parties shall be settled by arbitration administered by the American Arbitration Association (the **"AAA"**) in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction. Any dispute as to whether this arbitration clause applies or whether any particular claim is subject to arbitration shall be decided by arbitration in accordance with this Article 23.

**23.2.2.** <u>Arbitration Claims</u>.  The parties agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. The parties further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is waived and forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either party. The parties agree that arbitration will be conducted on an individual basis, that neither party shall pursue class claims nor multi-plaintiff actions, and that an arbitration proceeding between Franchisor and its affiliates, or any of them, on the one hand, and Franchisee and its affiliates and any of their respective officers, directors, managers, agents, representatives, employees, successors and assigns, on the other hand, may not be consolidated with any other arbitration proceeding to which Franchisor and/or its affiliates are a party. Notwithstanding the foregoing, if any court determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section, then the parties agree that this arbitration clause shall not apply to that dispute and that such dispute shall be resolved in a judicial proceeding. For purposes of this Section, Franchisor and its affiliates includes their respective shareholders, partners, members and other owners, officers, directors, managers, agents, representatives, employees, successors and assigns.

**23.2.3.** <u>Location</u>. The place of arbitration shall be the AAA office located nearest to Franchisor's principal place of business on the date the arbitration action is filed.

**23.2.4.** <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration will be confidential, except as required by law or as required for Franchisor to comply with laws and regulations applicable to the sale of franchises.

**23.2.5.** <u>Performance During Arbitration</u>. Franchisor and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration process.

**23.3.** <u>Venue</u>. For any matter which is not subject to the arbitration provisions of **Section 23.2**, each party hereto consents to personal jurisdiction in the federal or state courts located in the county in which Franchisor's principal place of business is located at the time that the action commences. Franchisee and its Principals hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.

**23.4.** <u>No Exclusive Remedies</u>. No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

**23.5.** <u>Injunctive Relief</u>. Notwithstanding anything contained herein, Franchisor reserves the right to seek and obtain temporary restraining orders or other emergency temporary or preliminary equitable injunctive relief and file actions to collect royalties and other amounts owed by Franchisee to Franchisor (collection actions) from federal or state courts located in the state in which the Franchise is located. The parties acknowledge and agree that the rights of Franchisor under this Agreement with respect to the use of the Marks and the System and the enforcement of the in-term and post-term noncompetition covenants of Franchisor are of a specialized and unique nature and that immediate and irreparable damage will result to Franchisor if Franchisee fails or refuses to perform obligations under this Agreement, and, notwithstanding any election by Franchisor to claim damages from Franchisee as a result of such failure or refusal, Franchisor may, in addition to any other remedies and damages available, seek an injunction in any court of competent jurisdiction to restrain such failure or refusal.

**23.6.** <u>Waiver of Jury Trial</u>. Franchisor and Franchisee irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action or proceeding.

**23.7.** <u>Limitation of Actions</u>. Any and all claims and actions arising out of or relating to this agreement, the relationship of Franchisee and franchisor, or Franchisee's operation of the Franchise (including any defenses or any claims of set-off or recoupment) must be brought or asserted before the expiration of the

earlier of (a) the time period for bringing an action under any applicable state or federal statute of limitations; (b) one  year after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim; or (c) two years after the first act or omission giving rise to an alleged claim; or it is expressly acknowledged and agreed by all parties that such claims or actions shall be irrevocably barred. Claims of franchisor attributable to underreporting of sales, and claims of the parties for failure to pay monies owed and/or indemnification shall be subject only to the applicable state or federal statute of limitations.

**23.8.** <u>Limitation on Damages</u>.  Franchisor and Franchisee hereby waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other, and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.  In any action arising out of or relating to this Agreement or the relationship of the parties, in no event shall Franchisor be liable to Franchisee for more than the total Initial Franchise Fee.

**23.9.** <u>Costs and Attorneys' Fees</u>.  If either Franchisor or Franchisee seeks to enforce this Agreement in an arbitration or a judicial or other proceeding, the prevailing party shall be entitled to recover its reasonable costs and expenses (including attorneys' fees, attorneys' assistants' fees, accountants' fees, expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel, room and board, salaries and benefits of those employees participating in such proceeding) incurred in connection with such judicial or other proceeding.

24.    <u>ACKNOWLEDGMENTS</u>

**24.1.** <u>Acknowledgments</u>.   Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, recognizes that the business venture contemplated by this Agreement involves business risks, and that its success will be largely dependent upon the ability of Franchisee and, if an entity, its owners as independent businesspersons.  Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received from Franchisor or any employee, representative or other party purporting to act on Franchisee's behalf, any warranty, promise or guarantee, express or implied, as to the potential sales volume, profits, or success of the business venture contemplated by this Agreement.

**24.2.** <u>Receipt of Documents</u>.  Franchisee acknowledges that it received a copy of this Agreement, the exhibit(s) hereto, and agreements relating hereto, if any, with all of the blank lines therein filled in, prior to the date on which this Agreement was executed, and with sufficient time within which to review this Agreement, with advisors of its choosing.  Franchisee further acknowledges that it received the franchise disclosure document required by the Federal Trade Commission's Franchise Rule at least 14 days prior to the date on which this Agreement was executed.

**24.3.** <u>Representations and Warranties</u>. Franchisee and its Principals represent and warrant to Franchisor that: (a) neither Franchisee nor any of its Principals have made any untrue statement of any material fact nor omitted to state any material fact in obtaining the rights granted herein; (b) neither Franchisee nor any of its Principals have any direct or indirect legal or beneficial interest in any business that may be deemed a Competitive Business, except as otherwise completely and accurately disclosed in its franchise application materials; and (c) Franchisee and its Principals have a legal right to own and operate the Franchise. Franchisee recognizes that Franchisor approved Franchisee in reliance on all of the statements Franchisee and its Principals have made in connection therewith, and that Franchisee has a continuing obligation to advise Franchisor of any material changes in these statements and representations made to Franchisor in this Agreement or in the franchise application.

**24.4.** <u>Compliance with Executive Order 13224</u>. Under applicable U.S. law, including, without limitation, Executive Order 13224, signed on September 23, 2001 (**"Order"**), Franchisor is prohibited from engaging in any transaction with any person engaged in, or with a person aiding any person engaged in, acts of terrorism, as defined in the Order. Accordingly, Franchisee represents and warrants to us that, as of the date of this Agreement, neither Franchisee nor any person holding any ownership interest in you, controlled by you, or under common control with Franchisee is designated under the Order as a person with whom business may not be transacted by Franchisor, and that Franchisee: (a) does not, and hereafter will not, engage in any terrorist activity; (b) are not affiliated with and do not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and (c) are not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity.

**24.5.** <u>No Other Obligations</u>. Each party represents and warrants to the others that there are no other agreements, court orders, or any other legal obligations that would preclude or in any manner restrict such party from: (a) negotiating and entering into this Agreement; (b) exercising its rights under this Agreement; and/or (c) fulfilling its responsibilities under this Agreement.

**24.6.** <u>No Other Representations</u>. Franchisee acknowledges Franchisor has not (and shall not be deemed to have) given any representation, promise, or guarantee of Franchisee's success.

**24.7.** <u>Business Judgment</u>. Franchisee understands and agrees that Franchisor may operate and change the System and its business in any manner that is not expressly and specifically prohibited by this Agreement. Whenever Franchisor has expressly reserved in this Agreement or is deemed to have a right and/or discretion to take or withhold an action, or to grant or decline to grant Franchisee a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement, Franchisor may make such decision or exercise its right and/or discretion on the basis of Franchisor's judgment of what is in Franchisor's best

interests, including without limitation Franchisor's judgment of what is in the best interests of the franchise network, at the time Franchisor's decision is made or its right or discretion is exercised, without regard to whether: (a) other reasonable alternative decisions or actions, or even arguably preferable alternative decisions or actions, could have been made by Franchisor; (b) Franchisor's decision or the action taken promotes Franchisor's financial or other individual interest; (c) Franchisor's decision or the action it takes applies differently to Franchisee and one or more other franchisees or Franchisor's company-owned or affiliate-owned operations; or (d) Franchisor's decision or the exercise of its right or discretion is adverse to Franchisee's interests.  In the absence of an applicable statute, Franchisor will have no liability to Franchisee for any such decision or action. Franchisor and Franchisee intend that the exercise of Franchisor's right or discretion will not be subject to limitation or review.  If applicable law implies a covenant of good faith and fair dealing in this Agreement, Franchisor and Franchisee agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants Franchisor the right to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisee's rights and obligations hereunder.

**24.8.** <u>Consultation</u>.  Franchisee acknowledges that it has read and understands this Agreement, the exhibits hereto, and agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors (including attorneys) of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Agreement on the day and year first above written.

<b>KOALA INSULATION FRANCHISOR, LLC</b>

By: _Scott Eide_ _____
Name:  Cory Lyons
Title: Brand President

<b>Lotus & The Rooster Holdings Company</b>

By: _____
Name:  Salim Michel Makhlouf
Title: Owner of Lotus & The Rooster Holdings Company

**EXHIBIT A TO THE FRANCHISE AGREEMENT**

TRADEMARKS

| Mark | Registration Number | Registration Date |
|---|---|---|
| **KOALA INSULATION** | 6006546 | March 10, 2020 |
|  | 6007883 | March 10, 2020 |
|  | 6173027 | October 13, 2020 |
| **Delivering Efficiency. Improving Comfort.** | 6079379 | March 31, 2020 |

## EXHIBIT B TO THE FRANCHISE AGREEMENT

LEASE RIDER TO LEASE AGREEMENT DATED _____

BY AND BETWEEN

_____, AS "LANDLORD"

AND

_____, AS "TENANT" FOR
THE DEMISED PREMISES ("PREMISES") DESCRIBED THEREIN

This Rider and the provisions hereof are hereby incorporated into the body of the lease to which this Rider is attached (the "Lease"), and the provisions hereof shall be cumulative of those set forth in the Lease, but to the extent of any conflict between any provisions of this Rider and the provisions of the Lease, this Rider shall govern and control.

1.      <u>Consent to Collateral Assignment to Franchisor</u>. If Franchisor takes possession of the Premises and confirms to Landlord that Franchisor has assumed the Lease as tenant thereunder, Landlord will recognize Franchisor as tenant under the Lease.  Landlord agrees that in such event Franchisor may further assign the Lease to or enter into a sublease with a person or entity who agrees to assume the tenant's obligations under the Lease and is reasonably acceptable to Landlord and that, upon that assignment, Franchisor will have no further liability or obligation under the Lease as assignee, tenant or otherwise, other than to certify that the additional assignee or sublessee operates the Premises as a Franchise.

2.      <u>Use of Premises</u>.   Without limitation of uses permitted under the Lease, but in expansion thereof, the Premises may be used for the purpose of operation of a Koala Insulation Franchise offering insulation installation, removal, evaluation and related services.

3.      <u>Compliance of Premises With Applicable Law</u>.  Landlord represents and warrants that as of the date hereof the Premises are in compliance with all applicable law.

4.      <u>Notice and Cure Rights to Franchisor</u>.  Prior to exercising any remedies under the Lease (except in the event of imminent danger to the Premises), Landlord shall give Franchisor written notice of any default thereunder by Tenant, and commencing upon receipt thereof by Franchisor, Franchisor shall have the same length cure period as is given to Tenant under the Lease for such default, provided that in no event shall Franchisor have a cure period of less than (i) 10 days after Franchisor's receipt of such notice as to monetary defaults or (ii) 30 days after Franchisor's receipt of such notice as to non-monetary defaults.  Landlord agrees to accept cure tendered by Franchisor as if the same was tendered by Tenant, but Franchisor has no obligation to cure such default. The initial address for notices to Franchisor is as follows:

KOALA INSULATION FRANCHISOR, LLC
2426 Old Brick Road
Glen Allen, VA 23060
Attention:  General Counsel

5.    <u>Non-disturbance from Mortgage Lenders</u>. It is a condition of the Lease being subordinated to any mortgage, deed of trust, deed to secure debt or similar encumbrance on the Premises that the holder of such encumbrance agree not to disturb Tenant's rights under the Lease or Tenant's possession of the Premises, so long as Tenant is not in default of its obligations under the Lease beyond any applicable grace or cure period provided therein.

*CHECK THE FOLLOWING PARAGRAPH THAT APPLIES. CHECK ONLY ONE.  IF NONE IS CHECKED, THEN CLAUSE a) BELOW WILL BE APPLICABLE, AND CLAUSE b) BELOW WILL BE DEEMED DELETED*

a)    ☐    Landlord represents and warrants that on the date hereof no mortgage, deed of trust, deed to secure debt or similar encumbrance encumbers the Premises.

b)    ☐    A mortgage, deed of trust or deed to secure debt currently encumbers the Premises.  It is a condition precedent to Tenant's obligations under the Lease that the holder of such encumbrance enter into a written recordable form subordination and non-disturbance agreement with Tenant, in a form reasonably acceptable to Tenant, as described above.

6.    <u>Third Party Beneficiary</u>.  For so long as Franchisor holds a collateral assignment of the Lease, Franchisor is a third party beneficiary of the Lease.

7.    <u>Franchisor Right to Enter</u>.  Upon the expiration or earlier termination of the Lease or the Franchise Agreement, Franchisor or its designee may enter upon the Premises for the purpose of removing all signs and other material bearing the Koala name or trademarks, service marks or other commercial symbols of Franchisor.

AGREED and executed and delivered under seal by the parties hereto as of the day and year of the Lease.

**LANDLORD:**                                **TENANT:**

_____                _____

By:                                         By:

_____                _____

                                           _____

_____
_____

Name:

_____
_____

Title:

_____
_____
_____

_____
_____

Name:

_____
_____

Title:

_____
_____
_____

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D95560771821

# EXHIBIT C TO THE FRANCHISE AGREEMENT

## GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to KOALA INSULATION FRANCHISOR, LLC, a Delaware limited liability company ("Franchisor") to execute the Franchise Agreement between Franchisor and Lotus & The Rooster Holdings Company, a Pennsylvania Corporation ("Franchisee"), dated 10/11/2023 | 7:26 AM PDT _____, (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and Franchisor's successors and assigns that all of Franchisee's monetary and other obligations under the Agreement will be punctually paid and performed.

Each of the undersigned has had the opportunity to review the Agreement, and understands his or her obligations hereunder and thereunder.

Upon demand by Franchisor, the undersigned each hereby jointly and severally agree to immediately make each payment required of Franchisee under the Agreement and waive any right to require Franchisor to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee; or (d) give notice of demand for payment by Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee, and the undersigned each hereby jointly and severally waive notice of same and agree to remain and be bound by any and all such amendments and changes to the Agreement.

The undersigned each hereby jointly and severally agree to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorney's fees, reasonable costs of financial and other investigation, court costs, and fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned each hereby jointly and severally acknowledge and expressly agree to be individually bound by all of the covenants contained in Sections 8, 12, 14, 15 and 17.4 of the Agreement, and acknowledge and agree that this Guarantee does not grant the undersigned any right to use the "Koala" marks or system licensed to Franchisee under the Agreement. Each of the undersigned represents that he or she has received a copy of the Franchise Agreement and understands his or her obligations hereunder and thereunder.

Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

If Franchisor is required to enforce this Guarantee in a judicial or arbitration proceeding, and prevails in such proceeding, Franchisor shall be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court

costs, other litigation expenses, travel and room and board expenses, salaries and benefits of those of Franchisor's employee's participating in such proceeding, whether incurred prior to, in preparation for, or in contemplation of the filing of any such proceeding.  If Franchisor is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guarantee, the undersigned shall reimburse Franchisor for any of the above-listed costs and expenses Franchisor incurs.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Sections 22 and 23 of the Agreement.  This Guarantee shall be interpreted and construed under the laws of the Commonwealth of Virginia.  In the event of any conflict of law, the laws of the Commonwealth of Virginia shall prevail (without regard to, and without giving effect to, the application of Virginia conflict of law rules).  Jurisdiction and venue shall be in the state or federal courts located nearest Franchisor's principal place of business at the time that the action is commenced, and the undersigned hereby waives any objection to such jurisdiction and venue. The arbitration provisions of Section 23 of the Agreement shall apply to this Guaranty.

Non-Owner Spousal Guarantee. If this Guarantee is executed by a spouse (or domestic partner or immediate family member) of the owner of a franchisee entity and such person has no equity or ownership in the franchisee entity or franchise then this Guarantee shall only be enforceable against such non-owner spouse in the event that they receive a material transfer of assets from the spouse (or domestic partner or immediate family member) who has the ownership interest in the franchise or franchisee entity.  This section is intended to ensure that one spouse cannot avoid liability under their guarantee by simply transferring assets to the other spouse.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

**GUARANTOR(S)**

Signed: _____
(In his/her individual capacity)
Name: Salim Michel Makhlouf
Address:  251 S Pitt St, Carlisle, PA 17013

## EXHIBIT D TO THE FRANCHISE AGREEMENT

## NON-DISCLOSURE AND NON-COMPETITION AGREEMENT

**THIS AGREEMENT** ("**Agreement**") is made this <u>10/11/2023 | 7:26 AM PDT</u>, by and between Lotus & The Rooster (the "**Franchisee**"), and Salim Michel Makhlouf, who is a principal, manager, supervisor, member, partner, or a person in a managerial position with, Franchisee (the "**Member**").

BACKGROUND:

A.     Koala Insulation Franchisor, LLC, a Delaware limited liability company ("**Franchisor**") owns a format and system (the "**System**") relating to the establishment, development and operation of an insulation and related services business that operate under the name "Koala Insulation" (or other names designated by Franchisor, the "**Marks**") and such additional or alternate services and/or products as Franchisor may designate from time to time (each a "**Franchise**").

B.     Franchisor and Franchisee have executed a Franchise Agreement ("**Franchise Agreement**") granting Franchisee the right to operate a Franchise (the "**Franchise**") and to produce and distribute products and services approved by Franchisor and use the Marks in connection therewith under the terms and conditions of the Franchise Agreement;

C.     The Member, by virtue of his or her position with Franchisee, will gain access to certain of Franchisor's Confidential Information, as defined herein, and must therefore be bound by the same confidentiality and non-competition agreement that Franchisee is bound by.

**IN CONSIDERATION** of these premises, the conditions stated herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.     <u>Confidential Information</u>. Member shall not, during the term of the Franchise Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity, persons, partnership, entity, association, or corporation any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised thereunder which may be communicated to Member or of which Member may be apprised by virtue of Franchisee's operation under the terms of the Franchise Agreement. Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others.

2.    <u>Covenants Not to Compete</u>.

(a)    Member specifically acknowledges that, pursuant to the Franchise Agreement, and by virtue of its position with Franchisee, Member will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.

(b)    Member covenants and agrees that during the term of Member's employment with, or ownership interest in, Franchisee, and except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity:

(i)    Divert or attempt to divert any business or customer of the Franchise or of any other System franchisee or unit operated by Franchisor (or an affiliate of Franchisor) to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and/or the System;

(ii)    Employ or seek to employ any person who is at that time employed by Franchisor or Franchisee, or otherwise directly or indirectly induce such person to leave his or her employment; or

(iii)    Own, maintain, operate, engage in, be employed by, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services.

(c)    Member covenants and agrees that during the Post-Term Period (defined below), except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity, own, maintain, operate, engage in, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services and which business is, or is intended to be, located: (i) at the Franchise location; (ii) within the Territory of the Franchise, which Territory includes the areas defined by the Summary Page of the Franchise Agreement and any amendments thereto; (iii) within a 25-mile radius of the Territory; or (iv) within a 25-mile radius of the territory any other System franchisee or Koala Insulation business owned by Franchisor or its affiliate at the time that the obligations under this **Section 2(c)** commence;

(d)    As used in this Agreement, the term **"Post-Term Period"** shall mean a continuous uninterrupted period of two years from the date of: (a) a transfer permitted under **Section 12** of the Franchise Agreement with respect to Member; and/or (b) termination of Member's employment with, and/or ownership interest in, Franchisee.

3.    <u>Injunctive Relief.</u> Member acknowledges that any failure to comply with the requirements of this Agreement will cause Franchisor irreparable injury, and Member agrees to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this Agreement.

4.    <u>Severability.</u> All agreements and covenants contained herein are severable. If all or any portion of the covenants in this Agreement is held to be unenforceable or unreasonable by any court, then it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

5.    <u>Delay.</u> No delay or failure by Franchisor or the Franchisee to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right provided herein, and no waiver of any violation of any terms and provisions of this Agreement shall be construed as a waiver of any succeeding violation of the same or any other provision of this Agreement.

6.    <u>Third-Party Beneficiary.</u> Member hereby acknowledges and agrees that Franchisor is an intended third-party beneficiary of this Agreement with the right to enforce it, independently or jointly with Franchisee.

**IN WITNESS WHEREOF**, Franchisee and the Member attest that each has read and understands the terms of this Agreement, and voluntarily signed this Agreement on this day of _10/11/2023 | 7:26 AM PDT_____.

**FRANCHISEE:**                                **MEMBER:**

**Lotus & The Rooster Holdings Company**                    **Salim Michel Makhlouf**

Signature: _____        Signature: _____
**Salim Michel Makhlouf,**

**Title:** _Owner of Lotus & The Rooster Holdings Company_

## EXHIBIT E TO THE FRANCHISE AGREEMENT

EQUIPMENT SALES AGREEMENT

THIS EQUIPMENT SALES AGREEMENT is made on _____, 2022, by KOALA FRANCHISE LLC, a Delaware limited liability company (hereinafter known as "Seller") and [Franchisee], a _____ (hereinafter known as "Buyer"). Buyer and Seller shall collectively be known herein as "the Parties".

BACKGROUND

WHEREAS, Seller desires to sell the equipment described below, known herein as the "Acquired Equipment", under the terms and conditions set forth below;

WHEREAS, Buyer desires to purchase the Acquired Equipment offered for sale by Seller under the terms and conditions set forth below; and, therefore,

TERMS AND CONDITIONS

IN CONSIDERATION of the mutual promises and other valuable consideration exchanged by the Parties as set forth herein, the Parties, intending to be legally bound, hereby agree as follows:

**1.  Description of Acquired Equipment.**

The following vehicle (and all equipment within or attached to such vehicle):

1 – Spray Foam Rig

1 – Blow-In Rig

**2. Purchase Price.** The total purchase price to be paid by Buyer to Seller for the Acquired Equipment is _____ ("Purchase Price").

Payment is to be made by Buyer to Seller in cash, by certified funds, financed under the terms of a commercial finance agreement, or through another instrument acceptable to Seller. Buyer must receive permission in advance from Seller for use of a non-certified funds in payment of the Purchase Price.

**3.  Delivery of Acquired Equipment and Conveyance of Title.**

(a).    <u>Delivery of Acquired Vehicle</u>. Seller shall deliver the Acquired Equipment, and Buyer shall take possession of same, at Seller's premises or other premises as designated by Seller (either in person or through a third party) on or before that date that is within 10 days of the date hereof ("Delivery Date"). If delivery is to be made at a date after the execution of this contract, it is Seller's duty to ensure that the Acquired Equipment is delivered in the same condition as when last inspected by the Buyer (or, if no Buyer inspection, the execution date of this agreement). It is Buyer's duty, either in person or through a third party to appear at Seller's premises during standard business

hours on or before the Delivery Date to remove the Acquired Equipment from Seller's premises. However, if Buyer fails to appear at Seller's premises on or before the Delivery Date to accept possession of the Acquired Equipment, then risk of loss passes to the Buyer on the Delivery Date.

(b).    <u>Conveyance of Title</u>. Seller shall convey title to Buyer upon delivery of the equipment to Buyer, which shall not occur until payment is made in full. Seller agrees and covenants to execute all documents presented by Buyer which are necessary to finalize transfer of title and registration upon the Acquired Equipment to Buyer.

## 4.  Representations, Warranties, and Disclosures.

(a)  Warranties.

THIS EQUIPMENT IS SOLD "AS IS", AND SELLER DOES NOT IN ANY WAY, OTHER THAN PARAGRAPH A §§ 1-7 ABOVE, EXPRESSLY OR IMPLIEDLY, GIVE ANY WARRANTIES TO BUYER. SELLER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE.

_____
Buyer Initials

(b)  Odometer Declaration. Seller hereby states that the odometer in the Acquired Equipment (if such equipment has an odometer) now reads as indicated above and, to the best of Seller's knowledge, it reflects the actual mileage of the equipment described herein.

**(c)  Buyer Representation**. The individual signing this agreement on behalf of Buyer hereby represents to Seller that he or she has the power and authority to do so on behalf of Buyer.

## 5.    Buyer's Responsibility – Insurance, Tags and Inspections. Buyer acknowledges that unless prohibited by applicable law, any insurance coverage, license, tags, plates or registration maintained by Seller on the Acquired Equipment shall be canceled upon delivery of the Acquired Equipment to, and the acceptance of, by Buyer. Buyer shall inspect and test all equipment and vehicles delivered under this agreement including the inspection of all workmanship performed by installation contractors, vehicle outfitters and other parties that performed any work on the conveyed equipment and vehicle.  Buyer accepts full responsibility for the condition, effectiveness, appropriateness, and use of the conveyed equipment and vehicle. Buyer must inform Seller of any discovered problems or inspection failure prior to taking delivery of vehicle, and provide Seller at least 7 days to cure any flaw, at Seller's own expense. Upon acceptance of delivery, Buyer acknowledges compliance with these requirements and waives all rights of claim against Seller and agrees to indemnify Seller against all claims resulting from the ownership or use of conveyed equipment and vehicles.  Buyer agrees to ensure through due diligence and through its own inspection, assisted by professionals as it sees fit, that all equipment and vehicles comply with all applicable laws, regulations and rules including any weight and engineering requirements.

_____

Buyer's Initials

**6.  Continuation of Representations and Warranties**. All representations and warranties contained in this Agreement (if any) shall continue in full force and effect after execution of this agreement. If either party later learns that a warranty or representation that it made is untrue, it is under a duty to promptly disclose this information to the other party in writing. No representation or warranty contained herein shall be deemed to have been waived or impaired by any investigation made by or knowledge of the other party to this Agreement.

**7.  Indemnification of Attorneys' Fees and out-of-pocket costs.** Should any party materially breach this agreement (including representations and warranties made to the other side), the non-breaching party shall be indemnified by the breaching party for its reasonable attorneys' fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach of this contract (including the breach of representations or warranties). This provision shall not limit in any way the remedies either party may have otherwise possessed in law or equity relative to a breach of this contract. The term "out-of-pocket costs", as used in this contract, shall not include lost profits.

**8.  Severability**. In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

**9.  Modification.** Except as otherwise provided in this document, this agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.

**10.  Acknowledgements**. Each party acknowledges that he or she has had an adequate opportunity to read and study this Agreement, to consider it, to consult with attorneys if he or she has so desired.

**11.  Exclusive Jurisdiction for Suit in Case of Breach**. The Parties, by entering into this agreement, submit to jurisdiction in Richmond, Virginia for adjudication of any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts which have jurisdiction over Richmond, Virginia shall have **exclusive** jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sound in contract, tort, or other areas of the law.

**12.  State Law.** This Agreement shall be interpreted under, and governed by, the laws of the Commonwealth of Virginia.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, Seller and Buyer affix their signatures hereto.

**SELLER**


By: _____
Name: _____ Authorized Officer for Seller
Date: _____, 2022


**BUYER**


By: _____
Name: _____ Authorized Officer for Buyer
Date: _____, 2022

**EXHIBIT B**
**FRANCHISE AGREEMENT AND EXHIBITS**

*MULTISTATE FORM*



KOALA INSULATION FRANCHISOR, LLC

FRANCHISE AGREEMENT

<u>Lotus & The Rooster Holdings Company</u>
Franchisee Name

10/11/2023 | 7:26 AM PDT

Date of Agreement

# TABLE OF CONTENTS

<b>Page</b>

| | | |
|---|---|---|
| 1. | GRANT | 5 |
| 2. | TERM AND RENEWAL | 7 |
| 3. | FRANCHISOR'S DUTIES | 8 |
| 4. | ROYALTY FEES; SALES REPORTING | 10 |
| 5. | FRANCHISEE'S DUTIES | 12 |
| 6. | PROPRIETARY MARKS | 24 |
| 7. | CONFIDENTIAL OPERATING MANUALS | 27 |
| 8. | CONFIDENTIAL INFORMATION | 27 |
| 9. | ACCOUNTING AND RECORDS | 28 |
| 10. | ADVERTISING | 30 |
| 11. | INSURANCE | 35 |
| 12. | TRANSFER OF INTEREST | 37 |
| 13. | DEFAULT AND TERMINATION | 43 |
| 14. | OBLIGATIONS UPON TERMINATION OR EXPIRATION | 46 |
| 15. | COVENANTS | 48 |
| 16. | TAXES, PERMITS, AND INDEBTEDNESS | 50 |
| 17. | INDEPENDENT CONTRACTOR AND INDEMNIFICATION | 51 |
| 18. | FORCE MAJEURE | 52 |
| 19. | APPROVALS AND WAIVERS | 52 |
| 20. | NOTICES | 52 |
| 21. | ENTIRE AGREEMENT AND AMENDMENT | 53 |
| 22. | SEVERABILITY AND CONSTRUCTION | 53 |
| 23. | APPLICABLE LAW AND DISPUTE RESOLUTION | 55 |
| 24. | ACKNOWLEDGMENTS | 57 |

<u>PAGE</u>

1. Effective Date: <u>10/11/2023 | 7:26 AM PDT</u>

2. Franchisee's Name: Lotus & The Rooster Holdings Company

3. Franchisee's State of Organization (if applicable): Pennsylvania

4. Ownership of Franchisee:

   If the Franchisee is an entity, the following persons constitute all of the owners of a legal and/or beneficial interest in the franchisee:

| <u>Name</u> | <u>Percentage Ownership</u> |
|---|---|
| Salim Michel Makhlouf | 100% |

5. Territory (Section 1.1):  Brickerville, PA

Initial Geographic Area: 17557, 17540, 17522, 17578, 17517, 17543, 17501, 17508, 17581, 19501, 17569, 17545, 17550, 17547, 17552, 17538, 17520

Population: 209,888

6. Initial Franchise Fee (Section 4.1): $30,000.00

7. Operating Principal (Section 5.6): Salim Michel Makhlouf

8. Franchisee's Address for Notices (Section 20): 251 S. Pitt St, Carlisle, PA 17013

   Franchisee Email Address for Notices: salim.makhlouf@gmail.com

9. Additional Terms (if any): N/A



Initials: _____(KOALA INSULATION FRANCHISOR, LLC)    _____ (Franchisee)

<u>Exhibits</u>:
A    Trademarks
B    Lease Rider
C    Guarantee, Indemnification and Acknowledgment
D    Non-Disclosure and Non-Competition Agreement
E    Equipment Sale Agreement
F    General Release

## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into as of the date (the "Effective Date") set forth on the Summary Page, which appears after the cover page of this Agreement (the "Summary Page") (the Summary Page and all appendices and schedules attached to this Agreement are hereby incorporated by this reference), by and between KOALA INSULATION FRANCHISOR, LLC, a Delaware limited liability company with its principal place of business at 2426 Old Brick Road, Glen Allen, VA 23060 ("Franchisor" or "we" or "us"), and the entity identified on the Summary Page as the franchisee ("Franchisee" or "you") with its principal place of business as set forth on the Summary Page.

## BACKGROUND:

A.     Franchisor owns a format and system (the "System") relating to the establishment, development and operation of franchises (each a "Franchise") that offer and provide insulation evaluation, removal, installation and related services that operate under the Marks (as defined below) using specially equipped Koala service vehicles and equipment (collectively "Koala Rigs").

B.     The distinguishing characteristics of the System include, without limitation, distinctive business formats; procedures; the Manual (as defined in Section 3.5); the Koala Rigs; procedures for operations, accounting, collections, management and inventory control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time;

C.     Franchisor identifies the System by mark Koala Insulation and associated logos, commercial symbols and such other trade names, mascots, service marks and trademarks as are now, or in the future, designated by Franchisor as an integral part of the System ("Marks") including but not limited to the currently registered Marks identified on Exhibit A some of which may be incorporated into other brands or other systems developed by Franchisor or its affiliates in the future;

D.     Franchisor continues to develop, use, and control the use of such Marks to identify for the public the source of services and products marketed thereunder and under the System, and to represent the System's high standards of quality, appearance, and service; and

E.     Franchisee desires to operate a Franchise under the System and using the Marks, and wishes to obtain a license from Franchisor for that purpose, as well as to receive the training and other assistance provided by Franchisor in connection therewith;

NOW, THEREFORE, the parties agree as follows:

1.    GRANT

    **1.1.**    Grant of Rights; Protected Territory.  Upon the terms and conditions set forth in this Agreement, Franchisor hereby grants to Franchisee a non-exclusive license (the **"License"**) to operate a Franchise that specializes in providing insulation evaluation, removal, installation and related services (the **"Services"**) within the initial geographic area described on the Summary Page (the **"Territory"**).  Franchisee hereby accepts such License and undertakes the obligation to operate a Franchise in accordance with this Agreement during the entire initial term of the License (as specified in **Section 2.1**).  Franchisee acknowledges and agrees that this Territory is non-exclusive but subject to certain limited protections as defined below.

    **1.2.**    Protected Territory.  The Territory, as listed on the Summary Page, shall be designated as "Protected" from the Effective Date of this agreement and shall remain Protected for the duration of the entire initial term plus any extensions thereof provided that the Territory may lose its Protected status through any default of this Agreement or any other agreement with Franchisor or its Affiliates, or by Franchisee's failure to maintain sufficient equipment and staff as required in Franchisor's discretion to provide, without substantial delay, all Services offered under the System to customers within the Territory.  Any of these events, without limitation, constitute cause for revocation of Protected status of the Territory.  Protected status may be revoked only with cause and upon notice.  Once the Territory loses its Protected status it may not be regained.

        **1.2.1.**    While the Territory is Protected Franchisor shall not provide the Services or grant other franchisees or others the right to provide the Services using the Koala Insulation System and Koala Insulation Marks to customers at any location within the Territory other than through the Revenue Sharing Program as hereafter defined.

        **1.2.2.**    Franchisor and other franchisees may advertise (subject to Franchisor approval) online or through any other medium without geographical limitations, including within the Protected Territory, but only Franchisee shall be permitted to provide the Services under the Koala Insulation System within the Protected Territory.

    **1.3.**    Reservation of Rights.  Franchisor and its affiliates have the right to conduct any business activities, under any name, in any geographic area, and at any location, without any liability to Franchisee regardless of the proximity to or effect on the Franchise. By way of illustration, and without limiting the foregoing, Franchisor and its affiliates have the right:

        **1.3.1.**    to operate and permit franchisees or others to establish and operate Franchises at any location within or outside the Territory (subject to the

Protections defined in section 1.2.1 above) notwithstanding their actual or threatened impact on sales of the Franchise;

**1.3.2.**  to operate or permit franchisees or others to establish and operate businesses at any location under other systems or other Marks, including businesses that may offer or sell products or services that are the same or similar to the products or services offered from the Franchise, within or outside the Territory and notwithstanding their proximity to the Territory, Protected status of Territory, or their threatened or actual impact on sales of the Franchise;

**1.3.3.**  to sell and distribute, directly or indirectly, or license others to sell and distribute, directly or indirectly, within or outside of the Territory, products and services bearing the Marks or similar marks through other channels of distribution including, without limitation, the internet, catalogs, or commercial channels other than the on-site installation or removal of insulation; and

**1.3.4.**  to acquire, be acquired by, or merge with other businesses and to convert them to the Marks or any other name at any location and such acquiring or acquired businesses shall not be bound by any Protections applicable to the Territory.

**1.3.5.**  If the Territory is not Protected, the geographic area of the Territory may be revised by Franchisor from time to time, after the expiration of the initial term, to include only the Population listed as the actual population in the initial geographic area increases.  If Franchisor reduces the Territory's geographic area due to a population increase after the expiration of the initial term, Franchisor shall first offer the right to purchase such additional population to Franchisee at the then-current rates, provided that Franchisee is and has been at all times in compliance with the terms hereunder.

Franchisee acknowledges that the activities described in Section 1.3. through 1.3.5 are only examples, and do not limit the business activities that Franchisor and its affiliates may undertake. Franchisee also acknowledges that, other than those rights expressly conveyed through this agreement and narrowly limited to same, Franchisor has made no other representations  concerning Franchisee's rights in any geographic territory.

**1.4.**  <u>Advertising and Promotional Materials</u>.  Franchisor and Franchisee acknowledge that advertising and promotional materials created, placed, and/or distributed by Franchisor, other franchisees operating under the System, or other entities authorized by Franchisor, may appear in media distributed in, or may be directed to prospective customers located within, trade areas or market areas nearby or encompassing the Territory, including on Franchisor's website or any related website.  Neither Franchisee, nor any other franchisee, is restricted from advertising or promoting products or services to any customers regardless of where they reside; provided, however, Franchisee may not perform Services outside of the Territory, except as expressly provided herein.

**1.5.**    Sale of Products and Services.  Unless otherwise permitted by Franchisor, Franchisee shall offer and sell only then-current products and services previously authorized by Franchisor, using Koala Rigs, and only within the Territory, only in accordance with the requirements of this Agreement and the then-current procedures set forth in the Manuals as they may be developed and/or modified from time to time.  Franchisee may not perform Services using equipment other than a Koala Rig that meets Franchisor's then-current specifications and standards.  Franchisee understands and acknowledges that certain other Koala franchisees were granted protected territories, and shall not perform Services in the protected territory of another Koala franchisee.

**1.5.1.**    Franchisee may perform Services for customers that are located outside of the Territory provided (a) Franchisee has submitted to Franchisor a written request to provide Services for such customer giving the name of the customer and its location; and (b) Franchisor has approved such request in writing.  Franchisor may at any time revoke its approval effective upon giving written notice of the same to Franchisee.  Franchisor may require Franchisee to purchase any territory, at then-current rates, in which Franchisee requests permission to provide Services if (a) Franchisee requests permission to service customers in the area more than twice per 90-day period, or (b) if Franchisee has operated for at least 12 months and Gross Sales for Services performed outside the Territory constitute more than 10% of the prior 12 months' Gross Sales.  Any permission granted to operate outside of the Territory shall not constitute an ongoing grant of rights to the area and Franchisor retains all rights thereto.

**1.5.2.**    Revenue Sharing Program.  Franchisee may at its option enter into a revenue sharing program ("Revenue Sharing Program") with any other franchisee which may permit the out of territory franchisee to operate within Franchisee's Territory for the purposes of servicing existing clients who have previously received services within the out of territory franchisee's own territory.  Franchisee may also enter into a revenue sharing agreement with any other franchisee as Franchisee deems appropriate to complete extraordinarily large jobs or for other purposes subject to Franchisor approval which must be received in writing in advance of any Revenue Sharing Program between franchisees.  Franchisor shall not be a party to any Revenue Sharing Program which shall be conducted solely between franchisees.

2.    TERM AND RENEWAL

**2.1.**    Term.  Except as otherwise provided herein and unless sooner terminated in accordance with the provisions hereof, the initial term of the License commences on the Effective Date and continues until that date which is 10 years after the Effective Date.

**2.2.**    Renewal.  Franchisee may, at its option, request to renew Franchisee's right to operate the Franchise for two additional terms of five years each.  Franchisee's option of renewal is subject to the following conditions, each of which must be met prior to the renewal:

**2.2.1.**    Franchisee shall give Franchisor written notice of Franchisee's election to renew no fewer than six months, nor more than 12 months, prior to the end of the initial term;

**2.2.2.**    Franchisee shall update, refurbish, or replace the Franchise Location (if applicable) and its Koala Rig(s) to comply, as determined solely by Franchisor, with Franchisor's then-current standards;

**2.2.3.**    From the time of Franchisee's election to renew through the expiration of the original term, Franchisee and its affiliates shall not have been in default of any provision of this Agreement, any amendment to this Agreement, any successor to this Agreement, or any other agreement between Franchisee (and its affiliates) and Franchisor (and its affiliates); and, as determined in the sole discretion of Franchisor, Franchisee and its affiliates shall have complied with all the terms and conditions of this Agreement, such other agreements, as well as the Operating Standards (as defined in **Section 5.9**) prescribed by Franchisor during the term of this Agreement;

**2.2.4.**    Franchisee shall have satisfied all monetary, reporting and other obligations owed by Franchisee to Franchisor and its affiliates, and shall have timely met those obligations throughout the term of this Agreement;

**2.2.5.**    Franchisee shall execute Franchisor's then current form of franchise agreement; which agreement shall supersede this Agreement in all respects (except the renewal franchise agreement shall not require payment of an initial franchise fee or include the ability to renew for any years beyond the aggregate of those contained in the original term and extensions herein). Franchisee acknowledges that the terms, conditions, and provisions of the renewal franchise agreement, and the obligations of the parties thereto, may differ substantially from the terms, conditions, provisions and obligations in this Agreement, including, without limitation, a higher percentage royalty fee and advertising contribution;

**2.2.6.**    Franchisee shall pay, in lieu of an initial franchise fee, a renewal fee equal to 25% of the Initial Franchise Fee or $5,000, whichever is greater;

**2.2.7.**    Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, agents, and employees; and

**2.2.8.**    Franchisee and its personnel shall comply with Franchisor's then current qualification and training requirements, prior to commencement of operations under the renewal form of franchise agreement.

3.    <u>FRANCHISOR'S DUTIES</u>

**3.1.**    <u>Initial and On-Going Training</u>. Franchisor shall provide for Franchisee's Operating Principal (as defined in **Section 5.6**) Salesperson, and Manager (as

defined in **Section 5.6**), such initial training programs as Franchisor may designate, to be conducted at such time(s) and location(s) designated by Franchisor. Franchisor may charge a reasonable fee for additional individuals who attend training. Franchisor shall also provide such ongoing training as it may, from time to time, deem appropriate. Franchisor shall be responsible for the cost of instruction and materials, subject to **Section 5.6** for the training of the initial Operating Principal, Manager, and Salesperson. Franchisee shall be responsible for the cost of training any subsequently hired or replacement staff including without limitation Operating Principal, Manager and Salesperson.

**3.2.**  Opening Assistance and Training.  In addition to the initial training described in Section 3.1, should Franchisee request additional assistance from Franchisor to facilitate the opening of the Franchise and should Franchisor, in its discretion, deem it necessary, feasible and appropriate to comply with the request, Franchisee shall reimburse Franchisor for the expenses of Franchisor providing such additional assistance, which may include Franchisor's then-current service fee, as set forth in the Manuals or otherwise communicated to Franchisee in writing from time to time.  Franchisor will provide such additional on-site assistance as Franchisor deems advisable.

**3.3.**  Manuals.  Franchisor shall provide Franchisee access to the confidential operations manuals (which may include technical bulletins, and other written, video or audio materials (collectively the "**Manuals**"), as more fully described in **Section 7**.

**3.4.**  Advertising and Promotion.  Franchisor shall review, and shall have the right to approve or disapprove, all advertising and promotional materials that Franchisee proposes to use pursuant to **Section 10.6**.  In addition, during the term of this Agreement, Franchisor shall provide Franchisee with such other advertising assistance, sales advice, or related materials as Franchisor deems advisable.

**3.4.1.**  Electronic Advertising and Support Services.  Franchisor shall establish and maintain, during the Term of this agreement, a website and/or other such listings as Franchisor deems appropriate for the Koala brand which shall contain content deemed appropriate in its sole and unlimited discretion. Franchisor may also maintain certain location specific or franchise specific sites ("Micro-Sites") in its sole discretion.  Franchisor may establish and assign a phone number to the Franchise and if it does so, Franchisee must use this number as its only published and/or advertised phone number for the Franchise.  Franchisor shall retain full rights to control, suspend, redirect and transfer any web domains and phone numbers and other listings.  Franchisor shall have the right to suspend or revoke any or all of these services immediately and without further notice upon Franchisee's Default of any term of this Agreement, specifically but not limited to financial or reporting obligations.

**3.5.**  Brand Fund.  Franchisor may establish and administer a System-wide advertising, marketing, promotional, and creative fund, which is referred to as the

"**Brand Fund**", or such other name as Franchisor may designate, in the manner set forth in **Section 10.3.**

**3.6.** <u>Technology System</u>.  Franchisor shall specify or require that certain brands, types, makes, and/or models of communications, computer systems, software and hardware be used by, between, or among the Franchises, including without limitation:  (a) back office and point of sale systems, data, audio, video, and phone, voice storage, retrieval, and transmission systems for use at the Franchise, between or among Koala franchisees, the corporate units and Franchisor; (b) physical, electronic, and other security systems including without limitation vehicle and/or Koala Rig tracking devices; (c) printers and other peripheral devices; (d) archival back-up systems; (e) communication systems (including without limitation email and phone systems); and (f) Internet access mode and speed (collectively, the "**Technology System**").  Franchisor may also designate: (i) software programs that Franchisee must use in connection with the Technology System ("**Required Software**"), which Franchisee shall install; (ii) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee shall install; (iii) the tangible media upon which such Franchisee shall record data; (iv) the database file structure of the Technology System; and (v) additional Technology Systems that must be used.

**3.7.** <u>On-Going Assistance</u>.  Franchisor shall provide periodic assistance to Franchisee in the marketing, management, and operation of the Franchise as Franchisor determines at the time(s) and in the manner determined by Franchisor.

**3.8.** <u>Additional Services.</u>  Franchisor, at its option may provide Additional Services including a call center, recruiting assistance and other services at the then-current fees.  Franchisor shall have no ongoing obligation to offer these services and may discontinue them for any or all franchisees at any time.

4.  <u>ROYALTY FEES; SALES REPORTING</u>

**4.1.** <u>Initial Franchise Fee</u>.  Franchisee shall pay Franchisor an initial franchise fee that is specified on the Summary Page (the "**Initial Franchise Fee**"), which must be paid in full prior to or upon execution of this Agreement.  The Initial Franchise Fee is not refundable under any circumstances and shall be deemed earned in full upon receipt, except if Franchisee's Operating Principal or Manager fails to successfully complete initial training in accordance with the requirements of **Section 5.6**.  If Franchisor terminates this Agreement due to any failure to successfully complete initial training pursuant to **Section 5.6**, Franchisor will refund the Initial Franchise Fee, less an amount equal to $5,000, subject to Franchisee' and its owners' execution of a General Release.

**4.2.** <u>Royalty Fees</u>.  Franchisee shall pay Franchisor continuing royalty fees ("**Royalty Fees**") at such time, for such periods, and in such manner as specified herein, or as otherwise specified in writing by Franchisor.  The term "**Gross Sales**" means amounts, less refunds, sales tax and chargebacks, derived from all products or services sold from or through the Franchise, including any sale of

products or services made for cash or credit, or partly for cash and partly for credit. **"Gross Sales"** also includes the fair market value of any services or products received by the Franchisee in barter or in exchange for Franchisee's services and products.

Royalty Fees shall be paid weekly in an amount equal to 6.5% of Gross Sales during the first 6 calendar months of operations (which for clarity shall begin and include any portion of any month during which Franchisee first receives any Gross Sales). Beginning on the 7th month of operations, Royalty Fees shall be paid weekly in an amount that is the greater of the required Minimum Royalty, or 6.5% of Gross Sales for the first $1,000,000 in Gross Sales (see Table 1 below); then the Royalty Fee shall be reduced to 5% of Gross Sales for amounts between $1,000,000.01 and $1,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 4.5% of Gross Sales amounts between $2,000,000 and $2,999,999.99 annually for the remainder of the calendar year; then the Royalty Fee shall be reduced to 3.5% of Gross Sales for all amounts over $3,000,000 annually for the remainder of the calendar year.

Table 1: Minimum Royalty Per Territory, Per week.

| Months After Opening | 1 Territory | 2 Territories | 3 Territories | 4 Territories | 5+ Territories |
|---|---|---|---|---|---|
| 7-12 | $250 | $225 | $200 | $175 | $150 |
| 13-24 | $350 | $325 | $300 | $275 | $250 |
| 25-36 | $500 | $475 | $425 | $400 | $375 |
| 37+ | $625 | $600 | $575 | $550 | $525 |

Franchisee expressly acknowledges and agrees that Franchisee's obligations for the full and timely payment of Royalty Fees, Brand Fund Contributions (as defined in Section 10.2), if any, and all other amounts provided for in this Agreement, shall be absolute and unconditional. Franchisee shall not for any reason delay or withhold the payment of all or any part of those or any other payments due hereunder, put the same in escrow or setoff the same against any claims or alleged claims Franchisee may allege against Franchisor, the Brand Fund or others. Franchisee shall not, on grounds of any alleged nonperformance by Franchisor or others, withhold payment of any fee, including without limitation Royalty Fees, Brand Fund Contributions, nor withhold or delay submission of any reports due hereunder. Royalty Fees shall be deemed earned in full upon receipt. Franchisee and Franchisor expressly acknowledge that all services provided by Franchisor to Franchisee shall not exceed in cost the amount of the Royalty Fees received from Franchisee.

  **4.2.1.**  Sales Reports.  Franchisee shall deliver to Franchisor any and all reports, statements and/or other information regarding its Gross Sales and other metrics or data specified by Franchisor at the time(s) and in the format(s) reasonably requested by Franchisor from time to time ("Sales Reports").

Upon notice by Franchisor Franchisee must use, and pay the fees required to use, the Koala proprietary software or other software as specified by Franchisor, when made available, or other systems or methods as specified by Franchisor for the purposes of providing Sales Reports in compliance with this Section. All payments required by this Agreement to Franchisor, its affiliates, and/or the Brand Fund must be made by the method or methods that Franchisor specifies from time to time, which may include, without limitation, payment by deduction as specified in Section 3.8.2, payment via wire transfer or electronic debit to Franchisee's bank account. Franchisee must furnish Franchisor and Franchisee's bank with all authorizations necessary to effect payment by the methods Franchisor specifies.

**4.3.** <u>Overdue Payments or Reports</u>. Any payment, Sales Report or other required report not actually received by Franchisor on or before the date such payment or report is due (currently, no later than noon Eastern Time on Monday of each week) shall be deemed overdue. If an attempt to electronically debit Franchisee's bank account fails or any other payment method is declined or returned, the payment shall be deemed not received. Franchisor may at its option from time to time specify or change the date such reports are due upon 7 days' Notice to Franchisee. If any payment or required report is overdue, Franchisor shall collect from Franchisee the greater of the Minimum Royalty amount, or 1.5 times the Royalty Fees and other fees or amounts due based on the prior report received ("Presumptive Fees"). The Presumptive Fees shall be credited towards the actual Royalty Fees due once the Sales Report is received. Additionally, Franchisee shall pay Franchisor, a late payment/late report charge of $50 for each day (or portion thereof) that the payment or report is late (collectively "Late Fee"). Entitlement to such Late Fee shall be in addition to any other remedies Franchisor may have including without limitation the suspension of services as defined in §3.4.1 and elsewhere in this Agreement.

**4.4.** <u>Payments on Behalf of Franchisee</u>. Franchisee shall pay to Franchisor, within 15 days after any written request by Franchisor which is accompanied by reasonable substantiating material, any monies (plus a fee equal to 10% of the amount paid by Franchisor on Franchisee's behalf) which Franchisor has paid, or has become obligated to pay, on behalf of Franchisee, by consent or otherwise under this Agreement.

5.    <u>FRANCHISEE'S DUTIES</u>

**5.1.1.** Franchisee may operate from their home office, provided doing so would be in compliance with applicable laws and regulations. If Franchisee choses to rent or lease a site, storage location or other physical site other than Franchisee's home, at which it will base or park Koala Rigs or from which it will operate the Franchise, Franchisee must provide notice to Franchisor at least 30 days in advance. Before Franchisee makes a binding commitment to lease, sublease or purchase a site, Franchisor must approve the location in writing and approve in writing the proposed lease for the location (the "**Lease**") or purchase agreement or any letter of intent between Franchisee and the third-party seller or lessor. FRANCHISEE ACKNOWLEDGES AND AGREES THAT FRANCHISOR'S

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D9F560771821

APPROVAL OF A PROPOSED SITE IS NOT A WARRANTY OR REPRESENTATION OF ANY KIND AS TO THE POTENTIAL SUCCESS OR PROFITABILITY OF THE FRANCHISE. If Franchisee leases the approved Franchise Location, unless Franchisor waives the requirement in writing, Franchisee must arrange for the execution of the Lease Rider in the form of **Exhibit B** by Franchisee and its landlord in connection with any Lease for the approved Franchise Location and any other provisions that Franchisor may reasonably require. Franchisee must deliver to Franchisor the completely executed purchase agreement or Lease and Lease Rider within 10 days after execution of the Lease or purchase agreement. Franchisee must comply with the terms and conditions of the Lease for the approved Franchise Location. Franchisor is not obligated to execute Franchisee's Lease or guarantee a Lease for Franchisee.

**5.1.2.** Before commencing construction of the Franchise Location, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

**5.1.2.1.** Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations, including, without limitation, the applicable provisions of the American with Disabilities Act (as amended, the "ADA") regarding the construction and design of the Franchise Location.

**5.1.2.2.** If so requested by Franchisor, Franchisee shall submit to Franchisor, for Franchisor's approval, final plans for construction based upon the preliminary plans and specifications. Franchisor shall not review, nor shall any approval be deemed to include, approval or acceptance of Franchisee's compliance with federal, state, or local laws and regulations, including the ADA. Once approved by Franchisor, such final plans shall not thereafter be changed or modified without the prior written permission of Franchisor.

**5.1.2.3.** Franchisee shall obtain all permits and certifications required for the lawful construction of the Franchise Location. Franchisee shall be responsible for obtaining all zoning classifications and clearances which may be required by state or local laws, ordinances, or regulations or which may be necessary or advisable owing to any restrictive covenants relating to the Franchise Location.

**5.1.2.4.** Franchisee shall employ a qualified licensed general contractor who is acceptable to Franchisor to construct the Franchise Location and to complete all improvements. Franchisee shall obtain and maintain in force during the entire period of construction the insurance required under Article 11. Franchisee shall deliver to Franchisor such proof of such insurance as Franchisor shall require.

**5.1.2.5.** During the construction of the Franchise Location, Franchisee will permit Franchisor to make such on-site inspections of the Franchise Location as Franchisor determines appropriate to evaluate the construction or remodeling of the Franchise Location for compliance with

Franchisor's requirements. Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.

**5.1.2.6.** Within 30 days after the opening of the Franchise Location, Franchisee shall provide to Franchisor a full breakdown of all costs associated with the development and construction of the Franchise Location if so requested by Franchisor.

**5.1.3.** Franchisee shall use the Franchise Location solely for the operation of the Franchise; shall keep the Franchise open and in normal operation for such hours and days as Franchisor may from time to time specify in the Manuals or as Franchisor may otherwise approve in writing; and shall refrain from using or permitting the use of the Franchise Location for any other purpose or activity at any time. As used in this Section, the term Franchise Location shall include the grounds surrounding the Franchise.

**5.1.4.** Franchisee shall at all times maintain the Franchise Location in a high degree of sanitation, repair, and condition, and in connection therewith shall make such additions, alterations, repairs, and replacements thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting or replacement of obsolete signs, furnishings, equipment, and decor as Franchisor may reasonably direct. If at any time in Franchisor's judgment the general state of repair or the appearance of the Franchise Location or its equipment, fixtures, signs or decor does not meet Franchisor's quality control and standards therefor, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate, within 30 days after receipt of such notice, and thereafter diligently continue a bona fide program to complete any required maintenance, Franchisor shall have the right, in addition to all other remedies, to enter upon the Franchise Location and effect such repairs, painting, maintenance or replacements of equipment, fixtures or signs on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand.

**5.1.5.** In addition to the maintenance obligations set forth in above, Franchisee shall, at its expense, undertake such periodic and ongoing remodeling and upgrading of the Franchise Location, and the furniture, fixtures, equipment, décor, signage and trade dress of the Franchise Location, as required by Franchisor to cause the Franchise Location building design, exterior facade, trade dress, signage, fixtures, furnishings, equipment, decor, color schemes, and presentation of the Marks to be consistent with the then-current standards. Such remodeling and refurbishment may include structural changes, installation of new equipment and signs, remodeling, redecoration, and modifications to existing improvements, and, shall be completed to Franchisor's satisfaction pursuant to such standards, specifications, and deadlines as Franchisor may specify.

**5.1.6.** Franchisee may not relocate its Franchise Location unless it receives Franchisee's prior written approval. Franchisee's relocation will be at its

expense and Franchisor has the right to charge Franchisee for all reasonable costs and expenses it incurs to approve and implement the relocation.

**5.2.**    Koala Rigs.

**5.2.1.**    Franchisee shall obtain that number of Koala Rigs prescribed by Franchisor from time to time, and ensure that its Koala Rigs are in proper working order.

**5.2.2.**    Each Koala Rig shall consist of an enclosed trailer and certain proprietary equipment, and other items (the **"Koala Rig" or "Rig"**) installed in accordance with Franchisor's standards and requirements pursuant to the terms of an Equipment Sale Agreement.  Currently Koala Rigs include blow-in rigs and spray-foam rigs but may include other equipment packages or otherwise be modified or substituted as specified from time to time by Franchisor.  Franchisee acknowledges and agrees that Franchisor and its designees are the only approved suppliers of such Rigs, equipment and installation services.  The Koala Rig must generally be moved by towing with an approved truck capable of and rated for the weight and requirements of the Koala Rig.  When attached, the truck ("Truck") and trailer shall collectively constitute the Koala Rig.

**5.2.3.**    Prior to Franchisee purchasing a Truck, Franchisee shall submit to Franchisor, in a form specified by Franchisor, information regarding the specifications and conditions of the Truck as Franchisor may reasonably require or Franchisee may comply with the then current guidelines as defined in the Manual.  Franchisee may not purchase any Truck to be used with a Koala Rig unless and until it has received Franchisor's prior approval or ensures that the Truck complies with brand appearance standards in Franchisor's discretion. Franchisor may establish relationships with truck dealers and if it does so, Franchisee agrees to purchase solely from these approved dealers.

To the extent that other vehicles or equipment are used in the Franchise, including without limitation Manager or Salesperson vehicles, they must comply with the then current Brand Standards and Manual.

**5.2.4.**    If the Franchise is not operated from a Franchise Location, Franchisee will make arrangements to store the Koala Rig(s) used in the operation of the Franchise in compliance with all applicable state and local laws and other restrictions.

**5.2.5.**    Franchisee shall at all times maintain the Koala Rigs in a high degree of repair and condition, and in connection therewith shall make such repairs, replacements and refurbishment thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting, replacement of wraps or decals, replacement of equipment and parts or installation or refurbishment of signage as Franchisor may reasonably direct and pursuant to such standards, specifications and deadlines as Franchisor may specify.

**5.3.**    System Standards.  Franchisee understands and acknowledges that every detail of the Franchise is important to Franchisee, Franchisor, and other franchisees to develop and maintain high operating standards, to increase the demand for the Services sold by all franchisees, and to protect Franchisor's reputation and goodwill.

**5.4.**    Pre-Opening Obligations.  Before commencing operations, Franchisee, at its expense, shall comply, to Franchisor's satisfaction, with all of the following requirements:

**5.4.1.**    Franchisee shall comply, at Franchisee's expense, with all federal, state and local laws, codes and regulations.

**5.4.2.**    Franchisee shall obtain all licenses, permits, and certifications required for the operation of the Franchise within the Territory and the parking and/or storage of Koala Rigs in the Territory.

**5.4.3.** Franchisee shall pay a Technology Activation Fee in the amount of $5,000, due within ten days of receipt of an invoice from us.

**5.5.**    Opening.  Franchisee shall open the Franchise within four months after the Effective Date.  Prior to opening for business, Franchisee shall comply with all preopening requirements set forth in this Agreement, the Manuals, and/or elsewhere in writing by Franchisor.  In addition, in connection with the opening of the Franchise:

**5.5.1.**    Franchisee shall provide at least 14 days' prior notice to Franchisor of the date on which Franchisee proposes to first open the Franchise for business.

**5.5.2.**    If the Franchise will operate from a Franchise Location, Franchisee shall not open the Franchise until Franchisor has determined that all construction has been substantially completed, and that such construction conforms to Franchisor's standards, and Franchisor has given Franchisee written approval to open, which approval shall not be unreasonably withheld.

**5.5.3.**    Franchisee shall not open the Franchise until Franchisor has determined that Franchisee has obtained a sufficient number of Koala Rigs to Franchisor's standards in compliance with **Section 5.2** which shall be no less than one Blow-In and one Spray Foam rig.

**5.5.4.**    Franchisee shall not open the Franchise until the Operating Principal, Salesperson and Manager have successfully completed all initial training required by Franchisor, and Franchisee has hired and trained, to Franchisor's standards, a sufficient number of employees to service the anticipated level of the Franchise's customers.

**5.6.**    Management and Training.  Franchisee must appoint an individual owner as its **"Operating Principal"** who has at least a 20% equity interest in

Franchisee, must have authority over all business decisions related to the Franchise, and must have the power to bind Franchisee in all dealings with Franchisor. The Operating Principal is specified on the Summary Page. Franchisee must also appoint a manager to manage the day-to-day business of the Franchise (the **"Manager"**). Franchisee's Operating Principal may serve as its Manager, unless Franchisor believes that he or she does not have sufficient experience. Franchisee must appoint a salesperson to manage the day-to-day customer service and sales functions in accordance with Franchisor's specifications (the "Salesperson"). Franchisee must provide Franchisor with written notice of its Manager and Salesperson at least 14 days prior to initial training. Prior to the opening of the Franchise, the Manager, Salesperson and the Operating Principal must attend and successfully complete, to Franchisor's satisfaction, the initial training program offered by Franchisor, pursuant to **Section 3.2**. If Franchisor determines, in its sole discretion, that the Operating Principal, Salesperson or Manager is unable to satisfactorily complete any phase of the training program, Franchisor shall have the right to: (i) require the Salesperson, Operating Principal or Manager, as the case may be, to attend such additional training as Franchisor may require, at Franchisee's expense; or (ii) terminate this Agreement, in which event neither Franchisor nor Franchisee shall have any further rights or obligations hereunder. If Franchisor terminates this Agreement pursuant to the prior sentence, Franchisor shall refund a portion of the Initial Franchise Fee as provided in Section 4.1. The daily operations of the Franchise are at all times required to be supervised under the active full-time management of the Manager and Salesperson who have each successfully completed Franchisor's initial training program.

    **5.6.1.** If the Manager or Salesperson ceases active management of the Franchise or in the event the Operating Principal is changed or is no longer a 20% equity owner of the Franchisee, Franchisee must hire a new Manager or Salesperson or appoint a new Operating Principal (as the case may be), who must be approved in writing by Franchisor. The new Manager, Salesperson or Operating Principal must undergo a certification training program that is prescribed by Franchisor, which may include training at the Franchise, another Franchise or such other place as Franchisor shall designate. All expenses incurred by the new Manager, Salesperson or Operating Principal in attending such program including, without limitation, travel costs, room and board expenses and salaries and other benefits, shall be the sole responsibility of Franchisee. In addition, Franchisee shall: (a) pay Franchisor's then-current certification program fees; and (b) reimburse Franchisor for its out of pocket expenses, including without limitation, reasonable travel and room and board expenses. If Franchisor determines, in its sole discretion, that the new Manager, Salesperson or Operating Principal is unable to satisfactorily complete the certification program, Franchisor shall have the right to: (i) require the new Manager, Salesperson or Operating Principal, as applicable, to attend such additional training, at Franchisee's expense, so as to demonstrate his or her ability to operate the Franchise to Franchisor's satisfaction; or (ii) require Franchisee to promptly hire a replacement New Manager, Salesperson or appoint a new Operating Principal among its equity owners (who

must have at least 20% equity ownership) who shall be required to undergo the training and certification programs contemplated by this Section.

**5.6.2.**    Franchisor from time to time may provide and, if it does, may require that the Operating Principal, Manager, Salesperson and/or other employee attend and successfully complete refresher training programs or seminars including without limitation an annual conference ("Annual Conference"), to be conducted at such location as may be designated by Franchisor.  Franchisee shall pay to Franchisor the then current Annual Conference Fee for each person required to attend.  All expenses incurred by Franchisee and its employees in attending such program including, without limitation, travel costs, room and board expenses and salaries and benefits, shall be the sole responsibility of Franchisee.

**5.6.3.**    If Franchisee requests that Franchisor provide on-site training in addition to the opening assistance described in **Section 3.4**, and Franchisor chooses to do so, then Franchisee agrees that it shall pay Franchisor's then-current per diem charges and out-of-pocket expenses, which shall be as set forth in the Manuals or otherwise in writing.

**5.7.**    Personnel.  Franchisee agrees to maintain a competent, conscientious and trained staff in numbers sufficient to promptly provide the Services and to take such steps as are necessary to ensure that its employees preserve good customer relations and comply with such dress code as Franchisor may prescribe. Franchisee will be solely responsible to locate, interview, hire, schedule, supervise, compensate and discipline all employees of the Business and be exclusively responsible for all terms of their employment, compensation and other personnel-related matters without influence from Franchisor. All employees hired by or working for Franchisee shall be the employees of Franchisee and shall not, for any purpose, be deemed employees of Franchisor or subject to Franchisor's supervision or control.

**5.8.**    Equipment Upgrades.  Franchisee shall make, from time to time, such upgrades and other changes to the equipment, Koala Rigs and electronic equipment utilized in the Franchise, the Technology System and Required Software as Franchisor may request in writing (collectively, "**Equipment Upgrades**").  Franchisor shall have the right to require any Equipment Upgrades it deems necessary for the Franchise.

**5.9.**    Standards and Specifications.  To insure that the highest degree of quality and service is maintained, Franchisee shall operate the Franchise in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manuals or otherwise in writing (as used in this Agreement, Franchisor's "**standards**", "**requirements**", "**specifications**" or "**Operating Standards**").  At a minimum, the Operating Standards shall include:

**5.9.1.**  offering and selling at all times such services that conform to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming services without Franchisor's specific prior written consent

**5.9.2.**  maintaining in sufficient supply, using, offering and selling at all times only such products, equipment, supplies, materials, and goods that conform to Franchisor's written standards and specifications, and refraining from deviating therefrom by the use or offer of any nonconforming products without Franchisor's specific prior written consent.

**5.9.3.**  offering and selling only such products as have been expressly approved for sale in writing by Franchisor; offering all products and services as Franchisor may specify from time to time as required offerings at the Franchise; offering all products authorized for sale as specified by Franchisor; refraining from any deviation from Franchisor's standards, without Franchisor's prior written consent; and discontinuing the sale of any products which Franchisor has disapproved, in writing, at any time.  If Franchisee deviates or proposes to deviate from Franchisor's standards, whether or not such deviation is approved by Franchisor, such deviation shall become the property of Franchisor.

**5.9.4.**  operating the Franchise to fully comply with all applicable laws and regulations.

**5.9.5.**  offering and selling the services and products in accordance with any minimum, maximum, and/or specific prices that Franchisor may determine from time to time (except to the extent determination of prices by Franchisor is limited or prohibited by applicable law).

**5.10.**  <u>Non-Compliance</u>.  If Franchisee violates an Operating Standard, and fails to bring the Franchise into compliance with such Operating Standard within 10 days after Franchisor has delivered to Franchisee written notice of the violation, Franchisee shall pay to Franchisor upon demand $100 for each day that Franchisee is not in compliance with the relevant Operating Standard.  Franchisor's right to charge these amounts is in addition to any other remedy provided under this Agreement, including under **Section 13**.  Franchisor's damages from Franchisee's failure to comply with this Section may include loss of good will and other damages, and are difficult to measure and quantify; such amount is, therefore, a reasonable approximation of damages, and not a penalty.

**5.11.**  <u>Suppliers and Sourcing Requirements</u>.  Franchisor has the right to require that services and products offered by Franchisee, and services, products and equipment used by Franchisee in the establishment and operation of the Franchise:  (a) meet specifications that Franchisor establishes from time to time; and/or (b) be purchased only from manufacturers, vendors, distributors, and other suppliers that Franchisor has expressly approved; and/or (c) be purchased only from a single source (which may include Franchisor or its affiliates or other suppliers which provide a financial benefit to Franchisor and may not be the least

expensive supplier). To the extent that Franchisor establishes specifications, requires approval of suppliers, or designates specific suppliers for particular items, Franchisor will notify Franchisee via the Manuals or otherwise in writing. In determining whether Franchisor will approve any particular supplier, Franchisor shall consider various factors, including a supplier who can demonstrate, to Franchisor's continuing reasonable satisfaction, the ability to meet Franchisor's then current standards and specifications for such items; who possesses adequate quality controls and capacity to supply Franchisee's needs promptly and reliably; who would enable the System, in Franchisor's sole opinion, to take advantage of marketplace efficiencies; and who has been approved in writing by Franchisor prior to any purchases by Franchisee from any such supplier, and have not thereafter been disapproved. For the purpose of this Agreement, the term **"supplier"** shall include, but not be limited to, manufacturers, distributors, resellers, and other vendors. Franchisee recognizes that Franchisor shall have the right to appoint only one supplier for any particular item, and that Franchisor may so designate itself or its affiliate.

 **5.11.1.** If Franchisee wishes to purchase any services, products, equipment or any items that Franchisor has not approved or to purchase from an unapproved supplier, Franchisee shall first submit to Franchisor a written request for such approval. Franchisee shall not purchase any products or services or make purchases from any supplier until, and unless, such item or supplier has been approved in writing by Franchisor. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered, either to Franchisor or to an independent laboratory designated by Franchisor for testing or evaluation. Franchisor may require that Franchisee or supplier pay a reasonable fee charge for such testing or evaluation. Franchisor may also require that the supplier comply with such other requirements as Franchisor may deem appropriate, including payment of reasonable continuing inspection/evaluation fees and administrative costs. Franchisor reserves the right, at its option, to reinspect from time to time the facilities and products or equipment of any such approved supplier and to revoke its approval of any item or supplier upon the item's or supplier's failure to continue to meet any of Franchisor's then current criteria.

 **5.11.2.** Franchisee acknowledges and agrees that Franchisor shall have the right to collect and retain all manufacturing allowances, markups, marketing allowances, rebates, credits, monies, payments or benefits (collectively, **"Allowances"**) offered by suppliers to Franchisee or to Franchisor or its affiliates based upon purchases of products, equipment and other goods and services made by the Brand Fund or Franchisees. These Allowances are based on System-wide purchases of products, services, merchandise and other items and shall be unrestricted income to Franchisor. Franchisee assigns to Franchisor or its designee all of Franchisee's right, title and interest in and to any and all such Allowances and authorizes Franchisor or its designee to collect and retain any or all such Allowances without restriction (unless otherwise instructed by the supplier). Franchisor may mark up or receive Allowances from any providers or

vendors doing business with Franchisees, Franchisor or the Brand Fund including without limitation, equipment, supplies, advertising and marketing vendors. Franchisor may in its sole discretion retain as income with no further obligations, or utilize some or all of the Allowances for System-wide marketing, other brand enhancement activities or specific required or local area marketing, or such Allowance monies may be deposited into the Brand Fund for future use and expenditures by the Brand Fund.

**5.11.3.** Compliance with laws regarding the chemicals, products, equipment and other supplies that Franchisee uses in its Franchise is Franchisee's sole responsibility.  Franchisor makes no warranty or representation that chemicals, products and other supplies that it recommends, approves or requires comply with applicable laws in Franchisee's jurisdiction. Franchisee must notify Franchisor in writing immediately if any recommended, approved or required chemical, product or supply is subject to regulation or laws in Franchisee's jurisdiction.  Franchisor will cooperate with Franchisee in identifying substitute equipment, products or supplies as appropriate.

**5.12.**  Inspections.  Franchisee grants Franchisor and its agents the right to enter upon the Franchise premises (if applicable) or attend and monitor Franchisee while performing services for customers at any time for the purpose of conducting inspections, for among other purposes, preserving the validity of the Marks, and verifying Franchisee's compliance with this Agreement and the Operating Standards and policies and procedures outlined in the Manuals.  Franchisee shall cooperate with Franchisor's representatives in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents and without limiting Franchisor's other rights under this Agreement, Franchisee shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Franchisee shall reimburse Franchisor for the travel expenses and room and board of Franchisor's representatives for all inspections including subsequent inspections to ensure all deficiencies have been corrected.  Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right, but not the obligation, to correct any deficiencies which may be susceptible to correction by Franchisor and to charge Franchisee for Franchisor's actual expenses in taking such actions, payable by Franchisee upon demand. The foregoing shall be in addition to such other remedies Franchisor may have.

**5.13.**  Technology System.  At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Technology System and Required Software, and Franchisee shall enter into all licenses or agreements and pay such licensing fees as necessary for Franchisee to obtain the rights to use the Technology System and Required Software.  Franchisee shall also pay to Franchisor the then-current amount of the Technology Fee ("Technology Fee"), currently $80 per Territory per week.  If Franchisee has more than one Territory, the total Technology Fee for up to 4 contiguous Territories shall be equal to the then-current Technology Fee for

one Territory. Franchisor shall have the right at any time to retrieve and use such data and information from Franchisee's Technology System that Franchisor deems necessary or desirable, including, without limitation, the uses identified in **Section 9.5**, and Franchisee agrees to do all things necessary to provide such access. Franchisee expressly agrees that it shall strictly comply with Franchisor's standards and specifications for all item(s) associated with Franchisee's Technology System, and will otherwise operate its Technology System in accordance with Franchisor's standards and specifications. Franchisee agrees it shall keep its Technology System in good maintenance and repair, at its expense, and shall promptly install such additions, changes, modifications, substitutions and/or replacement to the Technology System and the Required Software as Franchisor directs periodically in writing. Franchisee shall provide to Franchisor, upon Franchisor's request, all email lists and customer lists used or maintained by Franchisee on the Technology System, the Required Software or elsewhere. Franchisee must execute and pay any fees associated with any software license agreements or any related software maintenance agreements that Franchisor or the licensor of the Required Software require. Franchisee must comply with all laws and payment card provider standards relating to the security of the Technology System, including, without limitation, the Payment Card Industry Data Security Standards. Franchisee may not use any other cash registers or computer systems in the Franchise.

**5.14.** Uniform Attire. To promote a uniform System image, Franchisee shall require all of its personnel to dress during business hours in the attire specified in the Manuals.

**5.15.** Participation in Promotions and Incentive Programs. Franchisee shall participate in promotional programs developed by Franchisor for the System, in the manner directed by Franchisor in the Manuals or otherwise in writing.

**5.16.** Franchisee Advisory Council. Franchisor may establish an advisory council comprised of Franchisees for the purpose of fostering communication among and between franchisees and Franchisor, as well as to establish, modify or discuss various policies applicable to Franchise businesses operating under the System (the **"Franchisee Advisory Council"**). If Franchisor establishes the Franchisee Advisory Council, Franchisee may be required to become a member of the Franchisee Advisory Council, and participate in Franchisee Advisory Council meetings and programs as Franchisor shall designate. Franchisor will not assess fees or dues for participation in or on the Franchisee Advisory Council, but Franchisee may be required to pay dues (which may be expended in any allocation in accordance with the vote of the Franchisee Advisory Council subject to the approval of Franchisor) to the Franchisee Advisory Council if the Franchisee Advisory Council, which is controlled by franchisees, determines that fees shall be assessed. Franchisee may be required to pay all costs and expenses incurred in connection with participation in the Franchisee Advisory Council including, without limitation, the costs of transportation, lodging, and meals.

**5.17.** <u>Franchisee Structure</u>.

**5.17.1.** Except as otherwise approved in writing by Franchisor, if Franchisee is a corporation, it shall:  (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles or certificates of incorporation and bylaws, as well as such other documents as Franchisor may reasonably request, and any amendment thereto; (iii) maintain stop transfer instructions on its records against the transfer of any equity securities and shall only issue securities upon the face of which a legend, in a form satisfactory to Franchisor, appears which references the transfer restrictions imposed by this Agreement; (iv) not issue any voting securities or securities convertible into voting securities; and (v) maintain a current list of all owners of record and all beneficial owners of any class of voting stock of Franchisee and furnish the list to Franchisor upon request, which list shall be amended to reflect changes in ownership, as permitted under this Agreement.

**5.17.2.** If Franchisee is a partnership or limited liability partnership it shall:  (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with its partnership agreement as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all general and limited partners in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records and in its partnership agreement against the transfer of partnership interests and equity securities, and shall only issue securities or partnership interests with documentation which bears a notice or legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.17.3.** If a Franchisee is a limited liability company, Franchisee shall: (i) confine its activities, and its governing documents shall at all times provide that its activities are confined, exclusively to operating the Franchise; (ii) furnish Franchisor with a copy of its articles of organization and operating agreement, as well as such other documents as Franchisor may reasonably request, and any amendments thereto; (iii) prepare and furnish to Franchisor, upon request, a current list of all members and managers in Franchisee, which list shall be amended to reflect changes in ownership, as permitted under this Agreement; and (iv) maintain stop transfer instructions on its records against the transfer of equity securities and shall only issue securities upon the face of which bear a legend, in a form satisfactory to Franchisor, which references the transfer restrictions imposed by this Agreement.

**5.18.** <u>Guarantee of Performance</u>.  Each present and future:  (i) shareholder of a corporate Franchisee; (ii) member of a limited liability company Franchisee; (iii) partner of a partnership Franchisee; or (iv) partner of a limited liability partnership Franchisee; shall jointly and severally guarantee Franchisee's

performance of each and every provision of this Agreement by executing the Guarantee, Indemnification and Acknowledgment in the form attached to this Agreement as **Exhibit C**. In addition, Franchisor may require that the spouse (or domestic partner or other immediate family member) of an owner of Franchisee sign the Guarantee, Indemnification and Acknowledgment however such Guarantee by a spouse shall only be pursued by Franchisor if there is a material transfer of assets from the spouse having an ownership interest in the Franchisee to the non-owning spouse.

**5.19.**  System Modifications.  Franchisee acknowledges and agrees that from time to time hereafter Franchisor may change or modify the System as Franchisor deems appropriate, including, without limitation, to reflect the changing market and/or to meet new and changing consumer demands, and that variations and additions to the System may be required from time to time to preserve and enhance the public image of the System and operations of Franchises. Franchisor's changes to the System may include, without limitation, the adoption and use of new or modified products, services, equipment and furnishings and new techniques and methodologies relating to the sale, promotion and marketing of products and services, and new trademarks, service marks and copyrighted materials. Franchisee shall, upon reasonable notice, accept, implement, use and display in the operation of the Franchise any such changes in the System, as if they were part of this Agreement at the time of execution hereof, at Franchisee's sole expense. Additionally, Franchisor reserves the right, in its sole discretion, to vary the standards throughout the System, as well as the services and assistance that Franchisor may provide to some franchisees based upon the peculiarities of a particular site or circumstance, existing business practices, or other factors that Franchisor deems to be important to the operation of any Franchise or the System.

**5.20.** Third-Party Management.  The Franchise shall be operated under the control and supervision of Franchisee (or if an entity, the Operating Principal) or its Manager. Franchisee shall not, without the prior written approval of Franchisor, which may be denied for any reason or no reason at all, hire or retain a management company, manager (other than an employee manager trained and approved by Franchisor), or third party to undertake any of the management or operational functions of the Franchise.

6.    PROPRIETARY MARKS

**6.1.**    Ownership of the Marks.  Franchisor represents that it is the owner of all right, title and interest in and to the Marks or otherwise maintains the right to use, license and sub-license such Marks.

**6.2.**    Use of the Marks.  With respect to Franchisee's use of the Marks, Franchisee agrees that:

**6.2.1.**    Franchisee shall use only the Marks designated by Franchisor, and shall use them only in the manner authorized and permitted by Franchisor; all items bearing the Marks shall bear the then-current logo.

**6.2.2.**  Franchisee shall use the Marks only for the operation of the business franchised hereunder and only at the location authorized hereunder, or in Franchisor approved advertising for the business conducted at or from that location.

**6.2.3.**  Unless Franchisor otherwise directs Franchisee, in writing to do so, Franchisee shall operate and advertise the Franchise only under the name "Koala Insulation" or the name listed on the Summary Page to this Agreement.

**6.2.4.**  During the term of this Agreement and any renewal of this Agreement, Franchisee shall identify itself to the public (in a manner reasonably acceptable to Franchisor) as an independent contractor operating the Franchise under a license from Franchisor, and to post a notice to that effect, and as Franchisor directs, in Franchisee's advertising, contracts, forms, stationery and promotional materials.

**6.2.5.**  Franchisee's right to use the Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights.

**6.2.6.**  Franchisee shall not use the Marks to incur any obligation or indebtedness on behalf of Franchisor.

**6.2.7.**  Franchisee shall not use the Marks or the word Koala or any variant thereof as part of its corporate or other legal name, or as part of any e-mail address, domain name, or other identification of Franchisee in any electronic medium.

**6.2.8.**  Franchisee shall execute any documents deemed necessary by Franchisor to obtain protection for the Marks or to maintain their continued validity and enforceability.

**6.2.9.**  With respect to litigation involving the Marks, the parties agree that:

**6.2.9.1.**  Franchisee shall promptly notify Franchisor of any suspected infringement of the Marks, any known challenge to the validity of the Marks, or any known challenge to Franchisor's ownership of, or Franchisee's right to use, the Marks licensed hereunder.  Franchisee acknowledges that Franchisor shall have the right to direct and control any administrative proceeding or litigation involving the Marks, including any settlement thereof.  Franchisor shall also have the right, but not the obligation, to take action against uses by others that may constitute infringement of the Marks.

**6.2.9.2.**  If Franchisor undertakes the defense or prosecution of any litigation relating to the Marks, Franchisee shall execute any and all documents and do such acts and things as may, in the opinion of counsel for Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action.

**6.3.** Franchisee Acknowledgments. Franchisee expressly understands and acknowledges that:

**6.3.1.** The Marks are valid, owned by Franchisor, and serve to identify the System and those who are authorized to operate under the System.

**6.3.2.** Neither Franchisee nor any owner of Franchisee shall directly or indirectly contest the validity of Franchisor's ownership of the Marks, nor shall Franchisee, directly or indirectly, seek to register the Marks with any government agency, except with Franchisor's express prior written consent.

**6.3.3.** Franchisee's use of the Marks does not give Franchisee any ownership interest or other interest in or to the Marks, beyond the limited non-exclusive License granted by this Agreement.

**6.3.4.** Any and all goodwill arising from Franchisee's use of the Marks shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement and the License herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Marks.

**6.3.5.** The License of the Marks is nonexclusive, and Franchisor thus has and retains the rights, among others:

**6.3.5.1.** To use the Marks itself in connection with selling products and services;

**6.3.5.2.** To grant other licenses for the Marks, in addition to those licenses already granted to existing franchisees or other licensees authorized to operate using the Marks;

**6.3.5.3.** To develop and establish (or acquire or be acquired by) other systems using the same or similar Marks, or any other proprietary marks, and to grant licenses or franchises thereto without providing any rights therein to Franchisee.

**6.3.6.** Franchisor reserves the right to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder if the Marks no longer can be used, or if Franchisor, exercising its right to do so, determines that substitution of different proprietary marks will be beneficial to the System. In such circumstances, Franchisee shall implement, at Franchisee's expense, such substituted proprietary marks in such ways as Franchisor may direct, and the use of the substituted proprietary marks shall be governed by the terms of this Agreement.

7. <u>CONFIDENTIAL OPERATING MANUALS</u>

**7.1.** <u>Manuals</u>. In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under Franchisor's Marks, Franchisee shall conduct its business in accordance with the Manuals, one or more copies of which, or access to, Franchisee acknowledges having received on loan from Franchisor for the term of this Agreement. The Manuals may consist of multiple volumes of printed text, video and/or audio tapes and files, computer disks, and other electronically stored data, and Franchisee acknowledges and agrees that Franchisor may provide a portion or all of the Manuals (including updates and amendments), and other instructional information and materials in, or via, electronic media, including without limitation, through the Internet.

**7.2.** <u>Confidentiality of the Manuals</u>. Franchisee shall at all times treat the Manuals, any other manuals created for or approved for use in the operation of the Franchise, and the information contained therein, as confidential, and shall use best efforts to maintain such information as secret and confidential, protect it from viewing by others, and treat the Manuals with the same degree of care as it would treat its most highly confidential documents. Franchisee shall not at any time download, print, copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person.

**7.3.** <u>Protection of the Manuals</u>. The Manuals shall at all times remain the sole property of Franchisor and shall at all times be kept in a secure manner at the Franchise premises. Franchisee shall ensure that the Manuals are kept current and up to date; and, in the event of any dispute as to the contents of the Manuals, the terms of the master copy of the Manuals maintained by Franchisor at Franchisor's home office shall be controlling.

**7.4.** <u>Revisions to the Manuals</u>. Franchisor may from time to time revise the contents of the Manuals, and Franchisee expressly agrees to make corresponding revisions to its copy (to the extent Franchisor permits Franchisee to maintain a written copy) of the Manuals and to comply with each new or changed standard immediately upon receipt of such revision.

8. <u>CONFIDENTIAL INFORMATION</u>

**8.1.** <u>Confidential Information</u>. Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised hereunder which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement. Franchisee shall divulge such confidential information only to such of its employees as must have access to it in order to operate the Franchise. Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which

Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others. Any employee who may have access to any confidential information regarding the Franchise shall execute a covenant that s/he will maintain the confidentiality of information they receive in connection with their association with Franchisee. Such covenants or non-disclosure/non-competition agreements shall be on a form provided by Franchisor, which form shall, among other things, designate Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.

**8.2.**    Irreparable Injury.   Franchisee acknowledges that any failure to comply with the requirements of this **Section 8** will cause Franchisor irreparable injury, and Franchisee agrees to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this **Section 8**.

**8.3.**    Information Exchange.   Franchisee agrees to disclose to Franchisor all ideas, concepts, methods, techniques, services, and products conceived or developed by Franchisee, its affiliates, owners, agents, or employees during the term of this Agreement relating to the development and/or operation of the Franchise. Franchisee hereby grants to Franchisor and agrees to procure from its affiliates, owners, agents, or employees a perpetual, nonexclusive, and worldwide right to use any such ideas, concepts, methods, techniques, services and products. Franchisor shall have no obligation to make any payments to Franchisee with respect to any such ideas, concepts, methods, techniques or products. Franchisee agrees that Franchisee will not use or allow any other person or entity to use any such concept, method, technique or product without obtaining Franchisor's prior written approval.

9.    ACCOUNTING AND RECORDS

**9.1.**    Records.    With respect to the operation and financial condition of Franchisee and the Franchise, Franchisee shall adopt, until otherwise specified by Franchisor, a fiscal year and fiscal accounting periods which coincide with Franchisor's then-current fiscal year, as specified by Franchisor. Franchisee shall maintain for a period of not less than three years during the term of this Agreement, and, for not less than three years following the termination, expiration, or non-renewal of this Agreement, full, complete, and accurate books, records, and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor from time to time in the Manuals or otherwise in writing.

**9.2.**    Periodic Reports.    In addition to the record keeping requirements of **Section 9.1**:

    **9.2.1.**    If requested by Franchisor, Franchisee shall, at its expense, provide to Franchisor, in a format specified by Franchisor, a complete annual financial

statement (prepared according to generally accepted accounting principles, that includes a fiscal year-end balance sheet, an income statement of the Franchise for such fiscal year reflecting all year-end adjustments, and a statement of changes in cash flow of Franchisee), on a review basis, prepared by an independent certified public accountant satisfactory to Franchisor, no later than April 15 of each year for the preceding fiscal year of the Franchise, showing the results of operations of the Franchise during the most recently completed fiscal year. Franchisee shall also provide Franchisor with a copy of Franchisee's federal and state tax returns, not more than 30 days following Franchisee's submission of the same to governmental authorities. If Franchisee files any extension request with any taxation authority, Franchisee shall within 30 days of filing such extension request provide a copy of the request and any confirmation or approval received by the taxing authority.

**9.2.2.** Within 45 days following the end of each calendar quarter during the term of this Agreement, after the opening of the Franchise, Franchisee shall submit to Franchisor, in a format acceptable to (or, at Franchisor's election, specified by) Franchisor, as amended from time to time: (i) a fiscal quarter and fiscal year to date profit and loss statement and a quarterly balance sheet (which may be unaudited) for the Franchise; (ii) reports of those income and expense items of the Franchise which Franchisor specifies from time to time for use in any revenue, earnings, and/or cost summary it chooses to furnish to prospective franchisees and/or developers; and (iii) copies of all state sales tax returns for the Franchise. If required by Franchisor, Franchisee shall use on-line or other electronic accounting and reporting systems as Franchisor may specify periodically.

**9.3.** <u>Reporting Requirements</u>. Franchisee shall also submit to Franchisor in addition to the Sales Reports required pursuant to **Section 4.2**, for review or auditing, such other forms, reports, records, information, and data as and when Franchisor may reasonably designate, in the form and format, and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manuals or otherwise in writing, including, without limitation, via computer diskette, or otherwise in electronic format, and/or restated in accordance with Franchisor's financial reporting periods, consistent with Franchisor's then current financial reporting periods and accounting practices and standards. Franchisee shall, without limitation, provide Franchisor with login, API and other access information as required from time to time to permit Franchisor to remotely access Franchisee's bookkeeping software (i.e. QuickBooks or other software designated by Franchisor) to pull reports, download data and perform any other action permitted under this Agreement. Franchisee shall immediately, without further request from Franchisor, provide updated access information to Franchisor when the previously provided information is changed. The reporting requirements of this **Section 9.3** shall be in addition to, and not in lieu of, the electronic reporting that may be required in connection with the use of the required Technology System under **Section 5.13**.

**9.4.** <u>Audit</u>. Franchisor or its designated agents shall have the right at all reasonable times to examine, copy, and/or personally review or audit, at Franchisor's expense, all books, records, and sales and income tax returns of Franchisee. Franchisor shall also have the right, at any time, to have an independent audit made of the books of Franchisee and Franchisee agrees that it shall pay Franchisor the costs of one audit each calendar quarter during the term of this Agreement, if an audit is necessitated because Franchisee fails to timely provide Sales Reports or if an audit discloses an understatement in any report by Franchisee of 5% or more, Franchisee shall, reimburse Franchisor for all costs and expenses connected with the audit (including, without limitation, travel, room and board and salaries and other benefits, and reasonable accounting and legal costs). If an inspection should reveal that any payments have been understated in any report to Franchisor, then Franchisee shall immediately pay Franchisor the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of 1.5% per month, or the maximum rate permitted by law, whichever is less. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

**9.5.** <u>Data</u>. Franchisor may, from time-to-time, specify in the Manuals or otherwise in writing the information that Franchisee shall collect and maintain on the Technology System installed at the Franchise, and Franchisee shall provide to Franchisor such reports as Franchisor may reasonably request from the data so collected and maintained. All data provided by Franchisee in any form, and whether required by this **Section 9.5** or any other requirement under the System or in the Manuals, including data uploaded to Franchisor's computer system from the Franchisee's Technology System, and/or downloaded from the Franchisee's Technology System to Franchisor's computer system, is and will be owned exclusively by Franchisor, including without limitation, customer lists and email lists, and Franchisor will have the right to use such data in any manner that Franchisor deems appropriate without compensation to Franchisee. In addition, all other data created or collected by Franchisee in connection with the System, or in connection with Franchisee's operation of the business (including but not limited to consumer and transaction data), is and will be owned exclusively by Franchisor during the term of, and following termination or expiration of, this Agreement. Copies and/or originals of such data must be provided to Franchisor upon Franchisor's request. Franchisor hereby licenses use of such data back to Franchisee, at no additional cost, solely for the term of this Agreement and solely for Franchisee's use in connection with the business franchised under this Agreement. Franchisor may use all such information, data, and reports in any manner, including, without limitation, providing financial and operating reports to franchisees and developers operating under the System.

10. <u>ADVERTISING</u>

Recognizing the value of advertising, and the importance of the standardization of advertising programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

**10.1.**  Brand Funds.  Franchisor shall have the right to establish, at any time, the Brand Fund as described in this **Section 10**.

**10.2.**  Brand Fund Contributions and Local Marketing Expenditures.  Franchisee shall, during each calendar month, spend on advertising and promotion the greater of $2,000 or 5% of Franchisee's Gross Sales to advertise and to promote the Franchise through methods, media and advertising approved by Franchisor (together, "Local Marketing").  If Franchisee has more than one Territory, the total combined Local Marketing minimum spending requirement for up to 4 contiguous Territories shall be equal to the then-current Local Marketing minimum spending requirement for one Territory.  Franchisor shall have the right to designate in writing from time to time how, and in what proportions, Franchisee is to allocate its Local Marketing.  Additionally, Franchisee shall contribute (i) 1% of Gross Sales to the Brand Fund ("Brand Fund") as may be established pursuant to Section 10.3. The Brand Fund contribution may be increased to 2% upon notice to Franchisee.

**10.2.1.1.**  Franchisor shall provide Franchisee with not less than 60 days prior written notice of any change in the required Local Marketing (which will not exceed 5% of Gross Sales).  Franchisor shall not increase required Brand Fund contributions to an amount exceeding 2% of Gross Sales.

**10.2.1.2.** Franchisee shall pay required Brand Fund Contributions in the manner required under **Section 4** (or as otherwise provided in this **Section 10**).

**10.2.1.3.** For all company-owned Franchises, Franchisor shall contribute to the Brand Fund on the same basis as franchisees.

**10.3.**  Brand Fund.  Although it is under no obligation to do so, Franchisor may at any time establish a Brand Fund, as follows:

**10.3.1.** Franchisor or its designee shall have the right to direct all advertising programs, as well as all aspects thereof, including without limitation, the concepts, materials, and media used in such programs and the placement and allocation thereof.  Franchisee agrees and acknowledges that the Brand Fund is intended to maximize general public recognition, acceptance, perception of, and use of the System; and that Franchisor and its designee are not obligated, in administering the Brand Fund, to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or pro rata from expenditures by the Brand Fund.  Franchisor may engage the services of a franchise sales organization for development of the franchise system, and Franchisee specifically acknowledges and agrees that such franchise sales organization may be compensated out of the Brand Fund in exchange for services and products that, while not intended solely to market the sale of franchises, benefit the franchise system through franchise development and brand marketing."

**10.3.2.** The Brand Fund, all contributions thereto, and any earnings thereon, shall be used exclusively (except as otherwise provided in this **Section 10.3**) to meet any and all costs of maintaining, administering, directing, conducting, creating and/or otherwise preparing advertising, marketing, public relations and/or promotional programs and materials, research and design relating to branding and implementation of re-branding programs and strategies, and any other activities which Franchisor believes will enhance the image of the System, including, without limitation, the costs of: preparing and/or conducting media advertising campaigns; marketing surveys and other public relations activities; employing advertising and/or public relations agencies; purchasing promotional items; developing new or modified trade dress and marks; point-of-purchase (POP) materials; design and photographs; purchasing media space or time (including all associated fees and expenses); administering regional and multi-regional marketing and advertising programs; market research; developing and implementing customer loyalty programs; the creative development of, and actual production associated with, premium items, give-aways, promotions, contests, public relation events, and charitable or non-profit events; developing, implementing and maintaining an electronic commerce website and/or related strategies; maintaining and developing one or more websites devoted to the System, the Marks and/or the "Koala" brand; providing promotional and other marketing materials and services to the Franchises operated under the System; and the salaries of Franchisor's employees to the extent such employees provide services in conjunction with System marketing activities. The Brand Fund may also be used to provide rebates or reimbursements to franchisees for local expenditures on products, services, or improvements, approved in advance by Franchisor, which products, services, or improvements Franchisor shall have the right to determine what will promote general public awareness and favorable support for the System.

**10.3.3.** Franchisee shall contribute to the Brand Fund in the manner specified by Franchisor. All sums paid by Franchisee to the Brand Fund shall be maintained in an account separate from Franchisor's other monies. The Brand Fund will not be used to defray the general operating expenses of Franchisor except that Franchisor shall have the right to charge the Brand Fund for such reasonable administrative costs and overhead as Franchisor may incur in activities reasonably related to the direction and implementation of the Brand Fund and advertising programs for franchisees and the System. The Brand Fund and its earnings shall not otherwise inure to the benefit of Franchisor.

**10.3.4.** The Brand Fund is not intended to be, nor will it be deemed to be a trust, and Franchisor does not assume any fiduciary obligation to Franchisee for maintaining, directing or administering the Brand Fund or for any other reason. A statement of the operations of the Brand Fund as shown on the books of Franchisor shall be prepared annually by Franchisor, and shall be made available to Franchisee on an annual basis upon Franchisee's written request.

**10.3.5.** Although the Brand Fund is intended to be of perpetual duration, Franchisor maintains the right to terminate the Brand Fund. The Brand Fund shall not be terminated, however, until all monies in the Brand Fund have been expended for advertising and/or promotional purposes. If Franchisor terminates the Brand Fund, Franchisor shall have the right to require Franchisee to spend an amount equal to previous Brand Fund contribution amount on Local Marketing and allocate such spending as directed by Franchisor.

**10.4.** Promotional Materials and Marketing Assistance. Franchisor shall make available to Franchisee from time to time, at Franchisee's expense, advertising plans and promotional materials, including newspaper mats, coupons, merchandising materials, sales aids, point of purchase materials, special promotions, direct mail materials, community relations programs, and similar advertising and promotional materials for use in advertising and promotion. Franchisor may provide periodic marketing assistance to Franchisee.

**10.5.** Approvals. For all proposed advertising, marketing, and promotional plans, Franchisee shall submit samples of such plans and materials to Franchisor (by means described in **Section 20**), for Franchisor's review and prior written approval (except with respect to prices to be charged by Franchisee). If written approval is not received by Franchisee from Franchisor within 30 days of the date of receipt by Franchisor of such samples or materials, Franchisor shall be deemed to have disapproved them. Franchisee acknowledges and agrees that any and all copyright in and to advertising and promotional materials developed by or on behalf of Franchisee shall be the sole property of Franchisor, and Franchisee agrees to execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Franchisor to give effect to this provision.

**10.6.** Minimum Requirements Only. Franchisee understands and acknowledges that the required Local Marketing and Brand Fund contributions are minimum requirements only, and that Franchisee may, and is encouraged by Franchisor to expend additional funds for local advertising and promotion of a local nature which will focus on disseminating advertising directly related to the Franchise.

**10.7.** Websites; Internet Use. Franchisee shall not, without Franchisor's prior written approval, offer, promote, or sell any products or services, or make any use of the Marks, through the Internet, including the use of websites, domain names, uniform resource locators, keywords, linking, search engines (and search engine optimization techniques), banner ads, meta-tags, marketing, auction sites, e-commerce (as defined below) and co-branding arrangements. Any website shall be deemed "advertising" under this Agreement, and will be subject to (among other things) Franchisor's approval under **Section 10.6**. Franchisor has the right to control or designate the manner of Franchisee's use of all URLs, domain names, website addresses, metatags, links, key words, e-mail addresses and any other means of electronic identification or origin ("**e-names**"). Franchisor also has the right to designate, approve, control or limit all aspects of Franchisee's use of the Internet, Intranet, World Wide Web, wireless technology, digital cable, use of e-

names, e-mail, home pages, bulletin boards, chat rooms, social networking sites, linking, framing, online purchasing cooperatives, marketplaces, barter exchanges, and related technologies, methods, techniques, registrations, networking, and any electronic communication, commerce, computations, or any means of interactive electronic documents contained in a network of computers or similar devices linked by communications software or hardware (collectively, "**e-commerce**"). Franchisee agrees to follow all of Franchisor's policies and procedures related to the use and regulation of e-commerce. Franchisee agrees to be bound by any terms of use, privacy policy and copyright notice and takedown policies and the like that Franchisor establishes from time to time. Franchisor may require Franchisee, at Franchisee's expense, to coordinate its e-commerce activities with Franchisor, other Franchises, suppliers and/or affiliates. Other than any e-mail or any similar account provided to Franchisee by Franchisor, if any, Franchisee shall not establish any e-mail account using the Marks or similar names or marks. Franchisee agrees to use any e-mail or any similar account provided to Franchisee by Franchisor solely for business purposes. Franchisee shall be required to follow Franchisor's intranet and Internet usage rules, policies and requirements. Franchisor retains the sole right to approve any linking to, or other use of, the Koala Website. Franchisee may not establish or participate in any Koala related blog or other discussion forum. Franchisee recognizes and agrees that Franchisor and its affiliates own all rights, title and interest in and to any and all websites and e-names that Franchisor commissions or utilizes, or requires or permits Franchisee to utilize, in connection with the System, which bear the Marks or any derivative of the Marks. Franchisee also recognizes and agrees that Franchisor and/or its affiliates own all rights, title and interest in and to any and all data or other information collected via e-commerce related to the System or the Marks, including any customer data, click-stream data, cookies, user data, hits and the like. Such data or other information also constitutes Franchisor's confidential information subject to **Article 8.**

**10.8.** <u>Limitations on Associations with the Marks</u>. Franchisee acknowledges and agrees that certain associations between Franchisee and/or the Franchise, and/or the Marks and/or the System, and/or businesses operating under or products sold under the Marks or the Koala brand names on the one hand, and certain political, religious, cultural or other types of groups, organizations, causes, or activities, on the other, however well-intentioned and/or legal, may create an unwelcome, unfair, or unpopular association with, and/or an adverse effect on, the reputation of Franchisor, the System, the Koala brand, or the good will associated with the Marks. Accordingly, Franchisee shall not, without the prior written approval of Franchisor, engage in any activities with, or donate any money, products, services, goods, or other items to, any charitable, political or religious organization, group, or activity, if such action is taken, or may be perceived by the public to be taken, in the name of, in connection with, or in association with Franchisee, the Marks, the Franchise, the Franchisor, or the System.

11.  <u>INSURANCE</u>

**11.1.**  <u>Insurance Requirements</u>.  Prior to the commencement of any activities or operations pursuant to this Agreement, Franchisee shall procure and maintain in full force and effect during the term of this Agreement (and for such period thereafter as is necessary to provide the coverages required hereunder for events having occurred during the term of this Agreement), at Franchisee's expense, the following insurance policy or policies in connection with the Franchise or other facilities on the premises, or by reason of the construction, operation, or occupancy of the Franchise or other facilities on premises.  Such policy or policies shall be written by an insurance company or companies acceptable to Franchisor, having a rating of at least "A-7" in the most recent Key Rating Guide published by the A.M. Best Company (or another rating that Franchisor reasonably designates if A.M. Best Company no longer publishes the Key Rating Guide) and licensed to do business in the state in which the Franchise is located.  Such policy or policies shall be in accordance with standards and specifications set forth in the Manuals or otherwise in writing and shall include, at a minimum (except as additional coverages and higher policy limits may reasonably be specified for all franchisees from time to time by Franchisor in the Manuals or otherwise in writing to reflect inflation, identification of new risks, changes in the law or standards of liability, higher damage awards and other relevant changes in circumstances), the following:

**11.1.1.**  Comprehensive general liability insurance, written on an occurrence basis, extended to include contractual liability, products and completed operations, and personal and advertising injury, with a combined bodily injury and property damage limit of not less than $1,000,000 per occurrence.

**11.1.2.**  If any vehicles are used for business purposes, business automobile liability insurance, including a combined single bodily injury and property damage coverage for all owned, nonowned, and hired vehicles, with limits of liability not less than $1,000,000 per occurrence for both bodily injury and property damage.

**11.1.3.**  Statutory workers' compensation insurance and employer's liability insurance for a minimum limit of at least $500,000, as well as such other disability benefits type insurance as may be required by statute or rule of the state in which the Franchise is located.

**11.1.4.**  Commercial umbrella liability insurance with limits which bring the total of all primary underlying coverages to not less than $2,000,000 total limit of liability.

**11.1.5.**  Property insurance providing coverage for direct physical loss or damage to real and personal property for all-risk perils, including the perils of flood and earthquake.

**11.1.6.**  Any other insurance coverage that is required by federal, state, or municipal law.

**11.2.**   Referenced in Manuals.   All policies listed in **Section 11.1** (unless otherwise noted below) shall contain such endorsements as shall, from time to time, be provided in the Manuals.

**11.3.**   Policy Cancellation.   In the event of cancellation, material change, or nonrenewal of any policy, 60 days' advance written notice must be provided to Franchisor in the manner provided in **Article 20**.  Franchisee shall arrange for a copy of such notification to be sent to Franchisor by the insurance company.

**11.4.**   Construction and Remodeling Insurance.  In connection with all significant construction, reconstruction, or remodeling of the Franchise during the term of this Agreement, Franchisee will cause the general contractor, its subcontractors, and any other contractor, to effect and maintain at general contractor's and all other contractor's own expense, such insurance policies and bonds with such endorsements as are set forth in the Manuals, all written by insurance or bonding companies approved by Franchisor, having a rating as set forth in **Section 11.1**.

**11.5.**   No Waiver of Obligations.  Franchisee's obligation to obtain and maintain the foregoing policy or policies in the amounts specified shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in **Section 17.4**.

**11.6.**   Franchisor to be Additional Insured.   All insurance policies shall list Franchisor and its affiliates, officers, directors, employees, and agents as additional insureds.

**11.7.**   Certificates of Insurance.  At least 30 days prior to the time any insurance is first required to be carried by Franchisee, and thereafter at least 30 days prior to the expiration of any such policy, Franchisee shall deliver to Franchisor, certificates of insurance evidencing the proper coverage with limits not less than those required hereunder.  All certificates shall expressly provide that no less than 30 days' prior written notice shall be given Franchisor in the event of material alteration to, cancellation, or nonrenewal of the coverages evidenced by such certificates.   Further certificates evidencing the insurance required by **Section 11.1** shall name Franchisor, and each of its affiliates, directors, agents, and employees as additional insureds, and shall expressly provide that any interest of same therein shall not be affected by any breach by Franchisee of any policy provisions for which such certificates evidence coverage.   In the event that Franchisee fails to provide evidence reasonably satisfactory to Franchisor of the insurance policies required by this **Article 11**, Franchisor may, but is not required to, obtain such required policies on Franchisee's behalf, and Franchisee agrees that it will promptly reimburse Franchisor for all costs related to obtaining such policies upon notice from Franchisor.

**11.8.**   Proof of Insurance.  In addition to its obligations under **Section 11.7**, on the first anniversary of the Effective Date, and on each subsequent anniversary thereof during the term of this Agreement and any renewal hereof, Franchisee shall

provide Franchisor with proof of insurance evidencing the proper coverage with limits not less than those required hereunder, in such form as Franchisor may reasonably require.

**11.9.**  Policy Limit Changes.  Franchisor shall have the right, from time to time, to make such changes in minimum policy limits and endorsements as it may determine; provided, however, all changes shall apply, generally, to all franchisees of Franchisor who are similarly situated.

12.    TRANSFER OF INTEREST

**12.1.**  Franchisor Transfers.  Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations under this Agreement, or any interests in the assets of Franchisor, or any ownership or equity interests in Franchisor, to any person or entity, and any assignee of Franchisor shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment.

**12.2.**  Principals.  If Franchisee is an entity, each person or entity that is an owner of, or has an ownership interest in, Franchisee (each, a "**Principal**"), and the interest of each Principal in Franchisee, is identified on the Summary Page. Franchisee represents and warrants that its owners are as set forth on the Summary Page attached to this Agreement, and covenants that it will not permit the identity of such owners, or their respective interests in Franchisee, to change without complying with this Agreement.  Franchisor shall have the right to designate any person or entity which owns a direct or indirect interest in Franchisee as a Principal, and the Summary Page shall be so amended automatically upon notice thereof to Franchisee.

**12.3.**  Franchisee Transfers.  Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee and its Principals, and that Franchisor has granted this License in reliance on Franchisee's or Franchisee's Principals' business skill, financial capacity, and personal character.  Accordingly:

**12.3.1.** Franchisee shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber:  (a) this Agreement or any of the rights and obligations of Franchisee under this Agreement; or (b) any material asset of Franchisee or the Franchise; provided, however, that Franchisee may grant a security interest in, or otherwise encumber certain assets of the Franchise, excluding the Franchise Agreement, in connection with Franchisee obtaining financing for the development and/or operation of the Franchise or equipment leasing, if such financing satisfies the requirements of Franchisor, which may include, without limitation, execution of agreements by Franchisor, Franchisee, and/or such Principal, and any secured creditor of Franchisee, in a form satisfactory to Franchisor, acknowledging such creditor's obligations to be bound by the terms of this **Article 12**.

**12.3.2.** If Franchisee is a corporation or limited liability company, Franchisee shall not, without the prior written consent of Franchisor, issue any voting securities or securities convertible into voting securities, and the recipient of any such securities shall become a Principal under this Agreement, if so designated by Franchisor.

**12.3.3.** If Franchisee is a partnership or limited partnership, the partners of the partnership shall not, without the prior written consent of Franchisor, admit additional general partners, remove a general partner, or otherwise materially alter the powers of any general partner.  Each general partner shall automatically be deemed a Principal of Franchisee.

**12.3.4.** A Principal shall not, without the prior written consent of Franchisor, transfer, pledge or otherwise encumber any interest of a Principal in Franchisee.

**12.4.**  Conditions for Approval.  Franchisor shall not unreasonably withhold any consent required by **Section 12.3**; provided, that if Franchisee proposes to transfer its obligations hereunder or any interest in any material asset, or if a Principal proposes to transfer any direct or indirect interest in Franchisee, or if Franchisee or any Principal proposes to undertake any transfer that is subject to **Section 12.3**, Franchisor shall have the right to require any or all of the following as conditions of its approval (except as provided in **Section 12.9**):

**12.4.1.** The transferor shall have executed a general release (which shall include a release from the transferor, Franchisee, Principals, and guarantors of Franchisee), in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, successors, and assigns, and their respective directors, officers, owners, members, managers, partners, agents, representatives, servants, and employees in their corporate and individual capacities including, without limitation, claims arising under this Agreement, any other agreement between Franchisee and Franchisor or its affiliates, and federal, state, and local laws and rules.

**12.4.2.** The transferee of a Principal shall be designated as a Principal and each transferee who is designated a Principal shall enter into a written agreement, in a form satisfactory to Franchisor, agreeing to be bound as a Principal under the terms of this Agreement as long as such person or entity owns any interest in Franchisee; and, the Principal shall guarantee the performance of all such obligations in writing in a form satisfactory to Franchisor.

**12.4.3.** Prior to, and after the transfer, Franchisee's new Principals shall meet Franchisor's educational, managerial, and business standards; each shall possess a good moral character, business reputation, and credit rating; have the aptitude and ability to operate the Franchise, as may be evidenced by prior related business experience or otherwise; and have adequate financial resources and capital to operate the Franchise.

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D9F560771821

**12.4.4.** If a proposed transfer would result in a change in control of Franchisee, at Franchisor's option, Franchisee (or transferee) shall execute, for a term ending on the expiration date of this Agreement the form of franchise agreement then being offered to new System franchisees, and such other ancillary agreements required by Franchisor for the business franchised hereunder, which agreements shall supersede this Agreement and its ancillary documents in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, higher royalty and advertising fees.

**12.4.5.** If a proposed transfer would result in a change in control of Franchisee, and if so requested by Franchisor, Franchisee, at its expense, shall upgrade the Franchise to conform to the then current standards and specifications of new Franchises then being established in the System, and shall complete the upgrading and other requirements set forth in **Sections 5.1.6** and **5.2.5** within the time period specified by Franchisor.

**12.4.6.** All monetary obligations of Franchisee hereunder shall be paid in full on a current basis, and Franchisee must not be otherwise in default of any of its obligations hereunder including, without limitation, its reporting obligations.

**12.4.7.** The transferor shall remain liable for all of the obligations to Franchisor in connection with the Franchise that arose prior to the effective date of the transfer, and any covenants that survive the termination or expiration of this Agreement, and shall execute any and all instruments reasonably requested by Franchisor to evidence such liability.

**12.4.8.** At Franchisee's expense, the transferee's Manager and other employees designated by Franchisor shall successfully complete (to Franchisor's satisfaction) all training programs required by Franchisor upon such terms and conditions as Franchisor may reasonably require (and while Franchisor will not charge a fee for attendance at such training programs, the transferee shall be responsible for the salary and all expenses of the person who attends training).

**12.4.9.** If a proposed transfer would result in a change in control of Franchisee, and to compensate Franchisor for Franchisor's legal, accounting, training, and other expenses incurred in connection with the transfer, Franchisee shall pay Franchisor a non-refundable transfer fee in an amount equal to the greater of $10,000 or 20% of the then-current franchise fee applicable to the Territory. One-half of the transfer fee shall be paid at the time Franchisee submits its request to Franchisor for consideration of the proposed transfer, and such amount shall be non-refundable. The balance of the transfer fee shall be paid at the time the transfer is consummated or closes. In addition, in the event a proposed transfer is not consummated or closed, for any reason except for disapproval by Franchisor, Franchisee or the proposed transferee shall reimburse Franchisor for all of its costs and expenses incurred in connection with its evaluation of the proposed transfer, including, without limitation, attorneys' and accountants' fees, background checks, site evaluation, and training, if applicable,

to the extent the portion of the transfer fee paid when the transfer approval request was made does not cover those costs and expenses.

**12.4.10.**    If the proposed transfer will result in a change in control of Franchisee, the terms of the proposed transfer will not adversely impact the continued operations of the Franchise, as determined in Franchisor's sole discretion.

**12.4.11.**The transferor must acknowledge and agree that the transferor shall remain bound by the covenants contained in **Sections 15.2** and **15.3**.

**12.4.12.**    Franchisee shall be solely responsible for paying any broker fees and/or commissions involved with the sale or transfer of the Franchise regardless of whether Franchisee directly engages such broker or if, at Franchisee's request, Franchisor engages such broker to assist with the sale or transfer of the Franchised Business.

**12.5.**    Right of First Refusal.

**12.5.1.**    If Franchisee or any Principal desires to accept any *bona fide* offer from a third party to purchase Franchisee, any material assets of Franchisee, or any direct or indirect interest in Franchisee, Franchisee or such Principal shall promptly notify Franchisor of such offer and shall provide such information and documentation relating to the offer as Franchisor may require.  Franchisor shall have the right and option, exercisable within 30 days after receipt of all such information, to send written notice (the "**Exercise Notice**") to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party.  If Franchisor elects to purchase the seller's interest, the contract to purchase the Franchise (or interests or assets) shall be executed within 60 days after the Exercise Notice and the closing shall occur at the principal offices of Franchisor; provided, however, that in no event shall the closing occur later than 90 days following the execution of the definitive purchase agreement.

**12.5.2.**  Any material change in the terms of the *bona fide* offer prior to closing shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of the third party's initial offer.   Additionally, if Franchisor elects not to exercise its purchase right and Franchisee fails to complete the proposed sale within six months from the date Franchisor notifies Franchisee that Franchisor will not make the purchase, Franchisor shall again have the right of first refusal described in this **Section 12.5.**  Failure of Franchisor to exercise the option afforded by this **Section 12.5** shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this **Section 12**, with respect to a proposed transfer, or a waiver of any subsequent offer.

**12.5.3.**    In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase

the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, they must attempt to appoint a mutually-acceptable independent appraiser to make a binding determination. If the parties are unable to agree upon one independent appraiser, then an independent appraiser shall be promptly designated by Franchisor and another independent appraiser shall be promptly designated by Franchisee, which two appraisers shall, in turn, promptly designate a third appraiser; all three appraisers shall promptly confer and reach a single determination, which determination shall be binding upon Franchisor and Franchisee. The cost of any such appraisal shall be shared equally by Franchisor and Franchisee. If Franchisor elects to exercise its right under this **Section 12.5**, Franchisor shall have the right to set off all amounts due from Franchisee, and one-half of the cost of the appraisal, if any, against any payment to the seller.

**12.6.** <u>Transfer Upon Death</u>. Upon the death of a Principal, the deceased's executor, administrator, or other personal representative shall transfer the deceased's interest to a third party approved by Franchisor within 12 months after the death. If the distributee is not approved by Franchisor, then the distributee shall transfer the deceased's interest to a third party approved by Franchisor within 12 months after the deceased's death.

**12.7.** <u>Transfer Upon Permanent Disability</u>. Upon the permanent disability of any Principal with a controlling interest in Franchisee, Franchisor shall have the right to require such interest to be transferred to a third party in accordance with the conditions described in this **Section 12** within six months after notice to Franchisee, provided that no transfer fee shall be due for a transfer pursuant to this **Section 12.7**. "**Permanent Disability**" shall mean any physical, emotional, or mental injury, illness, or incapacity that would prevent a person from performing the obligations set forth in this Agreement for at least six consecutive months, and from which condition recovery within six consecutive months from the date of determination of disability is unlikely. Permanent disability shall be determined by a licensed practicing physician upon examination of such person or, if such person refuses to be examined, then such person shall automatically be deemed permanently disabled for the purposes of this **Section 12.7** as of the date of refusal. The licensed practicing physician making such determination shall be chosen by the mutual agreement of a doctor selected by Franchisor and a doctor selected by Franchisee. Franchisor shall pay the cost of the required examination.

**12.8.** <u>Notification Upon Death or Permanent Disability</u>. Upon the death or permanent disability any Principal of Franchisee, such person or his representative shall promptly notify Franchisor of such death or claim of permanent disability. Any transfer upon death or permanent disability shall be subject to the same terms and conditions as any *inter vivos* transfer.

**12.9.** <u>Exceptions for Entity Formed Convenience of Ownership or Transfer to Family Member</u>. Notwithstanding anything to the contrary in this **Section 12**, if Franchisee is an individual and seeks to transfer this Agreement to an entity

formed for the convenience of ownership or if Franchisee seeks to transfer this Agreement to a spouse, adult sibling or adult child (subject to compliance with all other provisions of the Transfer), the conditions of **Sections 12.4.4** (signing a new franchise agreement), **12.4.5** (upgrading the Franchise), **12.4.8** (initial training of new Manager), and **12.4.9** (transfer fee) shall not apply; provided however, that in lieu of a transfer fee, Franchisee shall reimburse Franchisor for its legal, accounting and other professional fees and other costs incurred in connection with the transfer if any, and Franchisee may undertake such transfer, provided that Franchisee (or their spouse, sibling or child as applicable above) owns 100% of the equity interest in the transferee entity, and the Franchisee and transferee personally guarantees, in a written guaranty satisfactory to Franchisor, the performance of the obligations of Franchisee under this Agreement.

**12.10.** No Waiver of Claims. Franchisor's consent to a transfer which is the subject of this **Section 12** shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

**12.11.** Insolvency. If Franchisee or any person holding any interest (direct or indirect) in Franchisee becomes a debtor in a proceeding under the U.S. Bankruptcy Code or any similar law in the U.S. or elsewhere, it is the parties' understanding and agreement that any transfer of Franchisee, Franchisee's obligations and/or rights hereunder, any material assets of Franchisee, or any indirect or direct interest in Franchisee shall be subject to all of the terms of this **Section 12**.

**12.12.** Securities Offerings. All materials for an offering of stock or partnership interests in Franchisee or any affiliate of Franchisee which are required by federal or state law shall be submitted to Franchisor for review as described below before such materials are filed with any government agency. Any materials to be used in any exempt offering shall be submitted to Franchisor for such review prior to their use. No offering by Franchisee or any affiliate of Franchisee shall imply (by use of the Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of the securities of Franchisee or Franchisee's affiliates; and Franchisor's review of any offering shall be limited solely to the relationship between Franchisor and Franchisee and affiliates, if applicable, and shall not constitute any opinion as to any legal requirement. Franchisor may, at its option, require the offering materials to contain a written statement prescribed by Franchisor concerning the limitations stated in the preceding sentence. Franchisee (and the offeror if not Franchisee), the Principals, and all other participants in the offering must fully indemnify Franchisor, its affiliates, successors, and assigns, and their respective directors, officers, shareholders, partners, agents, representatives, servants, and employees in connection with the offering and shall execute any and all documents required by Franchisor to endorse such indemnification. For each proposed offering, Franchisee shall pay Franchisor an amount as is necessary to reimburse Franchisor for its reasonable costs and

expenses (including legal and accounting fees) for reviewing the proposed offering. Franchisee shall give Franchisor written notice at least 30 days before the date that any offering or other transaction described in this **Section 12.12** commences. Any such offering shall be subject to all of the other provisions of this **Article 12**; and further, without limiting the foregoing, it is agreed that any such offering shall be subject to Franchisor's approval as to the structure and voting control of the offeror (and Franchisee, if Franchisee is not the offeror) after the financing is completed.

13.    <u>DEFAULT AND TERMINATION</u>

**13.1.**    <u>Automatic Termination</u>.  Franchisee shall be deemed to be in default under this Agreement, and all rights granted herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or makes a general assignment for the benefit of creditors; or if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and not opposed by Franchisee; or if Franchisee is adjudicated as bankrupt or insolvent; or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; or if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; or if a final judgment remains unsatisfied or of record for 30 days or longer (unless unappealed or a supersedeas bond is filed); or if Franchisee is dissolved; or if execution is levied against Franchisee's business or property; or if suit to foreclose any lien or mortgage against the Franchise premises or equipment is instituted against Franchisee and not dismissed within 30 days; or if the real or personal property of Franchisee's Franchise shall be sold after levy thereupon by any sheriff, marshal, or constable.

**13.2.**    <u>Termination Upon Notice Without Opportunity to Cure</u>.  Franchisee shall be deemed to be in default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the delivery of written notice to Franchisee by Franchisor (in the manner set forth under **Section 20**), upon the occurrence of any of the following events:

**13.2.1.**  If Franchisee fails to open the Franchise as provided in **Section 5.5**;

**13.2.2.**  If Franchisee or other designated employee fails to complete the initial training program pursuant to **Sections 3.2** and **5.6** of this Agreement;

**13.2.3.**  If Franchisee at any time ceases to operate or otherwise abandons the Franchise for three consecutive business days, or loses the right to possession of the Franchise Location, any Koala Rig(s), or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchise is located;

**13.2.4.** If Franchisee or any Principal is convicted of a felony or engages in any other activity that Franchisor believes is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or Franchisor's interest therein;

**13.2.5.** If a threat or danger to public health or safety results from the construction, maintenance, or operation of the Franchise;

**13.2.6.** If Franchisee or any Principal purports to transfer any rights or obligations under this Agreement or any interest to any third party in a manner that is contrary to the terms of **Section 12**;

**13.2.7.** If Franchisee or any Principal fails to comply with the covenants in **Section 15.2**;

**13.2.8.** If, contrary to the terms of **Sections 7** or **8**, Franchisee discloses or divulges confidential information provided to Franchisee by Franchisor;

**13.2.9.** If Franchisee knowingly maintains false books or records, or submits any false reports (including, but not limited to, information provided as part of Franchisee's application for this franchise) to Franchisor, underreports Gross Sales by more than 5% or more for any period;

**13.2.10.** If Franchisee commits three or more defaults under this Agreement in any 12-month period, whether or not each such default has been cured after notice;

**13.2.11.** If Franchisee or any Principal makes any unauthorized or improper use of the Marks or contests the validity of Franchisor's ownership of the Marks or its right to use and to license others to use the Marks; and/or

**13.2.12.** If Franchisee or any Principal is in breach or default under any other agreement (whether existing as of the date of this Agreement or subsequently made) with Franchisor or any of its subsidiaries or Affiliates, and if such default is curable, fails to cure the default as required within the time permitted.

**13.3.** <u>Termination With Opportunity to Cure</u>. Except as otherwise provided in **Sections 13.1** and **13.2**, upon any other default by Franchisee of its obligations hereunder, Franchisor may terminate this Agreement only by giving written notice of termination (in the manner set forth under **Article 20**) setting forth the nature of such default to Franchisee at least 30 days prior to the effective date of termination (or, with respect to monetary defaults, five days); provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor, all within the 30 day period (or five day period with respect to monetary defaults). If any such default is not cured within the specified time, this Agreement may, upon Franchisor's election, be terminated without further notice to Franchisee effective immediately upon the expiration of the 30

day period (or five day period with respect to monetary defaults) or such longer period as applicable law may require.

**13.4.**  <u>Extended Notice of Termination</u>.  If any law applicable to this **Section 13**, requires a longer notice period prior to termination of this Agreement, or prior to a refusal to enter into a successor or renewal franchise, than is required hereunder, a different standard of "good cause", or the taking of some other action not required hereunder, the prior notice, "good cause" standard, and/or other action required by such law shall be substituted for the comparable provisions hereof.

**13.5.**  <u>Assignment Upon Bankruptcy</u>.  If, for any reason, this Agreement is not terminated pursuant to this **Article 13**, and this Agreement is assumed, or assignment of the same to any person or entity who has made a *bona fide* offer to accept an assignment of this Agreement is contemplated, pursuant to the United States Bankruptcy Code, then notice of such proposed assignment or assumption, setting forth:  (i) the name and address of the proposed assignee; and (ii) all of the terms and conditions of the proposed assignment and assumption, shall be given to Franchisor within 20 days after receipt of such proposed assignee's offer to accept assignment of this Agreement, and, in any event, within 10 days prior to the date application is made to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption, and Franchisor shall thereupon have the prior right and option, to be exercised by notice given at any time prior to the effective date of such proposed assignment and assumption, to accept an assignment of this Agreement to Franchisor itself upon the same terms and conditions and for the same consideration, if any, as in the *bona fide* offer made by the proposed assignee, less any brokerage commissions which may be payable by Franchisee out of the consideration to be paid by such assignee for the assignment of this Agreement.  In the event Franchisor does not elect to exercise the options described in this **Section 13.5**, any transfer or assignment pursuant to the United States Bankruptcy Code shall be subject to the same terms and conditions of any other transfer or assignment set forth in **Article 12**.

**13.6.**  <u>Damages</u>.  In addition to any other claims Franchisor may have (other than claims for lost future Royalty Fees and Brand Fund Contributions), if Franchisor terminates this Agreement based on Franchisee's default or if Franchisee terminates this Agreement in violation of its terms, Franchisee must pay Franchisor liquidated damages calculated as follows:  (a) the greater of (i) the average of Franchisee's monthly Royalty Fees and Brand Fund Contributions due for the last 12 months (or for such shorter period of time that the Franchise has been in operation) before termination, (ii) or the average monthly amount which would be due based on the minimum fees set forth in **Section 4.2** for a period 37+ months after the Effective Date,  (b) multiplied by the lesser of 24 or the number of months remaining in the then-current term under **Section 2.1**, (c) discounted to present value using the then-current prime rate of interest quoted by Franchisor's principal commercial bank.  The parties hereto agree that calculation of damages if Franchisor terminates due to default or if Franchisee terminates this Agreement in violation of its terms will be difficult to measure and quantify, and

the damages described in this **Section 13.6** are a reasonable approximation of such damages, and are not a penalty.

14.    OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

**14.1.**    Cease Operations.    Franchisee shall immediately cease to operate the Franchise, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

**14.2.**    Cease Use of Marks.    Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures and techniques associated with the System, the mark "Koala Insulation" and all other Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System.    In particular, Franchisee shall cease to use, without limitation, the Koala Rigs, all signs, advertising materials, displays, stationery, forms, and any other articles that display the Marks.

**14.3.**    Cancellation of Assumed Names.    Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the mark "Koala Insulation" and all other Marks, and/or any other service mark or trademark of Franchisor, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five days after termination or expiration of this Agreement.

**14.4.**    Assign Lease; Modification of Premises.    Franchisor, or any affiliate of Franchisor, shall have the right and option, but not the obligation, in Franchisor's sole discretion, to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location (if applicable).    Franchisor may assign or delegate this right or option to any affiliate or designee of Franchisor, without notice to, or request for approval from, the landlord or lessor of the Franchise Location.    If Franchisor or its assignee or delegatee does not elect or is unable to exercise any option it may have to acquire the Lease, or otherwise acquire the right to occupy the Franchise Location, Franchisee shall make such modifications or alterations to the Franchise Location operated hereunder immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of said premises from that of other Franchises, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.    If Franchisee fails or refuses to comply with the requirements of this **Section 14.4**, Franchisor (or its designee) shall have the right to enter upon the premises of the Franchise, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

**14.5.**    Telephone, Etc.    Franchisee shall cease use of, and if Franchisor requests, shall transfer to Franchisor, all telephone numbers, customer lists, and any

domain names, websites, email addresses, and any other identifiers, whether or not authorized by Franchisor, used by Franchisee while operating the Franchise.

**14.6.**  No Confusion.  Franchisee agrees, if it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit copy, or colorable imitation of the Marks, either in connection with such other business or the promotion thereof, which is likely to cause confusion, mistake, or deception, or which is likely to dilute Franchisor's rights in and to the Marks, and further agrees not to utilize any designation of origin, description, trademark, service mark, or representation which suggests or represents a present or past association or connection with Franchisor, the System, or the Marks.

**14.7.**  Pay Monies Owed.  Franchisee shall promptly pay all sums owing to Franchisor and its subsidiaries and affiliates (regardless of whether those obligations arise under this Agreement or otherwise).  In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default.

**14.8.**  Damages and Costs.  Franchisee shall pay Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this **Section 14**.

**14.9.**  Return of Manuals.  Franchisee shall immediately deliver to Franchisor the Manuals and all other manuals, records, and instructions containing confidential information (including without limitation any copies thereof, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of Franchisor.

**14.10.** Option to Purchase Furnishings and Equipment.  Franchisor shall have the option to purchase from Franchisee any or all of the Koala Rigs and other vehicles, furnishings, equipment, signs, fixtures, supplies, or inventory of Franchisee related to the operation of the Franchise, at the lesser of the fair market value or Franchisee's book value.  Franchisor shall have 30 days from the expiration or termination of this Agreement to notify Franchisee that Franchisor will exercise its option under this Section 14.10, and another 60 days from such notice to complete such purchase.  The book value of any such item shall be determined based upon a five-year straight-line depreciation of original costs.  For equipment that is five or more years old, the parties agree that fair market value shall be deemed to be 10% of the equipment's original cost.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee as well as all amounts due to Franchisor's affiliates from Franchisee.  Franchisee shall take all actions as necessary to ensure that any items purchased by Franchisor shall be free of all liens or other encumbrances at the time Franchisee sells such items to Franchisor.

**14.11.** Right to Enter and Operate.  In order to preserve the goodwill of the System following termination, Franchisor (or its designee) shall have the right to enter the Franchise Location (if applicable) (without liability to Franchisee, Franchisee's Principals, or otherwise) or to take possession of the Koala Vehicle(s) used by Franchisee for the purpose of continuing the Franchise's operation and maintaining the goodwill of the business.

**14.12.** Close Vendor Accounts.  Franchisee must close all accounts with vendors which were opened in connection with the opening and operation of the Franchise. Franchisor has the right to notify Franchisee's vendors that this Agreement has expired or been terminated and to require them to close Franchisee's accounts, if Franchisee fails to do so.

**14.13.** Security Interest.  For the purpose of securing its obligations under this Agreement, Franchisee hereby grants Franchisor a security interest in all personal property related to the operation of the Franchise of any nature now owned or hereinafter acquired by Franchisee, including, but not limited to, all signs, logos bearing any of the Marks, inventory, equipment, Koala Rigs(s), trade fixtures, furnishings and accounts, together with the proceeds therefrom (the **"Security Agreement"**).  Any event of default by Franchisee under this Agreement shall be deemed a breach of the Security Agreement.  Franchisee covenants to execute and deliver to Franchisor any and all instruments Franchisor may reasonably request from time to time in order to perfect the security interest granted herein, including, without limitation, the appropriate UCC-1 Financing Statements.

15.   COVENANTS

**15.1.**  Full Time and Best Efforts.  Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee (or its Operating Principal if Franchisee is an entity) (or a Manager who will assume primary responsibility for the franchise operations and shall have been previously approved in writing by Franchisor) and a Salesperson shall devote full time, energy, and best efforts to the management and operation of the Franchise.

**15.2.**  In-Term Covenants.  Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.  Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or entity:

**15.2.1.** Divert or attempt to divert any business or customer of the Franchise or of any Franchise using the System to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's Marks and the System.

**15.2.2.**  Unless released in writing by the employer, (a) employ or seek to employ any person who (i) is at that time employed by Franchisor, or (ii) who was, within six months prior to his/her employ by Franchisee, or any person acting for, on behalf of, or at the directions of Franchisee employed by Franchisor, or (b) otherwise directly or indirectly induce such person to leave his or her employment.

**15.2.3.**  Except as otherwise approved in writing by Franchisor, own, maintain, operate, engage in, or have any interest in any "**Competitive Business**" in any location, which shall mean a business which offers insulation evaluation, installation or removal, energy efficiency evaluations and improvements, and related services.

**15.3.**  Post-Term Covenants.  Franchisee covenants that, except as otherwise approved in writing by Franchisor, it shall not, for a continuous uninterrupted period of two years from the date of:  (a) a transfer permitted under **Section 12**; (b) expiration or termination of this Agreement (regardless of the cause for termination); or (c) a final order of a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to the enforcement of this **Section 15.3**; either directly or indirectly (through, on behalf of, or in conjunction with any persons or entity), own, maintain, operate, engage in, or have any interest in any Competitive Business which is, or is intended to be, located:  (a) at the Approved Location; (b) within the Territory; (c) within a 25-mile radius of the Territory; or (d) within a 25-mile radius of the territory of any other Franchises or company or affiliate-owned Koala Insulation business in operation as of the time that the obligations under this **Section 15.3** commence.

**15.4.**  Publicly-Held Corporations.  **Section 15.3** shall not apply to ownership by Franchisee of less than 5% beneficial interest in the outstanding equity securities of any Publicly Held Corporation.  As used in this Agreement, the term "**Publicly Held Corporation**" shall be deemed to refer to a corporation which has securities that have been registered under the Securities Exchange Act of 1934.

**15.5.**  Individual Covenants.  Franchisee shall require and obtain execution of covenants similar to those set forth in **Section 8 and** this **Article 15** (as modified to apply to an individual) from any or all of Franchisee's Principals, the Manager, any replacement Manager and other highly trained personnel as designated by Franchisor.  The covenants required by this **Section 15.5** shall be in the form provided in **Exhibit D** to this Agreement.

**15.6.**  Severability.  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of the covenants in this **Section 15** is held to be unenforceable or unreasonable by any court, it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

**15.7.**  Scope of Covenants.  Franchisee understands and acknowledges that Franchisor shall have the right to reduce the scope of any covenant set forth in

**Sections 15.2** and **15.3** in this Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified.

**15.8.** Enforcement of Claims. Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this **Section 15**. Franchisee agrees to pay all costs and expenses (including without limitation reasonable attorneys' fees and all other costs) incurred by Franchisor in connection with the enforcement of this **Section 15**.

**15.9.** Irreparable Injury. Franchisee acknowledges that Franchisee's violation of the terms of this **Section 15** would result in irreparable injury to Franchisor for which no adequate remedy at law may be available, and Franchisee accordingly consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of the terms of this **Section 15**.

16.    TAXES, PERMITS, AND INDEBTEDNESS

**16.1.** Taxes. Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, income, unemployment, and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the conduct of the business franchised under this Agreement. Franchisee shall pay Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

**16.2.** Tax Disputes. In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchise, or any improvements thereon.

**16.3.** Compliance With Laws. Franchisee shall comply with all federal, state, and local laws, rules, and regulations, and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the business franchised under this Agreement, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, and fire clearances.

**16.4.** Notification of Claims. Franchisee shall notify Franchisor in writing within three days of receipt of notice of any health or safety violation, the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, or within three days occurrence of any accident or injury which may adversely affect

the operation of the Franchise or the financial condition of Franchisee, or give rise to liability or a claim against Franchisee or Franchisor.

17.    <u>INDEPENDENT CONTRACTOR AND INDEMNIFICATION</u>

**17.1.**    <u>Independent Contractors</u>.  It is understood and agreed by the parties hereto that this Agreement does not create a fiduciary relationship between them; that Franchisee shall be an independent contractor; and, that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.

**17.2.**    <u>Identification as Independent Contractor</u>.  At all times during the term of this Agreement and any extensions hereof, Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor.

**17.3.**    <u>No Agency</u>.  It is understood and agreed that nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and that Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be liable by reason of any act or omission of Franchisee in its conduct of the Franchise or for any claim or judgment arising therefrom against Franchisee or Franchisor.

**17.4.**    <u>Indemnification and Advancement</u>.  Franchisee shall immediately and unconditionally advance costs and expenses, indemnify and hold Franchisor and its affiliates, and their respective officers, directors, members, managers, employees, and agents harmless against any and all claims, obligations, and damages (as well as the costs, including attorneys' fees, of defending against them) arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Franchise or Franchisee's breach of this Agreement, including, without limitation, those alleged to be caused by Franchisor's negligence or breach of this Agreement, but not including those claims, obligations, and damages that are determined to be caused solely by Franchisor's gross negligence or willful misconduct according to a final, unappealable ruling issued by a court with competent jurisdiction. In addition to the above and without regard to the final ruling on any matter, Franchisee and its respective Principals hereby agree to immediately and unconditionally advance, or pay directly to designated parties, any amounts which are incurred in connection with any claim against Franchisor or its affiliates, and their respective officers, directors, members, managers, employees, and agents arising from or relating to, directly or indirectly, Franchisee's operation of the Franchise or Franchisee's breach of this Agreement without regard to any defenses based on errors, omissions or conduct of Franchisor or its members, managers, shareholders, directors, affiliates or agents.  If Franchisor incurs any costs or expenses, including, without limitation, legal fees, travel expenses, and other charges, in connection with any proceeding involving Franchisee in which Franchisor is not a party, Franchisee shall reimburse

Franchisor for all such costs and expenses promptly upon presentation of invoices. Franchisee acknowledges and agrees that Franchisee's indemnification and hold harmless obligations under this **Section 17.4** shall survive the termination or expiration of this Agreement.

18.    FORCE MAJEURE

Neither party shall be responsible to the other for non-performance or delay in performance occasioned by causes beyond its control, including without limiting the generality of the foregoing: (a) acts of God; (b) acts of war, terrorism, or insurrection; (c) strikes, lockouts, labor actions, boycotts, floods, fires, hurricanes, tornadoes, and/or other casualties; (d) the inability of Franchisor and/or its affiliates or suppliers to manufacture, purchase, and/or cause delivery of any products used in the operation of the Franchise; and (e) legislative changes and/or governmental orders affecting the sale of the products from Franchises. The inability of either party to obtain and/or remit funds shall be considered within control of such party.

19.    APPROVALS AND WAIVERS

**19.1.**   Approvals.   Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent must be obtained in writing.

**19.2.**   No Warranties.   Franchisee acknowledges and agrees that Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

**19.3.**   Waivers.   No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee or any other franchisee under any of the terms, provisions, covenants, or conditions of this Agreement, and no custom or practice by the parties at variance with the terms of this Agreement, shall constitute a waiver by Franchisor to enforce any such right, option, duty, or power as against Franchisee, or as to subsequent breach or default by Franchisee. Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding or succeeding breach by Franchisee of any terms, provisions, covenants, or conditions of this Agreement.

20.    NOTICES

All notices and other communications required or permitted under this Agreement will be in writing and will be given by one of the following methods of delivery: (i) personally; (ii) by certified or registered mail, postage prepaid; (iii) by overnight delivery service; or (iv) if to Franchisee, by email if an email address is designated on the Summary Page. Notices to Franchisee will be sent to the address set forth on the Summary Page. Notices to Franchisor must be sent to:

KOALA INSULATION FRANCHISOR, LLC
2426 Old Brick Road,
Glen Allen, VA 23060
Attention: General Counsel

Either party may change its mailing address by giving notice to the other party. Notices will be deemed received the same day when delivered personally or upon actual or attempted delivery when sent by registered or certified mail or overnight delivery service.

21.    ENTIRE AGREEMENT AND AMENDMENT

This Agreement and all exhibits to this Agreement, constitute the entire agreement between the parties. This Agreement supersedes any and all prior negotiations, understandings representations and agreements. No representations have induced You to execute this Agreement with Franchisor. Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require You to waive reliance on any representation that Franchisor made in the most recent disclosure document (including its exhibits and amendments) (the "FDD") that Franchisor delivered to You or Your representative, subject to any agreed-upon changes to the contract terms and conditions described in that disclosure document and reflected in this Agreement (including any riders or addenda signed at the same time as this Agreement).

You acknowledge that you are entering into this Agreement as a result of your own independent investigation and not as a result of any representations (with the exception of those representations made in the FDD) made by Franchisor, its members, managers, officers, directors, employees, agents, representatives or independent contractors that are contrary to the terms set forth in this Agreement. You acknowledge that the FDD you received contained a copy of this Franchise Agreement and that you reviewed the FDD and Franchise Agreement at least fourteen (14) days (or such other time as applicable law requires) before you signed this Agreement. You further understand acknowledge and agree that any information you obtain from any Franchisor's franchisee, including relating to their sales, profit, cash flows, and/or expenses, does not constitute information obtained from Franchisor, nor does Franchisor make any representation as to the accuracy of any such information.

22.    SEVERABILITY AND CONSTRUCTION

**22.1.** Severability. If any of the provisions of this Agreement may be construed in more than one way, one of which would render the provision illegal or otherwise voidable or unenforceable, such provision shall have the meaning which renders it valid and enforceable. The language of all provisions of this Agreement shall be

construed according to its fair meaning and not strictly against any party. In the event any court or other government authority shall determine any provision in this Agreement is not enforceable as written, the parties agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws and public policies of the jurisdiction in which enforcement is sought and affords the parties the same basic rights and obligations and has the same economic effect. If any provision in this Agreement is held invalid or otherwise unenforceable by any court or other government authority or in any arbitration proceeding, such findings shall not invalidate the remainder of this Agreement unless in the reasonable opinion of Franchisor the effect of such determination has the effect of frustrating the purpose of this Agreement, whereupon Franchisor shall have the right by notice in writing to the other party to immediately terminate this Agreement.

**22.2.** <u>No Other Rights</u>. Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or entity other than Franchisee, Franchisor, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted by **Article 12**), any rights or remedies under or by reason of this Agreement.

**22.3.** <u>Enforceability of Covenants</u>. Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision of this Agreement, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

**22.4.** <u>Construction</u>. All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

**22.5.** <u>Importance of Timely Performance</u>. Time is of the essence in this Agreement.

**22.6.** <u>Survival of Provisions</u>. All provisions of this Agreement which, by their terms or intent, are designed to survive the expiration or termination of this Agreement, shall so survive the expiration and/or termination of this Agreement.

**22.7.** <u>Additional Terms; Inconsistent Terms</u>. The parties may provide additional terms by including the terms on the Summary Page. To the extent that any provisions of the Summary Page are in direct conflict with the provisions of this Agreement, the provisions of the Summary Page shall control.

23.    <u>APPLICABLE LAW AND DISPUTE RESOLUTION</u>

**23.1.** Governing Law.  This Agreement takes effect upon its acceptance and execution by Franchisor, and shall be interpreted and construed exclusively under the laws of the Commonwealth of Virginia, which laws shall prevail in the event of any conflict of law (without regard to, and without giving effect to, the application of Virginia choice-of-law rules).  Nothing in this **Section 23.1** is intended by the parties to subject this Agreement to any franchise, business opportunity, consumer protection, or similar law, rule, or regulation of the Commonwealth of Virginia to which this Agreement would not otherwise be subject.

**23.2.** Arbitration.

**23.2.1.** Disputes Subject to Arbitration. Except as expressly provided to the contrary in this Agreement, any controversy or claim arising out of or relating to this Agreement or the relationship of the parties shall be settled by arbitration administered by the American Arbitration Association (the **"AAA"**) in accordance with its Commercial Arbitration Rules. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction. Any dispute as to whether this arbitration clause applies or whether any particular claim is subject to arbitration shall be decided by arbitration in accordance with this Article 23.

**23.2.2.** Arbitration Claims.  The parties agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier. The parties further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any claim which is not submitted or filed as required is waived and forever barred. The arbitrator may not consider any settlement discussions or offers that might have been made by either party. The parties agree that arbitration will be conducted on an individual basis, that neither party shall pursue class claims nor multi-plaintiff actions, and that an arbitration proceeding between Franchisor and its affiliates, or any of them, on the one hand, and Franchisee and its affiliates and any of their respective officers, directors, managers, agents, representatives, employees, successors and assigns, on the other hand, may not be consolidated with any other arbitration proceeding to which Franchisor and/or its affiliates are a party. Notwithstanding the foregoing, if any court determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Section, then the parties agree that this arbitration clause shall not apply to that dispute and that such dispute shall be resolved in a judicial proceeding. For purposes of this Section, Franchisor and its affiliates includes their respective shareholders, partners, members and other owners, officers, directors, managers, agents, representatives, employees, successors and assigns.

**23.2.3.** <u>Location</u>. The place of arbitration shall be the AAA office located nearest to Franchisor's principal place of business on the date the arbitration action is filed.

**23.2.4.** <u>Confidentiality</u>. All documents, information, and results pertaining to any arbitration will be confidential, except as required by law or as required for Franchisor to comply with laws and regulations applicable to the sale of franchises.

**23.2.5.** <u>Performance During Arbitration</u>. Franchisor and Franchisee will comply with this Agreement and perform their respective obligations under this Agreement during the arbitration process.

**23.3.** <u>Venue</u>. For any matter which is not subject to the arbitration provisions of **Section 23.2**, each party hereto consents to personal jurisdiction in the federal or state courts located in the county in which Franchisor's principal place of business is located at the time that the action commences. Franchisee and its Principals hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.

**23.4.** <u>No Exclusive Remedies</u>. No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

**23.5.** <u>Injunctive Relief</u>. Notwithstanding anything contained herein, Franchisor reserves the right to seek and obtain temporary restraining orders or other emergency temporary or preliminary equitable injunctive relief and file actions to collect royalties and other amounts owed by Franchisee to Franchisor (collection actions) from federal or state courts located in the state in which the Franchise is located. The parties acknowledge and agree that the rights of Franchisor under this Agreement with respect to the use of the Marks and the System and the enforcement of the in-term and post-term noncompetition covenants of Franchisor are of a specialized and unique nature and that immediate and irreparable damage will result to Franchisor if Franchisee fails or refuses to perform obligations under this Agreement, and, notwithstanding any election by Franchisor to claim damages from Franchisee as a result of such failure or refusal, Franchisor may, in addition to any other remedies and damages available, seek an injunction in any court of competent jurisdiction to restrain such failure or refusal.

**23.6.** <u>Waiver of Jury Trial</u>. Franchisor and Franchisee irrevocably waive trial by jury in any action, proceeding, or counterclaim, whether at law or in equity, brought by either of them against the other, whether or not there are other parties in such action or proceeding.

**23.7.** <u>Limitation of Actions</u>. Any and all claims and actions arising out of or relating to this agreement, the relationship of Franchisee and franchisor, or Franchisee's operation of the Franchise (including any defenses or any claims of set-off or recoupment) must be brought or asserted before the expiration of the

earlier of (a) the time period for bringing an action under any applicable state or federal statute of limitations; (b) one  year after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim; or (c) two years after the first act or omission giving rise to an alleged claim; or it is expressly acknowledged and agreed by all parties that such claims or actions shall be irrevocably barred.  Claims of franchisor attributable to underreporting of sales, and claims of the parties for failure to pay monies owed and/or indemnification shall be subject only to the applicable state or federal statute of limitations.

**23.8.**  Limitation on Damages.  Franchisor and Franchisee hereby waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other, and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.  In any action arising out of or relating to this Agreement or the relationship of the parties, in no event shall Franchisor be liable to Franchisee for more than the total Initial Franchise Fee.

**23.9.**  Costs and Attorneys' Fees.  If either Franchisor or Franchisee seeks to enforce this Agreement in an arbitration or a judicial or other proceeding, the prevailing party shall be entitled to recover its reasonable costs and expenses (including attorneys' fees, attorneys' assistants' fees, accountants' fees, expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel, room and board, salaries and benefits of those employees participating in such proceeding) incurred in connection with such judicial or other proceeding.

24.    ACKNOWLEDGMENTS

**24.1.**  Acknowledgments.  Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, recognizes that the business venture contemplated by this Agreement involves business risks, and that its success will be largely dependent upon the ability of Franchisee and, if an entity, its owners as independent businesspersons.  Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received from Franchisor or any employee, representative or other party purporting to act on Franchisee's behalf, any warranty, promise or guarantee, express or implied, as to the potential sales volume, profits, or success of the business venture contemplated by this Agreement.

**24.2.**  Receipt of Documents.  Franchisee acknowledges that it received a copy of this Agreement, the exhibit(s) hereto, and agreements relating hereto, if any, with all of the blank lines therein filled in, prior to the date on which this Agreement was executed, and with sufficient time within which to review this Agreement, with advisors of its choosing.  Franchisee further acknowledges that it received the franchise disclosure document required by the Federal Trade Commission's Franchise Rule at least 14 days prior to the date on which this Agreement was executed.

**24.3.** <u>Representations and Warranties</u>. Franchisee and its Principals represent and warrant to Franchisor that:  (a) neither Franchisee nor any of its Principals have made any untrue statement of any material fact nor omitted to state any material fact in obtaining the rights granted herein; (b) neither Franchisee nor any of its Principals have any direct or indirect legal or beneficial interest in any business that may be deemed a Competitive Business, except as otherwise completely and accurately disclosed in its franchise application materials; and (c) Franchisee and its Principals have a legal right to own and operate the Franchise. Franchisee recognizes that Franchisor approved Franchisee in reliance on all of the statements Franchisee and its Principals have made in connection therewith, and that Franchisee has a continuing obligation to advise Franchisor of any material changes in these statements and representations made to Franchisor in this Agreement or in the franchise application.

**24.4.** <u>Compliance with Executive Order 13224</u>.  Under applicable U.S. law, including, without limitation, Executive Order 13224, signed on September 23, 2001 (**"Order"**), Franchisor is prohibited from engaging in any transaction with any person engaged in, or with a person aiding any person engaged in, acts of terrorism, as defined in the Order.  Accordingly, Franchisee represents and warrants to us that, as of the date of this Agreement, neither Franchisee nor any person holding any ownership interest in you, controlled by you, or under common control with Franchisee is designated under the Order as a person with whom business may not be transacted by Franchisor, and that Franchisee: (a) does not, and hereafter will not, engage in any terrorist activity; (b) are not affiliated with and do not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and (c) are not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity.

**24.5.** <u>No Other Obligations</u>.  Each party represents and warrants to the others that there are no other agreements, court orders, or any other legal obligations that would preclude or in any manner restrict such party from: (a) negotiating and entering into this Agreement; (b) exercising its rights under this Agreement; and/or (c) fulfilling its responsibilities under this Agreement.

**24.6.** <u>No Other Representations</u>.  Franchisee acknowledges Franchisor has not (and shall not be deemed to have) given any representation, promise, or guarantee of Franchisee's success.

**24.7.** <u>Business Judgment</u>.  Franchisee understands and agrees that Franchisor may operate and change the System and its business in any manner that is not expressly and specifically prohibited by this Agreement. Whenever Franchisor has expressly reserved in this Agreement or is deemed to have a right and/or discretion to take or withhold an action, or to grant or decline to grant Franchisee a right to take or withhold an action, except as otherwise expressly and specifically provided in this Agreement, Franchisor may make such decision or exercise its right and/or discretion on the basis of Franchisor's judgment of what is in Franchisor's best

interests, including without limitation Franchisor's judgment of what is in the best interests of the franchise network, at the time Franchisor's decision is made or its right or discretion is exercised, without regard to whether: (a) other reasonable alternative decisions or actions, or even arguably preferable alternative decisions or actions, could have been made by Franchisor; (b) Franchisor's decision or the action taken promotes Franchisor's financial or other individual interest; (c) Franchisor's decision or the action it takes applies differently to Franchisee and one or more other franchisees or Franchisor's company-owned or affiliate-owned operations; or (d) Franchisor's decision or the exercise of its right or discretion is adverse to Franchisee's interests.  In the absence of an applicable statute, Franchisor will have no liability to Franchisee for any such decision or action. Franchisor and Franchisee intend that the exercise of Franchisor's right or discretion will not be subject to limitation or review.  If applicable law implies a covenant of good faith and fair dealing in this Agreement, Franchisor and Franchisee agree that such covenant shall not imply any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants Franchisor the right to make decisions, take actions and/or refrain from taking actions not inconsistent with Franchisee's rights and obligations hereunder.

**24.8.** <u>Consultation</u>.  Franchisee acknowledges that it has read and understands this Agreement, the exhibits hereto, and agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors (including attorneys) of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly signed and delivered this Agreement on the day and year first above written.

**KOALA INSULATION FRANCHISOR, LLC**

By: _Scott Bide_
5666CDC624054AC...
Name:  Cory Lyons
Title: Brand President

**Lotus & The Rooster Holdings Company**

By: _[signature]_
81C15828149B403...
Name:  Salim Michel Makhlouf
Title: Owner of Lotus & The Rooster Holdings Company

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D9E560771821

## EXHIBIT A TO THE FRANCHISE AGREEMENT

### TRADEMARKS

| Mark | Registration Number | Registration Date |
|---|---|---|
| **KOALA INSULATION** | 6006546 | March 10, 2020 |
|  | 6007883 | March 10, 2020 |
|  | 6173027 | October 13, 2020 |
| **Delivering Efficiency. Improving Comfort.** | 6079379 | March 31, 2020 |

**EXHIBIT B TO THE FRANCHISE AGREEMENT**

LEASE RIDER TO LEASE AGREEMENT DATED _____

BY AND BETWEEN

_____, AS "LANDLORD"

AND

_____, AS "TENANT" FOR
THE DEMISED PREMISES ("PREMISES") DESCRIBED THEREIN

---

This Rider and the provisions hereof are hereby incorporated into the body of the lease to which this Rider is attached (the "Lease"), and the provisions hereof shall be cumulative of those set forth in the Lease, but to the extent of any conflict between any provisions of this Rider and the provisions of the Lease, this Rider shall govern and control.

1. <u>Consent to Collateral Assignment to Franchisor</u>. If Franchisor takes possession of the Premises and confirms to Landlord that Franchisor has assumed the Lease as tenant thereunder, Landlord will recognize Franchisor as tenant under the Lease. Landlord agrees that in such event Franchisor may further assign the Lease to or enter into a sublease with a person or entity who agrees to assume the tenant's obligations under the Lease and is reasonably acceptable to Landlord and that, upon that assignment, Franchisor will have no further liability or obligation under the Lease as assignee, tenant or otherwise, other than to certify that the additional assignee or sublessee operates the Premises as a Franchise.

2. <u>Use of Premises</u>.  Without limitation of uses permitted under the Lease, but in expansion thereof, the Premises may be used for the purpose of operation of a Koala Insulation Franchise offering insulation installation, removal, evaluation and related services.

3. <u>Compliance of Premises With Applicable Law</u>.  Landlord represents and warrants that as of the date hereof the Premises are in compliance with all applicable law.

4. <u>Notice and Cure Rights to Franchisor</u>.  Prior to exercising any remedies under the Lease (except in the event of imminent danger to the Premises), Landlord shall give Franchisor written notice of any default thereunder by Tenant, and commencing upon receipt thereof by Franchisor, Franchisor shall have the same length cure period as is given to Tenant under the Lease for such default, provided that in no event shall Franchisor have a cure period of less than (i) 10 days after Franchisor's receipt of such notice as to monetary defaults or (ii) 30 days after Franchisor's receipt of such notice as to non-monetary defaults. Landlord agrees to accept cure tendered by Franchisor as if the same was tendered by Tenant, but Franchisor has no obligation to cure such default. The initial address for notices to Franchisor is as follows:

KOALA INSULATION FRANCHISOR, LLC
2426 Old Brick Road
Glen Allen, VA 23060
Attention:  General Counsel

5.    <u>Non-disturbance from Mortgage Lenders</u>. It is a condition of the Lease being subordinated to any mortgage, deed of trust, deed to secure debt or similar encumbrance on the Premises that the holder of such encumbrance agree not to disturb Tenant's rights under the Lease or Tenant's possession of the Premises, so long as Tenant is not in default of its obligations under the Lease beyond any applicable grace or cure period provided therein.

*CHECK THE FOLLOWING PARAGRAPH THAT APPLIES. CHECK ONLY ONE.  IF NONE IS CHECKED, THEN CLAUSE a) BELOW WILL BE APPLICABLE, AND CLAUSE b) BELOW WILL BE DEEMED DELETED*

a)    ☐    Landlord represents and warrants that on the date hereof no mortgage, deed of trust, deed to secure debt or similar encumbrance encumbers the Premises.

b)    ☐    A mortgage, deed of trust or deed to secure debt currently encumbers the Premises.  It is a condition precedent to Tenant's obligations under the Lease that the holder of such encumbrance enter into a written recordable form subordination and non-disturbance agreement with Tenant, in a form reasonably acceptable to Tenant, as described above.

6.    <u>Third Party Beneficiary</u>.  For so long as Franchisor holds a collateral assignment of the Lease, Franchisor is a third party beneficiary of the Lease.

7.    <u>Franchisor Right to Enter</u>.  Upon the expiration or earlier termination of the Lease or the Franchise Agreement, Franchisor or its designee may enter upon the Premises for the purpose of removing all signs and other material bearing the Koala name or trademarks, service marks or other commercial symbols of Franchisor.

AGREED and executed and delivered under seal by the parties hereto as of the day and year of the Lease.

**LANDLORD:**                          **TENANT:**

_____          _____

By:                                           By:

_____          _____
                                               _____

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D95560771B21

_____          _____
_____          _____
Name:                                     Name:
_____          _____
_____          _____
Title:                                    Title:
_____          _____
_____          _____
_____          _____

## EXHIBIT C TO THE FRANCHISE AGREEMENT

### GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to KOALA INSULATION FRANCHISOR, LLC, a Delaware limited liability company ("Franchisor") to execute the Franchise Agreement between Franchisor and Lotus & The Rooster Holdings Company, a Pennsylvania Corporation ("Franchisee"), dated 10/11/2023 | 7:26 AM PDT _____, (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and Franchisor's successors and assigns that all of Franchisee's monetary and other obligations under the Agreement will be punctually paid and performed.

Each of the undersigned has had the opportunity to review the Agreement, and understands his or her obligations hereunder and thereunder.

Upon demand by Franchisor, the undersigned each hereby jointly and severally agree to immediately make each payment required of Franchisee under the Agreement and waive any right to require Franchisor to:  (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee; or (d) give notice of demand for payment by Franchisee.  Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee, and the undersigned each hereby jointly and severally waive notice of same and agree to remain and be bound by any and all such amendments and changes to the Agreement.

The undersigned each hereby jointly and severally agree to defend, indemnify and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorney's fees, reasonable costs of financial and other investigation, court costs, and fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned each hereby jointly and severally acknowledge and expressly agree to be individually bound by all of the covenants contained in Sections 8, 12, 14, 15 and 17.4 of the Agreement, and acknowledge and agree that this Guarantee does not grant the undersigned any right to use the "Koala" marks or system licensed to Franchisee under the Agreement.  Each of the undersigned represents that he or she has received a copy of the Franchise Agreement and understands his or her obligations hereunder and thereunder.

Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

If Franchisor is required to enforce this Guarantee in a judicial or arbitration proceeding, and prevails in such proceeding, Franchisor shall be entitled to reimbursement of its costs and expenses, including, but not limited to, reasonable accountants', attorneys', attorneys' assistants', arbitrators', and expert witness fees, costs of investigation and proof of facts, court

costs, other litigation expenses, travel and room and board expenses, salaries and benefits of those of Franchisor's employee's participating in such proceeding, whether incurred prior to, in preparation for, or in contemplation of the filing of any such proceeding.  If Franchisor is required to engage legal counsel in connection with any failure by the undersigned to comply with this Guarantee, the undersigned shall reimburse Franchisor for any of the above-listed costs and expenses Franchisor incurs.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Sections 22 and 23 of the Agreement.  This Guarantee shall be interpreted and construed under the laws of the Commonwealth of Virginia.  In the event of any conflict of law, the laws of the Commonwealth of Virginia shall prevail (without regard to, and without giving effect to, the application of Virginia conflict of law rules).  Jurisdiction and venue shall be in the state or federal courts located nearest Franchisor's principal place of business at the time that the action is commenced, and the undersigned hereby waives any objection to such jurisdiction and venue. The arbitration provisions of Section 23 of the Agreement shall apply to this Guaranty.

Non-Owner Spousal Guarantee. If this Guarantee is executed by a spouse (or domestic partner or immediate family member) of the owner of a franchisee entity and such person has no equity or ownership in the franchisee entity or franchise then this Guarantee shall only be enforceable against such non-owner spouse in the event that they receive a material transfer of assets from the spouse (or domestic partner or immediate family member) who has the ownership interest in the franchise or franchisee entity.  This section is intended to ensure that one spouse cannot avoid liability under their guarantee by simply transferring assets to the other spouse.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

**GUARANTOR(S)**

Signed: _____
(In his/her individual capacity)
Name: Salim Michel Makhlouf
Address:  251 S Pitt St, Carlisle, PA 17013

## EXHIBIT D TO THE FRANCHISE AGREEMENT

## NON-DISCLOSURE AND NON-COMPETITION AGREEMENT

**THIS AGREEMENT** ("**Agreement**") is made this <u>10/11/2023 | 7:26 AM PDT</u>, by and between Lotus & The Rooster (the "**Franchisee**"), and Salim Michel Makhlouf, who is a principal, manager, supervisor, member, partner, or a person in a managerial position with, Franchisee (the "**Member**").

BACKGROUND:

A.    Koala Insulation Franchisor, LLC, a Delaware limited liability company ("**Franchisor**") owns a format and system (the "**System**") relating to the establishment, development and operation of an insulation and related services business that operate under the name "Koala Insulation" (or other names designated by Franchisor, the "**Marks**") and such additional or alternate services and/or products as Franchisor may designate from time to time (each a "**Franchise**").

B.    Franchisor and Franchisee have executed a Franchise Agreement ("**Franchise Agreement**") granting Franchisee the right to operate a Franchise (the "**Franchise**") and to produce and distribute products and services approved by Franchisor and use the Marks in connection therewith under the terms and conditions of the Franchise Agreement;

C.    The Member, by virtue of his or her position with Franchisee, will gain access to certain of Franchisor's Confidential Information, as defined herein, and must therefore be bound by the same confidentiality and non-competition agreement that Franchisee is bound by.

**IN CONSIDERATION** of these premises, the conditions stated herein, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

1.    <u>Confidential Information</u>. Member shall not, during the term of the Franchise Agreement or thereafter, communicate, divulge, or use for the benefit of any other person or entity, persons, partnership, entity, association, or corporation any confidential information, knowledge, or knowhow concerning the methods of operation of the business franchised thereunder which may be communicated to Member or of which Member may be apprised by virtue of Franchisee's operation under the terms of the Franchise Agreement. Any and all information, knowledge, knowhow, and techniques which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate came to its attention prior to disclosure thereof by Franchisor; or which, at or after the time of disclosure by Franchisor to Franchisee, had become or later becomes a part of the public domain, through publication or communication by others.

2.    <u>Covenants Not to Compete</u>.

(a)    Member specifically acknowledges that, pursuant to the Franchise Agreement, and by virtue of its position with Franchisee, Member will receive valuable specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.

(b)    Member covenants and agrees that during the term of Member's employment with, or ownership interest in, Franchisee, and except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or entity:

(i)    Divert or attempt to divert any business or customer of the Franchise or of any other System franchisee or unit operated by Franchisor (or an affiliate of Franchisor) to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and/or the System;

(ii)    Employ or seek to employ any person who is at that time employed by Franchisor or Franchisee, or otherwise directly or indirectly induce such person to leave his or her employment; or

(iii)    Own, maintain, operate, engage in, be employed by, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services.

(c)    Member covenants and agrees that during the Post-Term Period (defined below), except as otherwise approved in writing by Franchisor, Member shall not, either directly or indirectly, for itself, or through, or in conjunction with any person, persons, partnership, corporation, or entity, own, maintain, operate, engage in, or have any interest in any business which offers insulation evaluation, insulation removal, insulation installation or related services and which business is, or is intended to be, located: (i) at the Franchise location; (ii) within the Territory of the Franchise, which Territory includes the areas defined by the Summary Page of the Franchise Agreement and any amendments thereto; (iii) within a 25-mile radius of the Territory; or (iv) within a 25-mile radius of the territory any other System franchisee or Koala Insulation business owned by Franchisor or its affiliate at the time that the obligations under this **Section 2(c)** commence;

(d)    As used in this Agreement, the term **"Post-Term Period"** shall mean a continuous uninterrupted period of two years from the date of: (a) a transfer permitted under **Section 12** of the Franchise Agreement with respect to Member; and/or (b) termination of Member's employment with, and/or ownership interest in, Franchisee.

3.    <u>Injunctive Relief.</u> Member acknowledges that any failure to comply with the requirements of this Agreement will cause Franchisor irreparable injury, and Member agrees to pay all court costs and reasonable attorney's fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this Agreement.

4.    <u>Severability.</u> All agreements and covenants contained herein are severable. If all or any portion of the covenants in this Agreement is held to be unenforceable or unreasonable by any court, then it is the intent of the parties that the court modify such restriction to extent reasonably necessary to protect the legitimate business interests of Franchisor.

5.    <u>Delay.</u> No delay or failure by Franchisor or the Franchisee to exercise any right under this Agreement, and no partial or single exercise of that right, shall constitute a waiver of that or any other right provided herein, and no waiver of any violation of any terms and provisions of this Agreement shall be construed as a waiver of any succeeding violation of the same or any other provision of this Agreement.

6.    <u>Third-Party Beneficiary.</u> Member hereby acknowledges and agrees that Franchisor is an intended third-party beneficiary of this Agreement with the right to enforce it, independently or jointly with Franchisee.

**IN WITNESS WHEREOF**, Franchisee and the Member attest that each has read and understands the terms of this Agreement, and voluntarily signed this Agreement on this day of __10/11/2023 | 7:26 AM PDT__.

**FRANCHISEE:**                                    **MEMBER:**

**Lotus & The Rooster Holdings Company**                       **Salim Michel Makhlouf**

Signature: _____          Signature: _____
**Salim Michel Makhlouf,**

Title: __Owner of Lotus & The Rooster Holdings Company__

## EXHIBIT E TO THE FRANCHISE AGREEMENT

### EQUIPMENT SALES AGREEMENT

THIS EQUIPMENT SALES AGREEMENT is made on _____, 2022, by KOALA FRANCHISE LLC, a Delaware limited liability company (hereinafter known as "Seller") and [Franchisee], a _____ (hereinafter known as "Buyer"). Buyer and Seller shall collectively be known herein as "the Parties".

### BACKGROUND

WHEREAS, Seller desires to sell the equipment described below, known herein as the "Acquired Equipment", under the terms and conditions set forth below;

WHEREAS, Buyer desires to purchase the Acquired Equipment offered for sale by Seller under the terms and conditions set forth below; and, therefore,

### TERMS AND CONDITIONS

IN CONSIDERATION of the mutual promises and other valuable consideration exchanged by the Parties as set forth herein, the Parties, intending to be legally bound, hereby agree as follows:

**1.  Description of Acquired Equipment.**

The following vehicle (and all equipment within or attached to such vehicle):

1 – Spray Foam Rig

1 – Blow-In Rig

**2. Purchase Price.** The total purchase price to be paid by Buyer to Seller for the Acquired Equipment is _____ ("Purchase Price").

Payment is to be made by Buyer to Seller in cash, by certified funds, financed under the terms of a commercial finance agreement, or through another instrument acceptable to Seller. Buyer must receive permission in advance from Seller for use of a non-certified funds in payment of the Purchase Price.

**3. Delivery of Acquired Equipment and Conveyance of Title.**

(a).    <u>Delivery of Acquired Vehicle</u>. Seller shall deliver the Acquired Equipment, and Buyer shall take possession of same, at Seller's premises or other premises as designated by Seller (either in person or through a third party) on or before that date that is within 10 days of the date hereof ("Delivery Date"). If delivery is to be made at a date after the execution of this contract, it is Seller's duty to ensure that the Acquired Equipment is delivered in the same condition as when last inspected by the Buyer (or, if no Buyer inspection, the execution date of this agreement). It is Buyer's duty, either in person or through a third party to appear at Seller's premises during standard business

hours on or before the Delivery Date to remove the Acquired Equipment from Seller's premises. However, if Buyer fails to appear at Seller's premises on or before the Delivery Date to accept possession of the Acquired Equipment, then risk of loss passes to the Buyer on the Delivery Date.

(b). <u>Conveyance of Title</u>. Seller shall convey title to Buyer upon delivery of the equipment to Buyer, which shall not occur until payment is made in full. Seller agrees and covenants to execute all documents presented by Buyer which are necessary to finalize transfer of title and registration upon the Acquired Equipment to Buyer.

**4.  Representations, Warranties, and Disclosures.**

(a) Warranties.

THIS EQUIPMENT IS SOLD "AS IS", AND SELLER DOES NOT IN ANY WAY, OTHER THAN PARAGRAPH A §§ 1-7 ABOVE, EXPRESSLY OR IMPLIEDLY, GIVE ANY WARRANTIES TO BUYER. SELLER EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE.

_____
Buyer Initials

(b) Odometer Declaration. Seller hereby states that the odometer in the Acquired Equipment (if such equipment has an odometer) now reads as indicated above and, to the best of Seller's knowledge, it reflects the actual mileage of the equipment described herein.

**(c) Buyer Representation**. The individual signing this agreement on behalf of Buyer hereby represents to Seller that he or she has the power and authority to do so on behalf of Buyer.

**5.  Buyer's Responsibility – Insurance, Tags and Inspections.** Buyer acknowledges that unless prohibited by applicable law, any insurance coverage, license, tags, plates or registration maintained by Seller on the Acquired Equipment shall be canceled upon delivery of the Acquired Equipment to, and the acceptance of, by Buyer. Buyer shall inspect and test all equipment and vehicles delivered under this agreement including the inspection of all workmanship performed by installation contractors, vehicle outfitters and other parties that performed any work on the conveyed equipment and vehicle.  Buyer accepts full responsibility for the condition, effectiveness, appropriateness, and use of the conveyed equipment and vehicle. Buyer must inform Seller of any discovered problems or inspection failure prior to taking delivery of vehicle, and provide Seller at least 7 days to cure any flaw, at Seller's own expense. Upon acceptance of delivery, Buyer acknowledges compliance with these requirements and waives all rights of claim against Seller and agrees to indemnify Seller against all claims resulting from the ownership or use of conveyed equipment and vehicles.  Buyer agrees to ensure through due diligence and through its own inspection, assisted by professionals as it sees fit, that all equipment and vehicles comply with all applicable laws, regulations and rules including any weight and engineering requirements.

DocuSign Envelope ID: 2061E074-6019-48D1-A840-D9F560771821

_____

Buyer's Initials

**6.  Continuation of Representations and Warranties**. All representations and warranties contained in this Agreement (if any) shall continue in full force and effect after execution of this agreement. If either party later learns that a warranty or representation that it made is untrue, it is under a duty to promptly disclose this information to the other party in writing. No representation or warranty contained herein shall be deemed to have been waived or impaired by any investigation made by or knowledge of the other party to this Agreement.

**7.  Indemnification of Attorneys' Fees and out-of-pocket costs.** Should any party materially breach this agreement (including representations and warranties made to the other side), the non-breaching party shall be indemnified by the breaching party for its reasonable attorneys' fees and out-of-pocket costs which in any way relate to, or were precipitated by, the breach of this contract (including the breach of representations and warranties). This provision shall not limit in any way the remedies either party may have otherwise possessed in law or equity relative to a breach of this contract. The term "out-of-pocket costs", as used in this contract, shall not include lost profits.

**8.  Severability**. In the event any provision of this Agreement is deemed to be void, invalid, or unenforceable, that provision shall be severed from the remainder of this Agreement so as not to cause the invalidity or unenforceability of the remainder of this Agreement. All remaining provisions of this Agreement shall then continue in full force and effect. If any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope and breadth permitted by law.

**9.  Modification.** Except as otherwise provided in this document, this agreement may be modified, superseded, or voided only upon the written and signed agreement of the Parties. Further, the physical destruction or loss of this document shall not be construed as a modification or termination of the agreement contained herein.

**10.  Acknowledgements**. Each party acknowledges that he or she has had an adequate opportunity to read and study this Agreement, to consider it, to consult with attorneys if he or she has so desired.

**11.  Exclusive Jurisdiction for Suit in Case of Breach**. The Parties, by entering into this agreement, submit to jurisdiction in Richmond, Virginia for adjudication of any disputes and/or claims between the parties under this agreement. Furthermore, the parties hereby agree that the courts which have jurisdiction over Richmond, Virginia shall have **exclusive** jurisdiction over any disputes between the parties relative to this agreement, whether said disputes sound in contract, tort, or other areas of the law.

**12.  State Law.** This Agreement shall be interpreted under, and governed by, the laws of the Commonwealth of Virginia.

IN WITNESS WHEREOF and acknowledging acceptance and agreement of the foregoing, Seller and Buyer affix their signatures hereto.

**SELLER**

By: _____

Name: _____ Authorized Officer for Seller

Date: _____, 2022

**BUYER**

By: _____

Name: _____ Authorized Officer for Buyer

Date: _____, 2022