## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KOALA INSULATION FRANCHISOR,** | : | **CIVIL ACTION NO. 1:25-CV-1008** |
| **LLC,** | : | |
| | : | **(Judge Neary)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LOTUS & THE ROOSTER HOLDINGS** | : | |
| **COMPANY and SALIM MICHEL** | : | |
| **MAKHLOUF,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court is a dispute between a franchisor, plaintiff Koala Insulation Franchisor, LLC, [1] ("Koala") and a franchisee, defendant Lotus & the Rooster Holdings Company, owned by defendant Salim Michel Makhlouf.[2] Once a franchisee of Koala, Makhlouf now operates a different business in the same industry—home insulation. Koala seeks a preliminary injunction ordering Makhlouf to cease using any goods or services with Koala's trademarks and systems, as well as ordering Makhlouf to cease his business operations per restrictive covenants within the franchise agreements. Because Koala failed to make a showing of

---

[1] Until April 2023, Koala's official name was Koala Franchising, LLC. (Hr'g Tr. 12:25-13:5). Empower Brands acquired Koala in 2023 and it became Koala Insulation Franchisor, LLC. (Id. 13:6-8). For purposes of this case, these corporate identities are identical, and "Koala" will be used to refer to them both.

[2] For the remainder of this memorandum, the court will simply use "Makhlouf" to refer to himself and, where appropriate, his company Lotus and the Rooster Holdings Company.

irreparable harm, and because its covenants are unenforceable, the court will deny Koala's motion.

## I.    **Factual Background**

### A. **Acquisition of Koala Franchises**

Sometime in 2021, Makhlouf was looking for ways to supplement his income. (Doc. 25, 07/14/2025 Hr'g Tr. 189:9-24). He focused his search on franchise opportunities, which led him to the home insulation industry. (Id. 190:1-8; 191:3-9). The key criterion Makhlouf searched for was whether these franchises could operate on a "semi-absentee model." (Id. 191:22-23). That is, Makhlouf wanted a franchise where he, as the owner, would not be involved in "the day-to-day grit and grind of running the company." (Id. 192:14-15).

His quest led him to Franchise Fastlane. (Id. 193:10-194:1). Franchise Fastlane had a variety of marketing materials about Koala, which enticed Makhlouf to contact Koala's team.[3] (Id. 204:25-205:6). Among the documents Makhlouf reviewed when preparing to open a Koala franchise was the Franchise Disclosure Document ("FDD"). (Id. 217:8-24). This document covered the various expenses a franchisee could expect to undertake, the obligations they would face, as well as the expected revenue for Koala franchises. (See generally Ex. D26). Based on all this, Makhlouf decided to open a Koala franchise. (Doc. 25, 7/14/25 Hr'g Tr. 221:5-11).

---

[3] The court does not decide today whether Franchise Fastlane was an agent acting on behalf of Koala.

Koala franchises appear across the nation. (Id. 14:4-8). These franchises primarily do residential retrofit insulation, where new insulation is added to an existing home, as well as replacing the insulation entirely. (Id. 13:22-25). Additionally, the franchises do some work with new builders for residential and commercial properties. (Id. 13:25-14:1). Most of this insulation is fiberglass, cellulose, or a specialized foam and is blown in to a particular structure. (Id. 15:7-13). As of July 2025, Koala had 98 active franchises which operate in 391 territories. (Id. 14:4-14). In Koala's system, a "territory" refers to the specific geographical area, based on zip codes, where a franchisee may operate and provide services. (See, e.g., Ex. J2 at 4).[4] Each territory has approximately 200,000 people. (Doc. 25, 7/14/25 Hr'g Tr. 113:23-25).

In March 2022, Makhlouf signed agreements (the "2022 Agreements") with Koala to franchise three territories: Harrisburg, Carlisle, and Elizabethtown. (Id. 221:10-21). However, problems began to arise almost immediately. According to Makhlouf, the training he received by Koala was sub-par. Not only did Koala fail to give hands-on training on how to operate one of the spray-foam rigs central to business, but the spray gun they demonstrated was also different from the one being sold to franchisees. (Id. 227:1-18). Makhlouf did his best to find trainings on

---

[4] Though there are five separate franchise agreements in this case, they are nearly identical. When citing to a provision common to all agreements, the court cites to Ex. J2, which is the 2022 franchise agreement for Harrisburg, to stand in for all the agreements. The agreements only differ in the specific territory they cover, when they were signed, the governing law for the contract, and certain conditions about post-termination obligations of a franchisee. The latter two of those differences are addressed later in this memorandum.

the business on his own, without help from Koala. (<u>Id.</u> 227:22-228:1). Moreover,
Makhlouf had to set up a Google Business profile for his Koala franchises himself,
without help from Koala; although, the latter had posting privileges at one point.
(<u>Id.</u> 254:18-255:9).

### B. Operation of the Franchises

Throughout his first year of business, Makhlouf never turned a profit with his
Koala franchises. (<u>Id.</u> 235:14-16). Then, Makhlouf learned someone else was
interested in purchasing neighboring territories to his own in central Pennsylvania.
(<u>Id.</u> 237:21-24). This competition would threaten his already nonexistent bottom
line. (<u>Id.</u> 30:7-15; 238:14-18). After that party obtained approval but failed to acquire
these territories, located in Lancaster and Brickerville, Makhlouf purchased them
in October 2023 (the "2023 Agreements.") (<u>Id.</u> 31:1-8; 239:1-6). Even with these other
territories, Makhlouf's business did not improve. (<u>Id.</u> 239:1-6). Though, Makhlouf
did not ask Koala for different terms when he signed these agreements because, to
him, the offers from Koala were "take it as is or don't take it at all." (<u>Id.</u> 167:3-7).

By the end of 2024, Makhlouf felt his business was on the verge of
bankruptcy. (<u>Id.</u> 239:22-240:6). He needed help. On December 3rd, 2024, Makhlouf
sent an email to Cory Lyons, the Brand President of Koala, (<u>id.</u> 11:13-15), relaying
his troubles to Koala and asking for a pause on his obligation to make royalty
payments, (Ex. D7 at 3-4). These required minimum royalty payments were, per
Makhlouf, the source of his financial distress. (Doc. 25, 7/14/25 Hr'g Tr. 96:6-9).
Lyons informed Makhlouf that suspending the minimum royalty payments would

not be an option. (Ex. D7 at 3). Makhlouf felt like "there was no budging" on Koala's side and no significant help they could offer. (Doc. 25, 7/14/25 Hr'g Tr. 240:23-25).

Evidently, Makhlouf was not the only Koala franchisee having trouble. On January 29, 2025, Makhlouf sent an email to Lyons stating several franchisees were struggling with Koala's royalty structure. (Ex. D11). Lyons confirmed Koala was in negotiation with franchisees on reducing the minimum royalty structure. (Doc. 25, 7/14/25 Hr'g Tr. 99:5-9). Koala eventually ended up offering all of the franchisees a deal: they could lower their minimum royalty payments in exchange for signing a release for all claims a franchisee may have against Koala at that time. (Id. 99:1-13; 100:1-5). All franchisees who agreed to this deal signed the same amendment; Koala did not offer any modifications to its system-wide offer. (Id. 144:19-22).

Makhlouf rejected Koala's offer in March of 2025. (Id. 47:6-15). On March 24, 2025, Koala sent Makhlouf a notice of default under the franchise agreements for failing to pay the required royalties and provide weekly sales reports. (Ex. P1). Makhlouf admits his reporting of weekly sales data became "sporadic" in 2025 and does not deny he failed to provide at least some reports. (Doc. 25, 7/14/25 Hr'g Tr. 169:7-20; 171:1-5). He also concedes to not paying the required royalties. (Id. 170:23-25). At some point this year, Makhlouf told Koala he wished to go to arbitration pursuant to the franchise agreements. (Id. 244:17-20). Despite seeming to have agreed to mediate their dispute, Koala issued a notice terminating Makhlouf's franchise agreement. (Id. 244:21-245:13; Ex. J7). Upon termination, the terms of the franchise agreements required Makhlouf to cease operating a Koala franchise and cease the use of Koala's Marks and propriety systems and equipment. (Ex. J2 at 44).

Additionally, the franchise agreements also imposed a restrictive covenant on Makhlouf. Under the 2022 Agreements, Makhlouf was prohibited from owning or operating any competitive business in his old territories, within 100 miles of his old territories, or within 100 miles of the territory of any Koala franchise operating at the time the agreement was terminated. (<u>E.g.</u>, Ex. J2 at ECF 47-48). The 2023 Agreements contained the same restriction except that the mileage restriction was reduced to 25 miles. (<u>E.g.</u>, Ex. J5 at 49).[5] The agreements also differ in their governing law: the 2022 Agreements are governed under Florida law, (<u>e.g.</u>, Ex. J2 at 53), whereas the 2023 Agreements are governed by Virginia law, (<u>e.g.</u>, Ex. J5 at 55).

### C. Transition to the Cozy Penguin

These contractual restrictions notwithstanding, Makhlouf did not cease operating a home insulation business after receiving the notice of termination. Instead, he began removing references to Koala and created a new business—the Cozy Penguin. (Doc. 25, 7/14/25 Hr'g Tr. 246:11-21). As a home insulation business, the Cozy Penguin provided the same services as a Koala franchise. (<u>Id.</u> 176:4-20). Makhlouf operates the Cozy Penguin with same Google Business profile he created for his Koala franchises, though now branded for the Cozy Penguin, (<u>id.</u> 179:20-25), he uses the same phone number as before, (<u>id.</u> 61:8-9), and he uses the same equipment and some of the same employees for his new business, (<u>id.</u> 177:3-178:8). He also operates the Cozy Penguin in the same manner as he did with his Koala

---

[5] For the 2023 Agreements, they are identical to each other except for the specific territory covered. So, only the Lancaster agreement, Ex. J5, will be cited when referring to the restrictive covenants of the 2023 Agreements.

franchises: Makhlouf uses his home office, (Doc. 25, 7/14/25 Hr'g Tr. 163:2-9, 176:18-20), and a warehouse where he stores equipment, (id. 222:15-23).

While operating his new business, Makhlouf serviced at least two overlap customers.[6] (Id. 57:13-20; 179:2-12). An invoice for one of these customers was branded for the Cozy Penguin, but mentioned the high quality of service that Koala Insulation utilizes. (Id. 58:10-14). The other incident was a customer referred to Makhlouf originally through an agreement Koala had with Lowe's, (id. 58:15-59:19), though, Makhlouf denies knowledge of the Lowe's as the referral source, (id. 179:13-19). There were other hiccups with the transition as well. For example, at some point, the Cozy Penguin's website featured a picture of someone installing a solar attic fan in a Koala t-shirt. (Id. 61:8-62:9; Ex. P2 at 1).

The biggest area of cross-over between Makhlouf's businesses, however, are the reviews posted to the Google Business profile. These are reviews customers left on the Google Business profile created by Makhlouf. (Doc. 25, 7/14/25 Hr'g Tr. 110:19-111:10). Some of these reviews reference the work done by Koala, since customers posted them while Makhlouf was running his Koala franchises. (Id. 183:13-19). Makhlouf utilizes a plug-in for the Cozy Penguin website, which automatically pulls in reviews from his Google Business profile to his new website. (Id. 182:15-24). Thus, reviews referencing Koala can and do appear on the Cozy Penguin's website. (Ex. P3). Still, Makhlouf decided to keep importing these

---

[6] These are customers who approached one of Makhlouf's Koala franchises for service, but the service was completed by the Cozy Penguin.

reviews to the Cozy Penguin's website. (Doc. 25, 7/14/25 Hr'g Tr. 183:4-8). Only Google can remove reviews from a business profile. (Id. Hr'g Tr. 111:5-7). Lyons never contacted Google to request removing the reviews referencing Koala from Makhlouf's Google Business profile, (id. 153:15-21), and Makhlouf said when he tried, Google did not have an option to delete reviews simply for being old or for being for a different company, (id. 183:22-184:2).

The Cozy Penguin currently has $350,000 in open customer contracts, (id. 256:15-16), and hopes to achieve around $1.5 million in sales over the next two years, (id. 257:11-18). Makhlouf has no intention of shutting down the Cozy Penguin any time soon. (Id. 184:16-20). As for potential competition, Koala has not identified any possible prospective franchisees who may wish to purchase Makhlouf's old territories.

## II.    <u>Procedural History and Evidentiary Hearing</u>

Koala initiated these current proceedings by filing a complaint and motion for a preliminary injunction on June 4, 2025. (Docs. 1, 2). The court scheduled an evidentiary hearing which was held on July 14, 2025. (Doc. 10). Lyons, on behalf of Koala, and Makhlouf were the only witnesses who testified at the hearing. (Doc. 25).

Both witnesses were credible and their testimony was generally reliable. Yet, it is notable what evidence was not offered at the hearing. For example, Koala was unable to provide any evidence of Makhlouf using confidential information, custom-made equipment, training manuals, field support, training or technical materials, or research or development provided by Koala on behalf of the Cozy Penguin. (Id. 103:7–10, 103:23–104:3, 105:2–6, 108:20–109:5, 109:15–18). While Lyons testified that

Koala was a national brand and identified some nearby Koala franchises, Koala proffered no evidence establishing the territory of the active franchises at the time Koala terminated its relationship with Makhlouf. In other words, the court was given no evidence of all the locations covered by the restrictive covenants. Last, Koala never provided any examples of customer confusion surrounding the Cozy Penguin or harm to its reputation. At most, two customers had contacted "Koala" to do work and ended up being serviced by the Cozy Penguin, but Koala offered no signs of actual confusion since Makhlouf began operating his new business.

After the evidentiary hearing, both parties submitted proposed findings of fact and conclusions of law, (Docs. 28, 29), as well as supplemental briefing, (Docs. 27, 30, 31), and this matter is now ripe for disposition.

### III.    <u>Legal Standards</u>

"A preliminary injunction is an extraordinary remedy granted in limited circumstances. Whether a plaintiff can get one depends on whether (1) he is likely to succeed on the merits, (2) he will suffer irreparable harm without preliminary relief, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest." <u>Veterans Guardian VA Claim Consulting LLC v. Platkin</u>, 133 F.4th 213, 218 (3d Cir. 2025) (internal citations omitted).

"The first two factors are 'gateway factors': A plaintiff must satisfy them both to be eligible for preliminary relief." <u>Id.</u> (quoting <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017)). "On the first factor, a likelihood of success on the merits means only a 'reasonable probability' of success—odds that are 'significantly better than negligible but not necessarily more likely than not.'" <u>Id.</u> (quoting <u>Reilly</u>,

858 F.3d at 176, 179). "The standard for irreparable harm is more demanding: The plaintiff must show that it is more likely than not." Id. (citing Reilly, 858 F.3d at 179). "If both gateway factors are satisfied, the court must still weigh all four factors before *granting* preliminary relief." Id. (citations omitted). The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief. Reilly, 858 F.3d at 179.

In both Virginia and Florida, contracts are reviewed to give meaning to the parties' intent when signing the contract. See Schuiling v. Harris, 747 S.E.2d 833, 836 (Va. 2013) (citations omitted); MDS (Canada) Inc. v. Rad Source Techs., Inc., 143 So.3d 881, 890-91 (Fla. 2014). To understand what the parties agreed to, the central focus is to review the plain language of the contract. Schuiling, 747 S.E.2d at 836 (Va. 2013) (quoting Wilson v. Holyfield, 313 S.E.2d 396, 398 (Va. 1984)); MDS, 143 So.3d at 890-91 (citations omitted).

## IV.    **Discussion**

Koala seeks a preliminary injunction with two directives: (1) order Makhlouf to stop "producing, selling, offering for sale, distributing, advertising, providing, or promoting any goods or services using [Koala]'s trademarks or systems licensed by [Koala];" and (2) enjoin him from "[o]perating, owning maintaining, or engaging in any business competitive with [Koala] without [sic] 100 miles of any of Plaintiff's franchises, including those formerly operated by [Makhlouf]." (Doc. 2-1). Koala has not met its burden as to either request.

At the outset, there is no dispute Koala terminated the franchise agreements in accordance with their contracts. Additionally, the court is doubtful about the

strength of Makhlouf's fraudulent-inducement affirmative defense. To prove fraudulent inducement, he must show a false representation that Koala made with knowledge of or recklessness as to its falsity; with intent to mislead him into relying on it, justifiable reliance on his part, and proximate causation. See Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005).[7] Yet, for the most part, the claim is not that Koala did not provide relevant information, only that this information was buried in footnotes or in other text. Makhlouf had plenty of information in front of him. (See Doc. 29 ¶ 15). While Makhlouf additionally claims there was also a lack of support from Koala, as his attorney's made clear, the franchise agreements explicitly state much of Koala's obligations were up to Koala's discretion. (See Doc. 25, Hr'g Tr. 85:14-91:14). Even if victorious on the fraudulent inducement issue, Koala must still prevail on its contractual claims as well.

### A. Use of Marks or Other Materials

Koala failed to prove any possible irreparable harm from alleged use of its proprietary materials or systems. Put another way, there is simply no evidence that Makhlouf is currently misusing Koala's Marks or other materials, or would do so in

---

[7] It appears Pennsylvania, Florida, and Virginia all use the same elements to prove fraudulent inducement. See Dziegielewski v. Scalero, 352 So.3d 931, 934 (Fl. Ct. App. 2022); Nestler v. Scarabelli, 886 S.E.2d 301, 312 (Va. Ct. App. 2023). As no party has identified an actual conflict in regards to fraudulent inducement, per Pennsylvania's choice of law framework, which this court is required to apply, Collins On behalf of herself v. Mary Kay, Inc., 874 F.3d 176, 183 (3d Cir. 2017), this court will cite to Pennsylvania cases, see Budtel Assocs., LP v. Cont'l Cas. Co., 915 A.2d 640, 643, 645 (Pa. Super. Ct. 2006).

the future. Koala claims Makhlouf's use of Housecall Pro, despite it being publicly available software, is prohibited since he is using the "customer data, business processes, or operational know-how acquired through [his] Koala franchise." (Doc. 22 at 10). But Koala provides no evidence to support this proposition. Makhlouf was required to cease using "any *confidential* methods, procedures and techniques associated with the System, the mark "Koala Insulation" and all other Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System." (E.g. J2 at 44) (emphasis added). Housecall Pro is not a confidential or proprietary program, (Doc. 25, 7/14/25 Hr'g. Tr. 249:24-250:9), and Koala has not identified some other confidential method, procedure, or technique Makhlouf is using. As such, Koala is not entitled to relief in this regard.

Nor is the court convinced Makhlouf's alleged use of Koala's Marks. For example, the fact that one invoice, which was not submitted into evidence, contained a reference to Koala Insulation, (Doc. 25, 7/14/25 Hr'g Tr. 58:5-14), does not represent an on-going issue worthy of a preliminary injunction. Similarly, at one point, there may have been a picture of a Koala's logo on a t-shirt of a worker contained in a picture on Cozy Penguin's website. (Ex. P2 at 1). It does not establish irreparable harm. First, seeing Koala's logo requires a very keen eye; a potential customer just looking for service almost certainly would not notice the logo in this picture. Second, that image is no longer on Cozy Penguin's website. (Doc. 25, 7/14/25 Hr'g. Tr. 181:14-18). Finally, there were some customer projects started while Makhlouf was a franchisee of Koala, but then completed as Cozy Penguin. (Id. 57:16-20; 179:2-10). Those projects have been finished because, as Mr. Maklouf

12

explained, he had made a promise to do work on behalf of individual customers, and he wanted to fulfill that promise. (Id. 179:6-12). Whatever the error of finishing those projects, Koala has offered no evidence Makhlouf will continue to take on work that was to be done by a Koala franchisee.

At its strongest, Koala has shown there may have been past issues of Cozy Penguin using Koala's Marks. However, those were all discrete events, and Koala has not demonstrated harm from such use of Marks will continue. To the extent Koala suffered past damages for unauthorized use of its Marks, it may proceed with an action against Makhlouf on those grounds and recover damages. Yet when asking for a preliminary injunction, Koala must demonstrate irreparable harm. Veterans Guardian, 133 F.4th at 218. Presently, the Cozy Penguin is just a competitor in the same business; there is no evidence the Cozy Penguin is using any Marks or materials to misappropriate business from Koala.

The only possible continuing harm identified by Koala would be the customer reviews on the Google Business profile. The contract prohibits the *franchisee* from using any of Koala's Marks. However, based upon uncontroverted evidence, Makhlouf is not in control of these third-party reviews, Google is. Koala has not explained how or why Makhlouf is responsible for the actions of a party not bound by the contract. Nor has Koala taken any action themselves to remove the Google reviews. The court is also not convinced any substantial harm arises from these reviews appearing on the Cozy Penguin's website. While some reviews relating to services provided by Koala were pulled onto the Cozy Penguin's website, that is a process governed by Google's algorithm. (Id. 182:18-24).

### B. Restrictive Covenants

Moving on to Koala's request that the court order Makhlouf to cease his business activity, this request is grounded in covenants as part of the franchise agreement signed by the parties. But these covenants are unreasonable and unenforceable, so Koala cannot show a likelihood of success on the merits.

#### 1. 2022 Agreements and Florida Law

The 2022 Agreements are governed by Florida law. (e.g., Ex. J2 at 53). Specifically, FLA. STAT. § 542.335 defines when restrictive covenants are permissible. While restrictive covenants can be enforceable, "section 542.335 is a carve out of the general prohibition, striking a delicate balance between legitimate business interests and a person's inalienable right to work." White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC, 226 So. 3d 774, 785 (Fla. 2017) (citations omitted). "For [a party] to be entitled to protection, 'there must be special facts present over and above ordinary competition' such that, absent a non-competition agreement, '[one party] would gain an unfair advantage in future competition with [another].'" Id. (quoting Passalacqua v. Naviant, Inc., 844 So.2d 792, 795 (Fla. 4th Dist. Ct. App. 2003)).

For a restrictive covenant to be enforceable, a party must "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." FLA. STAT. § 542.335(b). Florida law enumerates some specific examples of legitimate business interests including "[v]aluable confidential business or professional information" and "[c]ustomer, patient, or client goodwill." Id. ¶ 542.335(1)(b)(2), (4). This list is non-exhaustive. White, 226 So.3d at 786.

Koala's brief does not identify any legitimate business interests or "plead and prove" in any why its covenants are necessary; rather, it just flatly asserts "the covenants are clearly enforceable" without any citation. (<u>See</u> Doc. 4 at 10). Only in its reply brief[8] does Koala identify its alleged legitimate business interests, which are "harm to its brand, customer base, and ability to re-franchise the territory." (Doc. 22 at 8). It also adds in its proposed findings of fact and conclusions of law the legitimate business interests of "customer goodwill, proprietary systems, and franchise system integrity." (Doc. 28 at 6-7).

Taking the last of those first, Koala claims its "goodwill and franchise model depend on its ability to enforce reasonable noncompetition agreements and safeguard its confidential information." (Doc. 4 at 13). Additionally, it states "if these covenants are not enforced, other franchisees of Koala who honor their contracts might lose confidence in the system." (<u>Id.</u>). However, as even Koala admits, it is only entitled to the enforcement of *reasonable* noncompetition agreements. (<u>Id.</u>). The necessity of enforcing a noncompete covenant cannot—by itself—be a legitimate business interest. If so, a franchisor like Koala would be able to enforce unconscionable restrictive covenants *on the sole grounds* that not enforcing them would destroy its franchise model. This circular logic does not establish a franchisee

---

[8] Koala comes very close to, if not over the line, of having abandoned this line of argument for failing to clearly identify the legitimate business interests in its opening brief. <u>See</u> <u>United States v. Cruz</u>, 757 F.3d 372, 387-88 (3d Cir. 2014) (deeming waived "arguments that were raised for the first time in the Reply Brief") (citing <u>United States v. Pelullo</u>, 399 F.3d 197, 222 (3d Cir. 2005), <u>as amended</u> (Mar. 8, 2005)).

would have "an unfair advantage" by operating a similar business after terminating a franchise agreement. See White, 226 So.3d at 785 (citations omitted). And if the concern is simply that any new franchisee will face competition, it is well-settled that Florida law "does not protect covenants 'whose sole purpose is to prevent competition per se' because those contracts are void against public policy." Id. (quoting Colucci, 918 So.2d at 440). The mere existence of a restrictive covenant in a contract cannot justify its enforcement; it must exist to "prevent[] unfair competition by protecting crucial business interest." Id. at 784.

As for control over Koala's systems and reputation, there is no evidence Makhlouf is presently using any propriety systems or any of Koala's Marks. To the extent Koala claims the old Google reviews mentioning Koala could impact its reputation, (see Ex. P3), the Google reviews are a completely separate (and already addressed above) issue from the operation of a competitor business. To put it another way, ordering Makhlouf to cease operating any home insulation business within a given geographic area is a rather indirect way of dealing with some stray reviews on webpage. Therefore, the restrictive covenants are unconnected to this potential harm and so Koala has again failed to demonstrate a threat to a legitimate business interest.

This just leaves Koala's claims of Cozy Penguin's misappropriation of customer goodwill. The Florida statute does contemplate customer goodwill associated with "[a] specific geographic location." FLA. STAT. § 542.335(1)(b)(4)(b). However, "the determination of whether an activity qualifies as a protected legitimate business interest under the statute is inherently a factual inquiry, which

is heavily industry- and context-specific." <u>White</u>, 226 So.3d at 786 (citing <u>Infinity</u>

<u>Home Care, L.L.C. v. Amedisys Holding, LLC</u>, 180 So. 3d 1060, 1065-66 (Fla. 4th

Dist. Ct. App. 2015)).

Looking at the specific facts in this case, the court finds there are no

legitimate concerns about lingering customer goodwill. Consider location. Koala

argues the Cozy Penguin is operating at the same location as the previous Koala

franchises. While true, that location is Makhlouf's house. (Doc. 25, 7/14/25 Hr'g. Tr.

222:3-7). There is no physical store location, as Makhlouf and his crews travel onsite

to the specific job location. (<u>Id.</u> 248:14-17, 257:25-258:1). Home insulation is

completely different from the businesses in the cases Koala cites, which deal with

franchises operating specific storefronts in specific locations, with specific, repeat

customers. <u>See, e.g.</u>, <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rodger</u>, 75 F.

Supp. 2d 375, 377 (M.D. Pa. 1999) (restrictive covenant tied to soliciting previous

customers and the specific office location where employees worked); <u>Dunkin'</u>

<u>Donuts Inc. v. N. Queens Bakery, Inc.</u>, 216 F. Supp. 2d 31, 33 (E.D.N.Y. 2001)

(specific storefronts); <u>Bad Ass Coffee Co. of Hawaii v. JH Nterprises, L.L.C.</u>, 636 F.

Supp. 2d 1237, 1243 (D. Utah 2009) (physical storefront where "repeat customers are

critical to the success of [the business]."); <u>IHOP Franchising, LLC v. Tabel</u>, No. 13-

2641-KHV-TJJ, 2014 WL 1767199 (D. Kan. Apr. 15, 2014), <u>report and</u>

<u>recommendation adopted,</u> No. CIV.A. 13-2641-KHV, 2014 WL 1767191 (D. Kan. Apr.

30, 2014) (specific storefront still using franchisor branding); <u>Fitness Together</u>

<u>Franchise, L.L.C. v. EM Fitness, L.L.C.</u>, No. 120CV02757DDDSTV, 2020 WL 6119470

(D. Colo. Oct. 16, 2020) (specific storefronts with same clientele).

Additionally, Makhlouf testified that once a customer has been serviced, they likely will not need additional service for 15 to 20 years. (Doc. 25, 7/14/25 Hr'g Tr. 258:4-5). While Lyons mentioned there may be some repeat work with specific "contractors and builders," no evidence was offered establishing how important repeat customers are to a Koala franchise. (Id. 14:15-20). Conversely, Makhlouf's plan for growing his business is to acquire new customers, not to try to win over former Koala customers. (Id. 258:6-15). All these considerations demonstrate Koala has failed to show there exists customer goodwill that is threatened by the Cozy Penguin.

Fundamentally, what is lacking are any "special facts [] over and above ordinary competition" which would give the Cozy Penguin "an unfair advantage" in competing against Koala. White, 226 So.3d at 785 (quoting Passalacqua, 844 So.2d at 795). As such, Koala fails to establish a *prima facie* case the restrictive covenants are reasonably necessary under Florida law, making them unenforceable.[9]

### 2. 2023 Agreements and Virginia Law

Turning to the 2023 contracts, they are governed by Virginia law. (E.g., Ex. J5 at 55). In Virginia, restrictive covenants "are enforceable only if 'narrowly drawn to protect the employer's legitimate business interest, . . . not unduly burdensome on the employee's ability to earn a living, and . . . not against public policy.'" Preferred Sys. Sols., Inc. v. GP Consulting, LLC, 732 S.E.2d 676, 681 (Va. 2012) (quoting

---

[9] Because the court has determined Koala has not made a prima facie case, it is unnecessary to consider whether any modification would be possible to make the restrictions enforceable. See FLA. STAT. § 542.335(1)(c).

Omniplex World Servs. v. U.S. Investigations Servs., 618 S.E.2d 340, 342 (Va. 2005)

(alternations in original)). In evaluating restrictive covenants, Virginia courts

consider "the function, geographic scope, and duration of the restriction." Id. (citing

Home Paramount Pest Control Cos. v. Shaffer, 718 S.E.2d 762, 764 (Va. 2011)).

Additionally, Virginia applies two levels of scrutiny to restrictive covenants. Courts

are to be more exacting on covenants between employers and employees compared

to covenants between a seller of a business and a buyer. Cap. One Fin. Corp. v.

Kanas, 871 F. Supp. 2d 520, 527 (E.D. Va. 2012) (citations omitted).

　　　As far as this court can tell, the Virginia Supreme Court has never opined

which level of scrutiny courts ought to apply when considering franchise

agreements. Confounding this lack of guidance, is that Koala never mentions these

two standards, much less argues which one should apply. A Virginia trial court has

noted the relationship between franchisors and franchisees does not cleanly fit in

either the employer/employee box or the seller/buyer box. Brenco Enterprises, Inc.

v. Takeout Taxi Franchising Systems, Inc., No. 177164, 2003 WL 21659422, *11 (Va.

Cir. Ct. May 2, 2003). Nevertheless, the court applied the lesser tier of scrutiny

because "there [wa]s no evidence of disparity in bargaining power between the

parties." Id.

　　　Similarly, federal courts in Virginia, applying Virginia law, have observed

disparate bargaining power between employers and employees counsels the

application of the stricter standard. See Cap. One Fin. Corp. v. Kanas, 871 F.

Supp.2d 520, 528 (E.D. Va. 2012); McClain & Co. v. Carucci, No. 3:10-CV-00065, 2011

WL 1706810 *5 (W.D. Va. May 4, 2011). Therefore, a key question is whether the

agreement between the parties "[wa]s the product of an arms-length negotiation, between sophisticated parties of comparable bargaining power, for substantial consideration." <u>Cap. One</u>, 871 F. Supp.2d at 528 (citations omitted).

In the present case, it is clear Koala had far more bargaining power than Makhlouf. While he did not ask for changes in the franchise agreements, that was because Makhlouf's sense was the agreements were offered on a take-it-or-leave-it basis. (Doc. 25, 7/14/25 Hr'g Tr. 167:3-11). Additionally, when Koala was offering to modify the terms of the franchise agreements, franchisees had to accept the terms Koala offer; no modifications were allowed. (<u>Id.</u> 144:19-22). In fact, Makhlouf repeatedly tried to work with Koala for changes to meet his specific circumstances, (<u>see</u> <u>generally</u>, Ex. D7, D16), but there is no evidence Koala offered Makhlouf anything it was not offering other franchisees, (Ex. D16 at 1 (stating the only offer from Koala is for Makhlouf to sign the standard contract amendment); Doc. 25, 7/14/25 Hr'g Tr. at 143:3-7 (revealing Koala offered zero precent promissory notes to other struggling franchisees)).

Accordingly, Makhlouf did not have equal bargaining power to Koala when negotiating his franchise agreements. He was free not to become a franchisee, just like a person is free not to seek employment with a specific company. However, Koala has provided nothing showing it considered Makhlouf an equal partner when discussing the original franchise agreements. Therefore, the stricter employer-employee framework applies when evaluating this restrictive covenant.

With the proper framework established, the court turns to the lodestar factors in Virginia restrictive covenant analysis: the function, geographic scope, and

duration of the covenant. First, as to function, as explained in Part III.B.1 *supra*, Koala has put forward no legitimate business interests to justify its covenants. Preventing the mere operation of a competitor business is not a legitimate interest and Koala has not identified any unfair advantage reaped by the Cozy Penguin.

Geographic scope, on the other hand, is difficult to analyze because Koala has not offered the evidence required to evaluate this criterion. The 2023 Agreements bar Mr. Mahklouf from operating a competitive business in any Koala territory or within 25 miles of any Koala territory active at the time the agreements were terminated. (E.g., Ex. J5 at 49). Koala claims there is nothing "nebulous" about this restriction. (Doc. 31 at 5). Perhaps there is nothing nebulous about creating a 25-mile restriction around a given area, but to carry out this task, it is crucial to set the initial point of the restriction. A 25-mile boundary is meaningless without knowing where to begin. But that is precisely the situation Makhlouf, and this court, is in. Koala was unable to give the exact boundaries of the other territories in Pennsylvania and the adjacent states, much less the extent of their territories all over the country. (Doc. 25, 7/14/25 Hr'g Tr. 113:9-117:14). Again, it is Koala who bears the burden of proving the geographic scope contained in the covenant is reasonable. Preferred Sys. Sols., Inc. v. GP Consulting, LLC, 732 S.E.2d 676, 681 (Va. 2012) (citing Modern Env'ts, Inc. v. Stinnett, 561 S.E.2d 694, 695 (Va. 2002)). Because Koala fails to meet its burden, this factor favors Makhlouf.

Finally, there is no issue with the duration of the covenant. The Virginia Supreme Court has gone as far to approve covenants lasting three years. Simmons v. Miller, 544 S.E.2d 666, 678 (Va. 2001) (citations omitted). However, the three

lodestar factors must be considered together. Id.; see also Preferred Sys., 732 S.E.2d
at 681. On balance, while the duration of the covenant may be reasonable, its
function or its scope are anything but. Koala has not identified legitimate business
interests it needs to protect, nor has it provided this court with the information
necessary to determine the exact geographic scope of the covenants. These
covenants are unreasonable and so, Koala's request to have them enforced will be
denied.

**V.**     **Conclusion**

Koala failed to show Makhlouf is misusing any Marks or other proprietary
material of his former franchisor. Further, Koala failed to plead and prove the
continued operation of the Cozy Penguin Insulation Company threatens legitimate
business interests justifying enforcement of a non-compete covenant. Accordingly,
Koala's motion for a preliminary injunction will be denied.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated:     September 10th, 2025